1  FRANNY A. FORSMAN
   Federal Public Defender
2  State Bar No. 0014
   DAVID ANTHONY
3  Assistant Federal Public Defender
   Nevada Bar No. 7978
4  ALBERT SIEBER
   Assistant Federal Public Defender
5  California Bar No. 233482
   411 E. Bonneville, Ste. 250
6  Las Vegas, Nevada 89101
   (702) 388-6577
7  (Fax) 388-5819

8  Attorneys for Petitioner

9              UNITED STATES DISTRICT COURT

10                  DISTRICT OF NEVADA

11 ROBERT McCONNELL,              )
                                  )
12        Petitioner,             )   Case No.  3:10-cv-0021-GMN-RAM
                                  )
13 v.                             )   **AMENDED PETITION FOR WRIT
                                  )   OF HABEAS CORPUS PURSUANT TO
14 E.K. McDANIEL, Warden, and     )    28 U.S.C. § 2254 BY A PERSON IN
   CATHERINE CORTEZ MASTO         )   STATE CUSTODY**
15 Attorney General of the State  )
   of Nevada,                     )
16                                )
          Respondents.            )   (Death Penalty Habeas Corpus Case)
17 _____ )

18        Petitioner, Robert McConnell, by and through counsel, hereby files this Amended Petition

19 for a Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254.  Mr. McConnell alleges that he is being

20 held in custody in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments of the

21 Constitution of the United States of America.

22                        **Procedural Allegations**

23 1.     Mr. McConnell is currently in the custody of the State of Nevada at Ely State Prison in Ely,

24 Nevada, pursuant to a state court judgment of conviction and sentence of death.  Respondent E.K.

25 McDaniel is the warden of Ely State Prison, and Catherine Cortez Masto is the Attorney General of

26 the State of Nevada.  The Respondents are sued in their official capacities.

27 2.     On September 9, 2002, Robert McConnell was charged by criminal information with murder

28 with use of a deadly weapon (both felony murder and premeditated murder were alleged), sexual

                                        1

assault, and first degree kidnaping in the Second Judicial District Court, Washoe County, Nevada, Case No. CR02-1938.  Ex. 33.  Mr. McConnell pleaded not guilty to this complaint on September 13, 2002.   9/13/02 TT[1] at 3.   The State filed its Notice of Intent to Seek the Death Penalty on September 9, 2002.  Ex. 34.

3.       On May 15, 2003, Mr. McConnell filed a motion to represent himself.  Ex. 25.  After a brief Faretta canvass, the trial court granted Mr. McConnell's motion on May 30, 2003.  5/30/03 TT at 38.  Mr. McConnell's first act as his own attorney was to plead guilty to all charges without any negotiations from the state.  5/30/03 TT at 41-52.  Mr. McConnell was sentenced on the sexual assault and kidnaping charges on July 10, 2003.

4.       Mr. McConnell's penalty hearing on the murder charge began on August 25, 2003.  Mr. McConnell represented himself throughout the entire proceeding, and also testified on his own behalf.  See 8/27/03 p.m. TT.  The jury found three aggravating circumstances– that the murder occurred during the course of a robbery, occurred during the course of a burglary, and involved mutilation– and imposed a sentence of death. Ex. 445.  The court entered the judgment of conviction and execution warrant on September 9, 2003.  Exs. 446, 447.

5.       Mr. McConnell did not file a notice of appeal, however, the appeal was automatic pursuant to NRS 177.055.  The record on appeal was docketed on September 25, 2003.  On December 29, 2004 in case number 42101, the Nevada Supreme Court affirmed Mr. McConnell's conviction and death sentence. Ex. 3.  The State filed a petition for rehearing which the Nevada Supreme Court denied in a published opinion on March 24, 2005. Ex. 4.  The Nevada Supreme Court issued its remittitur on April 19, 2005.

6.       On June 10, 2005, Mr. McConnell filed his Petition for Writ of Habeas Corpus (Post-Conviction) in the Second Judicial District Court.[2]  On January 16, 2007, Mr. McConnell filed a

---

[1]All references to TT refer to transcripts.

[2] The following claims were raised:
I.       Failure to instruct the jury that it had to find the aggravators were not outweighed by the mitigators beyond a reasonable doubt before it could find death eligibility;
II.      Lack of standards for Nevada Supreme Court review;

Supplemental Petition for Writ of Habeas Corpus.[3]  Ex. 458.  On June 11, 2007, the district court issued its order dismissing Mr. McConnell's Petition for Writ of Habeas Corpus.  Ex. 5.  On July 23, 2009, in case number 49722, the Nevada Supreme Court affirmed the district court's denial of Mr. McConnell's petition.  Ex. 9.  The petition for rehearing was denied by the Nevada Supreme Court on October 6, 2009, and remittitur issued on November 3, 2009.

7.     On January 13, 2010, Mr. McConnell filed a Propria Person Petition for Writ of Habeas Corpus with this Court.  Docket #1.  Pursuant to this court's scheduling order, Mr. McConnell hereby files the instant Amended Petition for Writ of Habeas Corpus.

**Statement With Respect to Exhaustion and Procedural Default**

8.     Claims One(D), Two, Three, Four, Five Six, Eight, Nine, Ten, Eleven, Twelve, Thirteen, Fifteen, and Eighteen, Sixteen (part), and Seventeen (part) have been presented or arguably have been presented, to the Nevada Supreme Court.  Claims One(A) and Five should be deemed presented

---

III.     Due process violated because trial and appeal conducted by elected judges;
IV.     Ineffective Assistance of Counsel on Direct Appeal

[3] The following claims were raised:
I.      Invalid guilty pleas under state and federal law;
II.     Two aggravators were improperly based on predicate felony murder on which state sought and obtained a murder conviction, and the Nevada Supreme Court erred in failing to apply this rule to Mr. McConnell, in violation of federal constitution;
III.    Federal due process and right to fair trial violated because jury was death qualified;
IV.     Trial counsel/ standby counsel were ineffective for allowing Mr. McConnell to plead straight up while discovery requests were pending;
V.      Death penalty is wanton, arbitrary infliction of pain and constitutes cruel and unusual punishment under the federal constitution;
VI.     Nevada's death penalty scheme allows district attorneys to select capital defendants arbitrarily, inconsistently, and discriminatorily in violation of federal constitution;
VII.    Mr. McConnell's death sentence violates international law;
VIII.   Lethal injection is invalid as cruel and unusual punishment under the federal constitution;
IX.     Mr. McConnell's sentence is invalid under the federal constitution because he may become incompetent;
X.      Due process violated because trial and appeal conducted by elected judges;
XI.     Death penalty unconstitutional because it may be applied to innocent persons;
XII.    Possibility of rehabilitation renders death sentence unconstitutional;
XIII.   Nevada's death penalty statutes are unconstitutional for allowing death qualified juries to determine guilt or innocence;
XIV.    Ineffective assistance of appellate counsel;
XV.     Cumulative error.

3

to the Nevada Supreme Court pursuant to its sua sponte review of constitutional issues under Bejarano v. State, 106 Nev. 840, 843, 801 P.2d 1388 (1990), and Bennett v. State, 111 Nev. 1099, 1108-1109, 901 P.2d 676 (1995).  Claims One(A, B, C), Seven, Fourteen, Sixteen (part), and Seventeen (part) have not been presented to the Nevada Supreme Court for review.

9.      The claims that have not been presented to the state courts have not been previously raised because of ineffective assistance of trial, appellate, and state post-conviction counsel. See Claim Sixteen; Evitts v. Lucey, 469 U.S. 387, 395-97 (1985); Strickland v. Washington, 644 U.S. 668, 687-91 (1984); Crump v. Warden, 113 Nev. 293, 302-3, 934 P.2d 247, 254 (1997).  In addition, failure to raise any claim during the post-conviction proceedings cannot properly be attributed to Mr. McConnell because he was effectively abandoned by appointed counsel during those proceedings.

10.     Mr. McConnell also alleges that the state district court prevented counsel from litigating Mr. McConnell's constitutional claims in the state post-conviction proceedings, and violated Mr. McConnell's state and federal constitutional right to due process by preventing him from developing the facts necessary to prove his claims.  Mr. McConnell was prevented from proving the necessary elements of his ineffective assistance of counsel claims by the district court's refusal to admit and consider relevant evidence, and concomitant failure to provide resources adequate to allow counsel to fully and fairly litigate these constitutional issues.

11.     At this point, there is no valid default ruling imposed by the state courts against any of petitioner's claims, that would or could properly bar their consideration in proceedings to exhaust state remedies, and this court cannot anticipate such a default ruling. Cassett v. Stewart, 406 F.3d 614, 627-623 (9th Cir. 2005).

**Prior Counsel**

12.     The attorneys who previously represented Mr. McConnell were:

a.      Pre-trial:

Washoe County Public Defender (Maizie Pusich, John Malone, Michael Specchio)

b.      Pre-trial, Trial and Sentencing proceedings:

Pro Se

c.      Direct Appeal:

4

1    Washoe County Public Defender (Cheryl Bond)

2    d.    Post-Conviction:

3    Thomas Qualls

4    Scott Edwards

5    **Grounds for Relief:**

6  13.    Mr. McConnell alleges the following grounds for relief from the judgment of conviction and

7  sentence.  References in this amended petition to the accompanying exhibits incorporate the contents

8  of the exhibit as if fully set forth in this amended petition.

**CLAIM ONE**

Mr. McConnell's guilty plea, conviction and death sentence are invalid under the federal constitutional guarantees of due process and the right to the assistance of counsel due to trial counsel's ineffectiveness during the pre-trial proceedings and the <u>Faretta</u> hearing.  U.S. Const. amends. V, VI, XIV.

**SUPPORTING FACTS**

1.     Mr. McConnell alleges that trial counsel were ineffective in the pre-trial period leading up to the trial court's granting his motion to represent himself at his capital penalty hearing.  Mr. McConnell was represented by Michael Specchio, Maizie Pusich, John Malone, and Cheryl Bond from the Washoe County Public Defender's Office.  The majority of the legal work and interactions with Mr. McConnell were performed by Mr. Specchio and Ms. Pusich.  Mr. McConnell alleges that trial counsel were subject to an actual conflict of interest due to their prior representation of April Robinson, the lead witness for the state, and a jailhouse informant who provided information against Mr. McConnell.  Mr. McConnell alleges that his purported waiver of the conflict was not voluntary and knowing because trial counsel did not adequately inform him of the nature of the conflict itself and no conflict-free counsel was appointed to advise him of the rights he was waiving.  Furthermore, the conflict of interest adversely affected the outcome of the proceedings by improperly influencing trial counsels' decision regarding whether Mr. McConnell should fire counsel, represent himself, and plead guilty.   The conflict also adversely affected the proceedings by causing trial counsel to suppress exculpatory information from Mr. McConnell that could have been used to impeach Ms. Robinson at the penalty hearing.

2.     Mr. McConnell alleges that trial counsel were ineffective in failing to adequately investigate mitigation evidence in the pre-trial period, were ineffective in their communications with Mr. McConnell during the pre-trial period, and were ineffective at the <u>Faretta</u> hearing.  As explained below, Mr. McConnell alleges that trial counsel were ineffective in advising him that he should plead guilty to the offenses even without any negotiations from the state and that he would inevitably be sentenced to death.  Mr. McConnell alleges that there was substantial evidence before trial counsel regarding his background and mental health that would have alerted counsel that Mr. McConnell was

not capable of representing himself, but trial counsel failed to bring that information to the attention of the trial court during the hearing on Mr. McConnell's motion to represent himself.  In addition, trial counsel failed to adequately use the mental health information before them in dealing with Mr. McConnell during the pre-trial period, and they improperly advised him to follow through on wishes to represent himself.  Mr. McConnell further alleges that trial counsel were ineffective in failing to conduct an adequate mitigation investigation and to present mental health testimony to show that his mental illness prevented him from representing himself.

3.     Singly and cumulatively, Mr. McConnell alleges that trial counsel's acts and omissions were prejudicial and that there is a reasonable probability of a more favorable outcome if counsel had performed effectively.

### A.     Trial Counsel Were Subject to an Actual Conflict of Interest Due to their Prior Representation of April Robinson and a Jailhouse Informant.

4.     During the hearing on Mr. McConnell's motion to represent himself, it became apparent that trial counsel had violated their duty of loyalty to Mr. McConnell by concealing impeachment material from him regarding the state's witnesses.  The state represented that trial counsel had conflicted off the case of a jailhouse informant witness who would purportedly testify to incriminating statements made by Mr. McConnell regarding the offense. 5/30/03 TT at 25-26.  The state further represented that "[w]e have not received, nor have we seen any waivers from anybody provided by the Public Defender's Office from this individual, or even from Mr. McConnell." Id. at 26.  The state correctly acknowledged that trial counsel "got out of half of [the conflict].  They didn't get out of this half." Id.  In response, trial counsel represented that Mr. McConnell waived any conflict, but they did not represent whether they had explained the nature of the conflict to him. See id. at 28.  Trial counsels' subsequent representations revealed that counsel did not understand the nature of the conflict because they believed that by resolving the conflict issue against Mr. McConnell, they had obviated the conflict itself:

> the reason there would be a conflict . . . would be if counsel for Mr. McConnell had access to private and confidential information about the other inmate that could be used to his detriment in cross-examining.  And that could be completely obviated by ordering us, and we will absolutely comply, that no personal information be provided to Mr. McConnell, who will, in fact, be the one doing the cross-examining. He won't – this person won't be cross-examined by a former counsel or employee of former

counsel, and the information that would have created the conflict will not be provided to the person whose [sic] doing the cross-examining.

5/30/03 TT at 28.  Trial counsel represented that when they discovered the conflict, they resolved it by withholding discovery from Mr. McConnell.  See id. at 32.  Counsel further represented that they had located the public defender's file on the former client, given it to another attorney in the office, and offered "to provide it to the Court for sealing."  Id. at 33.  Based on these representations, trial counsel represented that Mr. McConnell waived the actual conflict of interest.  See id. at 30-31.  The trial court clarified that trial counsel "would not – as an officer of the court, you would not give any information, i.e., the letter or that type of information, to your counsel [sic] to use against your former client – I said 'your counsel' – I meant your client."  Id. at 32.  Counsel subsequently assented to the trial court's request for the case files of the public defender's office.  See id. at 53.

5.      Trial counsel further represented that they intended to obviate any conflict regarding their prior representation of the victim, April Robinson, by concealing her case file from Mr. McConnell.  During the hearing on his motion to represent himself, counsel represented that they had not yet located the file for Ms. Robinson but they offered to locate it and provide it to the court to be sealed:

> The second provides a great deal of information about the charges against Miss Robinson, and I'm not sure that he would even be needed by the State if my client pleads guilty to that charge.  So I did not pull that file.
> But with respect to both we would be happy to pull our files, provide them to Mr. Petty, and he can provide them to the Court to be sealed.

5/30/03 TT at 33.  Counsels' representations regarding whether Ms. Robinson would testify were incorrect and their conflict taints Mr. McConnell's waiver of his right to self representation and his guilty plea itself, because both were affected by trial counsels' underlying conflict of interest.

6.      Mr. McConnell alleges that his waiver of the conflicts of interest was not voluntary, knowing and intelligent because he was misled regarding the existence of the conflict itself.  As an advocate, an attorney is required to investigate and present all the impeachment information known to him to cross-examine the witnesses for the state.  Here, trial counsel violated their duties as advocates and their duty of loyalty by failing to investigate the existence of impeachment information and by failing to make Mr. McConnell aware of it.  Instead, counsel initially resolved the conflict against Mr. McConnell by failing to make themselves aware of impeachment information in their own files and

1   then exacerbated the conflict by further offering to conceal the information from Mr. McConnell by

2   providing it to the court for sealing.  These actions did not obviate the conflict.  On the contrary, they

3   demonstrate that there was an actual conflict and that counsel had already resolved the conflict

4   against Mr. McConnell.  Mr. McConnell alleges that trial counsels' misunderstanding regarding the

5   nature of the conflict rendered his waiver invalid because he was inaccurately informed that there

6   was no conflict when there was in fact an actual conflict and counsel had responded to it by resolving

7   the conflict against him.

8   7.      Mr. McConnell alleges that trial counsels' conflict of interest adversely affected their

9   representation and tainted his decision to represent himself and plead guilty.  As explained above,

10  trial counsels' express position on whether a conflict of interest could be obviated depended upon

11  Mr. McConnell firing counsel and pleading guilty to the charges.  5/30/03 TT at 33.  Mr. McConnell

12  alleges that trial counsel were not able to obviate a conflict that they had already resolved against

13  him at a time when they were still representing him by having him subsequently represent himself

14  and plead guilty.  On the contrary, trial counsels' fundamental misunderstanding regarding the nature

15  of the conflict invalidates Mr. McConnell's decision to represent himself and plead guilty because

16  it was itself affected by the conflict of interest.  Trial counsel further exacerbated the conflict by

17  representing "that if, in fact, these witnesses testify we are not going to cross-examine.  I can almost

18  submit on behalf of Mr. McConnell he's probably not going to cross-examine them."  Id. at 36.

19  Counsels' representation that they would not cross-examine April Robinson again indicates that they

20  were pulled between conflicting interests and that they resolved the conflict against Mr. McConnell.

21  Counsel also had actual knowledge that Mr. McConnell intended to spend significant time cross-

22  examining April Robinson to establish a provocation defense and had no basis for saying that Mr.

23  McConnell would not cross-examine her.  Trial counsels' conflict of interest therefore adversely

24  affected Mr. McConnell's decision to represent himself and plead guilty.

25  8.      In addition, the conflict of interest adversely affected the penalty hearing because it prevented

26  Mr. McConnell from cross-examining the state's witnesses.  As the state correctly noted at the

27  hearing on Mr. McConnell's motion to represent himself,

28              I mean, as standby counsel, and all their good intentions not to say anything

9

1  or not to do anything, I don't see how they could be helpful if Mr. McConnell were
   to say, "How do I attack this guy? How do I get to his credibility? What am I going
2  to do? He's hurting me. He's hurting my case. He's going to get me life – the
   highest life I can get on his kidnapping, and he's going to hurt me on the death
3  penalty part of this."

4         I mean, we should not allow the conflict to be there just so that the Public
   Defender's Office feels good about itself and so they can put their files in a box.
5  That's not the point. The point is there is a real conflict. They recognized it because
   they got off of the other case. And we shouldn't go forward with that glitch in this
6  record already.

7  5/30/03 TT at 35. The trial court stated that with respect to the jailhouse informant witness, "if it's

8  in a penalty phase, so what if he comes on?" Id. at 36. The court further stated that if "it's in the

9  trial phase, that's just cumulative as far as more evidence against you, right?" Id. The trial court

10 said nothing about Mr. McConnell's ability to cross-examine April Robinson with impeachment

11 information contained in the public defender's file. As explained above, Mr. McConnell alleges that

12 trial counsels' conflict of interest adversely affected their representation because they failed to

13 investigate the existence of impeachment information for the state's witnesses, they concealed that

14 information from him, they misunderstood the nature of the conflict and the fact that they had

15 already resolved it against him, and they depended on Mr. McConnell representing himself and

16 pleading guilty to get out of the conflict.

17 9.     Trial counsel further defended themselves against the conflict of interest allegation by

18 misstating binding authority in a manner that was against Mr. McConnell's interests. Counsel

19 specifically implored the trial court to find that there was no conflict by disregarding controlling

20 Nevada Supreme Court authority in favor of a United States Supreme Court case that counsel was

21 incorrectly interpreting:

22        With all due respect to the Nevada Supreme Court, the United States Supreme
          Court addressed this issue on March 27, 2002. In a capital case from the State of
23        Virginia they declined to find that a conflict of interest had existed when the attorney
          for the defendant had formerly been the attorney for the victim. They said that even
24        that showing was insufficient to find that the defendant had been prejudiced, and they
          were not going to be reversing the Court below as a result of that having been proven.
25        In that case there was a question whether or not the defendant had been asked
          about conflict of interest. And the Court still found that it was not sufficient to
26        reverse that person's death-penalty conviction.

27 5/30/03 TT at 37. Mr. McConnell alleges that it was inappropriate for trial counsel to argue against

28 Mr. McConnell's interests to defend themselves against the conflict of interest allegation. In arguing

10

that position, trial counsel urged the trial court to disregard controlling state law while plainly

misinterpreting the High Court authority counsel was citing.   The case referenced by counsel,

Mickens v. Taylor, 535 U.S. 162 (2002), does not hold that counsel has no conflict of interest when

they have previously represented the victim of a crime.   Mickens also does not address the unique

situation posed by a victim witness who is actually testifying against Mr. McConnell when

impeachment evidence relating to the victim is in the possession of counsel.   Counsels' arguments

against Mr. McConnell's position at the hearing show that the conflict of interest adversely affected

counsels' representation.

10.     At a subsequent hearing, standby counsel confirmed that they had withheld discovery from

Mr. McConnell that related to the conflict of interest.   When the court heard Mr. McConnell's

motion to compel discovery, standby counsel confirmed that her office had kept all documents

received from the state that related to the conflict, had withheld them from Mr. McConnell, and had

provided them to the court to be sealed:

> [The discovery was] forwarded to Mr. McConnell, save and except the pages that
> related to what created the conflict, and you asked the files be provided to be sealed,
> and they were by Mr. Petty of our office, so the duplicate pages from the District
> Attorney's Office were not sent to Mr. McConnell.

7/10/03 TT at 30.  Mr. McConnell alleges that trial counsels' concealment of information from him

that could have been used to impeach the state's witnesses shows that counsels' conflict adversely

affected their representation.

11.     In its written order, the trial court specified that all information in the public defender's files

that related to the conflict of interest would be withheld from Mr. McConnell and that his self-

representation obviated the conflict.   Specifically, the trial court accepted trial counsels'

representation "that any access to private and confidential information about either person could be

completely obviated by ordering the Public Defender's office to not provide any confidential

information from the previous representation of the persons referred to above to the Defendant now

representing himself." Ex. 58 at 2. The court therefore held that Mr. McConnell had waived any

conflict and that the files would be sealed.  See id.  The court then appointed conflicted counsel as

standby counsel for Mr. McConnell.  See id.  The court's order went even further and ordered that

the public defender not disclose to Mr. McConnell any information generated during their

representation of him or of the state's witnesses: "The Washoe County Public Defender's Office is

further ordered not to disclose any information obtained during the course of their representation of

the Defendant or the above referenced inmates, both former clients, and including the

correspondence intercepted by jail security to the Defendant, who is now representing himself." Id.

Mr. McConnell was therefore deprived of any access to exculpatory information regarding the state's

witnesses and to the incriminating letters that were intercepted.  The court's order said nothing about

the public defender's files relating to their representation of April Robinson, the victim witness, or

the fact that Mr. McConnell required access to those files to cross-examine her.

12.     Mr. McConnell alleges that trial counsels' conflict of interest before and during the Faretta

hearing constitutes a constructive denial of counsel and is prejudicial per se.  In the alternative, Mr.

McConnell alleges that counsels' conflict of interest had an adverse effect on the representation by

influencing his decision to represent himself, to plead guilty, and to harm his own interests at the

sentencing hearing.  Mr. McConnell further alleges that the conflict of interest had an adverse affect

on the representation due to the suppression of exculpatory evidence in counsels' possession that

could have been used to cross-examine April Robinson at the penalty hearing.  Mr. McConnell

alleges that the information pertaining to Ms. Robinson is currently sealed in the Second Judicial

District Court and that he requires formal discovery from the Court in order to obtain that

information.  Mr. McConnell alleges on information and belief that the information contained the

court files could have been used to cross-examine Ms. Robinson by showing that she had an

incentive at the time that she gave information to the authorities to shade her information in the

state's favor given pending probation revocation proceedings.

**B.     Trial Counsel Were Ineffective in Their Communications With Mr. McConnell During the Pre-Trial Period**

13.     Mr. McConnell alleges that trial counsel were ineffective in their communications with Mr.

McConnell before trial.  As explained below, trial counsel had actual knowledge of Mr. McConnell's

personality disorders that caused him to vacillate between helping and harming his own interests.

Instead of recognizing that Mr. McConnell's actions were a symptom of his mental illness, trial

12

counsel exacerbated the problem by constantly telling him that he would inevitably be sentenced to death and that he should plead guilty to the capital offense even without negotiations from the state. Mr. McConnell alleges that trial counsels' actions (in addition to their conflict of interest) were a substantial factor behind his subsequent decisions to represent himself, plead guilty, and to harm his own interests before and during the penalty hearing.

14.     Mr. McConnell alleges that trial counsel were ineffective for advising him that he should plead guilty to the capital offense even without negotiations from the state.  Mr. Specchio advised Mr. McConnell that his best course of action would be plead guilty to the capital murder offense even without negotiations from the state.  In an email message, dated September 24, 2002, Mr. Specchio memorialized the contents of his conversations with Mr. McConnell wherein he advised him that he should plead guilty to preserve credibility with the jury at the penalty hearing.  Ex. 59. Specifically, Mr. Specchio advised Mr. McConnell that his best case scenario would be to plead guilty and proceed to a penalty hearing before a jury:

> In any event, I did the best I could to tell Rob the best case scenario for him would be. . .
>
> 1. Enter a Guilty plea in October;
> 2. Proceed to the Penalty Phase of the trial in January, as scheduled;
> 3. Dispense with the necessity of the Guilt Phase of the trial;
> 4. Have him testify at the Penalty Phase to tell 'his' story .. without the DA having a preview
> 5. This would be his best chance for success and there would be a reasonable period of time that we could prepare for this portion without being hammered on appeal that we did NOT have sufficient time.

Ex. 59.

15.     Mr. McConnell alleges that trial counsel pressured him to plead guilty, in part, because of an institutional policy of pressuring clients to plead guilty in the interest of saving time and money. At the time of its representation of Mr. McConnell, the Washoe County Public Defender was actively engaged with the Washoe County District Attorney in an Early Case Resolution (ECR) program.  Under the ECR program, public defenders and district attorneys worked together to convince criminal defendants to plead guilty as soon as possible after their arrest to get them out of the jail and save taxpayer dollars.  One attorney left the public defender's office due to the ECR program because, as he explained, "[t]here was a hell of a lot of pressure to negotiate your cases. ...

I asked clients if they had see a police report and they said 'no.'  And you were told to go ahead and plead these guys."  Mike Henderson, <u>Some defense lawyers wary of early resolution program</u>, Reno Gazette-Journal, Feb. 4, 2001, at 1A.  The ECR program was suspended in 2008 after the Nevada Supreme Court adopted new standards for indigent defense because "[s]ome on the [Indigent Defense Commission] [] were concerned that defendants were being pushed through the system at too rapid a rate and were not receiving the level of defense needed to ensure their constitutional right to due process." Martha Bellisle, <u>Fast-track program on hold in Washoe</u>, Reno Gazette-Journal, May 4, 2008, at 9A.  Like every other client of the Washoe County Public Defender's Office, Mr. McConnell alleges that he was pressured to plead guilty so as to save the county money.

16.     Mr. McConnell alleges that Mr. Specchio was ineffective in telling Mr. McConnell that he would inevitably be sentenced to death.  In an email created after a visit with Mr. McConnell, dated November 8, 2002, Mr. Specchio acknowledged that he had always informed Mr. McConnell that he would be sentenced to death:

> He wanted my real evaluation ... I told him that it has not changed ... I think he is a dead man walking.  I REMINDED HIM THAT I TOLD HIM IN OUR FIRST MEETING THAT I THOUGHT HE WAS AN EXCELLENT CANDIDATE FOR THE DEATH PENALTY AND HIS SUBSEQUENT ACTIONS HAVE CONFIRMED THAT.

> I told him that we would do what we could to save his life but we have to play the cards we are dealt and he provided us with a "bust" hand.

Ex. 60 (ellipses and emphasis in original).  Mr. Specchio followed up on this email with a letter that he sent to Mr. McConnell, dated December 5, 2002, which he advised was "more for the benefit of this office than you."  Ex. 61.  In the letter, Mr. Specchio emphasized his experience in capital murder cases to tell Mr. McConnell that he would inevitably be sentenced to death by the jury:

> I have advised you that based on my experience, (I have been involved in over two hundred (200) murder cases and more than one hundred (100) capital murder cases), it is my considered opinion that the death penalty <u>will</u> be imposed upon you by a jury, despite our best efforts to the contrary.

Ex. 61 at 2 (emphasis in original).  Mr. Specchio then highlighted the aggravating evidence that he anticipated that the state would present and told Mr. McConnell that "[a]ny of the foregoing would be sufficient for the imposition of the death penalty."  <u>Id.</u>

17.     In his letter, dated December 5, 2002, Mr. Specchio advised Mr. McConnell to plead guilty

1    based on the state's evidence against him:

2            In this instance, you have been advised that it is probably <u>not</u> in your best
     interests to proceed to trial.  That is the official position of this office and a mere
3    echo of what we have advised you to date.  I believe that will continue to be our
     recommendation based upon the weight of the State's case against you.
4
             You have been advised, on more than one occasion, of the possible alternative
5    avenues available to you, namely plea versus trial.

6            There is no doubt that you will be found guilty of Murder in the First Degree.
     . . .
7                                                . . . .

8            It is for this reason that we have urged you to consider to reserve some
     credibility with the jury and forego the issue of guilt so that we may direct our efforts
9    to the issue of penalty where this case belongs and the way this case <u>should</u> have
     been defended.
10
     Ex. 61 at 3 (emphasis in original).  Mr. Specchio made it clear that his letter was intended to
11
     represent his office's view that Mr. McConnell should waive his right to a jury trial and plead guilty:
12
             this letter is submitted to you so that someday, down the road, when you or someone
13   on your behalf may want to appeal your case or seek some post-conviction remedy,
     this office will be on record as having advised against your proceeding to trial.
14
             We all believe that the only chance available to save your life would be to
15   retain some credibility before the jury and put all efforts into the penalty portion of
     the proceedings.  This is the <u>only</u> intelligent defense to pursue in light of the
16   overwhelming evidence against you.

17   Ex. 61 at 6.  Mr. Specchio concluded his letter by commenting that "I do not think you have the

18   strength, intelligence nor courage to do so." Ex. 61 at 7.  Mr. McConnell alleges that Mr. Specchio's

19   advice and his derogatory posture towards Mr. McConnell constitutes deficient performance.

20   18.     Mr. McConnell alleges that trial counsels' actions were affected by Mr. Specchio's personal

21   animosity toward him.  In an email, dated January 30, 2003, Mr. Specchio instructed the trial team

22   not to make further contact with Mr. McConnell, and making the comment "[s]ince WHEN is this

23   ASSHOLE directing this case[?]" Ex. 62.  Specchio commented that "[h]e has just lost control to

24   ME." Id.  Mr. Specchio concluded his message by saying that "we would be taking this guy in next

25   week HOPEFULLY to plead to some god damn felony . . . I wanted him to stipulate to our waiver

26   of the PSI so we can accept the maximum sentence and get him to the joint ASAP . . .  Period . . .

27   ." Id. (emphasis and ellipses in original).  In an email message dated January 31, 2003, Mr. Specchio

28   re-affirmed that "I don't want anyone talking to or going to see this guy right now[.] This thing has

                                                 15

gotten way out of hand[.]  Anyone listed here should see ME before even THINKING about seeing this nut case. . ."  Ex. 63 (emphasis and ellipses in original).  Mr. McConnell alleges that Mr. Specchio's animosity toward him affected trial counsels' advice to represent himself and plead guilty to the offense without negotiations from the state.

19.   Trial counsel continued to pressure Mr. McConnell to plead guilty to the offense against his wishes.  In an email message dated December 9, 2002, trial counsel explained that she had met with Mr. McConnell and attempted to convince him to plead guilty:

> I explained what I thought we could accomplish by having him negotiate a plea or plead and demand a jury sentencing.  He discusses the applicable law well, and seems to understand.  He says he expects the same result either way, and would prefer to have a trial, and preserve any issues.  I could not argue that the result could be the same either way.  He did agree to think about authorizing me to offer a plea to life without.
>
> . . . .
>
> He said he did not want to plead because the other inmates would think he was not tough enough to make it through trial.

Ex. 64.  In a subsequent letter to Mr. McConnell, dated March 12, 2003, trial counsel informed him that he should plead guilty:

> You gain nothing legally by a trial.  This should not be news to you.  I have been presenting this idea since the beginning of your case.  Even without your statement there is evidence upon which a jury will base your conviction.  My responsibility professionally and ethically is to try to improve your legal position.  I believe that will be best accomplished by moving your case to sentencing, particularly if we are able to remove death as a sentencing option.

Ex. 65.

20.   Trial counsels' advice for Mr. McConnell to plead guilty was also based on their mistaken assumption that April Robinson would only testify if the case went to trial.  In a letter dated March 12, 2003, counsel informed Mr. McConnell that she was aware that Mr. McConnell intended to cross-examine Ms. Robinson to establish that she provoked him:

> you could be demanding a trial, even in the face of myriad logical reasons to be trying to avoid one, because your mind is still being driven by your obsession with April.  I think that is more likely.  Consequently, I will do my best work for you if you find a way to keep her from trial.

Ex. 65.  Mr. McConnell alleges that trial counsel were ineffective in believing that a guilty plea would prevent the state from offering the testimony of April Robinson.  Reasonably effective counsel would have known that the state would still offer the testimony of Ms. Robinson in the penalty

1    hearing as evidence of other bad acts.

2    21.    Mr. McConnell alleges that trial counsel were ineffective for encouraging Mr. McConnell

3    to plead guilty to the capital offense without any negotiations from the state.  Mr. McConnell alleges

4    that trial counsels' actions were contrary to existing professional norms which require that counsel

5    seek a negotiated resolution that removes the death penalty as a sentencing option.  Specifically, the

6    2003 version of American Bar Association ("ABA") Guideline 10.9.1 imposes a "duty to seek an

7    agreed-upon disposition" on trial counsel.  Guideline 10.9.1(B)(9)(a) specifies a "guarantee that the

8    death penalty will not be imposed" as the first benefit that counsel should discuss with the client

9    when negotiating the case.  The Guideline clarifies "the importance of pursuing an agreed-upon

10   disposition at every phase of the case, not just as a substitute for proceeding to trial initially."  Id.

11   Mr. McConnell alleges that trial counsels' initial advice to plead guilty even without negotiations

12   from the state constitutes deficient performance.  Counsels' advice was based on their own mistaken

13   assumption that a guilty plea would limit the evidence that the state presented to the jury.

14   Furthermore, by advising Mr. McConnell to plead guilty, Mr. McConnell was waiving his right to

15   preserve any issues from the trial proceedings without any corresponding benefit.  Mr. McConnell

16   therefore alleges that counsel was ineffective and that he suffered prejudice as a result.

17   22.    Mr. McConnell further alleges that trial counsels' insistence on a guilty plea even in the

18   absence of negotiations from the state influenced his decision to represent himself and plead guilty.

19   Mr. McConnell alleges that counsels' advice was a substantial factor that caused him to harm his

20   own interests by representing himself, pleading guilty, and engaging in conduct that was detrimental

21   to his legal interests.

22   23.    Mr. McConnell alleges that Michael Specchio had a pattern and practice of antagonizing

23   capital clients by sending them letters indicating that they would inevitably be sentenced to death

24   even when he himself was unaware of, or never investigated, any mitigation evidence.  Ex. 460

25   (letter to John Bejarano), Ex. 459 (letter to Vanisi).  Mr. McConnell alleges that Mr. Specchio's

26   pattern and practice of antagonizing clients was prejudicial in the circumstances of his case because

27   it caused a break down in the attorney client relationship and caused him to make decisions that were

28   detrimental to his legal interests.

**C.    Trial Counsel Were Ineffective in Failing to Adequately Investigate Mitigation Evidence During the Pre-Trial Period.**

**1.    Failure to Adequately Investigate Mitigation Witnesses**

24.    Mr. McConnell alleges that trial counsel were ineffective in failing to adequately investigate mitigation and mental health evidence regarding Mr. McConnell's background.  Various members of the Washoe County Public Defender's Office, including Michael Specchio and Maizie Pusich, represented Mr. McConnell from August 16, 2002, shortly after his arrest for the instant offenses, until May 30, 2003, when the trial court granted Mr. McConnell's motion to represent himself. See Ex. 353 at 24-25, 38.  During the nine month period after their appointment, Mr. McConnell's attorneys were constitutionally obligated to perform a thorough investigation into his background for mitigating evidence.  Evidence of a troubled life history is relevant to assessing a defendant's moral culpability and constitutes powerful mitigating evidence.  Here, Mr. McConnell's attorneys failed to conduct the constitutionally requisite investigation into his life history that culminated in the offenses with which Mr. McConnell was charged.

**a.    The Mitigation Investigation in Mr. McConnell's Case**

25.    Trial in Mr. McConnell's case (hereinafter referenced as "Rob" in this section) was originally scheduled for January 27, 2003.  9/13/02 RT at 5.  On January 15, 2003, on motion by the state, the trial court vacated the originally scheduled trial date pending the Nevada Supreme Court's review of the state's appeal of an adverse pre-trial order. During these proceedings, Rob's counsel made no suggestion that they would not be ready to proceed to trial in January 2003 and, indeed, a review of prior counsel's investigative files reveals that counsel's investigation – such as it was – was substantially completed by January 2003.  See Ex. 92 (memo regarding telephonic interviews with Rob's former step-mother Donna Andelmo on November 14 and November 26, 2002); Ex. 89 (memo regarding October 4, 2002 interview with Rob's half-brother Darren Bakondi); Ex. 365 (e-mail regarding telephone conversations with Rob's mother Kim Sauln and brother Darren on December 4, 2002 and December 5, 2002, respectively); Ex. 406 (e-mail regarding conversation with Darren on January 7, 2003); Ex. 400 (memo regarding December 24, 2002 interview with Joe Green, one of Rob's former work supervisors); Ex. 417 (memo regarding telephonic interview with Rob's

18

1  half-brother Vince Hensler on November 14, 2002); Ex. 402 (memo regarding [telephonic] interview

2  with Rob's friend Robert Jackson on December 20, 2002); Ex. 93 (memo regarding telephonic

3  interview with Rob's half-brother Robbin McConnell Jr. on November 14, 2002); Ex. 399 (memo

4  regarding telephonic interview with Rob's father Robbin McConnell Sr. on November 13, 2002);

5  Ex. 84 (memo regarding telephonic interview with Rob's uncle Donald Theodore ("Ted")

6  McConnell and his wife Renee on November 13, 2002); Ex. 418 (e-mail regarding telephonic

7  conversation with uncle Ted on January 9. 2003); Ex. 106 (memo regarding telephonic interview

8  with Rob's half-sister Dawn on November 13, 2002); Exs. 85, 86 (memos regarding telephonic

9  interviews with Rob's maternal aunt Dee Morris on October 25, 2002 and December 30, 2002); Ex.

10  403 (memo regarding [telephonic] interview with Rob's friend Alex Monroy on December 24,

11  2002); Ex. 419 (memo regarding telephonic interviews Rob's friends Jackie Quinn and Melissa

12  Burkhart on January 27 and January 31, 2002, respectively); Ex. 411 (e-mail regarding telephonic

13  conversation with Rob's ex-girlfriend Lisa Rose on November 5, 2002); Ex. 420 (memo regarding

14  interview with Lisa Rose on November 6, 2002); Ex. 87 (memo regarding telephonic interview of

15  Rob's mother and step-father, Kim and Roger Sauln, on October 28, 2002); Ex. 83 (memo regarding

16  telephonic interview with Kim Sauln on October 31, 2002); Ex. 422 (e-mail regarding telephonic

17  conversations with Kim and Roger Sauln on January 9, 2003); Ex. 421 (memo regarding brief

18  telephonic interview with Rob's friend and former boss Luis Vazquez on December 24, 2002).  By

19  every indication, therefore, Rob's counsel intended to proceed to trial in this case (including a likely

20  penalty phase) on the basis of interviews that were conducted telephonically, many lasting only a

21  short while, and generally leading to superficial results, as discussed in the sections below.

22  26.     Granted a reprieve by the State's motion to continue the January 2003 trial date, counsel

23  nevertheless made little effort to continue their mitigation investigation in the four months

24  immediately before the trial court granted Rob's motion to represent himself.  In those months,

25  counsel interviewed only two new potential witnesses – Rob's former step-father Chuck Bakondi

26  and Rob's friend and former co-worker Misty Tackman – and had only few, largely non-substantive

27  telephone conversations with their earlier interviewees.  See Ex. 423 (memo regarding April 9, 2003

28  interview with Mr. Bakondi); Ex. 401 (memo regarding February 14, 2003 interview Ms. Tackman);

1  <u>see also</u> Ex. 424 (e-mail regarding telephonic conversation with Robert Jackson on March 12, 2003);

2  Ex. 425 (e-mail regarding telephonic conversation with Robert Jackson on or about April 16, 2003);

3  Ex. 426 (e-mail regarding brief telephonic conversations with Luis Vazquez, Alex Monroy, Rob

4  Jackson, and Dee Morris on or about March 12, 2003).

5

6  **1.    Counsel    Failed    to    Conduct    Interviews    in    a Constitutionally Sufficient Manner**

7  27.    Considered in its entirety, counsel's investigation into Rob's background was wholly

8  deficient in both form and content.  The attorneys representing Mr. McConnell largely delegated this

9  responsibility entirely to their investigator, Holly Bergeret. Exs. 83, 84, 85, 86, 87, 89, 92, 93, 106,

10  365, 399, 400, 401, 402, 403, 406, 411, 417, 418, 419, 420, 421, 422, 423, 424, 425, 426; Ex. 42 ¶

11  50; Ex. 437 ¶ 58; Ex. 47 ¶¶ 46-47; Ex. 51 ¶ 64; Ex. 49 ¶ 31; Ex. 57 ¶ 31.   Only one witness

12  interviewed by undersigned counsel recalled speaking with Rob's attorneys.  <u>See</u> Ex. 44 ¶ 38 (spoke

13  once with Ms. Pusich).

14  28.    Almost all interviews were conducted by telephone.  <u>Compare, e.g.</u>, Ex. 44 ¶ 38; Ex. 42 ¶ 50;

15  Ex. 438 ¶ 89; Ex. 49 ¶ 31; Ex. 89; Ex. 400; Ex. 402; Ex. 89; Ex. 400; Ex. 402; Ex. 404 (in-person

16  interviews) <u>with</u> Ex. 46 ¶ 31; Ex. 437 ¶ 58; Ex. 50 ¶ 114; Ex. 47 ¶ 46; Ex. 55 ¶ 16; Ex. 51 ¶ 64; Ex.

17  48 Decl. ¶ 64; Ex. 57 ¶ 31; Ex. 41 ¶ 21; Ex. 87; Ex. 419 (telephone interviews).  Crucially, Rob's

18  prior counsel failed to interview <u>any</u> of Rob's family members or friends in Pennsylvania in person,

19  <u>see</u> Ex. 46 ¶ 31; Ex. 50 ¶ 114; Ex. 47 ¶ 46; Ex. 55 ¶ 16; Ex. 48 ¶ 64; Ex. 41 ¶ 21, even though

20  counsel was on notice that Rob lived with these family members for five years as a boy – during

21  which Rob suffered extensive abuse at the hands of his father and siblings – and again in the weeks

22  and months immediately before the crimes with which Rob was charged.  Ex. 50 ¶ 113; Ex. 54 ¶ 45;

23  Ex. 46 ¶ 28; Ex. 47 ¶ 44; Ex. 41 ¶ 20.   Further, counsel was on notice that most or all of the

24  Pennsylvania witnesses lived within minutes of another, <u>see, e.g.</u>, Ex. 417 ("Today, Donna, Robbin,

25  Vince, Robyn Jr. and Crystal all live within about a half hour of each other.").  Indeed, prior counsel

26  recognized the importance of interviewing witnesses in person, going so far as to book reservations

27  for a trip to Pennsylvania, <u>see</u> Ex. 428, but never following through.

28  29.    Nor did trial counsel interview in person either Rob's own mother Kim Sauln; her sister Dee

Morris, who helped raise him as a young boy; or Roger Sauln, Kim's then-current husband, with whom Rob lived (along with his mother) after fleeing his father's abuse in Pennsylvania, even though Kim and Roger Sauln lived in San Jose, California, a short plane ride from Reno.  Ex. 437 ¶ 58; Ex. 51 ¶ 64; Ex. 57 ¶ 31; Ex. 87.

30.     Counsel's contacts with potential witnesses, whether conducted directly or through Ms. Bergeret, whether in person or via telephone, were typically brief.  See, e.g., Ex. 438 ¶ 38 (describing one meeting with Ms. Pusich lasting twenty or thirty minutes, during which "she did not ask a lot of in-depth questions"); Ex. 438 ¶ 89 (describing one "brief" in-person conversation and subsequent "minimal" telephone conversations); Ex. 48 ¶ 64 (describing one telephonic conversation lasting no more than fifteen minutes and consisting of only a few questions); Ex. 41 ¶ 21 (describing one "short" telephone conversation); Ex. 400 ("brief[]" conversation with former work supervisor); Ex. 421 ("brief[]" conversation with Rob's friend Luis Vazquez).

31.     Even though counsel's files contained indications that Mr. McConnell's life history included instances of horrific abuse, most witnesses were interviewed only once or at most twice, see, e.g., Ex. 44 ¶ 38; Ex. 42 ¶ 50; Ex. 46 ¶ 31; Ex. 50 ¶ 114; Ex. 55 ¶ 16; Ex. 48 ¶ 64; Ex. 49 ¶ 31; Ex. 41 ¶ 21, preventing counsel from developing the sort of ongoing, trusting relationships conducive to eliciting sensitive, perhaps shameful, information necessary to developing a constitutionally sufficient mitigation case.

32.     Ms. Bergeret, the investigator assigned to Rob's case, recognized that her investigation was insufficient.  For example, in March 2003, Ms. Bergeret learned from Rob's maternal aunt Dee Morris that Kim and Roger Sauln would be visiting Reno later that month. Ex. 426.  She expressed a desire to meet them in person, to "hopefully build a rapport with Kim, as there is still a lot of information she could provide." Ex. 426. This meeting never occurred. Exs. 51, 57. Trial counsel intended to conduct follow-up interviews with other witnesses, but, on information and belief, did not do so. See, e.g., Ex. 404 (Lisa Rose); Ex. 423 (Chuck Bakondi).

33.     In addition to conducting interviews with crucial witnesses in a constitutionally insufficient manner, counsel failed to even contact, much less interview, numerous witnesses with powerful mitigating evidence to offer.  These included members of Rob's family in Pennsylvania with first-

hand information of the abuse he suffered, including (1) Art Leddon Sr., Rob's paternal step-uncle-in-law, see Ex. 54 ¶¶ 1, 47-48; (2) Art Leddon Jr., Rob's paternal cousin-in-law, see Ex. 56 ¶¶ 1, 21; Ex. 54 ¶¶ 47-48; and Crystal McConnell, Rob's paternal half-sister, see Ex. 382.

34.     Counsel also failed to contact at least three of Rob's best friends: (1)-(2) Athena Lindsay-Monroy and Tom Cheers, both of whom who knew Rob well from the years he lived in Reno, see Ex. 45 ¶¶ 1, 70, 76; Ex. 53 ¶¶ 1, 59; and (3) Stahn Muller, who met Rob while both were housed in the California Youth Authority (CYA) system and lived with Rob for several years following his release from CYA. Ex. 52 ¶¶ 1-2, 26, 36, 74.  Each of these witnesses would have been willing to talk to Rob's counsel and testify in support of Rob had they been asked.  Ex. 54 ¶¶ 47-48; Ex. 56 ¶ 21; Ex. 45 ¶ 76; Ex. 52 ¶ 74; Ex. 53 ¶ 59.

35.     All of these potential witnesses were known to counsel. Exs. 399 at 1, 3; 429 at 3, 5; 89 at 2; 83. Indeed, at least one these witnesses found herself puzzled by counsels' failure to seek her out. Athena Lindsay-Monroy explained:

> I've always found it strange that no one from Rob's trial team ever reached out to me even though everyone knew that we were roommates and very close friends.  I was living in the Reno area at the time of Rob's arrest and throughout his entire trial proceedings.  I didn't leave Nevada until November 2008.

Ex. 45 ¶¶ 70.

### b.     The Mitigation Investigation That Should Have Occurred

36.     Mr. McConnell alleges that trial counsels' limited investigation and presentation of mitigating evidence fell below the constitutional standard of effective representation required in capital cases. Counsel's failure to conduct in-person interviews with crucial mitigation witnesses, and their failure to conduct follow-up interviews with key witnesses, violated prevailing professional norms.  As far back as 1999, mitigation experts recognized the need to conduct in-person interviews of all potential witnesses, and to conduct multiple interviews of witnesses to build trust.  See, e.g., 2003 ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, Guideline 10.7, 10.11; Russell Stetler, Post-Conviction Investigation in Death Penalty Cases, The Champion (Aug. 1999); Russell Stetler, Mitigation Evidence in Death Penalty Cases, The Champion (Jan.-Feb. 1999); see also, e.g., Daniel J. Payne, Note, Building the Case for Life: A Mitigation

1   <u>Specialist as a Necessity and a Matter of Right</u>, 16 Cap. Def. J. 43, 52 (2003) (effective mitigation

2   investigation requires "in person and often follow up interviews . . . to get a complete account of a

3   defendant's history); <u>Arizona v. Bocharski</u>, 200 Ariz. 50, 59, 22 P.3d 43, 52 (2001) (noting testimony

4   of an experienced mitigation specialist that investigation for 1997 trial "would, at a minimum, require

5   her to travel to three states in order to interview the defendant's mother, wife, and foster parents" and

6   that no like trip had ever been refused "because of the importance of conducting a thorough

7   examination").

8   37.   As a result of prior counsel's constitutionally insufficient investigation, crucial mitigating

9   aspects of Mr. McConnell's life history were never uncovered, missed fundamental issues of

10  alcohol/FASD impairments; alcohol given to Mr. McConnell as an infant; the transitory home live;

11  the ADHD exemplified in family members; bipolar disorder in family members; familial

12  intergenerational physical and emotional abuse; Mr. McConnell's emotional disintegration which

13  included hallucinations and delusions; patterns of abuse mirrored by Mr. McConnell as a coping

14  mechanism for his abandonment issues; sucidality, gestures and feints; head injuries subsequent to

15  the 1978 accident; and multiple other familial mental health conditions on both sides of his parentage.

16  **c.   Overview of Rob's Dysfunctional Family History and Life Story**

17  38.   A brief orientation of Rob's dysfunctional family history and life story is necessary to

18  contextualize the mitigating evidence prior counsel failed to elicit from witnesses during the period

19  of their active representation.   Kim and Robbin Sr. were themselves the products of grossly

20  dysfunctional families rife with neglect, abuse, drug and alcohol addiction, and mental illness.

21  **1.   Maternal Family**

22  39.   Kim and her sister Dee were abandoned by their father Kenneth White (Rob's maternal

23  grandfather) at an early age. Ex. 437 ¶ 2.   Kenneth spent most of their childhoods going in an out of

24  prison, completely absent from their lives until a few years before his death in 2008. Ex. 347 ¶ 2.

25  Kim's mother (Rob's maternal grandmother) Sylvia drank throughout Kim's childhood and became

26  a full-fledged alcoholic later in life, drinking in bars with Kim and becoming "sloppy and belligerent"

27  when drunk – possibly in front of Rob.  Ex. 437 ¶ 47.

28  40.   Kim herself began drinking heavily as a teenager, became a full-fledged alcoholic and started

1   smoking marijuana no later than her early twenties, when she still had custody of Rob, and later

2   became addicted to cocaine. Ex. 437 ¶¶15, 45, 47-48; Ex. 51 ¶ 26; Ex. 430; see also Ex. 42 ¶ 34, 36

3   (reporting that Kim began using drugs after their divorce, when she still had custody of Rob, and that

4   she continued to abuse drugs after relocating to San Jose, California, including in front of her

5   children). Kim admitted to abusing cocaine in her late twenties as well. Ex. 51 ¶ 3; Ex. 437 ¶ 48; Ex.

6   430. Kim's myriad addictions had not gone undetected by law enforcement – by about 1989, she had

7   been arrested and ticketed several times on various drug- and alcohol-related charges. Ex. 42 ¶ 37;

8   see also Ex. 437 ¶ 30 (recalling that Kim had at least one DUI arrest).

9   41.     Rob's maternal family history is replete with instances of mental illness and disability, both

10  diagnosed and undiagnosed. Ex. 86 at 2; Ex. 51 ¶¶26-28. Kim had suffered from depression and low

11  self-esteem for many years, to the point that she has been suicidal at times, Ex. 86 at 3; 426 at 1; 437

12  ¶ 49, and was formally diagnosed and recommended treatment for severe depression and then anxiety

13  following separate mental breakdowns occurring thirty years apart. Ex. 51 ¶¶ 26, 28.  In the 1970s,

14  while she still had custody of Rob, Kim suffered a mental break which she believes to be have been

15  the product of tainted marijuana. Ex. 51 Decl. ¶ 26.  Found wandering along the edge of a highway

16  overpass, Kim was transported to a local hospital and kept overnight for observation and evaluation.

17  Ex. 51 ¶ 26.  She was diagnosed with severe depression and given a referral to attend therapy sessions

18  on an outpatient basis, which she briefly attended and then stopped.  Ex.51 ¶ 26.  She was not

19  prescribed medication to treat her condition. Ex. 51 ¶ 26.  In 2002, after a severe anxiety attack which

20  she describes as a nervous breakdown, Kim again sought treatment and was prescribed Zoloft for her

21  condition.  Ex. 51 ¶ 28.  Kim's sister Dee believes that Kim's rampant drug and alcohol abuse

22  through the years may have been an attempt to self-medicate to help deal with her mental health

23  conditions. Ex. 437 ¶ 49

24  42.     Several of Rob's maternal cousins have been diagnosed with ADHD and/or other learning

25  disabilities. See Ex. 437 ¶ 51-52; Ex. 200; Ex. 86 at 2-3. Others suffered assorted mental health

26  issues, see Ex. 437 ¶ 51 (Tom), or from mental disabilities, including autism and possible mental

27  retardation, see Ex. 437 ¶ 51 (Graham); Ex. 86 at 3 (Graham possibly autistic); Ex. 431 at 4 (Jerry

28  Kihara).  Many of these cousins were placed in state custody, foster homes or adopted by friends or

other family members; Ex. 437 ¶ 51 (Gina and Tom); Ex. 431 at 4 (Jesse and Thomas Kihara). Rob's maternal cousin Jerry molested his son, leading to his son being removed from his home and adopted by other family members and eventually being sent to a boys' home in Texas for children with special needs. Ex. 347 ¶ 41; Ex. 431 at 4.

## 2.   **Paternal Family**

43.    Rob's paternal grandfather Ted McConnell Sr. ("Ted Sr.") was the product of an impoverished, dysfunctional background. Ex. 50 ¶ 9.  Until he died when Ted Sr. was eleven, Ted Sr.'s father Joseph McConnell would abuse both his mother Mabel and him. Ex. 50 ¶ 9.  As he grew up, Ted Sr. learned to loved drinking and fighting: as explained by his son Ted Jr. (Rob's paternal uncle), Ted Sr. "was the kind of guy who loved honky-tonk bars that had lots of sawdust on the floor" and "appreciated having the sawdust on the ground to soak up the beer and  blood that he spilled." Ex. 50 ¶ 14. Ted Sr. would wind up in the hospital or the police station seemingly every weekend as a result of his carousing.  Ex. 50 ¶ 15.  He kept company with drug dealers, other criminals, and members of various biker gangs, including the Hell's Angels, all of whom he would bring around his family, including Rob's father Robbin Sr. Ex. 50 ¶ 16.  Ted Sr.'s body, with lots of scars and missing teeth, bore the marks of his hard living.  Ex. 50 ¶ 15

44.    Ted Sr. met his future wife Gloria shortly before he joined the Marines as a young man.  His tenure was a Marine turned out to be brief when he was  court-martialed and discharged after an incident in which he punched a captain in the face, knocking out several teeth and splattering blood on the captain's wife's white dress.  Ex. 50 ¶ 17.  The same day as his discharge from the Marines, Ted Sr. was accepted into the Army and was sent to Korea to fight in the Korean War.  Ex. 50 18; see also Ex. 84 at 2.

45.    Gloria herself came from a disadvantaged background, growing up poor and without a father. Ex. 50 ¶ 12.  While Ted Sr. was fighting in Korea, Gloria became pregnant with Robbin Sr., Rob's paternal father.  Ex. 50 ¶ 19; Ex. 48 ¶ 32; Ex. 54 ¶¶ 6-7; Ex. 84 at 2.  Although it was apparent that Gloria had cheated on him while he was abroad, Ted Sr. married Gloria upon his return.  Ex. 50 ¶ 19. Robbin Sr.'s true father was a man named Paul Garcia, to whom Ted Sr. referred using various racial slurs and whom Ted Sr. frequently demeaned and belittled.  Ex. 48 ¶ 33.  Ted Sr. also referred to

Robbin Sr. – who shared his biological father's Latin features – as "the fucking Mexican" and other racial slurs. Ex. 50 ¶ 20; see also Ex. 84 at 2 (though Ted Sr. raised Robbin Sr., he "resented him and treated him terribly").

46.     Ted Sr.'s military experience did little to change his ways.  Both he and Gloria were dysfunctional alcoholics who fought continuously. Ex. 50 ¶¶ 12-13, 22, 32, 37, 68-70; Ex. 48 ¶ 32; Ex. 54 ¶ 5, 7; Ex. 84 at 2; Ex. 430 at 2. Ted Sr. was arrested on several occasions for driving under the influence, including one instance in which he crashed his car and killed his passenger, a hitchhiker he had picked up along the way. Ex. 50 ¶ 25; see also Ex. 84 at 2. For this offense, he was convicted of driving under the influence, manslaughter, and – because he had kicked the hitchhiker's dead body out of the ambulance transporting them both to a local hospital – desecration of a human body. Ex. 50 ¶ 25.  Ted Sr. spent two-and-a-half years in prison for his crimes and lost his driving privileges for life plus one hundred years.  Ex. 50 ¶ 25.

47.     Gloria, on the other hand, developed an addiction to prescription drugs after she began taking pain killers for a severe back injury sustained during the 1960s. Ex. 50 ¶ 23; Ex. 84 at 2.  Gloria's drugs of choice were codeine and Dilaudid, which she often used in combination with alcohol.  Ex. 50 ¶ 23.  To maintain her addiction, she made up various stories of experiencing false pain to keep doctors writing prescriptions for her, and had her children, including Rob's paternal uncle Ted Jr., lie about witnessing various symptoms to make her stories more believable.  Ex. 50 ¶ 23.

48.     Robbin Sr. and his siblings often witnessed Ted Sr. beating their mother. Ex. 50 ¶¶ 29-30; Ex. 54 ¶ 7.  In her children's presence, Gloria would "get slapped, punched, pushed, choked, and thrown down to the ground" by her husband, and it was not unusual for the children to see her with bleeding cuts, bruises and scars on her body. Ex. 50 ¶ 30.  Ted Jr. once saw his father attack his mother while she lay sleeping, punching her so hard "that she began to fall out of the bed[ and] then . . . immediately punch[ing] her in the other direction[,] knock[ing] her body back onto the bed." Ex. 50 ¶ 29.  Ted Sr. would beat his wife for almost any reason, or no reason at all.  Ex. 50 ¶¶ 32-33.  Ted Sr. would beat his wife when he was drunk or when he suspected that Gloria was cheating on him, "which was all the time." Ex. 50 ¶ 30.  Ted Sr. also beat his wife when he perceived that she was spending too much money on drinks and running up high tabs at bars. Ex. 50 ¶ 32.  Sometimes he

beat his wife for no reason other than his own enjoyment.  Ex. 50 ¶ 29.

49.     On one occasion, with both Ted Jr. and Robbin Sr. present, Gloria and Ted Sr. fought each other with knives in their hands. Ex. 50 ¶ 33.  Ted Jr. called the police to break up the fight and paid a steep price for doing so:

> When the police officers responded to the scene, they took Gloria out of the house for her own protection and I begged them to take me along with her because I knew that my father was going to severely beat me in retaliation. My tearful pleas fell on deaf ears and the officers left me in the house with my father. Robbin [Sr.] was present during  this entire time and witnessed everything but did nothing to help our mother . . . . My father knew how much Robbin hated me, so he offered to pay Robbin to beat me for calling the police. I was surprised when Robbin turned our father's offer down and walked away.  For one of the first times I felt like Robbin cared about me on some level. My father became frustrated and said that he'd do it himself, and then he punched me to the ground.  When I hit the floor, my father began kicking and stomping me repeatedly.  The beating caused me to sustain various injuries.  Besides sustaining a broken nose and bloody mouth, I also suffered cracked ribs, a crushed instep on [my] foot and damage to an optic nerve in my eye which almost caused me to go blind. . . .

Ex. 50 ¶ 33.

50.     Ted Sr. would also beat all of his children, sometimes for no apparent reason, even while they slept. Ex. 50 ¶ 29; Ex. 84 at 2.  Relatives generally agreed that while Ted Sr. was extremely abusive to all his children, Robbin Sr. received the worst treatment because of his paternity.  Ex. 47 ¶ 32; Ex. 54 ¶¶ 6-7; Ex. 50 ¶ 34; Ex. 48 ¶ 19.  Ted Jr. estimates that Robbin Sr. received twice the number of beatings from their father that Ted Jr. did, and that these beatings were more severe. Ex. 50 ¶ 34; see also Ex. 84 at 2.  Ted Sr. would sometimes grab Robbin Sr. by his throat for no reason and shake him like a rag doll, or beat him until he bled. Ex. 50 ¶ 34.

51.     Ted Sr.'s propensity for violence extended outside the family home.  He would, for example, fight the with many of the men he caught flirting with his wife in bars and on the streets.  Ex. 50 ¶ 31. On one occasion, Ted Sr. beat the principal of Ted Jr.'s school in the principal's office. Ex. 50 ¶ 36. Ted Jr. believes this incident was emblematic of Ted Sr.'s approach to solving problems, even outside of the home – through extreme violence – and his children, including Robbin Sr. and Ted Jr., soon learned this trait. Ex. 50 ¶ 36.  Examples of Ted Sr.'s brutality are so extensive that family members believe they could never cover all of the things Ted Sr. did. Ex. 50 ¶ 36.

52.     In addition to physical violence, Ted Sr. would also subject his children, including Robbin Sr.,

to psychological abuse.  Sometimes when Ted Sr. would return home intoxicated, he would make Ted Jr. and Robbin Sr. stand in strange poses for his entertainment.  Ted Jr. recalled:

> Ted, Sr., often made us both stand in one place, with one foot in the air, and touching the wall with one hand.  Ted, Sr., then told us that he'd kick our asses if we moved an inch.  My father then sat down and drank more alcohol as he watched us intently to see if we'd move.  As soon as either of us took a hand off the wall or dropped a foot from exhaustion, Ted, Sr., always jumped up and began to attack us. When we were beaten by our father he struck us viciously and as if we were grown men.  Ted, Sr.'s beatings almost always drew blood and left marks.

Ex. 50 ¶ 35.

53.     On another occasion, the family visited a dam as part of a family road trip.  Ex. 50 ¶ 34.  Ted Sr. grabbed Ted Jr. and held him upside down over the dam's railing, hundreds of feet above the dam's spinning turbines. Ex. 50 ¶ 34.  Ted Sr. laughed while Ted Jr. cried and screamed for his life. Ex. 50 ¶ 34.

54.     In addition to the profound physical and emotional abuse and neglect present in the McConnell home, ultimately visited upon Rob himself, members of Rob's family were also the victims or perpetrators of sexual abuse.  Robbin Sr. sexually abused both his brother Ted Jr. (Rob's paternal uncle) and his sister Maureen (Rob's paternal aunt) in their youth. Ex. 50 ¶ 43; Ex, 92. On a few occasions when Ted Jr. was eight years old, and Ted Jr. and his siblings were left home alone by their parents, Robbin Sr. would sexually abuse Ted Jr., up to and including penetration.  Ex. 40 ¶ 43.  In interviews with undersigned counsel, Ted Jr. explained that he was too embarrassed and ashamed to tell anyone what his brother was doing to him. Ex. 50 ¶ 43.  Robbin Sr. exploited Ted Jr.'s shame, blackmailing Ted Jr. into doing things for him and threatening to tell everyone what had happened if Ted Jr. failed to comply with Robbin Sr.'s demands. Ex. 50 ¶ 43.  Robbin Sr.'s threats continued into adulthood – during arguments, Robin Sr. sometimes whispered threats into Ted's ear and told Ted Jr. to shut up or Robbin Sr. would would tell everyone what he used to do Ted Jr. when they were children.  Ex. 50 ¶ 43.  In his mid-twenties, Ted Jr. became so fed up with Robbin Sr.'s threats that he told a gathering of people about the abuse, and has since come to believe that Robbin Sr.'s abuse of him was the product of Robbin Sr.'s own maltreatment at the hands of his father.  Ex. 50 ¶ 43.

55.     Ted long thought he was the only person victimized by his brother until he began to speak

with his sister Maureen (Rob's paternal aunt) about his sexual abuse when they were both adults. Ex. 50 ¶ 44.  At that point, "Maureen became quiet[ and] stopped me from telling her any more details. Maureen then became emotional in a way that suggested to me that she shared my experiences." Ex. 50 ¶ 44.  Although Maureen did not admit to or discuss any sexual abuse she may have experienced, Ted believes that Robbin Sr. may have been taking out his anger and resentment on her as well.  Ex. ¶ 44.

56.     Robbin Sr. was also present when Ted's cousins Ronald and Donald attempted to have Ted (then in first grade) and Maureen (then in kindergarten) have sex with one another by taking off Ted and Maureen's clothing and having them lie on top of one another.  Ex. 50 ¶ 45.  Ted and Maureen cried until Ronald and Donald left them alone; Robbin Sr. just watched, doing nothing to assist his younger siblings.  Ex. 50.

57.     When not the subject of severe abuse, Robbin Sr. and his siblings "were latch-key kids of the worst kind," left alone by their parents for days as a time while they were out on drinking binges. Ex. 50 ¶ 37.  His mother would absent herself for extended periods while drinking and philandering with various men, often in the company of her sister Nellie. Ex. 50 ¶ 37.  His father would also abandon the family for weeks or months at a time when furious with his wife over her cheating ways and excessive spending habits. Ex. 50 ¶ 37.  Other times Ted Sr. was away from the family because he had been sent to county jail or prison.  Ex. 50 ¶ 37.

58.     During the periods of their parents' absence, Robbin Sr. and his siblings would go hungry, or be forced to shoplift or break into homes for food. Ex. 50 ¶ 38-39.  As the oldest child, Robbin Sr. directed these activities. Ex. 50 ¶ 39.  At one point, with their father incarcerated and their mother too ill to care from them, Robbin Sr. and his siblings were removed from their home by child protective services for over two years. Ex. 50 ¶ 48; see also Ex. 84 at 2 ("Robbin Sr. and his siblings lived with relatives a lot and were in and out of foster care quite a bit, sometimes together, sometimes not.").

59.     Along with Ted Sr. and Gloria, numerous members of Rob's paternal family suffered from severe alcohol and drug problems.  Gloria's sisters Nellie and Laura,  abandoned by their father at a young age, also became alcoholics when they grew up, drinking and partying for days at a time and

1   sleeping with various men. Ex. 50 ¶¶ 12-13, 32, 68-69.  Rob's paternal aunts Toni and Maureen have

2   been addicted to various narcotics for many years, as a result of which Toni spent much of her life

3   in and out of the California prison system and Maureen is currently living in the streets. Ex, 59 ¶¶ 72-

4   73; Ex. 84 at 2.  After a car accident, Rob's half-sister Dawn developed an addiction to prescription

5   pain medication and tried to acquire additional medication from family members.  Ex. 50 ¶ 85; Ex.

6   48 ¶ 56.  Rob's step-brother Vince smoked marijuana and used cocaine, and his half-sister Crystal

7   abused drugs in her youth as well.  Ex. 48 ¶ 56; Ex. 84 at 7.  Rob's maternal cousin Gina, the daughter

8   of his aunt Terry, overdosed on heroin at age nineteen or twenty.  Ex. 86 at 4.  Robbin Sr., already a

9   heavy drug user as a teenager dating Rob's mother, has a history of drug possession and DUI arrests.

10   Ex. 84 at 3.

11   60.     Gloria's sister Laura – who ultimately killed herself by overdosing on barbiturates  – and her

12   husband Roy were alcoholics. Ex. 50 ¶ 68.  Nellie, too, was an alcoholic who likely used liquor to

13   self-medicate her manic depression.  Ex. 50 ¶ 69.

14   61.     Mental illness was also common throughout several generations of Rob's paternal family.

15   Rob's paternal grandmother Gloria was a manic-depressive who exhibited extreme mood swings and

16   sometimes appeared to be in a state of dissociation or detachment. Ex. 50 ¶ 70.  Rob's paternal great-

17   aunt Nellie was also manic-depressive who suffered from extreme mood swings. Ex. 50 ¶ 69.  As a

18   teenager, Rob's paternal uncle Ted Jr. was diagnosed as bi-polar, manic depressive, and sociopathic,

19   but was denied the recommended treatment by his family and never put on medication.  Ex. 84 at 1-2;

20   Ex. 50 ¶ 71.

21   62.     Rob's paternal aunt Toni has been diagnosed as manic-depressive and suffers from other

22   mental health problems, for which she has been prescribed various psychotropic medications over the

23   years and without which she is incapable of functioning normally.   Ex. 50 ¶ 72; Ex. 84 at 2.

24   According to her brother Ted, "Toni becomes an absolute wreck whenever she goes as little as one

25   day without her medications."  Ex. 50 ¶ 72.  Likely as a result of her mental illnesses and related drug

26   problems, Toni has spent most of her life going in and out of California's prison system and is now

27   mostly out of touch with members of her family.Ex. 50 ¶ 72

28   63.     Rob's paternal aunt Maureen has been diagnosed with bipolar disorder and other mental health

disorders.  Ex. 50 ¶ 73; Ex. 84 at 2.  Rob's paternal step-mother Donna attempted suicide on more than one occasion following her divorce from Rob's father, Robbin, Sr.  Ex. 382.  In 1999, three separate doctors diagnosed Rob's paternal half-sister Crystal with bipolar disorder and prescribed a variety of prescription medications to treat her condition. Ex. 382.

64.     Suicide has played a role in Rob's paternal family history.  Rob's paternal great-aunt Laura killed herself in 1966 or 1967, the culmination of a stormy relationship with a daughter who frequently told Laura that she wished that Laura was dead. Ex. 50 ¶ 68.  One day, after the daughter again told Laura that she wish that she was dead, Laura took her comments to heart and ended up ingesting an entire bottle of "yellow jackets" – Nembutal, a barbiturate.  Ex. 50 ¶ 68.  Laura passed out and choked to death on her own vomit.  Ex. 50 ¶ 68.  Rob's paternal uncle Ted believes Laura suffered from a possibly undiagnosed and untreated depression. Ex. 50 ¶ 68.

65.     During her mid- to late-teenage years, Rob's half-sister Crystal was deeply depressed and tried to kill herself on a few occasions, including one attempt in 1995 when she ingested an entire bottle of muscle relaxants.  Ex. 382 at 5.   By the time paramedics arrived, Crystal had lost consciousness and was non-responsive.  At the hospital, doctors pumped her stomach and infused charcoal into her stomach to absorb the toxins.  Ex. 382 at 5. When Crystal regained consciousness, the doctors told her that she was very lucky because she would have been dead if the paramedics had been five minutes later. Ex. 382 at 5.

66.     Ted Sr. is "certain" that Robbin Sr. (Rob's father) suffers from mental illness.  Ex. 50 ¶ 74.  Ted also believes that if Robbin Sr. were "ever been diagnosed with a mental disorder, he would never tell anyone, because he wants people to think he is the most perfect, wonderful person in the world." Ex. 84 at 3.

**3.     Rob from Birth to Age Eight: Profound Maternal Neglect and Abuse**

67.     Rob was born in July 1972. Ex. 88.  His mother, Kim Sauln, was only sixteen years old when Rob was born, but already known as a "tough street wom[a]n" with a bad temper who shoplifted frequently and got into fights.  Ex. 299 at 22, 8; Ex. 437 at ¶¶ 3, 45.  Kim drank and smoked heavily throughout her pregnancy – alcohol to the point of intoxication two or three times a week and a pack

1  of cigarettes a day, during all three trimesters of her pregnancy – and gave others the impression she

2  used other drugs as well.  Ex. 41 ¶ 11-12; Ex. 437 ¶ 15; Ex. 50 ¶ 2.

3  68.    Rob's father, Robbin McConnell ("Robbin Sr."), was himself only eighteen when Rob was

4  born, but already a product of the California Youth Authority and "a troublemaker, running with

5  gangs, committing crimes, getting into fights, and abusing drugs," mainly cocaine but also heroin and

6  possibly others as well.  Ex. 41 ¶ 3; Ex. 47 ¶ 34; Ex. 121; Ex. 430 at 2.  Robbin Sr. abused Kim

7  verbally and physically throughout their relationship, before and after Rob was conceived.  Robbin

8  Sr. "pushed, shoved, grabbed and slapped Kim," and the two engaged in fist-fights "all the time." Ex.

9  51 ¶ 2.    Shortly after one particularly frightening encounter while Kim was already pregnant with

10 Rob – during which Robbin Sr. grabbed Kim hard by her arms, causing bruises, pushed her against

11 the wall, and began choking her by pushing his forearm into her  neck, Ex. 41 ¶ 10,  – Robbin Sr. left

12 California for Oklahoma, where he was promptly arrested for his involvement in a string of armed

13 robberies. Ex. 51 ¶ 10.  Robbin Sr. was incarcerated in Oklahoma at the time Rob was born, and had

14 no contact with his son until years later. Id.

15 69.    Ted Sr. kicked Robbin Sr. out of the family house when Robbin Sr. was only fifteen. Ex. 47

16 ¶ 34; Ex. 54 ¶ 7; Ex. 84 at 4. Robbin Sr. met Rob's mother Kim a couple of years later.  Against this

17 backdrop, Rob was born, to a single teenage mother who, by all accounts, was wholly unprepared to

18 provide care for him.  Kim has been described as selfish, lacking any maternal instinct or common

19 sense, and generally as an uninterested and uninvolved mother.  Ex. 437 ¶ 11.  Kim herself conceded

20 that she was "no great mother," immature, with no idea how to care for a child and no interest in

21 taking on the responsibility of caring for a child.  Ex. 51 ¶ 36.

22 70.    Even before Rob was born, Kim's mother Sylvia and her then-boyfriend recognized that Kim

23 was too young and ill-prepared to be a mother and raise a child on her own, and counseled Kim to

24 have an abortion.  Ex. 82 at 2; see also Ex. 437 ¶ 16.  Robbin Sr., on the other hand, threatened to kill

25 Kim if she had an abortion. Ex. 51 at ¶ 9.  By the time Kim acceded to her family's wishes, she was

26 too far along in her pregnancy to have a standard abortion and forwent a riskier procedure that would

27 put her health at risk. Ex. 51 at ¶ 9; see also Ex. 437 ¶ 16.  Kim decided to keep Rob after his birth

28 even though it seemed apparent that she was not mature enough for the task.  Ex. 437 ¶ 16.  Later in

1   life, Kim would tell Rob that she was supposed to have aborted him but was unable to do so.  Ex. 52

2   ¶ 67.

3   71.    Prior counsel's limited investigation into the circumstances of Rob's conception and birth

4   revealed only a small part of the story and failed to elicit information crucial to an understanding of

5   Rob's psychological development.  Prior counsel learned that Rob's mother Kim Sauln ("Kim") met

6   his father, Robbin McConnell Sr. ("Robbin Sr."), when he was eighteen years old and she was only

7   thirteen or fourteen years old. Ex. 87 at 1; see also Ex. 51 ¶ 2.   The two became intimately involved

8   soon thereafter.  Ex. 87a t 1; see also Ex. 51 ¶ 2.   Kim was only sixteen when Rob was born, by

9   which time Robbin Sr. had already left the state and been arrested for armed robbery in Oklahoma,

10  for which he ultimately served several years in prison. Ex. 85 at 1; Ex. 430 at 2.

11  72.    Kim described her pregnancy with Rob as "stressful" because Robbin Sr. abused her both

12  verbally and physically during the initial trimester. Ex. 430 at 2; Ex. 87 at 1. The verbal abuse

13  consisted of degrading comments that lowered Kim's self-esteem.  Ex. 430 at 2. Kim described the

14  initial physical abuse as Robbin Sr. "grabbing onto her arms very hard and holding on tight." See Ex.

15  430 at 2.

16  73.    Kim then recounted a more serious episode of physical abuse that occurred while she was

17  pregnant with Rob: Shortly after moving in with Robbin Sr. at his parents' trailer, the two began to

18  argue and Robbin Sr. "'nailed [Kim] in the jaw,'" causing her to fall from the bed onto the floor and

19  hard on her tailbone.  Ex. 83 at 1; Ex. 87 at 1; see also Ex. 51 ¶ 6. The fall ruptured a cyst and

20  required medical attention.  Ex. 87 at 1; see also Ex. 51 ¶ 6.  After this experience, Kim moved back

21  home with her mother, while Robbin Sr., until leaving for Oklahoma,  "kept coming around" Kim

22  to the point that she was afraid to go out. Ex. 87 at 1.

23  74.    Prior counsel's investigation of the circumstances of Kim's pregnancy with Rob – which

24  consisted only of telephonic interviews with Kim – failed to uncover the true extent of the physical

25  abuse between Robbin Sr. and Kim.  In subsequent investigation by undersigned counsel, Robbin

26  Sr.'s brother Donald Theodore McConnell ("Ted Jr.") described Kim during this time as "a tough

27  street woman who had a bad temper and got into fights."  Ex. 50 ¶ 2.  She and Robbin Sr. would get

28  into fist-fights "all of the time."  Ex. 50 ¶ 2. Ted Jr. reported that one time,

> Robbin smacked Kim in the face so hard that she fell off the hood of a car where she had been sitting.  Kim then picked herself up off the ground and punched Robbin so hard in his diaphragm that he lost his breath and fell to the ground.

Ex. 50 ¶ 2.

75.     Prior investigation also failed to unearth further chilling accounts of violence perpetrated by Robbin Sr. against Kim after she moved out of his parents' trailer. As Kim explained,

> I made the mistake of letting Robbin inside my family's home one day when he showed up unannounced.  Robbin was behaving himself at first and talking to me in a very sweet and charming way.  I allowed him in because I wanted to have a heart-to-heart discussion with him, and explain why I could never be with him.  I told Robbin I wasn't going to be anyone's punching bag and there was no way I was going to return . . . to live in his parents' trailer.  After hearing what I had to say, Robbin had an emotional meltdown and became violent. . . . The change in Robbin's demeanor was like looking at Bruce Banner changing into the Incredible Hulk. [His] eyes became small and piercing, like he was looking through me, and he became visibly agitated.  Robbin grabbed me by my arms and squeezed them extremely hard, causing bruises.  He then pushed me up against the wall and began forcing his forearm into my neck in an attempt to choke me.  This is when I began to give in[]to Robbin and pretended to warm up to him so that he would release me.  This was the most angered I had ever seen Robbin, and I was in fear for my life.  Robbin released me and then left my house.  This was the last time I saw Robbin before his arrest and incarceration in Oklahoma.  Rob was still in my womb when Robbin was incarcerated.

Ex. 51 ¶ 10.

76.     Prior counsel also failed to elicit and develop crucial information regarding Rob's prenatal exposure to alcohol, tobacco, and other drugs, despite being on notice that while dating Kim Robbin Sr. abused drugs, mainly cocaine but also heroin and possibly others as well, see, e.g., Ex. 121; Ex. 430 at 2; Ex. 83 at 1; Ex. 87 at 1, and despite being on notice that Kim developed an alcohol problem by her early twenties that has persisted through much of her life, see, e.g., Ex. 430 at 2; Ex. 89 at 4.

77.     Undersigned counsel learned through in-person interviews with Kim that even though she was only in her mid-teens, Kim drank alcohol heavily throughout her pregnancy with Rob – drinking to the point of intoxication two or three times a week during all three trimesters of her pregnancy.  Ex. 51 ¶ 11.  Her drinks of choice were screwdrivers, vodka mixed with orange juice, but she would consume other liquors as well.   Ex. 51 ¶ 11.  Kim's drinking placed Rob at great risk for Fetal Alcohol Spectrum Disorder (FASD), which at the time of Rob's trial had been already been recognized for over twenty-five years as a major known cause of neurodevelopmental disabilities, and the life-long implications of these disabilities had been known for eight years. Ex. 451.  A photograph

of Rob obtained by undersigned counsel shows that as an infant, Rob had the tell-tale facial characteristics of a child afflicted with FASD.  Ex. 441 at 8.

78.     Prior counsel also failed to discover and develop that fact that Kim smoked heavily – a pack a day – throughout all trimesters of her pregnancy with Rob, see Ex. 51 ¶ 12; Ex. 437 ¶ 15.  The negative neuropsychological effects of prenatal tobacco exposure (PTE) were likewise already well known at the time of counsel's representation of Rob, see, e.g., Marie D. Cornelius et al., Prenatal Tobacco Effects on Neuropsychological Outcomes Among Preadolescents, 22 J. Developmental Behav. 217 (2001) (finding that PTE "was significantly associated with deficits in learning and memory," including "deficits in verbal learning and design memory, . . . slowed responding on a test of eye-hand coordination[, and] a reduced ability for flexible problem solving and more impulsivity").  Furthermore, although in conversations with undersigned counsel Kim denied "abuse" of other drugs during her pregnancy, see Ex. 51 ¶ 3, Kim admitted that Robbin Sr. used drugs during her pregnancy, see Ex. 51 ¶ 3.  She also confirmed that by her early twenties, she was smoking marijuana as well.  Ex. 51 ¶ 26.  Kim's drug use may have begun far earlier:  Ted Jr. recalled having the impression that she used drugs while dating Robbin Sr.  See Ex. 50 ¶ 2.  Studies have long indicated a that prenatal exposure to cannabis can lead to negative neurodevelopmental effects.

79.     Prior counsel also failed to discover and develop the fact that Rob was exposed to anesthetics at least twice during his gestation and birth.  While at the hospital seeking treatment for the ruptured cyst she suffered, Kim was given a local anesthetic before the doctor lanced the cyst to extract what was left of it.  Ex. 51 ¶ 7.  There was no discussion of how the anesthesia may have affected her unborn fetus.  Ex. 51 ¶ 7.  Kim was also given an epidural anesthetic during Rob's delivery.  Ex. 51 ¶ 14.

80.     By the end of her pregnancy, Kim was having severe leg cramps, but did not visit with doctors regularly during her pregnancy, increasing the likelihood of Rob suffering the potential neuropsychological effects of his repeated prenatal exposure to alcohol, tobacco, and other drugs.  Ex. 51 ¶ 13.

81.     Although Kim lived with her mother when Rob was born, she was asked to move out after two months.  Sylvia said she would set a bad example for her siblings because she dropped out of

school and had a child.  Ex. 82 at 3.  Kim got her own apartment and a job waitressing, and in her own estimation, "was on her own for the most part." Ex. 87 at 1.  She was still a teenager and more interested in partying and spending time with friends, and Rob was always in the way of her plans and activities.  Ex. 437 ¶ 19.  When Rob was as young as three or four months old, Kim would frequently leave him in his crib at home without supervision.  Ex. 437 ¶ 19.  Out on the town alone, Kim often lied to Dee and others about Rob's whereabouts, falsely claiming that Rob was with another family member or a friend, when in reality he was home alone.  Ex. 437 ¶ 19.

82.     By the time Rob was five or six months old, Dee learned Kim would lace his milk bottle with whiskey or other hard liquor in an attempt to make Rob sleep quieter and longer while she was out. Ex. 42 at 1; Ex. 437 ¶ 20; Ex. 42 at ¶ 20.  Authorities denied attempts by Dee and Sylvia to gain custody of young Rob after they reported this behavior, and refused to take action against Kim because she never admitted to them what she did and there was no physical evidence of it. Ex. 437 ¶ 20.  As it was, Dee and Sylvia cared for Rob at least half the time Kim was living on her own.  Ex. 437 ¶ 17.  Even when with her son, Kim was not a nurturing mother. Ex. 437 ¶ 17.  Dee never saw Kim breast-feeding Rob, rocking him to sleep, or reading to him. Ex. 437 ¶ 17.  Moments of tenderness were fleeting at best and never sustained.  Ex. 437 ¶ 17.

83.     Rob was a "very hyperactive" and "wild" child who suffered from a short attention span and had trouble keeping still, see, e.g., Ex. 365; Ex. 83 at 2; Ex. 42 at 2; Ex. 47 at 2; Ex. 51 ¶ 57; Ex. 82 at 2; Ex. 48 4, traits consistent with Attention Deficit Hyperactivity Disorder (ADHD), Fetal Alcohol Spectrum Disorder (FASD), and other possible mental afflictions.  Indeed, when Rob was four or five, doctors wanted to put him on medication to address these symptoms, but Kim refused because "she didn't want a zombie for a son." Ex. 365.  But despite the extra care and attention Rob needed, Kim still showed little patience or tolerance with him.   Ex. 437 ¶ 17.

84.     Kim began dating Charles Bakondi ("Chuck") when Rob was about one-and-a-half years old. Ex. 82 at 3. On their first date, Chuck had no idea that Kim had a son as she had never told him.  Ex. 42 at ¶ 2. Upon taking Kim home that night between eleven and midnight, Chuck was surprised and upset to learn not only that Kim had a one-year-old son, but that she had left him home by himself all night while they were on their date. Ex. 42 at ¶2. Kim told Chuck to relax and that it was not a

1  problem and she gave Chuck the impression that she had done it in the past. Ex. 42 ¶ 2.

2  85.      The two continued dating and after a few months, Chuck decided to move Kim and Rob into

3  his apartment. Ex. 42 ¶ 3. In May 1975, when Rob was almost three years old, Kim and Chuck

4  became the parents of Darren Bakondi. Ex. 51 ¶ 16. A few months later, Kim and Chuck married.

5  Ex. 51 ¶ 16. Though he aspired to take care of Rob, see id., he, too, was unable to provide Rob a

6  stable and nurturing household.  Chuck was a "pothead" who smoked marijuana every day, and

7  appeared to have no ambition in life. Ex. 51 ¶ 17.  Both he and Kim had difficulty holding jobs and

8  they were often behind in paying their bills. Ex. 51 ¶ 17.

9  86.      When the bills became too much, Kim and Chuck simply allowed the utilities to be cut off

10  and moved to new places. Ex. 82 at 3. Kim estimated they lived in at least six places in two states

11  during their three-and-a-half years of marriage. Ex. 82 at 3.  During their brief marriage, Chuck had

12  a bird's-eye view of Kim's inability to provide care for her children.  Kim was a poor housekeeper

13  who did not keep the house clean. Ex. 42 ¶ 4.  She was also a terrible cook and her food was so bad

14  that Chuck had to take on the responsibility of cooking for the household. Ex. 42 ¶ 4.

15  87.      Chuck observed that Kim was self-centered, and would put her needs and wants ahead of

16  Rob's. Ex. 42 ¶ 6.  She wouldn't show Rob much love or affection or any sort of attention; Chuck

17  never saw Kim hugging and kissing Rob, or reading to him or tucking him in at night. Ex. 42 ¶ 11.

18  Rob continuously sought his mother's attention; usually unable to do so, he would rebel and

19  misbehave. Ex. 42 ¶ 12. Kim had no patience with Rob, and would frequently yell at Rob over minor

20  things like making noise. Ex. 42  ¶ 5. Rob soon learned that misbehaving was the only way to get his

21  mother's attention, even if it was negative attention.   Ex. 42 ¶ 12. Negative attention, however, was

22  better than no attention at all for Rob. Ex. 42 ¶ 12.

23  88.      Kim herself admitted that she had a bad temper – "a short fuse" – when Rob and Darren were

24  children and would easily become frustrated when they misbehaved. Ex. 51 ¶ 29.  Her frustration

25  would manifest itself both verbally and physically. Ex. 51 ¶ 30; see also Ex. 437 ¶ 17 (recalling that

26  Kim was "usually angry at Rob for one thing or another," and would frequently yell at him and spank

27  him). Kim recalled that if her boys were slow to fall asleep, she would storm into their room, grabbing

28  and tossing them onto their beds and demanding that they go to sleep. Ex. 51 ¶ 30.  Kim's physical

abuse of Rob left a lasting impression on him; as Kim explained in 2002, "'Even today, if I raise my hand for anything, [Rob] will flinch, and it just tears me up inside.'" Ex. 83 at 2.

89.     Chuck recalled an incident where Darren – only three years old – accidentally spilled his milk while the family was at the local bowling alley where Chuck was working. Ex. 42 ¶ 29.  In response, Kim slapped Darren hard on his face. Ex. 42 ¶ 29.  Darren began crying as Rob looked on with a look of horror on his face. Ex. 42 ¶ 29.  Chuck and Kim divorced shortly after this incident. Ex. 42 ¶ 29.  Because neither Kim nor Chuck were in a position to support two children on their own, Darren was sent to live with his father while Rob remained with his mother.  Ex. 51 ¶ 20;  Ex. 42 ¶ 30.

90.     This split did nothing to better Rob's care.  During the divorce proceedings, Kim moved in with another man. Ex. 42 ¶ 33.  Her live-in boyfriend would physically abuse both Rob and (when he would come to visit his mother) Darren. Ex. 42 ¶ 33.  Chuck once found Darren's back and legs covered with black and blue bruises and belt marks. Ex. 42 ¶ 39.  Rob – only seven years old – would try to protect and defend his younger brother, but he was helpless against a full-grown man.  Ex. 42 ¶ 39; see also Ex. 89 at 2 (Darren reporting that his mother's boyfriend "smack[ed] him around"). Kim, on the other hand, did nothing to stop the abuse. Ex. 42 ¶ 39.  At least some of this abuse was reported to authorities:  Rob's juvenile records refer to a police report of child abuse from October 1979, while Rob was still in his mother's care, naming Darren as the victim.  Ex. 436.  Darren was not the only one to be abused by Kim's various paramours and roommates, however, Rob was also abused.  Rob told authorities that one of Kim's male roommates "frequently struck and knocked [McConnell] down," and that her ex-husband often disciplined Rob by pouring cayenne pepper down his throat. Ex. 10.

91.     By this point, in her early twenties, Kim had already begun her descent into alcoholism and drug abuse and was often completely absent from Rob's life. Ex. 437 ¶¶ 15, 45, 47-48; Ex. 51 ¶ 26; Ex. 84 at 2; Ex. 52 ¶ ¶ 34, 36.  Rob, still a boy of less than eight, often found himself locked out of the house alone after school and late at night. Ex. 52 ¶ 40; Ex. 93.  Many mornings, Rob would have to prepare himself for school alone, picking from among his unwashed clothes the cleanest of the dirty underwear.  Ex. 93.

92.     Around this time, Rob's Aunt Dee – on whom Rob had often relied for surrogate care –

1   moved to Florida and became unable to perform any supervision in lieu of her sister. Ex. 437 ¶ 23.

2   Within a week of moving to Florida, Dee received her first call from Rob complaining about being

3   locked out of the house upon returning from school.

> 4   Rob called from a neighbor's house and the neighbor told me that this was going on every day. Rob was crying and begging me to come get him and he couldn't
> 5   understand why I was not able to.  Rob had no understanding of distances and that Florida was too far away for me to drive to the neighbor's house to pick him up.  I told
> 6   Rob to call his former step-dad, Chuck Bakondi, to see if he could pick him up. Chuck ended up coming over to the neighbors house to retrieve Rob that evening.

7

8   Ex. 437 ¶ 23.  Chuck recalled receiving four or five of these calls from Rob, always around ten or

9   eleven at night, after Rob had spent several hours at neighbors' homes waiting for Kim to return. Ex.

10   42 Decl. ¶ 40.  Chuck would then retrieve Rob.  Ex. 42 ¶ 40.

11   93.     As a result of this unstable, abusive, and neglectful environment, Rob suffered problems in

12   school.  His mother explained that Rob had problems with other children because the family moved

13   often (nine times from the time Rob was three until he was seven), and "[h]e didn't want to get to

14   know other children that well because he would be moving." Ex. 11 at 3.  Rob was described as "an

15   impulsive and emotionally disturbed child whose poor judgment and ability to control himself might

16   well lead to his being injured or otherwise endangered when left without appropriate supervision."

17   Ex. 10 at 5-6.  He was further described as a "serious behavioral problem, disruptive, unable to finish

18   tasks, aggressive and assaultive" at school. Ex. 10 at 2-3.  Even Rob's mother admitted that he was

19   "an emotionally disturbed, angry, impulsive child who has had to make many adjustments and who

20   has experienced many losses in his short life."  Ex. 10 at 4.

21                  **4.      Rob from Ages Eight to Ten: A Ward of the State**

22   94.     On April 17, 1980, Rob was yet again locked out of his mother's house. Ex. 42 ¶ 41; Ex. 270.

23   This time, instead of retrieving Rob, Chuck told Rob to break a window, go inside, and call the

24   police.  Ex. 42 ¶ 41.  Rob followed Chuck's instructions and a short time later, Chuck received a call

25   from the police officer who had responded to the scene. Ex. 42 ¶ 41.  At first, the officer seemed

26   willing to release Rob to Chuck's care but changed his mind in the course of the conversation,

27   deciding that he wanted to speak personally with Rob's mother. Ex. 42 ¶ 41; Ex. 90.

28   95.     Officers waited for a while with Rob at his home for his mother to arrive. Ex. 42 ¶ 41.  When

Kim failed to arrive, the police took Rob with them to the station, leaving a note on Kim's door explaining where Rob was and how she could retrieve him. Ex. 437 ¶ 24. Kim, however, failed to contact the police that night (or, for that matter, on any of the following three or four days). Ex. 437 ¶¶ 24-25; see also Ex. 85 at 2 (reporting that "Kim came home, found the note, but was tired so she went to bed." Dee says she didn't even show up for court.). Kim's selfish lapse caused Rob's transfer to the juvenile system as the police officers had no choice other than to contact child protective services. Ex. 437 ¶ 24.

96.     The next day, Chuck called the police to inquire about Rob's whereabouts and learned that Rob had been taken to juvenile hall, even though Rob had done nothing wrong. Ex. 42 ¶ 41. Chuck immediately went to visit with Rob to check on his well-being. Ex. 42 ¶ 41. He was Rob's first visitor; his mother would not come visit him for several more days. Ex. 42 ¶ 41. Authorities refused to release Rob to Chuck's care because he was not his legal guardian. Ex. 42 ¶ 41. Chuck was not allowed to visit Rob again, and ultimately lost all contact with Rob for the next two years he spent in the juvenile system because Kim refused to give him permission to contact Rob or know of his whereabouts. Ex. 42 ¶ 41.

97.     Kim's first visit with Rob came three or four days after he was taken. Ex. 437 ¶ 25. When her sister Dee asked about this delay, Kim's excuse was that she had a large banquet to waitress on her job and she also had to play in an important bowling tournament, and she had no child care arrangements. Ex. 437 ¶ 25. By that point, Rob had been transferred to the Albert Sitton Home, a grossly overcrowded county-operated home for neglected and abused children. Ex. 450 at 1; Ex. 94; Ex. 453. A psychiatric evaluation prepared while Rob was living in the home stressed the need to return Rob to his mother's care as soon as practicable:

> A prolonged period of placement for this boy, either at Albert Sitton home or at Father Peter's Group Home, would be construed as detrimental to the boy's emotional health as it would heighten feelings of rejection and deepen existing depression. It is recommended that the Department of Social Services aid the mother as much as possible in acquiring full-time employment, gaining adequate supervision for this boy and involving herself in therapy to deal with her own needs and her own ability to deal with her son. . . .

Ex, 443 at 6-7. The psychologist concluded that Rob's mother's "ability to provide for Bobby's nurturant needs has been somewhat limited" due to her "very ambivalant feelings about Bobby since

40

his birth." Ex. 11 at 6.  Rob did not take well to group living and longed to return home to his mother, complaining that he did not get to see her as often as he would like. Ex. 11 at 5.

98.      Rather than make an effort to regain custody of her son, Kim in effect abandoned him to the state juvenile system.  On May 12, 1980, the Department of Social Services set forth a detailed case plan designed to effectuate Rob's earliest possible return to his mother's care. Ex, 443 at 6-7; see also Ex. 437 ¶ 26.  This plan required Kim to attend counseling and/or therapy sessions that would teach her child management and parenting skills. Ex 443 at 6-7; Ex. 437 ¶ 26.  A subsequent report dated May 25, 1982 – over two years after the case plan was implemented – revealed that Kim had not yet initiated, much less completed, the required counseling. Ex, 100 at 4.

99.      Kim also failed to appear at a number of scheduled juvenile court hearings over that year. See Exs 454, 456, 255, 455, 457;  see also Ex. 399 ("'From what I was told by everybody, they never met a woman who had more flat tires.'"); Ex. 85 at 2 (Dee reporting that Kim skipped court hearings). Kim's failure to take any steps to regain custody of her son was not accident or oversight – Kim had in fact determined to leave him in institutional care. As she explained,

> I wasn't ready for the responsibilities of being a single mother and I didn't believe that my lifestyle was conducive to raising a child.  I enjoyed partying, going out to bars, and dating more than being a mom.  It broke my heart that Rob was not there with me, but I knew that I didn't have the proper mind-set to care for Rob in the way he needed. I thought Rob was better off being in the system because at least he'd have three square meals, a safe place to sleep and responsible caretakers.  I believed that life in the system for Rob was a better alternative than staying with me, at that time.

Ex. 51 ¶ 36.  As a result, Rob spent over two years – from April 17, 1980 to September 1, 1982, when he was sent to live with his father in Texas – in state-run group facilities. Ex. 269.  Kim hardly visited Rob during those years; indeed, his aunt Dee visited Rob more often than his mother, even though Dee lived across the country. Ex. 437 ¶ 28.

100.     Rob's earliest psychological evaluation, dated June 17, 1980, when he was still just seven years old, paints a grim picture of his mental and psychological health:

> [Rob] is quite depressed and anxious. There is evidence of suicidal ideation stemming from feelings of rejection and abandonment.  He feels somewhat helpless and tends to turn anger toward himself.  He uses magical thinking and feelings of omnipotence to deal with feelings.  He tends to feel that he has little control over what happens to him.  There is some evidence that he is somewhat presudomature and prematurely independent, deriving from his own dependency needs. . . .  He tends to discharge the

1             tension from his being depressed through being agitated and acting impulsively.  He
has strong needs to be liked and accepted.

2

3  Ex. 82.  Rob also exhibited feelings of rejection and depression after being taken from his mother.

4  Staff at the Albert Sitton Home described Rob as an

5             insecure, impulsive child who is in almost constant conflict and physical altercation
with his peers.  He is characterized as "tense" and needy and requiring much one-to-

6             one attention.  He has frequently had to be removed from the . . . classroom because
of his lack of self-control and abuse of other children. . . .  The minor is seen as a very

7             angry child who requires special attention due to his aggressive and disruptive impact.

8  Ex. 450 at 1. Elsewhere the report described Rob as "emotionally disturbed," "unmanageable," and

9  exhibiting "sociopathic tendencies." Ex. 450.  He was suspended from school almost daily.  Ex. 91

10  On the other hand, staffers described Rob as "a very bright youngster with good academic potential."

11  Ex. 450 at 1.

12  101.    Rob's behavioral problems at Albert Sitton mirrored those exhibited in earlier schooling,

13  where teachers found him to be a serious behavioral problem, disruptive, unable to finish tasks,

14  aggressive and assaultive.  Rob would lie with no remorse even when caught red-handed.  Ex. 90 at

15  2.  Again Rob was characterized as bright but emotionally disturbed.  Psychological evaluation at the

16  school and referral for special classes was under consideration but not yet instituted when Rob was

17  detained. Ex. 90 at 2 ; see also 82 at 3 (Rob's mother reporting that Rob "had a hard time getting

18  along with other children, fighting" at school).

19  102.    On June 30, 1980, Rob was moved from Albert Sitton and placed at Father Peter's Group

20  Home, where he remained for an additional two years.  Ex. 97.  During this time, aunt Dee reports

21  that Rob  molested on at least two occasions between the ages of eight and ten. Ex. 437 ¶ 39.

22  Rob was sexually abused by a staff member at the Father Peter's Community School, where he was

23  placed after being removed from his mother's care in 1980.  Ex. 437 ¶ 39.  So embarrassed and

24  ashamed by what took place, he told no one about this experience until his early twenties, when he

25  confided in his Aunt Dee.  Ex. 437 ¶ 39.  Rob also reported that he was sexually abused at a foster

26  home that he was placed in during the same time period.  Ex. 437 ¶ 40.  Rob's abuser in this instance

27  was either the father of the family or an older male child who was in the household.  Ex. 437  ¶ 40.

28  Again, Rob was so traumatized by this experience that he could not mention it until years later, again

1   to his Aunt Dee.  Ex. 437  ¶ 40.   In his early twenties, Rob also reportedly confided to his friend

2   Athena Lindsay-Monroy that he had been sexually abused as a boy. Ex. 45 ¶ 14.

3                       **5.      Rob from Ages Ten to Fifteen: Traumatic Verbal, Physical**
                                **and Psychological Abuse at the Hands of His Father and**
4                               **Siblings**

5   103.    In 1982, when Rob was ten, he was placed in his father's custody. Ex. 51 ¶ 37; Ex. 437 ¶ 29.

6   Robbin Sr. had served three and a half years in prison after his conviction for armed robbery in

7   Oklahoma.  Ex. 50 ¶ 75.  Before  his release, he met Donna Hensler as a penpal and visitor.  Upon

8   his release, he moved in with her and her young son, Vince.   Ex. 50 ¶ 75. They married soon

9   afterwards – in June 1975 – and had three children together,  Dawn, Robbin, Jr., and Crystal.   Ex.

10  50 ¶ 75; Ex. 47 ¶ 4. When he moved in with his father's family, Rob had seen his father only once

11  or twice in his life.  Ex. 85 at 1.

12  104.    Years of neglect had failed to teach Rob even the most basic skills.  His half-sister Dawn

13  recalled his poor hygiene habits when he first arrived to live with his father: "Rob didn't bathe every

14  day, he didn't brush his teeth every morning, he didn't know how to comb or brush his hair, and he

15  sometimes wore the same underwear for several days without washing them." Ex. 46 ¶ 10.  His half-

16  brother Robbin Jr. provided a similar account:

17
            Rob had exceptionally poor hygiene when he came to live with us. [He] came to the
18          house with one pair of underwear and wore them every[ ]day.  Rob's hair was not
            well-groomed and he did not know how to comb or brush it.  Rob had long nails with
19          lots of dirt underneath them, and he did not know how to cut them.  It appeared that
            no one had taught Rob how to take care of himself and he was learning proper hygiene
20          for the first time in his life.

21  Ex. 48 ¶ 13; see also Ex. 92 at 1 (step-mother Donna reporting that the family had to teach him how

22  to comb his hair, bathe, and brush his teeth).  When he first joined his father's family, Rob would

23  gorge at meals, eating large amounts of food in a sloppy manner. Ex. 48 ¶ 12.  To his step-brother

24  Robbin Jr., "[i]t seemed like Rob wasn't being fed properly where[]ever he was before coming to our

25  house."  Ex. 48 ¶ 12.

26  105.    Rob also already bore the psychological scars of years of neglect and abuse, which manifested

27  themselves in sleep abnormalities while living with his biological father.  Whereas Rob had once had

28  little difficulty sleeping through the night, see Ex. 51 ¶ 57, in his father's care he was a restless sleeper

who talked in his sleep and experienced frequent nightmares, at least two or three a week, see Ex. 48 ¶ 8.  Rob would wake from these nightmares yelling, screaming, crying, sweating, and hyperventilating, loud enough to wake his parents and bring his father running.  Ex. 48 ¶ 8.  His brothers sleeping in the same room did not suffer from nightmares and otherwise slept peacefully. Ex. 48 ¶ 8.

106.   Rob also continued to exhibit hyperactivity, "always moving around, fidgeting, picking things up, opening and closing things and taking things apart for no particular reason" and generally having a hard time keeping still.  Ex. 48 ¶ 4.  Unused to any sort of discipline from years spent in his neglectful mother's care, Rob appeared incorrigible, because he could not follow the rules of the house no matter how much he was spoken to or punished.  Ex. 48 ¶ 3.  At school, he had difficulty concentrating and his grades were generally mediocre or worse, despite testing indicating that he was quite intelligent. Ex. 48 ¶ 6; Ex. 148. Rob's mind always appeared to be somewhere else – his half-brother Robbin Jr. recalling seeing

> Rob sitting by himself and staring off to the distance, as if he were in a daze.  I often had to call Rob's name a few times before Rob snapped out of his trances and came back to reality.  These episodes occurred while Rob was at home, in school,  in cars, and almost anywhere that he went.  When Rob played the outfield position, in little league baseball games, he sometime missed balls that came straight to him because he was spacing out and staring in the sky for extended periods of times. . . .

Ex. 48 ¶ 7.  Rob would frequently lose items of clothing, and walk home without his shoes and jacket on many occasions, even during the cold winter months. Ex. 48 ¶ 5.

107.   This fragile young boy was dropped into a hyper-macho, hyper-violent environment for which he was particularly ill-suited.  Unlike his father and male siblings, Rob was not interested in sports, preferring movies, art and books. Ex. 84 at 5. His Uncle Ted recalled that "when Rob first came to live with his father he was introspective and didn't know what to expect.  'He was a nice, quiet, gentle kid.  He liked movies and books. . . . . He came to my house and we talked about poetry, writing, world  events."  Ex. 84 at 3; see also Ex. 50 ¶ 91.

108.   Like his father before him, see Ex. 50 ¶¶ 29-30; Ex. 54 Decl. ¶ 7, Robbin Sr. physically abused his wife Donna, including in front of Rob and his siblings, see Ex. 48 ¶ 29; Ex. 50 ¶ 79; Ex. 430 at 2-3 (reporting that Robbin Sr. beat Donna "to the point of allegedly causing several miscarriages").

44

He also threatened to kill her "all the time."  Ex. 92 at 2.  One relative described Robbin Sr. as "a terrible husband" – "'All of the things you hate in a man, the cheating; the lying; the sneakiness; the spending money; watching and looking at other women; the dirty movies; the sexual innuendo, Robbin was all those things put into one person.'" Ex. 84 at 6; <u>see also</u> Ex. 92 at 3 (noting Robbin Sr.'s unfaithfulness during his marriage to Donna).

109.    Robbin Sr. physically abused all of his children, beating the boys, including Rob, with not only his fists but with whatever implements he could get his hands on, including belts, belt buckles, sticks, wooden boards, and furniture.  Ex. 48 ¶ 20.  On one occasion, for example, he picked up a chair and slammed it against Robbin Jr.'s back.   Ex. 48 ¶ 20.  Rob and his two half-brothers, Vince and Robbin Jr., each received a variety of cuts and bruises from their father's beatings, including on their heads. Ex. 48 ¶ 21.  None were ever taken for treatment – instead, Robbin Sr. would dress the wounds with store-bought antiseptics and butterfly bandages. Ex. 48 ¶ 28.  The girls were spared the most brutal attacks, but would also get beaten with fists and belts. Ex. 48 ¶ 20. Looking back, Robbin Jr. believes that his father's beatings were excessive and by today's standards and could be considered child abuse.  Ex. 48 ¶ 20.

110.    Robbin Sr. ran his household the complete opposite of Rob's experience with Kim.  Robbin Sr.  was a strict disciplinarian who required beds to made in the military fashion, "with the four corners tucked tight enough to make a quarter bounce up off the center," and all clothes to be neatly folded and stacked in drawers. Ex. 48 ¶¶ 17-18.  Robbin Sr. suffered rages so sudden and violent that the family was forced to walk on eggshells.  Dawn provided one account:

> You ha[d] to do thing[s] his way, or believe me, it was total hell for all of us.  If there wasn't any milk for him to drink for supper or for breakfast, he'd throw a fit.  Things would go flying.  He would sit at the supper table, and if the butter was hard, and he couldn't spread [it on] his bread, the table would go.  There were times we would be so nervous when he came through the door.

Ex. 92 at 2.

111.    At the time of trial, Donna reported that her children remained afraid of Robbin Sr. Ex. 92 at 3.  Her two daughters, Dawn and Crystal, broke off contact with their father and remained estranged from him for many years, until Robbin Sr. developed a possibly terminal illness in the early 2000s.  Ex. 92 at 3. Thirteen years after her divorce from Robbin Sr., Donna remained petrified of him:

1        I'm getting nervous talking about all this stuff.  If I had to sit in court and talk about him, you see, I would be afraid to death, that he would kill me when I walked out of there.  That's how afraid I still am about this man.  He came and put a knife to my neck . . . .  I still have that fear.  I really do.  Because he has choked me and pushed me and threatened me to the point of, that I am still afraid of him.

4   Ex. 92 at 3 (alterations in original omitted).

5   112.     Robbin Sr. hated that Rob showed little interest in sports and preferred reading and the arts.

6   Ex. 84 at 5.  Within weeks of Rob moving in with his father's family, Robbin Sr. confided in Art

7   Leddon, Sr., Rob's step-uncle-in-law, that he "was going to break Rob and make a man out of him."

8   Ex. 54 ¶ 14.  Robbin Sr.'s attempt to recreate Rob in his image consisted of verbal humiliation,

9   physical abuse, and other forms of psychological and emotional abuse. Robbin Sr. was "constantly

10   verbally abusive" of Rob, and this abuse focused on what Robbin Sr. perceived as Rob's less

11   masculine qualities.  Ex. 92 at 2. Robbin Sr. would refer to Rob as a "sissy," "punk," "pussy," "little

12   pussy," "wimp," "queer," and "faggot" in front of family and strangers, ask Rob if he was gay, or tell

13   Rob he needed to put on his make-up since he wanted to be a girl.  Ex. 54 ¶ 13, 21; Ex. 48 ¶ 26; Ex.

14   47 ¶ 6; Ex. 50 ¶ 94; Ex. 92 at 2.  His siblings followed their father's lead, calling Rob many of the

15   same names.  Ex. 54 ¶ 22.

16   113.     Both Robbin Sr. and Rob's siblings would make embarrassing gestures toward Rob, like

17   blowing kisses at him, that questioned and insulted his manhood.  Ex. 54 ¶ 22; Ex. 48 ¶ 26.  If girls

18   who were interested in Rob visited the house, Robbin Sr. would call Rob any number of these

19   emasculating names and then chase the girls away, telling Rob "he needed to act like a man if he

20   wanted to have any girlfriends."  Ex. 54 ¶ 21.  Perhaps not surprisingly given his father effort's to

21   drive away potential suitors, Rob had no girlfriends during the years he lived with his father. Ex. 54

22   ¶ 21.  Rob's step-brother Vince, on the other hand, was allowed to date and his girlfriends freely

23   visited him in the family home.  Ex. 54 ¶ 21.

24   114.     Though he beat all of his children, Robbin Sr. beat Rob most of all.  See, e.g., Ex. 48 ¶ 19

25   ("Rob received the most beatings out of everyone in the house."); Ex. 50 ¶ 94 (Robbin picked on

26   andbeat Rob more than any of the other children in the house."); Ex. 84 at ("If [Robbin Sr.] beat the

27   kids three times, he beat [Rob] six times.").  Renee McConnell, the wife of Rob's paternal uncle Ted,

28   described one beating:

On one occasion when Rob was about 11 or 12, Robbin beat him the face with a belt buckle. [Vince] ran to her house to tell them to come over because Robbin was going to kill Rob. They had to pretend they were stopping by or he would have beat [Vince] too. Robbin was still beating Rob when they pulled in. He stopped the beating and went in other room, and Ted and Renee and took Rob home with them. He stayed with them about a week while the bruises healed and didn't go to school. Renee says at that point they should have reported Robbin, but they were afraid of him too. They wanted to take Rob and adopt him. She says they had a heated debate about whether they should call the police. But they knew if they did, they would have to pack up and leave town. They didn't have the money at the time to move.

"He had already said he would kill us. We were on the outs. There was a big blowup about some of the stuff he had done. He said if we said anything to his wife about any of this stuff, he would kill all of us – me, Ted, the kids, everybody. He would come to our house and kill us. That's what he said. . . . A whole bunch of stuff came out, and Robbin was mad at Ted because he told me all of this stuff. I really, truly believe he would have at that point. If he thought you were going to take his kid away, he would kill you."

Ex. 84 at 2; see also Ex. 50 ¶¶ 60-61.

115.   Robbin Sr. would stand Rob against a wall and hurl balls directly at him and Rob would either have to catch the balls or get injured if he missed them. Ex. 54 ¶ 15. Robbin Sr. would also order his step-son Vince to fight Rob in boxing and wrestling matches he set up in the family's backyard, even though Vince was older, stronger, and a much better athlete. Ex. 54 ¶ 16; see also Ex. 414 at 1 (describing backyard wrestling matches organized by Robbin Sr.). Rob would always lose these fights against Vince and would sometimes suffer injuries from them. Ex. 54 ¶ 16; Ex. 48 ¶ 22. 116.

Robbin Sr. would videotape some of these fights; Robbin Jr. recalled one video he watched only two years ago where Vince was beating Rob badly and then lifted Rob over his head and body-slamming him to the ground. Ex. 48 ¶ 23. Rob was also made to fight other relatives and kids in the neighborhood during these matches, but he was never allowed to fight anyone he had a chance of beating. Ex. 54 ¶ 18; see also Ex. 48 ¶ 28.

117.   On other occasions, Robbin Sr. ordered Vince to hold Rob so that their other younger siblings could punch Rob with impunity. Ex. 54 ¶ 17. If Rob ever tried to hit back, Robbin Sr. would order Vince to beat Rob himself. Ex. 54 ¶ 17; see also Ex. 84 at 3. Robbin Sr. would often unfavorably compare Rob to Vince, a star athlete, asking Rob why he couldn't be more like Vince. Ex. 48 ¶ 26. Even when not prodded by their father, Rob's siblings would pick on him and fight him, as would other kids at school, in the neighborhood, and Vince's friends. Ex. 46 ¶ 7; Ex. 48 ¶ 9. His siblings

1   recalled that during this time Rob was a loner with few friends.  Ex. 46 ¶ 7; Ex. 48 Decl. ¶ 11.

2   118.    In addition to the extraordinary physical abuse suffered by Rob at the hands of his biological

3   father, Rob suffered psychological abuse and humiliation unlike anything experienced by any of his

4   siblings.  Robbin Sr. forced Rob to wear women's dresses around the house as punishment, telling

5   him that "if he wanted to act like a girl, then he should dress like one as well."  Ex. 54 ¶ 19; see also

6   Ex. 58 ¶ 25 (recalling one occasion that Rob was made to wear a skirt that ran from his waist to below

7   his knees as punishment for not cutting his fingernails).  If Rob wanted to go outside, he was forced

8   to wear the dress, in front of the neighbors and his peers.  Ex. 54 ¶ 19.  Robbin Sr. also forced Rob

9   to wear colored nail polish on his fingers, as punishment for "not acting more like a man."  Ex. 54

10  ¶ 20; see also Ex. 48 ¶ 25 (recalling one occasion that Robbin Sr. made Rob put on fingernail polish).

11  Again, Rob was forced to keep wearing the nail polish if he wanted to go outside.  Ex. 54 ¶ 20.  On

12  other occasions, as punishment for not changing his underwear every day, Robbin Sr. forced Rob to

13  wear his dirty underwear over his head all day, from morning to night.  Ex. 48 ¶ 28; Ex. 46 ¶ 10.

14  Again, if Rob wanted to play outside, he would be required to keep the dirty drawers on his head.  Ex.

15  48 ¶ 28; Ex. 46 ¶ 10.

16  119.    Robbin Sr.'s emotional abuse of Rob took other forms as well.  When the family took

17  vacations, Rob was omitted from many of the family photos.  Ex. 50 ¶ 95.  Other times, when Rob

18  was allowed in the photos, he was made to stand on the side with his back turned toward the camera.

19  Ex. 50 ¶ 95; see also Ex. 84 at 3 (Rob's paternal uncle Ted recalling  Robbin Sr. showing him pictures

20  from a family vacation and laughing because in every picture "Rob was standing alone in a corner").

21  None of Rob's siblings received this form of punishment.  Ex. 50 ¶ 95.  On a family trip to Graceland,

22  Robbin Sr. made Rob wait outside, unattended, while everyone else in the family toured the facility.

23  Ex. 50 ¶ 96.  While Rob's siblings were treated with ice cream, Rob was sometimes given water

24  instead, and he was put on bread-and-water diets for punishment, forced to eat this "meal" for

25  breakfast, lunch, and dinner while everyone else in the house ate delicious full meals in front of him.

26  Ex. 50 ¶ 97; see also Ex. 84 at 3.

27  120.    When Rob first came to live with his father's family, he was well-mannered kid who happened

28  not to share his father's interest in sports but preferred other activities, like reading and watching

1   movies.  Ex. 54 ¶ 13; Ex. 48 ¶ 26.  Robbin Sr. found Rob's interests to be unacceptable, and became

2   obsessed with Rob's masculinity and in "making a man out of him."  Ex. 54 ¶¶ 13-14.

3   121.    In the midst of this abuse, Rob received no support from his mother Kim, who has no memory

4   of communicating with Rob in the five years he lived with his biological father – no letters, no phone

5   calls, and no visits.  Ex. 51 ¶ 38; Ex. 87 at 2; see also Ex. 106 at 1 (step-mother Donna recalling only

6   one time Rob's mother contacted him in the five years he lived with his biological father).  During

7   this time, the only contact Rob had with his maternal family was through his Aunt Dee, who would

8   call him on the phone and send him letters and cards, although Dee's contacts were limited by her

9   tending to her own family's needs. Ex. 51 ¶ 38; Ex. 437 ¶ 30.

10

11

### 6.   Rob's Responses to the Verbal, Physical and Psychological Abuses

12   122.    In response to the abuse visited upon him, Rob would isolate himself for long periods of time

13   by going to a room and sitting by himself for extended periods of time.  Ex. 48 ¶ 30.  Sometimes

14   during these episodes he sat quietly and did nothing; other times he would cry for long time.  Ex. 48

15   ¶ 30. Rob would also try to hurt himself.  His half-brother Robbin Jr. explained:

16
17   Rob often sat with his back against the wall and repeatedly hit the back of his head into the wall for extended periods of time.  When Rob did this, he often had a blank look on his face.  When our father caught Rob doing this, he would beat Rob again and then order him to stop.

18
19
20   On other occasions, Rob went into a separate room and tried to hurt himself in other ways.  I recalled seeing Rob, on a few occasions, pick up an e[r]aser and begin rubbing it furiously against his skin to cause it to burn and come off at times.  At times Rob had many burns and marks left on his arms and legs afterwards.

21   Ex. 48 ¶¶ 32-33.  On yet other occasions, Rob would angrily punch doors and walls once out of his

22   father's sight, sometimes hurting his hands.  Ex. 48 ¶ 31.  Contemporaneous records note a

23   counselor's estimation that Rob appeared to be "repressing a great deal of anger" when discussing

24   his experiences at his father's home.   Ex. 430 at 3.

25   123.    The combined psychological effect of his father's abuse was apparent to several family

26   members.  Art Leddon Sr., Rob's paternal step-uncle, recalled that

27
28   [a]s a result of the way that he was treated, Rob seemed to have developed a low self-esteem and poor self-image.  Rob often took the blame for things that he didn't do for no reason.  It seemed like Rob believed that he was no good and that he was

49

going to blamed for something regardless of the circumstances.  Rob seemed like he was a defeated person.

Ex. 54 ¶ 24; see also Ex. 92 at 2 (noting his step-mother's recollection that Rob became more introverted as he grew older).

124.   Rob repeatedly looked to escape from his father's home, either by running away from home, see Ex. 54 ¶ 26, or spending time with more caring family members who attempted to nurture his interests and neither belittled him nor abused him, see Ex. 54 ¶ 25; Ex. 50 ¶¶ 47, 93.

125.   Rob spoke frequently of leaving his father's care and returning to his mother's home, see Ex. 48 ¶ 34; Ex. 92 at 4; and actually attempted to run away from his father's home on at least five occasions:

- October 30, 1986: Rob ran away from home and was apprehended the next day when he asked a highway construction worker for a ride to the airport.  He was released with a warning.  Ex. 107.

- February 2, 1987:  Rob was referred to juvenile services for criminal trespass after running away from home a second time and seeking shelter in a theater.  Authorities suggested counseling, but the family had not responded to any of the suggested programs and the file was closed.  The counselor noted, "Anticipate future referrals." Ex. 108; Ex. 109.

- March 23, 1987: Again referred on runaway charges, Rob reported to the authorities that his father was beating him regularly for minor infractions and using humiliation as a form of punishment.  The family was referred for counseling, which they stopped attending after only three sessions.  Ex. 108; Ex. 111.

- May 27, 1987:  Rob was arrested in Alice, Texas, on runaway  charges, and transported to a shelter for runaways and then to juvenile hall.  Ex. 108; Ex. 111; Ex. 113; Ex. 114. His father returned to the runaway shelter with Rob the following day, where he remained for a few days before again being released to his father.  Upon closing the file the following month, the counselor presciently noted that Rob's problems "are related to his abandonment by the mother and his continued 'search'

1    of [sic] her." Ex. 111 at 3.

2    126.    Rob's half-brother Robbin Jr. recalled another undocumented runaway attempt while the

3    family was living in Corpus Christi, Texas. Ex. 48 ¶ 34.  Several hours later after he was first noticed

4    missing, Rob was brought home by police officers who had spotted him walking the streets alone.

5    Ex. 48 ¶ 34. Rob told the officers, and the family, that he was on his way back to California to live

6    with his mom.  Ex. 48 ¶ 34; see also Ex. 54 ¶ 26; Ex. 92 at 4 (step-mother Donna recalling that ran

7    away several times while the family lived in Texas); Ex. 430 at 3 (Rob claiming that the had run away

8    from his father's home on at least seven occasions).

9                    **7.    Rob at Fifteen: Back with His Mother**

10   127.    On the day he fled his father's care, Rob was beaten by his father with a wooden board that

11   struck his forehead, causing his head to bleed profusely. Ex. 48 ¶ 21.  Robbin Sr. dressed the wound

12   with a bandage, but did not seek medical treatment for his son. Ex. 48 ¶¶ 21, 35.

13   128.    Rob's mother Kim noticed a marked change in Rob's sleeping patterns upon returning from

14   his father's custody.  As a young boy still in his mother's care, Rob was hyperactive and on some

15   occasions would be slow to settle down at bedtime. Ex. 51 ¶ 57. Once he settled down, however, Rob

16   had no problems falling asleep, and would sleep through the night without complaints of nightmares

17   or other sleep disruptions. Ex. 51 ¶ 57.  By fifteen, however, Rob had become more restless and had

18   increasing difficulty falling asleep, and would often wake up in the middle of the night.  Ex. 51 ¶ 58.

19   He would hang out in the street until late at night, and stayed up until the early morning hours while

20   inside the house, seeming to his mother as if he did not want to sleep.  Ex. 51 ¶ 58.

21   129.    Both his mother Kim and her husband, Roger Sauln, recalled that Rob had become very

22   particular and detail-oriented about his appearance, more so than the average teenager. Ex. 51 ¶ 44.

23   He kept his hair cut and manicured perfectly, and spent a lot of time in front of the mirror brushing

24   his hair.  Ex. 51 ¶ 45.  He kept himself clean and his clothes were always ironed and neat in

25   appearance. Ex. 51 ¶ 47.  After showering, he would always fold the towel and hang it on the rack

26   the same way. Ex. 46 ¶ 46.  While eating, he would constantly brush crumbs away from himself.

27   When he took his food out of its wrapping, he would carefully fold the wrapping and place them on

28   the side of his place setting. Ex. 51 ¶ 48.  He did the same thing with napkins after he used them.

1  Ex. 51 ¶ 48.

2  130.    Rob did not last long at his mother's home before engaging in petty offenses and ultimately

3  being sent to the California Youth Authority.  His step-father Roger Sauln wanted Rob out of the

4  house if Rob continued to misbehave.  Ex. 430 at 2.  Kim "admitted to feeling depressed, as she

5  wanted to please Roger but not hurt her son."  Ex. 430 at 2.  Rob believed that during arguments Kim

6  would always side with Roger over him, which he perceived as a continuation of her life-long habit

7  of putting the men in her life ahead of him.  Ex. 52 ¶ 46; Ex. 432 at 2.  When Rob misbehaved, it was

8  Kim would call the police, paving the way for Rob to be sent to juvenile hall and ultimately the

9  California Youth Authority.  Ex. 52 ¶ 46.

10                        **8.        Rob's Experience at the California Youth Authority**

11  131.    Shortly before being transported from juvenile hall to California Youth Authority, Rob met

12  Stahn Muller.  Ex. 52 ¶ 2.  Both were fifteen years old.  Ex. 52 ¶ 2.  Stahn described Rob as

13
14              an emotionally pained person.  Rob was in a constant state of extreme anger and
               expressed a lot of animosity towards both of his parents.  Rob described his mother
15             as being an alcoholic and incompetent.  Rob said that his mother neglected and
               abandoned him when he was a young child.  Rob also blamed his mother for not
16             protecting him from his father, who used to beat him unmercifully.  Rob told me about
               his experiences of being beaten and abused by his father when he lived with his
17             father's family in Texas and Pennsylvania. Rob also talked about his feelings of being
               singled out and treated worse than everyone in his father's family.  Rob felt like both
18             of his parents did not care about him, and he blamed them both for his life's
               circumstances.  While Rob was very angry with both of his parents, he always seemed
19             to harbor more animosity towards his mother.  Although Rob always spoke negatively
               of his mother, he never allowed anyone else around him to say anything bad about her,
20             even if the other person was saying the exact things that Rob did.  I always found this
               to be strange . . . .

21  Ex. 52 ¶ 3.  It was clear to Stahn that Rob had emotional and psychological problems requiring

22  counseling, but no such services were made available to him in CYA.  Ex. 52 ¶ 6.  Rob's mother also

23  provided little support to Rob, visiting him only rarely.   Ex. 52 ¶ 21.

24  132.    Not surprisingly, Rob's mental health problems persisted.  Mr. McConnell's delinquent

25  behavior was determined to have been caused by his lack of direct contact with his father as a child,

26  placement in a group home when he "was too young . . . to conceptualize the need for out-of-home

27  placement and, therefore, his ability to trust authority figures was seriously compromised," physical

28  and emotional abuse by his father, his father withholding letters from his mother and telling him his

                                        52

mother did not love him, and a "long history of interpersonal difficulties and rejection." Ex. 14 at 3-4. "'Robert displays superficial insight into his psycho-dynamic processes. He is usually able to relate, after the fact, the emotional and behavioral precipitants to his acting-out behavior. Unfortunately for Robert, he is unable to use this insight before the fact in order to gain control of his behavior and to avoid confrontations with those in authority and with peers.'" Ex. 14 at 4. "The minor's gradual march toward irresponsible and unhealthy behavior appears to be due to significant emotional disturbances rather than as the result of a pathological personality." Ex. 14 at 5.

133.     When Mr. McConnell was sixteen, a psychological evaluation conducted by CYA revealed that:

> Due to a long history of emotional and physical abuse and neglect and no therapeutic program to address this, minor is not psychologically capable of completing the Ranch program successfully and should be kept in Juvenile Hall. He is oppositional, impulsive and immature with a mixed picture of antisocial features and emotional disturbance; and it is recommended that he be placed in a therapeutic group home which can provide him with daily structure and counseling aimed at helping him deal with his behavioral and characterological problems, as well as family therapy with the mother and her boyfriend. He needs to learn internal controls in order to avoid trouble in the future. . . .

Ex. 13 at 1. He was diagnosed as "Conduct Disordered, with chronic violations of a variety of important rules, fire setting, difficulties at home, the blaming of others for his difficulties, irritability and temper outbursts, with academic achievement below the level expected on the basis of intelligence and age." Ex. 13 at 4. He was further described as suffering from "chronic moderate malfunction, inadequate coping skills, repetitive poor judgment and a self-defeating life script. He also presents as a somewhat nervous and inept individual who is lacking in social stamina and stability." Ex. 14 at 2 (emphasis added). "Psychometric testing placed his intelligence in the normal range with verbal functioning higher than performance which is 'typical for overachievers and for most neuroses, especially anxiety and tension states.'" Ex. 17 at 1 (citing earlier report).

134.     One CYA facility supervisor recommended Rob be evaluated for suicide potential because while at the ranch he had a made a hangman's noose and had a razor blade in his possession. Ex. 430 at 3. Later evaluations reviewed by counsel noted Rob suffered from "ideation - plan or intent - and homicidal ideation," exhibited anxiety, and had problems with impulse control. Ex. 430 at 4; see also

1   Ex. 434.

2   135.     Lacking appropriate care for his emotional and psychological problems, Rob frequently acted

3   out – each time extending his period of incarceration. Exs. 153-156, 168, 176, 178-179, 195, 204-206,

4   209-210, 213, 215, 217-220, 229, 233-236, 238, 240-242, 244-245, 247, 250, 252, 253, 257-258, 261,

5   263, 265, 268, 269, 273, 275, 285, 288, 292, 294-300, 302, 315, 319, 326-328, 332, 334, 341, 345,

6   349-352, 354-355, 357-359, 362, 366, 374, 375.  Stahn Muller, a CYA veteran, explained the non-

7   productive way in which the CYA system handled Rob:

8              Instead of trying to develop an individualized program to address Rob's special needs,
           the officials just kept charging him with violations and extending his time.  When the
9          staff at one facility grew tired of Rob's behavior issues, they simply wrote
           Administrative Overrides to have him shipped out to another facility so that someone
10         else could deal with the headache.

11  Ex. 52 ¶ 20.

12  136.     During the period of Rob's placement, CYA facilities were essentially "gladiator schools" that

13  turned young people into violent future criminals.  Ex. 52 ¶¶ 2, 13; see generally Ex. 439.  Violence,

14  or the threat of violence, permeated the facilities. Ex. 52 ¶ 13.  CYA inmates were constantly at threat

15  of being attacked by fellow inmates, and needed to be especially vigilant in enclosed or isolated

16  spaces like toilets or showers. Ex. 52 ¶ 17.  Trips to the toilet often required asking a friend to act as

17  a lookout.  Ex. 52 ¶ 17.  Fights could break out over nothing at all:

18             In CYA, a youth couldn't look at someone or have someone look at them without one
           of the two feeling threatened.  Many fights were started over people feeling that
19         someone had simply stared at them too long.  Everyone was always paranoid and
           overly vigilant because no one ever knew what might happen to him over the slightest
20         issue.

21  Ex. 52 ¶ 14.  The threat of being physically assaulted was even higher for middle-class white children

22  like Rob.  Ex. 52 ¶ 13.

23  137.     Rob faced further difficulties as a CYA inmate.  When he first entered the system, CYA

24  officials misidentified Rob as a Norteño gang member based on a tattoo on one of his arms. Ex. 52

25  ¶ 8.  As a result, he was segregated with real Norteño gang members, leading the rival Sureño gang

26  to identify him as an enemy, even though he had no association with the Norteños. Ex. 52 ¶¶ 9-11.

27  As a result, Rob had to fight constantly to defend himself during the entire time he was in CYA –

28  from not only the Sureños who believed he belonged to a rival gang, but also Norteños who believed

Rob was pretending to be a part of their gang. Ex. 52 ¶ 11; <u>see also</u> Ex. 45 ¶ 10.

138.    The guards' responses to fights between inmates were swift and brutal. After his release, Rob reported some of his experiences to his mother:

> [He] told Kim that he was frequently and attacked by guards, sometimes by as many as three or four at a time, and beaten with sticks. Guards frequently threw smoke bombs and shot pepper spray into his cell, sometimes for no reason [other] than to antagonize him. It occurred so often that Rob developed a resistence to the effects of pepper spray and smoke. Rob also witnessed a riot break out around him while he was locked up at one CYA facility.

Ex. 52 ¶ 54; <u>see also</u> Ex. 50 ¶ 108. CYA guards would beat Rob and other inmates for fighting or just running their mouths and being disrespectful. Ex. 45 ¶ 12.

139.    In addition to rampant violence perpetrated against inmates by both authorities and fellow inmates, rapes often occurred among CYA inmates during the period of Rob's incarceration. Ex. 52 ¶ 18; Ex. 439. After his release from CYA, Rob confided in Stahn that one of his cell-mates tried to rape him in the middle of the night when he was seventeen. Ex. 52 ¶ 18. Stahn learned only that a scuffle ensued; Rob became visibly angry and did not tell the story to its conclusion. Ex. 42 ¶ 18. Stahn asked no questions – "Rob never seemed like the type of person who could ever admit to being the victim of a sexual attack" and in any event there "are things that ex-cons don't discuss on the outside." Ex. 52 ¶ 18.

140.    Other friends and relatives suspected that Rob may have been the target of additional sexual assaults. Several years later Rob discussed his experiences to Jacqueline Quin, a friend and former neighbor in Pennsylvania:

> Of all the comments that Rob made about his CYA experiences, the one that most sticks out was when Rob told me that he used take showers with his boxer shorts on because the shower was the place where most of the boys were raped. Rob said that boxer shorts were like a last line of defense if you were attacked. Rob also talked about occasions when fights broke out inside the shower area and everyone scurried out because no one knew if someone was being raped.

Ex. 55 ¶¶ 1, 8. Based on her experiences as a corrections officer in a male juvenile facility, Ms. Quin believed that Rob was a likely target for abusers while in the CYA, even if he would not admit to being a victim. Ex. 55 ¶¶ 8-9.

141.    Rob recounted similar stories to his paternal uncle Ted, who based on his own experiences in CYA as a teenager also suspected that Rob would have been a target for abuse:

> Rob told me that he used to take showers with his boxer shorts on.  Rob never explain why he did this and he never talked about being sexually abused.  I always suspected that something may have happened to Rob because he was such a pretty boy when he was a kid and pretty boys don't do well in adult or juvenile detention facilities. I know this from first-hand experience when I was locked up at CYA myself as a teenager. I never asked Rob if he was sexually assaulted because I didn't want to make Rob talk about anything that was emotionally disturbing for him.  Rob was emotionally disturbed enough and I didn't want to add to Rob's problems.

Ex. 50 ¶ 109; see also Ex. 50 ¶¶ 59, 71 (recounting his experience in the CYA system).

142.   To other friends Rob admitted witnessing rapes while in CYA, averting his eyes so he wouldn't have to watch.   Ex. 45 ¶ 11.  He also confirmed that he wore boxers in the showers and never picked up dropped soap for fear that he might be sexually attacked. Ex. 45 ¶ 11; see also Ex. 52 ¶ 17 (Rob's friend Stahn Muller, who met Rob in juvenile hall while both were fifteen and awaiting transfer to CYA facilities, explaining that "[i]nmates also wore boxers while taking showers because an inmate never knew if someone might try to attack him physically or sexually. . . .  From my experience, wearing boxers while showering was a sign that the person was concerned about being raped").

143.   In this dangerous environment, Rob learned to respond to the threat of violence with violence. Rob explained that he had

> to watch his back every day because he never knew when he would be attacked for any reason . . . ..  He said he had to be strong to make it, and couldn't show one moment of fear.  If he was asleep in his room, and someone came and told him to watch out, there were five guys coming to get him that night, he said before they had the chance, he would go after the worst or the biggest one first to make an example out of him to let the others know, 'If you threaten me, look what happens to you.'  He said that's how he grew up and there was no other he could handle it.  He told him it was the roughest time in his life.  He said he had two possessions, a toothbrush and a comb. . . .

Ex. 89 at 3.

144.   Mr. McConnell was again evaluated by a psychologist when he was eighteen. Ex. 17.  The psychologist opined that Mr. McConnell's

> narcissism and penchant for story-telling make it difficult for him to exercise good judgment when talking about his offense history; contrary to information in his case file, Robert insisted on telling me about two incidents of arson. . . . It is important to note that during this story, he became animated and described his involvement with a second youth in such a way that the story contained a great deal of action, similar to what would be seen on television or in the movies.  At this point, I'm not sure whether or not Robert actually believes the event occurred, but his telling of this story suggests that he may experience some difficulty discriminating between reality and fantasy on occasion.

Ex. 17 at 1-2 (emphasis added).  By this time, Mr. McConnell's resentment for his father had been redirected at his mother "for her repeated abandonment of him," and he had developed such an "intense anger" toward one of the female staff members that he contemplated raping her. Ex. 17 at 2.  The psychologist advised that McConnell "be counseled regarding his fear of close relationships and his inability to admit or to express his dependency needs and his feelings of rejection, abuse, and abandonment by his parents.  Finally, <u>staff should be aware of the stories which the ward is telling and should be alert to the possibility of possible loosening of ties with reality which might be suggestive of a personality decompensation.</u>  He should be re-referred to myself or to a psychiatrist in the event that his behavior should become tangential, euphoric, or bizarre." Ex. 17 at 3 (emphasis added).  Mr. McConnell was described as "his own worst enemy because of his anger and aggressive behavior." Ex. 19 at 1.  Contrary to repeated recommendations by doctors, during his time in CYA, Mr. McConnell "refused to participate in any type of psychotherapy." Ex. 19 at 2.

### 9.  <u>Post-CYA</u>

145.    Rob was released from the California Youth Authority in 1993 at the age of twenty-one, at which point he could not longer be held in custody. Ex. 52 Decl. ¶ 24.  After eight years in institutional settings, another eight years with a mother who failed to teach him even the most basic life skills, and five years in his father's abusive care, Rob was wholly unprepared to lead a normal life, even though he was nominally an adult.  As Rob explained to his friend Athena Lindsay-Monroy, he was thoroughly institutionalized and at a loss when it came to dealing with personal finances or relationships with friends, girlfriends, bosses and customers. Ex. 45 ¶ 13.  Rob often said that no one gave him a manual on how to live independently. Ex. 45 ¶ 13.  His friend Stahn believed that Rob was still a virgin when he was released from CYA at 21, at least "as far as girls were concerned." Ex. 52 ¶ 25.

146.    The mental and emotional scars of his collective experience were plainly evident.  Rob's stepfather Roger Sauln recalled that after Rob returned from CYA "very institutionalized, very angry at the world, and had an explosive temper all the time.  They told him he had to go to counseling to 'get the demons off his back.'" Ex. 87 at 4.  Rob himself left CYA "thoroughly convinced that there was no way he could escape his past and have a normal life" – a return to incarceration (adult prison)

1   seemed to him inevitable.   Ex. 52 ¶ 48.

2   147.   At first, Rob moved in within his mother and her husband, Roger Sauln.   Ex. 52 ¶ 24.

3   Within weeks, however, his mother had kicked him out of the house. Ex. 52 ¶¶ 24, 26.  His friend

4   Stahn Muller had the opportunity to meet Kim on various occasions.  He found her short-tempered,

5   manipulative, selfish, and emotionally unstable. Ex. 52 ¶ 45.  She did not seem to care about Rob

6   much and did not appear to have Rob's best interests at heart.  Ex. 52 ¶ 45.

7   148.   Kim immediately noticed a number of behavioral differences that underscored the cumulative

8   trauma of Rob's CYA experience that followed years of abuse and neglect.  Rob's defiance was at

9   an all-time high after he was released from CYA, and his mother believed she no longer had any

10  control over him. Ex. 51 ¶ 55.  He seemed bitter and set on a more self-destructive course.  Ex. 51

11  ¶ 52.  His ability to sleep, already disrupted by his prior experiences, worsened:

12          When Rob returned from CYA, he was more restless than I'd ever seen him before.
13          Rob had difficulty falling asleep and, more frequently than ever, he woke up in the
            middle of the night, sometimes multiple times.  Rob frequently complained about
            nightmares, and I sometimes went into his room to check on him to make sure that he
14          was all right.  Rob told me that his nightmares were usually about the different
            troubling experiences that he encountered while he was locked up in CYA.  The
15          nightmares usually were about fights with inmates, Rob being attacked by guards
            wielding billy clubs, Rob's cell being flooded by smoke bombs or pepper spray at the
16          hands of the guards, rioting, and other experiences that he had.  These were all events
            that Rob experienced or witnessed during the six years that he was in CYA, and he
17          often relived them in his dreams.

18  Ex. 51 ¶ 59.

19  149.   After being forced from his mother's home, Rob lived with his friend Stahn Muller on and

20  off for several years.  Ex. 52 ¶¶ 27-28, 34.  Stahn, too, noticed Rob's strange sleeping habits:  Rob

21  would lock the doors to his bedroom at night and fall asleep with mace under his pillow. Ex.52 ¶ 34.

22  Stahn added that Rob "had difficulty falling asleep," and would often remain awake during the night

23  and early morning hours, walking or biking around the neighborhood or visiting all-hours adult

24  bookstores.  Ex. 52 ¶ 35.

25  150.   His mother also noted that Rob had developed a controlling personality when it came to girls.

26  Ex. 51 ¶ 56.  After meeting one girl in the neighborhood to whom he had taken a liking, Rob stole

27  her cell phone so that she could not call other people. Ex. 51 ¶ 56.  The burgeoning relationship ended

28  soon afterward. Ex. 51 ¶ 56.  His friend Stahn Muller made similar observations, describing Rob as

"very possessive and jealous" with his girlfriends, as if he "was incapable of trusting a woman." Ex. 52 ¶¶ 24, 43  Rob's maternal grandmother Sylvia won several million dollars playing the state lottery in the late 1990s. Ex. 437 ¶ 54; Ex. 52 ¶ 29.  After his release from CYA, Rob considered attending college to turn his life around and asked his grandmother for financial assistance. Ex. 52 ¶ 29.  Though she helped her other grandchildren financially so that they could attend school (including Rob's half-brother Darren), she did nothing to assist Rob. Ex. 437 ¶ 54; Ex. 52 ¶ 29.  This differential treatment deeply hurt and bothered Rob. Ex. 52. ¶ 29..

151.    Stahn Muller recalled that all of Rob's clothing had to pressed and folded in a certain way, and if there was the slightest thing wrong with a piece of clothing, he would throw it away without hesitation.  Ex. 52 ¶ 40.  Rob made sure that all of his clothes fit into a particular suitcase he kept; if he could no longer close the suitcase, he would remove an item of clothing and throw it away.  Ex. 52 ¶ 41.  Rob also developed a ritual when preparing and drinking coffee – he would pour the coffee into a cup, smell and taste it, pour milk into the cup, smell and taste the coffee, pour sugar into the cup, and smell and taste the coffee, and then repeat these steps over and over again.  Ex. 52 ¶ 42.

152.    By failing to interview several of Rob's closest friends, particularly Stahn Muller, prior counsel failed to unearth numerous other head injuries Rob sustained as a young adult.  Specifically, in 1993 or 1994, while driving with his friend Stahn, Rob drove a car into a fire hydrant. Ex. 52 ¶ 49.  While Stahn escaped serious injuries when the airbag on his side of the car deployed, Rob's airbag did not deploy and he struck his forehead on the steering wheel with great force.  Ex. 52 ¶ 49. Rob was taken to the hospital for medical attention and treated for a concussion, bruised ribs, and whiplash.  Ex. 52 ¶ 49.  This accident had long-term ramifications:

> Rob dealt with pain in his head that occurred on and off for at least six or seven months.  I noticed that Rob had difficulty with his short term memory after this accident, and he began blanking out during conversations. Rob began forgetting what was said to him just moments before in discussions.  Before the accident Rob knew and listened to every word that was spoken to him during conversations.  In fact, Rob used to hang onto every word that a person said so that he could use their own words to argue a point against them. After this accident, Rob also began zoning out or day dreaming. Rob often sat down and stared off into the distance with a blank and emotionless look on his face.  These episodes usually occurred when Rob was stressed out or depressed.

Ex. 52 ¶ 49.

153.    Rob was involved in other car accidents, including in 1998 when he (1) drove his car off the road and struck a tree head on, and (2) drove another car into a large snowbank. Ex 52 ¶ 53.  After this second incident, his friend Stahn recalled Rob telling him that Rob didn't know how the accident occurred – he had been driving along the road "when he mentally zoned out, and the next thing he knew he was in the snowbank.  Rob was a little freaked out because it was like he was sleeping even though he was wide awake."  Ex. 52 ¶ 54.  In 1995, Rob was injured in a Home Depot store when garbage cans fell from high shelves onto his head and was treated for injuries to his neck, ribs, and a knee.  Ex. 52 ¶ 51.  In or around 1998, Rob dove into the shallow end of a swimming pool and struck his head on the bottom.  The impact was so severe that a portion of his scalp was torn off and a large lump formed on his head that lasted several days.  Ex. 52 ¶ 56.  In 1998 or 1999, Rob fell through a skylight, dropping at least ten feet and striking his head and injuring his legs. Ex. 52 ¶ 55.  He walked with a noticeable limp for about two months after this incident.  Ex. 52 ¶ 55.  Rob was also involved in several snowboarding and skiing accidents between 1994 and 2000 where he would fall down and strike his head.  Ex. 52 ¶¶ 50, 52.

### 10.    Age Twenty-Four to the Present: Rob in Reno

#### i.    Rob's Circles of Friends

154.    After being forced from his mother's home and living for a time with his friend Stahn Muller, Rob moved to Reno in March 1996.  Ex. 385.  He would soon develop two circles of friends that observed his continued mental deterioration and ultimate breakdown culminating in the instant offenses.  Rob was introduced to the first circle – which included Alex and Athena Monroy, Luis and Sandy Martinez, Robert Jackson, and others – through Luis Vazquez, who Rob met in the spring of 1995 when both worked at the Peppermill Hotel and Casino in Reno.  Ex. 438 ¶ 2; Ex. 44 ¶¶ 2, 4; Ex. 45 ¶¶ 2, 5, 16; Ex. 49 ¶¶ 2, 8.

155.    By then, Rob was already living with the mother of his first child, Maria, and their daughter Carina.  Ex. 438 ¶ 3.  Luis remembered Maria as unattractive, mentally unstable, and very possessive of Rob.  Ex. 438 ¶ 3; see also Ex. 52 ¶ 44 (friend Stahn Muller recalling that Maria may have been diagnosed as bipolar).  Rob, though, was still not long out of the California Youth Authority and, with virtually no track record with women or dating, see, e.g., Ex. 52 ¶ 25, was desperate for sexual

1  intimacy.  Ex. 438 ¶ 3.

2  156.    This group of friends took to Rob almost immediately.  Luis described him as friendly, upbeat,

3  with a smile that could light up any room.  Ex. 438 ¶ 4.  Alex described him as "just a teddy bear of

4  a guy and very fun[-]loving."  Ex. 438 ¶ 3.  Luis's then-wife Wanda instantly fell in love with Rob

5  and treated him like he was a member of the family.  Ex. 438 ¶ 4; see also Ex. 45 ¶ 5 (Athena

6  Lindsay-Monroy describing how she quickly became close friends with Rob and he became "like a

7  part of my family").

8  157.    Beginning in 1999, Rob also met a second circle of friends in Reno through Tom Cheers, a

9  co-worker at the Ramada Hotel. Ex. 53 ¶ 2; see also Ex. 44 ¶ 5; Ex. 45 ¶ 38.  Rob and Tom became

10  instant "old pals," spending time together at least three days a week almost immediately. Ex. 53 ¶ 3.

11  His friends described Rob as loyal and always deeply concerned about his friends' welfare; as Alex

12  explained it, "[i]f Rob was your friend, he was your friend for life."  Ex. 44 ¶ 7; see also, e.g., Ex. 438

13  ¶ 4 (noting that Rob had helped Luis' wife Wanda get a job in the same coffee shop in which Rob

14  worked); Ex. 438 ¶ 18 (Luis Vazquez describing a touching card from Rob that he and wife Wanda

15  received on their anniversary discussing the important of friendship and how much their friendship

16  meant to him); Ex. 438 ¶ 19 (Luis Vazquez recalling an incident where Rob interceded to stop false

17  rumors in their workplace about Wanda's infidelities); Ex. 55 at 2 (describing incident in which Rob

18  stepped in to prevent his friend Melissa Quin from being harassed in a bar after a stranger had

19  grabbed her); Ex. 438 ¶ 2; Ex. 45 ¶ 53; Ex. 53 ¶ 9.

20  158.    Rob's friends returned his loyalty.  In 1999, when Rob needed a place to live in Reno after

21  returning from Pennsylvania, his friend Alex Monroy gave Rob permission to move in with his then-

22  girlfriend Athena because he "trusted [Rob] completely."  Ex. 44 ¶ 9; see also Ex. 45 ¶¶ 3-4.

23  159.    Robert Jackson described Rob as a "'great friend. . . .  I trust him with my family.  I trust him

24  with my kids and anything else. . . . I know he wouldn't do anything to harm them, harm me. . . .  I've

25  never seen any bad sides to Rob.'" Ex. 86 at 4. (alterations in original).

26  160.    His ex-girlfriend Lisa Rose reported that early in their relationship, before his mental

27  condition deteriorated,

28         Rob was very polite, respectful and considerate.  He gave her his cell phone so they

could stay in touch.  He would pick her kids up from daycare and paid the bill several times. . . . Shortly after they met she came down with a very bad case of strep throat. Rob carried her to the hospital, picked up her prescriptions, and took care of her and her kids while she recuperated.  She believes he may have taken time off from work. The kids adored him, and still ask where he is.  Her son cried on Halloween because Rob wasn't there.

Ex. 404 at 1.  During a difficult pregnancy, Rob "was supportive and went to every doctor appointment with Lisa."  Ex. 404 at 2.  Even after Rob was arrested for the instant offenses, Lisa said "she trusted Rob fully with her kids, and still would."  Ex. 404 at 2.

### ii.    Evidence of Mental Illness in Reno

161.    Though they loved Rob and admired his good qualities, his friends in Reno also learned that Rob was a deeply troubled young man.  He angrily discussed feeling abandoned and neglected by his mother – whom he would refer to as "that bitch" – and getting severely beaten and abused by his father over even minor things. Ex. 438 ¶¶ 20, 31; Ex. 44 ¶¶ 11-12; Ex. 49 ¶ 5; Ex. 53 ¶¶ 6, 48.

162.    To some of his friends, Rob would be more forthcoming, explaining that his mother was constantly drunk while he was a child, chose the men in her life over him, and otherwise neglected him. Ex. 45 ¶ 8.  Sobbing, Rob would confide that he believed his mother hated him but could not understand why.  Ex. 45 ¶¶ 8, 50.  When Rob spoke about his mother to friends in Reno, it was accompanied by a physical change in his demeanor – he would become excited, "his voice changed, and he had a blank look in his eyes like no one was home." Ex. 53 ¶ 50.

Within weeks of meeting Rob, Luis learned about the dark side of Rob's personality:

Rob was with Luis Martinez and me while we were chatting over a few drinks one evening.  Rob was not drinking with us because he did not like to drink alcohol or abuse drugs.  Rob seemed like he was annoyed at the time and he kept asking me to give him a ride home.  After Rob asked me to take him home a couple of times, Luis Martinez jokingly told Rob to chill out and have a few drinks with them.  Rob then looked at Luis Martinez in a very scary way, and then told him, "I said I'm not going to have a drink, so I'm not going to drink, so, why don't you just shut the fuck up!" Rob's eyes were wide open and he was staring at Luis Martinez in a menacing fashion.  Although Luis Martinez was a body builder for many years and much larger than Rob, he seemed like he became deflated and appeared to cower in fear of Rob. I also saw others to react in the same way when Rob gave them the same type of menacing look. Rob's glare was terrifying and gave people the impression that he could go crazy and harm them in some way, but he never actually did.  During these episodes, Rob's eyes opened wide, he didn't blink, the expression on his face was cold and emotionless. . . .

Ex. 438 ¶ 13.  Luis later explained to Rob that he was out of line and Rob, remorseful, apologized to

1    Luis Martinez the next time they saw one another.  Ex. 438 ¶ 13.

2    163.    Rob explained that his behavior was a defense mechanism he had learned in the dangerous

3    California Youth Authority environment to protect himself – by getting into others' faces in a

4    threatening manner, speaking in an aggressive tone, and giving them a menacing glare, he was able

5    to prevent physical confrontations. Ex. 438 ¶ 14; see also Ex. 44 ¶ 3 (Alex Monroy explaining that

6    "Rob's tough exterior was just a facade he used as a defense mechanism," learned during the years

7    he spent incarcerated in the California Youth Authority).

8    164.    Rob lived with his friend Athena Lindsay-Monroy in Reno in 1999 and 2000. Ex. 45 ¶¶ 3-4.

9    She recalled that Rob suffered from insomnia, unable to sleep more than four or five hours at a time,

10   but unwilling to take any medication because of his dislike of drugs. Ex. 45 ¶¶ 19-20.  When he did

11   sleep, he suffered violent nightmares that increased in periods of stress. Ex. 45 ¶ 21.  He would wake

12   yelling and thrashing, as if he were wrestling someone, and in turn awaken Athena in the next room.

13   Ex. 45 ¶ 21.

14   165.    Alex Monroy, then Athena's boyfriend, would spend several nights a week in Athena's

15   apartment. Ex. 44 ¶ 9.  He also recalled that Rob would suffer from frequent nightmares, at least three

16   nights a week the entire year he lived in the apartment, from which he would awaken screaming,

17   yelling, and agitated.  Ex. 44 ¶ 10.

18        Athena recalled one of these nightmares:

19        Rob was having a nightmare and making quite a bit of noise.  I knocked on the wall
          but Rob didn't stop.  When I went to check on Rob, I found him yelling, "get off me,"
20        and "leave me alone," as he was punching the top bunk bed and frantically moving
          around.  When I turned the light on I saw that Rob's eyes were wide open but he was
21        still asleep in a dream-like state, as he continued to yelling and throwing punches.
          Rob had a blank look on his face and he didn't acknowledge my presence in the room
22        even after the lights were on.  I carefully walked over to Rob, lightly pushed him and
          shouted his name. Rob shook his head and snapped back into reality.  Rob calmed
23        down and said that he must have been having a bad dream.  When I saw Rob the next
          day, he did not mention the event and I have no idea whether he recalled what
24        happened.

25   Ex. 45 ¶ 21.

26   166.    During this time, Rob admitted to Athena – apparently for the first time to anyone – that he

27   heard voices in his head. Ex. 45 ¶ 23.  These voices started when Rob was a teenager and persisted

28   into adulthood, usually appearing when he was angry, anxious or fighting. Ex. 45 ¶ 24.  He described

the voices were as clear as someone who was physically there and speaking with him, an entity entirely separate from his own thoughts. Ex. 45 ¶¶ 24-25.  The voices were male, with their own personality, and would give Rob instructions – including instructions to fight and be destructive, yelling things like "Kill 'em!" and "Destroy 'em!"  Ex. 45 ¶¶ 25-26.

167.    To his friends in Reno, Rob also appeared to have problems relating to women, see Ex. 438 ¶ 31; Ex. 44 ¶ 14 – a perhaps unsurprising result considering his mother's earlier abandonment of him, followed by years of institutionalized in all-male environments in which he was subjected to sexual abuse.  Luis described him as "possessive, clingy, and jealous when it came to the women he dated," and needy in relationships. Ex. 438 ¶ 32.  In turn, all of Rob's serious girlfriends appeared to friends to be mentally ill or unstable. Ex. 438 ¶ 3; Ex. 52 ¶ 44; Ex. 45 ¶ 29; Ex. 44 ¶ 20; Ex. 45 ¶ 42; 433.

168.    Rob seemed especially troubled when women turned their backs on him. Ex. 53 ¶ 51.  His friend Stahn Muller explained:

> If someone wronged Rob in some way, all of his thoughts were dominated by wanting to know why they wronged him and how to get back at them.  Whenever a girl left Rob and didn't want anything more to do with him, Rob always wanted to know the reasons, and he sometimes hounded them for answers.  Rob was emotionally sensitive and he didn't know how to take rejection.

Ex. 52 ¶ 65.  Alex traced Rob's attitude towards women to his mother's neglect of him:

> Rob had no control over the way that he was mistreated and neglected by his mother when he was a child so, as an adult, it was his intention to control the women in his life before they had a chance to let him down or hurt him like his mom.

Ex. 44 ¶ 15.

169.    Friends also noted that Rob had never learned appropriate boundaries in discussing his relationships with women, sharing with his friends explicit pictures and videos he had taken of his willing girlfriends and going so far as to discuss possibly video-taping one of his girlfriends having sex with a dog at the animal shelter at which he briefly worked.  Ex. 438 ¶¶ 33-34; Ex. 44 ¶¶ 16, 18; Ex. 45 ¶¶ 31, 45.  Alex believed that Rob shared the pictures and videos of his girlfriend in order to prove his manhood to his friends.  Ex. 44 ¶ 17.

170.    Like his mother, his step-father and his friend Stahn Muller before them, Rob's friends in Reno noted Rob's obsessive tendencies.  Rob's friend Luis Vazquez noted that Rob was a "neat-

freak" who kept his clothes perfectly pressed, folded or hung and carefully organized in his closet. Ex. 438 ¶ 10. His hair was always perfectly cut, combed and manicured, he shaved every day, always kept his hands clean, and never allowed so much as a speck of dirt to get under his fingernails. Ex. 438 ¶¶ 11-12. Luis had never met anyone who cleaned their house as much as Rob – he was "always" sweeping, mopping, washing dishes and cleaning things around his house, and "[t]he floors in Rob's home were so clean you could literally eat off them." Ex. 438 ¶ 9.

171. Rob's friend and co-worker Robert Jackson too noted Rob's obsession with cleanliness and order. Ex. 49 ¶ 12. To his friends' amusement, Rob would continuously vacuum the rugs in his apartment, taking great care to ensure that all of the lines he made in the carpet were straight and went in the same direction. Ex. 49 ¶ 13. A running joke at the car dealership at which Rob worked was that Rob could never share an office with a messy person because with Rob it was important that everything be clean, neat, and in place. Ex. 49 ¶ 12.

172. Luis Vazquez recalled that Rob applied this same sort of obsessive, single-minded behavior to other aspects of his life. Rob's obsessive personality traits revealed themselves in other, more problematic ways. Rob was a life-long fan of baseball player Barry Bonds, who had played for the Pittsburgh Pirates when Rob was living in Pennsylvania as a boy and played for the San Francisco Giants in Northern California, where Rob lived after his release from the California Youth Authority. Ex. 438 ¶ 26; Ex. 52 ¶ 58. In the 1990s, Rob began to emulate his hero by shaving his head and wearing the same type of earring as Bonds. Ex. 52 ¶ 59. In 1994, Rob attended almost the entire divorce proceedings of Bonds and his first wife, Sun, and searched the court files to find as much personal information about them as possible. Ex. 52 ¶ 60.

173. Shortly before moving to Reno, Rob had the opportunity to work in a bagel shop in Redwood City, California, owned by Bonds. Ex. 438 ¶ 26. When he was able to meet his boyhood idol in the shop, however, he was disappointed to find that Bonds was a self-absorbed snob who ignored him, frequently refused to sign autographs for his young fans, and treated his ex-wife badly. Ex. 438 ¶ 26; Ex. 52 ¶ 61.

174. Rob grew increasingly obsessed with Bonds and his ex-wife Sun, staking out their homes in the Bay Area, going through their garbage, and learning all he could about their personal lives. Ex.

1   438 ¶¶ 25, 27; see also Ex. 44 ¶ 43; Ex. 52 ¶¶ 62, 64.  He developed fantasies about killing Bonds and

2   having sex with Sun, a beautiful Swedish model.  Ex. 438 ¶¶ 28-30; see also Ex. 52 ¶¶ 61-63.

3   175.    Rob's friends in Reno also soon discovered another unusual aspect to Rob's personality – in

4   all the years they knew him, they never knew Rob to drink alcohol or use drugs.  Ex. 52 ¶¶ 13, 15-16;

5   Ex. 44 ¶ 8; Ex. 45 ¶ 65; Ex. 53 ¶¶ 4-5; see also Ex. 52 ¶¶ 30, 32 (aside from one instance in which

6   he talked Rob into taking acid, Stahn Muller was unaware that Rob ever used drugs).  Luis saw Rob

7   with a drink in his hand on only one or two occasions, and each time Rob would hold the glass for

8   hours, taking only small sips.  Ex. 438 ¶ 16; see also Ex. 53 ¶ 4 (Tom Cheers recalling that on the

9   couple of occasions Rob had a drink in his hands in all the years they hung out, it was "something

10  light like a beer or a wine cooler," which he would hold for hours and take only a couple of sips). Rob

11  also could not tolerate being around anyone who abused drugs or drank to the point of intoxication.

12  Ex. 438 ¶ 15.  His distaste for drugs was virtually absolute – he even avoided taking aspirin and other

13  prescription and non-prescription medications.   Ex. 45 ¶ 15.

14  176.    The observations of Rob's friends in Reno were consistent with those of friends and family

15  in Pennsylvania. See, e.g., Ex. 48 ¶ 53 ("When Rob was out he usually just held a single drink for

16  hours at a time and barely took a sip off of it."); Ex. 46 ¶ 19 ("Rob never used drugs and he didn't

17  drink alcohol at all."); Ex. 55 ¶ 5 (friend and former neighbor in Pennsylvania Jacqueline Quin noting

18  when she interacted with Rob in 1999 and 2001 that Rob was to her knowledge not a substance

19  abuser and "if he drank alcohol it was never to intoxication" and never hard liquor).  Rob confided

20  in friends that his his avoidance of drugs and alcohol was borne in part from a desire to not follow

21  in his parents' footsteps, especially those of his alcoholic mother. Ex. 45 ¶ 15; Ex. 53 ¶¶ 5, 48; Ex.

22  52 ¶ 33.  And like his father, he also feared the loss of control that follows from drug use.  Ex. 45 ¶

23  15; Ex. 53 ¶ 5; Ex. 46 ¶ 19; Ex. 52 ¶ 33; see also Ex. 89 at 3 (after trying marijuana once, Rob

24  explained that "he lost . . . control over his body" and would not try the drug again).

25  177.    When turned to something positive, however, Rob's obsessive traits helped him to succeed.

26  Friends helped Rob get a job as a car salesman at Winkel Pontiac, where he worked on separate

27  occasions in 2000 and 2001.  Exs. 395, 409.  His focus on learning the details of the cars he was

28  selling allowed him to succeed as a salesman and to make the best money that he had ever made in

his life and, for a while, it seemed like his life was changing for the better, despite his deeply troubled past. Ex. 438 ¶ 7; see also Ex. 53 ¶ 7.  His friend Alex Monroy explained:

> When Rob began working in car sales, around 2000, it seemed like he finally found his true life's calling.  Rob was successful salesman; he was making a large salary and for the first time in his life he was able to afford nice things.  Rob purchased a brand-new car, he leased an apartment that was located in a great community and he filled his place with nice furniture and other items.  This is the first time in Rob's life that he was living completely independently and it seemed like he was proud of himself.

Ex. 44 ¶ 23.

### iii.     Rob's Relationship with April Robinson and Their Subsequent Break-Up

178.     Rob first met April Robinson in September 2000 at the Ramada Inn where they both worked. Ex. 53 ¶ 8; Ex, 45 ¶ 38; Ex. 385. All Rob's friends agreed that Rob's life took a turn for the worse when he met her.  Ex. 53 ¶ 7; Ex. 438 ¶ 36.

179.     From the beginning, their relationship was extremely volatile.  Like Rob's mother Kim and his earlier girlfriend Maria, April may have suffered from mental illness and exhibited violent  mood swings. Ex. 44 ¶ 20; Ex. 45 ¶ 42; Ex. 404 at 2.  April also got drunk constantly, abused various drugs, smoked cigarettes, and partied at bars and nightclubs – all things Rob detested.  Ex, 437 ¶ 37; Ex, 45 ¶ 39.  Though Rob loved April and was always faithful to her, April would sleep around on Rob.  Ex. 438 ¶ 41.   On the other hand, April was possessive of Rob, jealous of his friendships with other women, and would constantly accuse him of cheating on her. Ex, 437 ¶ 41; Ex, 45 ¶ 42.

180.     The two fought constantly to the point of leaving marks and bruises on each other.  See, e.g., Ex. 404 at 2; Ex. 438 ¶¶ 37-39;  Ex. 44 ¶ 21; Ex. 45 ¶ 44.  April had "a vicious mouth" which she used to provoke Rob to the point that he completely lost his temper.  Ex. 438 ¶ 38.  To some of Rob's friends, it appeared that April was determined to make Rob hit her; if her words failed to have the desired effect, she would physically attack him in order to force Rob to fight back. Ex. 438 ¶ 38; Ex. 44 ¶ 21.  Sometimes the two would break up, but only for short periods of time before gett0ing back together and continuing their troubled relationship.  Ex. 438 ¶ 37; Ex. 45 ¶ 43.

181.     Rob's friends did not understand his attraction to April and unavailingly counseled him to end the destructive relationship. Ex. 438 ¶¶ 36-37, 40; Ex. 44 ¶ 20; Ex. 45 ¶¶ 39, 41.  Rob, on the other

hand, was smitten: it was clear that Rob loved April and wanted to spend the rest of his life with her.Ex. 45 ¶ 45; Ex. 53 ¶ 11.  In the early days of their relationship, at least, April appeared "loyal, loving, and supportive of Rob," in some ways "a second mother to Rob because she showed him a lot of affection and attention that he never received from his mother." Ex. 53 ¶ 9.  Rob also enjoyed April's lack of sexual boundaries and even her violent nature.  Ex. 438 ¶ 39; Ex. 45 ¶ 44; Ex. 53 ¶ 9.  Luis believed that Rob's infatuation with April was in part the product of his stunted development – having spent puberty locked up in California Youth Authority, he had the relationship skills of a teenager and no idea how to deal with an adult woman.  Ex. 438 ¶ 40.

182.    Eventually April began to lose interest in Rob.  While Rob was ready to marry, April was a "party person" who enjoyed drinking, drugging, and going to clubs and she was in no way ready to settle down or change her lifestyle. Ex. 53 ¶¶ 11-12.  April resented and resisted Rob's efforts to change her wild lifestyle and slowly began distancing herself from Rob.  Ex. 53 ¶¶ 12-13.  Eventually April began dating Brian Pierce, the victim in the instant case, because Brian was also "a party person and enjoyed drinking and abusing drugs like she did."  Ex. 53 ¶ 13.  Rob's friend Luis reported that April began seeing Brian while she was still Rob's girlfriend. Ex. 438 ¶ 41.

183.    Rob was "devastated" by the breakup and began to exhibit signs of depression. Ex. 53 ¶¶ 14, 28. April, however, proceeded to toy with Rob's emotions, continuing to call him, visiting him at his apartment, and having sex with him, especially when she was angry with Brian. Ex. 438 ¶ 42; Ex. 45 ¶ 46. She continued to be jealous and possessive of Rob after their break-up: if she happened to see Rob with another woman, or another woman answered the phone at his apartment, she flew into a rage, cursing and yelling at Rob and the girl. Ex. 438 ¶ 43.

184.    Misty Tackman, Rob's friend and former co-worker, recalled one occasion when she visited Rob's apartment:

> April called his apartment at least twice while she was there.  Rob hung up on her once.  Misty talked to her once on the phone but doesn't remember the conversation, other than the girl was very mad. . . . A short time after the calls, April showed up at Rob's apartment. [She] had never seen [April] before.  April immediately started yelling at Misty, repeatedly saying she had a knife and was going to kill her.  She kept her hand in her jacket or pants like she was going to pull something out . . . .

Ex. 401 at 1. Eventually, Misty left the apartment and went home. Ex. 401 at 1. In a separate

interview, Alex Monroy corroborated Misty's account of this encounter. Ex. 403 at 2.

185.    As she continued to call, visit, and initiate sex with Rob, April simultaneously began filing complaints and seeking restraining orders against Rob. Ex. 438 ¶ 44; Ex. 45 ¶ 46.  Rob's friends believed that she sought these restraining orders in order to appease her new boyfriend Brian, or to cover for the fact that she was still having sex with Rob, or simply to embarrass Rob.  Ex. 438 ¶ 44; Ex. 53 ¶ 16.  Tom Cheers explained the dynamic:

> Even though they were no longer an item, Rob and April continued having sex with one another well into her relationship with Brian.  April frequently called Rob and told him to come over to her place or she was coming to his.  They also occasionally met for lunch or dinner. Brian actually caught Rob and April together on a number of occasions at April's home and in the streets.  I vaguely recall that Brian caught April and Rob in bed together on at least one or two occasions as well.  For April, the situation was ideal because she had the best of both worlds.  Rob continued to fulfill her sexual needs, and Brian got high with her whenever she wanted to.  When Brian would confront April about her apparent infidelities, she told Brian that Rob was stalking her, wouldn't leave her alone or pushed his way into her apartment.

> To appease Brian, April began contacting the authorities and filing false police complaints against Rob and taking out restraining orders against him in attempts to prove to Brian that she was the victim of unwanted attention.  It was all a big lie she created to keep Brian happy.   The complaints were also filed because Brian encouraged April to do so.  Whenever Brian caught April and Rob together, he was usually the one who insisted on calling the police to have Rob charged with violating the restraining orders. During the time when April was filing a false police reports and taking out restraining orders, she was continuously calling Rob and having sexual intercourse with him.  I know this first-hand because I was with Rob at many times when April called or visited him at his apartment.

Ex. 53 ¶¶ 15-16.

186.    Often the restraining orders filed against Rob were served  at his place of employment in front of his co-workers and customers. Ex. 438 ¶ 47; Ex. 44 Decl. ¶¶ 24-25.  These visits would upset and embarrass Rob.  Ex. 438 ¶ 47; Ex. 44 ¶ 25; Ex. 53 ¶ 19; Ex. 401 at 1; see also Ex. 403 at 2. ("'I think that's what upset him the most[, t]he fact that it's police officers coming to his work in front of all his peers and serving him with restraining orders.  Like anybody, he's proud.  Anybody would be a little embarrassed.").

187.    April would repeatedly violate her own restraining orders against Rob by calling him, visiting his apartment unannounced, and by acting belligerently towards other women with whom Rob associated.  Ex. 438 ¶ 48; Ex. 45 ¶ 48.  April would, for example, threaten to kill or castrate Rob if she ever saw him with another woman.  Ex. 438 ¶ 45.  Rob played for Misty at least two belligerent

messages left by April on Rob's answering machine after she had filed for a protective order. Ex. 401 at 2. Rob also played recordings of Misty's phone calls during at least one hearing regarding his alleged harassment, which caused the judge to rule in his favor. Ex. 438 ¶ 45. Misty recalled several other instances of April violating her own protective order, calling Rob at work frequently and coming in person at least once. Ex. 401 at 2. Friends could not understand why the courts continued entertaining April's complaints when it was so apparent that she herself was manufacturing the alleged abuse. Ex. 438 ¶ 46.

188.     Rob would receive calls not only from April but also from Brian and his friends, insulting and threatening him. Ex. Ex. 402 at 2; Ex. 44 ¶ 26; Ex. 45 ¶ 47; Ex. 414 at 2. On other occasions, because they shared mutual acquaintances, Rob and Brian would meet each other at random at house parties, bowling alleys, or other locations. Ex. 53 ¶ 17; Ex. 438 ¶ 48; Ex. 44 ¶ 26. In those instances, Brian and his friends would use the opportunity to threaten, antagonize, or attack Rob. Ex. 438 ¶ 48; Ex. 44 ¶ 26. In 2001, for example, Brian and nine of his friends spotted Rob on the street when he was alone. Ex. 53 ¶ 19; see also Ex. 49 ¶ 15. They all chased Rob, caught him, knocked him to the ground and began kicking and stomping him. Ex. 53 ¶ 19.

189.     On another occasion, April, Brian and their friends provoked a physical confrontation at the courthouse for a hearing on a restraining order. Ex. 53 ¶ 20. At the courthouse, Brian and his friends were continuously harassing Rob as he sat quietly, "blowing kisses, and calling Rob a faggot, a pussy, and saying, fuck you punk." Ex. 53 ¶ 20. Rob at first ignored them, but after several minutes of listening to these taunts, Rob jumped on one his abusers. Ex. 53 ¶ 20. They were pulled apart and no one was hurt. Ex. 53 ¶ 20. April herself instigated the fight, encouraging her friends to "'get him, get him.'" Ex. 411.

190.     Rob's friend Robert Jackson recalled Rob's frustration with the insults and threats against him:

> I . . . remember [h]ow he said how frustrated her was for the fact that he keeps getting these restraining orders and he's not the one contacting her. I remember he said that her boyfriend and some other roommate would always call him in the night and harass him, and say, "Oh, we're going to kill you, you motherfucker.  Tell us where you want to meet." They'd say to him, "You're not shit. You're white trash.' You know, all these stupid little things. And . . . they did that to him all the time. April would just verbally be ruthless to him on the phone in front of these other guys. He said they

> would just call him and just harass the crap out of him.  That it was April, her new boyfriend and some other guy.  In his words, it was uncalled for . . . .  He wasn't violating the TPO.  They were the ones that contact him.  They are the ones making a threat to him.  And he couldn't do anything about it.  The judge didn't believe him.  Then Rob would make threatening comments himself . . . .

Ex. 402 at 2 (alterations in original omitted).  Robert believed that Brian threatened and aggravated Rob because he "was trying to prove how tough he was to April and trying to prove he was a big shot by constantly threatening Rob and provoking him." Ex. 49 ¶ 16.

191.    Friends and family believe these threats against Rob triggered an instinctual response in Rob, who had survived over five years in the California Youth Authority by learning to attack first.  See Ex. 89 at 4.  Rob's half-brother Darren believed Brian's antagonism of Rob  "was the worst thing in the world . . . to do" to someone with Rob's past experience. Ex. 89 at 4.

192.    Brian and his friends found Rob's other weak spots.  They would call Rob names like "pussy, faggot, and punk" and make various gestures towards Rob like holding their crotches and blowing kisses at him, see Ex. 53 ¶ 18, just like Rob's abusive father and some of his paternal siblings years before.  Brian would also remind Rob that Brian had stolen his woman from him, and usually added that "April came to him because Rob wasn't man enough to keep her."  Ex. 53 ¶ 18.

193.    Many of Rob's friends tried to convince April and Brian to end their abuse of Rob, some already fearing that Rob might snap. Ex. 53 ¶¶ 19, 22;  see also Ex. 438 ¶¶ 48-49; Ex. 411.  Such efforts seemed only to encourage April and Brian.  See, e.g., Ex. 438 ¶ 48 (Luis Vazquez reporting that upon learning that Rob was suffering from visions of killing her and Brian, April "began threatening to kill Rob herself").

### d.    Rob's Mental Breakdown Following His Break-Up with April Robinson

194.    Friends in Reno witnessed the deterioration in Rob's personality and mental state after his break-up with April and the subsequent actions against Rob undertaken by her, Brian, and their acquaintances. Ex. 53 ¶ 27; Ex. 438 ¶ 48.  Initially, Rob was devastated and tried to win her back, and already he was not acting like himself and sometimes seemed depressed.  Ex. 53 ¶ 28.  April's subsequent hot-and-cold actions – filing restraining orders against Rob in order to appease Brian, while continuing to have sexual relations with Rob – left Rob confused and suffering from mood

71

swings.   Ex. 53 ¶ 29; Ex. 438 ¶ 45; Ex. 45 ¶ 49.   His depression increased, but he was still functioning.   Ex. 53 ¶ 29.   His performance at work suffered.   See, e.g., Ex. 403 at 2 (noting that after the TPOs started, Rob "didn't have his usual motivation for the job").   After receiving repeated threats from Brian – culminating in the vicious attack against Rob by Brian and Brian's nine friends described above  – Rob grew more paranoid, his anger at Brian and April grew, and he became even more depressed.   Ex. 53 ¶ 30.

195.   After the courthouse fight instigated by Brian and his friends, Rob's anger towards Brian intensified; his depression increased; and he grew distant from his friends.   Ex. 53 ¶ 31.   In conversation, he talked almost exclusively about his problems with April and Brian and became very emotional.   Ex. 53 ¶ 31.   His unraveling manifested itself in other ways – it was during this time, driving down a clear and unobstructed road, he drove off the road and into a snowbank.   Ex. 53 ¶ 32. His friend Tom Cheers found Rob in a daze, not intoxicated, but also unable to explain how the accident occurred.   Ex. 53 ¶ 32.

196.   Rob's mental condition continued to deteriorate.   Out with friends one night, Rob checked out of the conversation and began staring off into the distance while others continued playing pool, talking and laughing.   Ex. 53 ¶ 33.   Rob suddenly snapped, yelling about what April was doing to him.   Ex. 53 ¶ 33.   He threw his drink to the floor and began hyperventilating, and his eyes filled up with tears.   Ex. 53 ¶ 33.   Tom recalled that he had never seen anyone go from being so calm to so mad in such a short amount of time and without direct provocation.   Ex. 53 ¶ 33.   That night, Rob explained to Tom that he had begun hearing voices of demons in his head:

> I took Rob outside and we went for a walk.  I wanted to give Rob a chance to get fresh air and clear his mind.  While we were walking, Rob told me that he didn't understand what was going on inside his head.  Rob talked about hearing voices of demons in his head and that he had been having conversations with them. The demons were telling him that he should harm April, but he didn't want to do it.

Ex. 53 ¶ 34.

197.   After this incident, Rob grew even more depressed and would bring up his situation with April at inappropriate times, continuously interrupting conversations about sports, work, or any other area of daily life to talk about April, for no other reason than the fact that she was always on his mind.

Ex. 53 ¶ 35.  Rob grew increasingly distant from his friends, spending less and less time with them; sometimes he disappeared for a couple of days or as long as a couple of months, often without explaining where he'd been or what he'd been doing. Ex. 53 ¶ 38.  Sometimes Rob explained hat he had been staying in abandoned buildings because "he felt like everything was too much for him and he needed to get away."  Ex. 53 ¶ 38.

198.    Even when with his friends, Rob would still isolate himself, staring into the distance for long periods of time as if he were in a trance.  Ex. 53 ¶ 36.  He would zone out like this almost anywhere – in movie theaters, at friends' homes, in bars, and at social gatherings, "anywhere that had a chair for him to sit down."  Ex. 53 ¶ 36.  Sometimes friends would have to call his name several times to get him to snap out of it.  Ex. 53 ¶ 36.  Rob also began referring to himself in the third person in conversation, talking "about how 'Rob' was feeling, or what 'Rob' was going to do, or what 'Rob' thought," especially when referring to the past or to his upbringing.  Ex. 53 ¶ 37.  The number of these episodes increased as Rob continued along his downward spiral.  Ex. 53 ¶ 37.

199.    Friends believe the final straw for Rob was when he left his job at the Winkel car dealership when – acting on April's report – police arrived there to arrest him.  Ex. 53 ¶ 39; Ex. 438 ¶ 50.  Already embarrassed by the repeated attempts to serve restraining orders while working, Rob was unable to return to the dealership after this final episode.  Ex. 438 ¶ 50; Ex. 44  28; Ex. 45 ¶ 47.  His employer understood:

> He was very respectful.  That's one of the things I liked about him . . . .  When he was here he worked hard.  I was glad to see the last time he left, because I know he didn't want to get Winkel's name involved in anything.  He wanted to take care of his personal life.  I think he did that out of respect for the dealership.

Ex. 400.

200.    Having lost one of the few things in life at which he had succeeded and which provided him with a feeling of self-worth, Rob began to speak with a profound hopelessness, referring to himself as a "fuck-up" who messed things up even when he tried to do good.  Ex. 53 ¶ 39.  Any confidence Rob once possessed was gone; his self-esteem was practically gone. Ex. 53 ¶ 45.  Some friends began to believe that Rob had a chemical imbalance and possibly suffered from bipolar disorder. Ex. 45 ¶ 51; Ex. 411.

201.    For weeks after losing his job at Winkel, Rob spoke tearfully with friends about wanting to end his life. Ex. 53 ¶ 40; Ex. 438 ¶ 51; Ex. 44 ¶ 30.  At this point, Tom believed that "Rob's life had bottomed out and he was at the lowest point, mentally and emotionally, that I ever saw him.  It seemed like Rob had given up on life." Ex. 53 ¶ 40.  Not having heard from Rob for two weeks after the police arrived at the dealership to arrest him, Luis went to Rob's apartment unannounced and found Rob sobbing uncontrollably and hyperventilating:

> Rob told me that he was depressed over losing April, his job, and his money.  Rob felt hopeless and saw no point in living.  Rob told me that I needed to leave his apartment because there was something that he had to do.  After I insisted that Rob tell me what he had to do, Rob told me that he intended to hang himself in a closet.  I talked Rob out of killing himself that day and convinced him to stay with me for a while.  I didn't want to let Rob out of my sight for a few days because I feared that Rob might try to harm himself.  From this point onward, Rob regularly talked about wanting to kill himself almost every day.

Ex. 438 ¶ 51.

202.    Trying to help his friend, and worried about leaving him alone in his apartment in Reno, Luis took Rob on a trip to Florida that summer, hoping that the trip would give Rob the opportunity to clear his head and get himself together.  Ex. 438 ¶ 52.  The two visited Orlando and Miami and talked about moving to Florida.  Ex. 438 ¶ 53.  Rob continued to talk about killing himself during this trip.  Ex. 438 ¶ 59.  Though Luis interviewed for a job on this trip and believed he would be satisfied living in Miami, he returned to Reno with Rob because he did not want to leave Rob alone.  Ex. 438 ¶ 53.

203.    Rob's friend Alex Monroy also recalled Rob's suicidal bent:

> Rob talked about wanting to kill himself because he saw no point in living.  I felt like April and her boyfriend, Brian, had made his life a living hell and he saw no hope.  Rob blamed April and Brian for the loss of his job, loss of his way of life and the loss of his dignity.  All of his future hopes came crashing down around him and Rob saw no way for him to regain all that he had lost.

Ex. 44 ¶ 30.

204.    Consumed with thoughts of suicide on the one hand, Rob was also plagued by recurring images and uncontrollable thoughts in which he saw himself killing April and Brian and spending the rest of his life in prison.  Ex. 438 ¶¶ 48, 54.  Though in his right mind Rob had no interest in hurting April and Brian, he became increasingly disturbed by these thoughts and determined to leave Reno in an attempt to escape them.  Ex. 438 ¶¶ 54-56.  He admitted that the voices in his head – which he

74

had been hearing since he was a teenager, see Ex. 45 ¶¶ 23-24 – were instructing him to kill April, see Ex. 438 ¶¶ 57-58.  These voices dominated his thoughts and to Rob seemed inescapable.  Ex. 438 ¶ 57.  At first, Rob recognized that the voices compelling his actions were wrong; by the time of his trip to Miami, however, Rob explained to Luis that the voices had convinced him that killing was all right and that he was no longer bothered by the thought of killing. Ex. 438 ¶ 58. This realization itself disturbed Rob further.  Ex. 438 ¶ 59. see also Ex. 402 at 4 (friend Robert Jackson recounting Luis's description of Rob's tattered mental state on their trip to Florida).

205.    The violent nightmares that had plagued Rob since at least the age of ten and throughout his life, see Ex, 48 ¶ 8; Ex. 51 ¶¶ 57-59; Ex. 45 ¶ 21; Ex. 44 ¶ 10, persisted and intensified:

> Rob constantly complained about having frequent and repetitive nightmares and visions of himself killing and mutilating people. The victims in these nightmares and visions were usually just various random people.  Rob was so disturbed by these nightmares and visions that he often broke down and cried when he described the things that he saw himself doing in these dreams.  Rob was always the victimizer in these dreams and never the victim.  Rob also saw himself being locked up in prison during these dreams.  I sometimes found Rob crying at night and talking about wanting to kill himself when he stayed at my home some nights.

Ex. 438 ¶ 63.  Rob described feeling trapped by the constant nightmares, visions, thoughts and the voices that plagued him, and he felt like there was no way to turn them off no matter what he did or how hard he tried.  Ex. 438 ¶ 64.

206.    Rob's  mental deterioration in Reno manifested itself in all other aspects of his life.  He went from a being a guy who loved working out and staying in excellent shape, to not working out and being overweight.  Ex. 53 ¶ 41; Ex. 44 ¶ 29.   He went from being a sharp dresser who enjoyed wearing bright-colored clothing, to wearing only tacky black clothing, usually jeans and t-shirts, or sweat clothes. Ex. 53 ¶ 43; Ex. 45 ¶ 54.  He stopped caring about personal grooming, often walking around with uncombed hair and his face unshaven, looking scruffy.  Ex. 53 ¶ 44; Ex. 438 ¶¶ 75, 77; Ex, 44 ¶ 29; Ex. 45 ¶ 54.  He stopped cutting his hair or bathing every day, and sometimes carried a foul odor. Ex. 438 ¶¶ 75, 77-78; Ex. 44 ¶ 29. He began listening to angry, screaming heavy metal music filled with obscenities, and borrowed books from the library dealing only with horror, violence, and tragedy. Ex. 53 ¶¶ 46-47. His home, once spotless, became "a complete mess with piles of dirty clothing all over the place, the sink filled with dirty dishes, and his kitchen garbage overflowing and

1   stinking up his apartment."   Ex. 45 ¶ 54.

2   207.    Friends' attempts to intercede on Rob's behalf were unsuccessful.  See, e.g., Ex. 438 ¶ 60

3   (Luis describing his attempts to convince Rob to meet with mental health professionals, and offering

4   to accompany him to visit a doctor, but never following up on this plan); Ex. 438 ¶ 48 (Luis

5   describing attempt by mutual friend Lisa Rose to call secret witness phone line to report Rob's

6   apparent compulsion to harm April and Brian, but being told they were unable to help and providing

7   no further instruction on how to handle the situation); Ex. 45 ¶ 51 (Athena describing trying to

8   convince Rob to seek professional help for his severe depression and mood swings, which seemed

9   to her to be symptomatic of undiagnosed bi-polar disorder).

10  208.    In the Fall of 2001, Rob abruptly left Reno without telling anyone where he was going. Ex.

11  438 ¶ 65.  All that Rob told his friends was that he was going on a "one-way trip" and that they could

12  take all of his possessions from his apartment "because he did not need [them] where he was going."

13  Ex. 53 ¶ 41; Ex. 438 ¶ 71.  Rob left Reno with only the clothes on his back and a knapsack.  Ex. 53

14  ¶ 41; Ex. 438 ¶ 71; see also Ex. 44 ¶ 31 (Alex Monroy describing circumstances of Rob's departure

15  from Reno).  His friends divided up Rob's remaining possessions. See Ex. 44 ¶ 31.

16  209.    Not long after, friends learned that Rob had been arrested at the Mexican border for illegally

17  carrying a firearm across the border and had been sent to jail in Mexico. Ex. 438 ¶ 65. Rob noted that

18  the conditions inside the jail included people who were being raped and beaten, and drugs, alcohol

19  and prostitutes were readily available. Ex. 55 ¶ 15.  As an American, Rob was sufficiently concerned

20  about his safety inside the Mexican jail that – at Luis's suggestion – he hired another inmate to

21  provide protection. Ex. 438 ¶ 66.

22  210.    On the other hand, Rob continued to discuss suicide while incarcerated, and his friend Luis

23  made arrangements to have blankets from his cell removed because Rob intended to hang himself

24  with them. Ex. 438 ¶ 65.  Family and friends later learned that Rob's trip to Mexico was itself a

25  suicide attempt.  As Luis explained,

26

27          When I asked Rob why he went to Mexico, he told me that he was  going to spend
            some time in Mexico before making his way down to Belize. Rob then planned to kill
            himself after completing his entire trip.  However, Rob changed his mind by the time

28          that he drove down to the Tijuana border.  When Rob was going across the border, he

decided to abort his plans. Rob attempted to turn around or reverse his way back into the United States but the Mexican authorities intercepted him before he made it across. Rob thought about drawing his gun to commit suicide by cop, but he changed his mind as he was holding the pistol and decided to surrender peacefully.

Ex. 438 ¶ 69; see also Ex. 87 at 4 (Rob confiding in his mother and step-father that he had gone to Mexico to kill himself); Ex. 55 ¶¶ 1, 14 (Rob's friend and former neighbor in Pennsylvania Jacqueline Quin reporting that Rob's account of his arrest in Mexico sounded like "Rob may have been trying to commit suicide by cop").

211.    Ultimately Rob was released from jail in Mexico after friends and family loaned him money for bail. Ex. 438 ¶ 67; Ex. 44 ¶ 31; Ex. 45 ¶ 56. As part of the arrangement, Rob was forced to forfeit one of his last meaningful possessions, the vehicle he was driving when he had been arrested, a brand-new 2001 Pontiac Grand Am. Ex. 438 ¶ 67. Following his stay in the Mexican jail, Rob returned briefly to Reno but with no improvement in his mental condition. Severely depressed, Rob completely isolated himself from his friends, staying home by himself all day, doing nothing. Ex. 438 ¶¶ 72-74; see also Ex. 44 ¶ 29; Ex. 45 ¶ 55. He made no efforts to find employment. Ex. 438 ¶ 74. He was consumed by his thoughts of killing April and Brian, and found no pleasure in life and no point in living. Ex. 438 ¶ 70

212.    In September 2001, with Rob pleading for help, his then-girlfriend Lisa Rose had to talk him out of suicide and helped his dispose of bullets for his gun: "[H]e was tired of being embarrassed and having them ruin his life. He told her, 'Lisa, please stop me.' She said he was also in a depression and she talked him out of suicide. They took the bullets out of [Rob's] gun and threw them into a lake." Ex. 411.

213.    Shortly before returning to Pennsylvania in November or December 2001, Rob met with his friend Robert Jackson in a local restaurant and described his mental state:

> Rob told me that he did not feel right mentally because he kept seeing recurring visions of himself killing April and Brian. Rob also saw himself rotting in a jail cell for the rest of his life in these visions. Rob was afraid because these visions were dominating his thoughts and he felt like they were pushing him to do these things. He did not want to harm anyone. Rob felt as if he was losing control of his thoughts and himself, and he didn't know what to do.

Ex. 49 ¶ 18. Rob again left Reno without telling anyone where he was going, and none of his Reno

1  friends heard from Rob again for several months or longer. Ex. 49 ¶ 19; Ex. 438 ¶ 79; Ex. 44 ¶ 32;

2  Ex. 45 ¶¶ 57-58.

3  214.    While in Pennsylvania, after reinitiating contact with at least some of his Reno friends, Rob

4  admitted to Tom Cheers that he could not shake his thoughts and feelings of bitterness towards April

5  for everything she had put him through. Ex. 53 ¶ 26.  In these conversations, Rob would refer to the

6  "demons" in his head and the unshakable hate that he had carried with him to Pennsylvania:

7      Rob spoke about "the hate" as if it were its own entity and a thing that was controlling
       his thoughts.  Rob also talked about demons being inside his head and that he heard
8      them speaking to him and telling him to do things to April that he did not want to do.

9  Ex. 53 ¶ 26.

10  215.    Rob's family and friends in Pennsylvania noted his deteriorating mental health, suicidal

11  tendencies, obsession with April, and associated behavioral effects as well.  His uncle Ted and his

12  wife Renee thought "he looked like a totally different person[, ]very scary, with a shaved head, tattoos

13  and a cold look in his eyes." Ex. 84 at 6. Renee believed Rob had developed the sort of personality

14  type that could "snap."  Ex. 84 at 7; see also Ex. 48 ¶ 49 (Rob described as "on the verge of

15  snapping").

16  216.    During his time in Pennsylvania, Rob had become more reclusive, like "he didn't want to be

17  involved with anybody." Ex. 92 at 4. His half-sister Dawn recalled that Rob "didn't have any friends,

18  and would go shopping, out to eat, or to movies by himself all the time.  When everyone else would

19  get together for [b]irthday functions and holidays, Rob would stay home by himself.  They bought

20  him presents but he didn't even open them." Ex. 106 at 3, He didn't date, and would fight with and

21  threaten step-siblings with whom he had once been close. Ex. 92 at 4; Ex. 106 at 3.

22  217.    When around others, he spoke about his problems with April and Brian constantly.  Robbin

23  Jr. recalled that

24
25      Rob talked about April everyday that I was around him, and he sometimes went on
        talking about her for hours.  We could be sitting in a restaurant and then Rob would
        began talking about April because he saw someone there who reminded him of her.
26      We could be driving down the street and then Rob would start talking about April
        because he saw a car that looked like the one she drove.  It seemed like the slightest
27      things could trigger some kind of memory that took his mind back to April.  Even
        things as simple as a song, clothes or the color of someone's hair.  It was like he could
28      not escape her because she was in all of his thoughts.

Ex. 48 ¶ 57; see also, e.g., Ex. 55 ¶ 12; Ex. 106 at 3 (half-sister Dawn recalling how Rob would

discussing Brian messing with him at work, causing his to lose his job, and how April would call him

and want to have sex with him, and then seek a TPO after he left); Ex. 48 ¶ 48. Rob also spoke with

increasing anger about his parents' treatment of him. See, e.g., Ex. 48 ¶ 46; Ex, 55 ¶¶ 6, 10, 12.

218.    Rob was plainly suicidal and spoke with friends and family about wanting to end his life.

Robbin Jr. remembered:

> Rob repeatedly talked about killing himself because he thought that it was the solution
> to all his troubles. I tried to convince Rob that suicide was not the answer but he didn't
> agree.   Rob felt like he had nothing to live for and wished that he could just kill
> himself to end his suffering.   Rob spoke like he wanted to be put out of his misery.

Ex. 48 ¶ 50; see also Ex. 55 ¶¶ 1, 13 (Rob's friend and former neighbor in Pennsylvania Jacqueline

Quin reporting that Rob "frequently spoke about wanting to kill himself whenever he spoke about his

ex-girlfriend and the problems in his past").

219.    Rob's disrupted sleep patterns persisted in Pennsylvania. He frequently woke up in the middle

of the night and complained of having nightmares at least two or three times a week. Ex. 48 ¶ 58.

He would also have difficulty falling asleep, staying up late watching television or going on long

walks in the middle of the night lasting hours.  Ex. 48 ¶ 58.

220.    Rob exhibited signs of paranoia, carrying a gun twenty-four hours a day and explaining that

"you never know when someone's gonna come at you."  Ex. 48 ¶ 59.  Sometimes Rob would sit "in

a trance-like state for hours at a time just staring into space while he was cleaning his gun or

sharpening his knives," and would have to have his name called several times to awaken. Ex. 48 ¶ 48.

221.    Relatives noticed other dramatic changes in Rob's behavior as well.  Previously, Rob almost

never drank, but in 2001 he was drinking two or three beers every day after work and more on

weekends.  Ex. 48 ¶¶ 52-53.  He began drinking alone at bars, something he had never done before.

Ex. 48 ¶ 53.  To Robbin Jr.'s surprise, Rob was also smoking marijuana, eventually getting to the

point that he was smoking it morning, afternoon and night.  Ex. 48 ¶ 54.  Robbin Jr. also learned that

Rob had done cocaine with an acquaintance at a local bar.  Ex. 48 ¶ 55.  Rob's drug use surprised

Robbin Jr., because they had both remained drug-free throughout their lives, unlike many or most in

their family.  Ex. 48 ¶ 56. Robbin Jr. figured that Rob was trying to deal with the emotional pain he

1   was experiencing at the time.  Ex. 48 ¶¶  52, 55-56.

2   222.   Rob returned to Reno in the days before the offenses of which he was convicted.  None of his

3   friends felt comfortable around him because it was evident that he was mentally unstable.  Ex. 438

4   ¶¶ 80-81.  He was no longer the person his friends had come to know.  Ex. 44 ¶ 34.  He was distant,

5   looked exhausted, and slept little.  Ex. 438 ¶ 81; Ex. 45 ¶ 64.    Though he had been gone from Reno

6   almost a year, he had been unable to shake the voices and images commanding him to kill April and

7   Brian. Ex. 438 ¶ 81.  His friend Athena Lindsay-Monroy described his mental state at the time of the

8   offenses:

> Everything about Rob was weird and unusual when we saw him during the week of the murder.  In the past, Rob always played with my children and showed them a lot of attention but in those last days before the incident Rob did not interact with my children and he was not affectionate at all.
>
> Rob was very distant from everyone around him and acted like he was just going through the motions in all that he did.  Rob seemed like he was on cruise control and functioning like a computer.  Rob showed no emotion at all.  Rob seemed like his body was there but his mind was somewhere else. . . .  Rob often sat and stared off into the distance.
>
> Rob didn't laugh, smile, or get upset, agitated or happy about anything. It seemed like Rob was emotionless, flat and monotone in his demeanor. . . .

Ex. 45 ¶¶ 61-63.

223.   Days before the incident, Rob visited with his friend Robert Jackson. Ex. 49 ¶¶ 20-21; see also

Ex. 438 ¶ 86.  Rob looked "completely exhausted and in need of a place to rest," and told Robert he

was hungry.  Ex. 49  ¶¶ 20-21.  Although Rob again mentioned the unwanted recurring visions of

himself killing April and Brian, almost a year since first complaining about them, he spoke more of

returning to Pennsylvania.  Ex. 49 ¶¶ 20, 22.  To facilitate his return, Robert (who owned a used car

dealership) gave Rob a car and a small amount of money. Ex. 49 ¶¶  23.  He was surprised to learn

that Rob had used to car to drive to April's house instead.  Ex. 49 ¶ 23.

224.   Rob's father recalled that shortly before his arrest for the instant offenses, Rob had told him

that

> [h]e was going out, and there was no way he was going to jail. From this conversation I thought he was going to kill himself or they were going to kill him [be]cause he was going to resist.  He told me he loved me and he's telling me goodbye.  It was kind of final.

1  Ex. 399 at 3.

2  225.    The night before the offenses, Rob also visited his friend Tom Cheers at the hotel where Tom

3  worked, saying he had slept in his car the previous two nights and asking for a hotel room.   Ex. 53

4  ¶ 52.  Tom provided Rob a complimentary room and took him to the hotel's coffee shop for a meal.

5  Ex. 53 ¶ 52.  His friend of many years barely recognized the person in front of him:

> Rob appeared to be completely out of his mind and he did not seem like the same
> person that I knew.  Rob was talking during the entire meal, but he was not making
> any sense at all.  Rob talked as if he was having four different conversations and I was
> not able to follow anything that he was saying.  Rob was mumbling a lot and making
> various random incoherent comments.  From what I could make out, Rob was talking
> about April because I heard him repeat her name at various times throughout his
> rambling.
>
> Rob's eyes were wide and he had an empty look on his face, as if he was there
> physically but his mind was somewhere else.  Rob's appearance reminded me of the
> way that mental patients look when they don't take their medication for extended
> periods of time.  Rob seemed like he was totally detached from reality.

Ex. 53 ¶¶ 53-54.  In the course of their meal, Rob abruptly stopped talking and excused himself,

having hardly eaten any of his food.  Ex. 53 ¶ 55.  It was the last time Tom saw Rob in person; the

next day he learned Brian Pierce was dead and police were searching for Rob.  Ex. 53 ¶ 56.

226.    Though Rob's close and friends and relatives bore witness to his mental deterioration in the

weeks, months and years prior to the instant offenses, prior counsel never sought the help of Rob's

close friends or relatives in convincing Rob to not waive counsel. See Ex. 50 ¶ 114 (Rob's paternal

uncle Ted declaring that "I would have been willing to help with talking Rob out of his plans to

represent himself had I known what was going on.  I believe that Rob probably would have listened

to me because of the relationship that we had."); Ex. 48 ¶ 65 (Rob's brother Robbin Jr. declaring

"Rob's trial team never asked for my assistance in trying to convince Rob not to represent himself

at trial.   I had the closest relationship of anyone in my family with Rob and I'm certain that I could

have reasoned with him."); see also Ex. 44 ¶ 39; Ex. 46 ¶ 32; Ex. 51 ¶ 65; Ex. 57 ¶ 31; Ex. 53 ¶ 60.

### 2.     Failure to Adequately Investigate and Prepare Expert Witnesses

#### a.     Failure to Adequately Investigate and Present the Testimony of a Mental Health Expert

227.    Mr. McConnell alleges that trial counsel were ineffective in failing to adequately prepare a

mental health expert to assess whether he was capable of representing himself at trial.  On December

1    13, 2002, trial counsel obtained a psychological evaluation from Edward M. Varra, Ph.D, and

2    Elizabeth Neighbors, Ph.D.  Ex. 415.  Trial counsel also obtained a psychiatric evaluation of Mr.

3    McConnell from John N. Chappel, M.D. on January 6, 2003.  Ex. 22. Mr. McConnell alleges that trial

4    counsel were ineffective in failing to provide the information in their possession, including mental

5    health records, school records, and witness interviews, to these experts.  Mr. McConnell alleges that

6    counsel were ineffective for failing to compile this information into a social history to provide to their

7    experts, as current counsel has done.  Ex. 444.  Instead, trial counsel relied upon Mr. McConnell's

8    self-reporting as the source of the factual background information relating to his background and

9    family history.  Mr. McConnell further alleges that trial counsel were ineffective in failing to conduct

10   an adequate mitigation investigation, and he incorporates the allegations above regarding counsel's

11   failure to adequately investigate the existence of mitigation information from family members and

12   friends as if fully set forth herein.

13   228.    Even with the information actually known to counsel, trial counsel were still ineffective in

14   failing to inquire of their experts regarding how Mr. McConnell's mental health issues affected the

15   way they should interact with him and whether he was capable of representing himself.  In their

16   psychological report, Drs. Varra and Neighbors diagnosed Mr. McConnell as suffering from post-

17   traumatic stress disorder (provisional diagnosis) (Axis I[4]), borderline personality disorder (Axis II),

18   history of abuse and neglect (Axis IV), and gross impairment in current functioning (Axis V).  Ex.

19   415, at 6.  Likewise, Dr. Chappel diagnosed Mr. McConnell as suffering from post-traumatic stress

20   disorder (Axis I).  Ex. 22, at 4.  Despite having actual knowledge of these mental health issues, Mr.

21   McConnell alleges that trial counsel did not approach any of these experts to inquire how their

22   diagnoses should influence the manner in which they interacted with Mr. McConnell.  On the

23   contrary, Mr. McConnell alleges that trial counsel exacerbated the problems contained in his

24   psychological profile by communicating with him in a destructive manner by telling him that he

25   should plead guilty and that he would inevitably be sentenced to death.  Mr. McConnell hereby

26   incorporates the allegations of Claim One(B) regarding counsel's ineffective communications as if

27

28   _____

     [4]References to Axis in the instant petition refer to classification references found in the Diagnostic and Statistical Manual of Mental Disorders.

fully set forth herein.  Mr. McConnell further alleges that trial counsel never approached any of their experts to inquire whether his mental health background would prevent him from acting as counsel in his own defense.  Mr. McConnell alleges that trial counsel did not have a strategic justification for failing to make inquiries on these crucial issues given that these experts were readily available to them.

229.    Mr. McConnell alleges that he suffered prejudice due to trial counsel's failure to inquire of their experts whether his mental health background should influence their interactions with him and whether it would prevent him from acting as his own counsel.  Mr. McConnell has enlisted the assistance of Paula K. Lundberg-Love, Ph.D, a psychologist, to review all of the mental health data and witness information included with the instant petition.  Ex. 451.  Dr. Love has identified the mental health issues present in Mr. McConnell's background and discussed how these issues should have influenced trial counsel's interactions with him in the pre-trial period and why they should have enlisted expert assistance to explain to the trial court that he was not capable of representing himself at the penalty hearing.  In her report, Dr. Love discusses the psycho-social considerations present in Mr. McConnell's background which are discussed in more detail above, including the severe neglect he suffered in the custody of his mother, the abuse and humiliation he suffered at the hands of his father, and the deleterious effect of his experiences confined with the California Youth Authority.  Ex. 439, at 3-6.  Dr. Love concludes that the deprivations suffered by Mr. McConnell as a child was severe enough to cause borderline personality disorder (Axis II).  Id. at 6-7.  Dr. Love notes that Mr. McConnell's borderline personality disorder was the cause of his stalking behavior as well as his suicidal ideation.  See id.

230.    Dr. Love has also diagnosed Mr. McConnell as suffering from post-traumatic stress disorder ("PTSD").  Unlike Drs. Varra and Neighbors, Dr. Love was able to make a firm diagnoses of PTSD based upon symptom confirmation from collateral reporting sources regarding the recurrent nightmares and sleep disturbances suffered by Mr. McConnell.  Ex.451, at 9.  Unlike the experts retained by counsel, Dr. Love was provided with information regarding Mr. McConnell's dissociative behavior where he was hearing voices in the months leading up to the offense which she believes is indicative of potential bipolar disorder or psychotic depression.  Ex. 451, at 9-10.  With respect to

1  cognitive functioning, Dr. Love concludes that Mr. McConnell demonstrates indications of

2  neuropsychological impairment which may be due to Alcohol Related Neuro-Developmental

3  Disorder, which is attributable to his exposure to alcohol in utero.

4  231.    If trial counsel had sought the advice of a mental health expert, they could have understood

5  how to interact with Mr. McConnell in a constructive manner in the pre-trial period to prevent him

6  from filing a motion to represent himself.  As explained by Dr. Love, instead of advising Mr.

7  McConnell to go forward with his motion to represent himself, counsel should have known that such

8  a course of action would backfire because it would re-enforce the sense of abandonment that Mr.

9  McConnell felt from his borderline personality disorder:

10          A mental health practitioner would have been useful to advise trial counsel
        regarding the best ways to interact with Mr. McConnell before trial to prevent him
11       from going forward with his desire to represent himself.
                                      . . . .
12
            Given the powerlessness and personality deterioration experienced by Mr.
13       McConnell, trial counsel would have been advised by a competent mental health
        expert that patients with borderline personality disorder are hypervigilant for signs of
14       abandonment and rejection.  Because of this hypervigilance, I would have advised trial
        counsel to emphasize continually to the client that they will serve the client the best
15       they can throughout the litigation.  I would have advised that telling the client he is
        doomed and that there is little trial counsel can do for him would be seen as
16       abandonment and would severely disrupt the attorney / client relationship.

17  Ex. 451, at 16-17.  In particular, Dr. Love would have explained to trial counsel that Mr. McConnell's

18  vacillation before trial was a symptom of his borderline disorder, and that trial counsel should never

19  have told him to follow through on this threats to represent himself:

20          Similarly, any advice from trial counsel to follow through on  threats to
        represent himself, given Mr. McConnell's borderline driven issues with abandonment,
21       could have possibly terminally damaged the relationship.  Therefore, if counsel had
        asked for the advice of a mental health expert, they could have presented ample
22       evidence at the self-representation hearing that the request by Mr. McConnell to
        represent himself was driven by mental illness and that because of the mental illness,
23       he would be unable to rationally or reasonably function as counsel.  In addition, given
        a proper and thorough consultation with a mental health practitioner, they may have
24       convinced him not to proceed with the motion in the first place.

25  Ex. 451 at 17-18.  Mr. McConnell alleges that he suffered prejudice as a result of trial counsels'

26  failure to seek the advice of a mental health expert regarding the best way to interact with him before

27  trial, and there is a reasonable probability that Mr. McConnell would not have moved to represent

28  himself if counsel had performed effectively.

84

232.   Mr. McConnell further alleges that he suffered prejudice due to trial counsels' failure to seek advice from an expert and to present evidence at the <u>Faretta</u> hearing that he was not capable of acting as counsel in his own defense.  As explained by Dr. Love, a mental health expert could have presented evidence that Mr. McConnell was not capable of representing himself based solely on the evidence that was in trial counsels' possession:

> A mental health practitioner could have informed the trial court that Mr. McConnell was not able to act as his own counsel to contest the state's evidence against him or to present mitigation evidence.  There was substantial mental health information known by trial counsel regarding Mr. McConnell's background, including his severe neglect and abuse, post-traumatic stress disorder, borderline personality disorder, and severe depression that could have been presented to the trial court when the issue of Mr. McConnell's mental health was raised at his self-representation hearing to show that he was not capable of representing himself.  The information gathered by current counsel from the Federal Public Defender's Office that was not obtained by trial counsel only solidifies my opinion that Mr. McConnell was not capable of representing himself.  A mental health practitioner could have informed the trial court that Mr. McConnell's representation of himself would be a disaster and necessarily detrimental to his interests.

Ex. 451, at 12.

233.   Specifically, a mental health expert could have advised trial counsel and presented evidence that the Mr. McConnell was so grossly impaired in his functioning that he could not act as counsel in his own defense.  Dr. Love reviewed the Global Assessment of Functioning scores received by Mr. McConnell from his assessment by Drs. Varra and Neighbors and has concluded that the results demonstrate that Mr. McConnell was not capable of representing himself:

> A competent mental health practitioner would have informed the trial court that Mr. McConnell's performance on the Global Assessment of Functioning ("GAF") was indicative of gross impairment which would have prevented Mr. McConnell from representing himself.  The GAF scale is contained in Axis V of the Diagnostic and Statistical Manual of Mental Disorders and it represents a judgment of an individual's overall level of functioning.  Mr. McConnell's GAF score would have been important information that should have been brought to the attention of the trial court to measure the impact of his psychological issues on his behavior and to predict how Mr. McConnell would function as his own counsel in the stressful environment of a courtroom.  The optimal range for a GAF score is between 91 and 100.  I have personally known people to be hospitalized who have GAF scores as high as 50.

> The psychological evidence before trial counsel showed that Mr. McConnell's was in a range that indicated that he suffered from gross impairment on the GAF scale and that he was simply too disorganized to represent himself.  The psychological report of Edward M. Varra and Elizabeth Neighbors which was prepared before the self-representation hearing shows that Mr. McConnell's highest GAF score in the past year was a 35 and his present score was a 20.  According to the DSM IV-TR, a person functioning in the 11 through 20 range on the GAF scale would present "some danger

85

of hurting self or others (e.g., suicide attempts without clear expectation of death; frequently violent manic excitement) OR occasionally fails to maintain minimal personal hygiene (e.g., smears feces) OR gross impairment in communication (e.g., largely incoherent or mute)." Mr. McConnell's behavior during the time period before his penalty hearing shows strong symptoms of suicidal ideation and possible hypomanic excitement. A competent mental health practitioner could have informed the trial court and the jury that Mr. McConnell's level of functioning was so low that he was not capable of representing himself as counsel.

Ex. 451, at 12-13. Mr. McConnell alleges that trial counsel were ineffective in failing to use the mental health information in their own possession and to seek expert advise and to present evidence of Mr. McConnell's severely deteriorated mental state in opposition to his motion to represent himself.

234. Mr. McConnell further alleges that he suffered prejudice due to trial counsel's failure to present evidence of his borderline personality disorder at the <u>Faretta</u> hearing to show that he was not capable of representing himself. As explained by Dr. Love, Mr. McConnell's borderline personality disorder would have prevented him from acting as counsel, particularly with respect to confronting and examining his ex-girlfriends at the penalty hearing:

> A competent mental health practitioner would have informed the trial court that Mr. McConnell's personality disorder also prevented him from representing his own interests at the penalty hearing.

> Trial counsel knew from their interactions with Mr. McConnell that he intended to show that provocation by April Robinson and Brian Pierce caused him to commit the offense. Mr. McConnell's borderline personality disorder would have caused him to focus solely on demeaning and embarrassing Ms. Robinson even at the expense of his own interests. Mr. McConnell's chronic feelings of emptiness and abandonment would have caused him to lash out at Ms. Robinson based on his own perception that she also abandoned him. It is my opinion to a reasonable degree of medical certainty that Mr. McConnell was not capable of rationally assessing the testimony from April Robinson or any other person that abandoned or rejected him - his borderline personality disorder prevented such assessment. Mr. McConnell's emotional need to antagonize his ex-girlfriends in court would have overwhelmed his ability to assist as counsel in his own defense. A forensic psychologist could have specifically warned the trial court regarding Mr. McConnell's inability to confront and examine his ex-girlfriends as witnesses.

Ex. 451, at 13-14. As explained by Dr. Love, expert testimony on this issue was critical due to the mis-perceptions that lay persons have regarding the ability of a person like Mr. McConnell, who has above average intelligence, to function as counsel when he masks the symptoms of his illness. <u>Id.</u> at 15-16. Mr. McConnell alleges that trial counsel did not have a strategic justification for failing to

86

1   present the testimony of a mental health expert to explain that Mr. McConnell was not capable of

2   acting as counsel with respect to his ex-girlfriends given stand-by counsel's request before the hearing

3   to permit her to question those very same witnesses.  See 8/21/03 TT at 31-32.  Mr. McConnell

4   further incorporates the allegations of Claim Two which show in vivid detail the prejudice he suffered

5   due to trial counsels' failure to offer evidence of his personality disorders and how it prevented him

6   from acting as counsel.

7   235.   Mr. McConnell further alleges that trial counsel were ineffective in failing to adequately

8   prepare an expert with the information that Dr. Love has reviewed to be prepared to present

9   mitigation evidence to the jury at the penalty hearing, and that he suffered prejudice as a result.

10

11                          **b.      Failure to Investigate and Present Expert on the Effects of
                                      Confinement in the California Youth Authority**

12   236.   Mr. McConnell alleges that trial counsel were ineffective in failing to seek expert assistance

13   to explain the negative effects of Mr. McConnell's confinement in the California Youth Authority

14   ("CYA").   Prior counsel plainly recognized the potential mitigating significance of Rob's lengthy stay

15   in CYA because they requested and obtained Rob's file from the Authority and elicited information

16   from a small number of witnesses about Rob's experiences while housed there.  See, e.g., Exs. 87 at

17   3, 89 at 3, 399 at 2.   However, trial counsel failed to interview other key witnesses that could have

18   provided crucial additional information regarding Rob's experience in CYA.  These omitted witnesses

19   included (1) Rob's friend Stahn Muller, whom Rob met when both were fifteen years old and awaiting

20   intake into CYA and with whom Rob lived for years his release from CYA, see Ex. 52 ¶¶ 1-21, 26;

21   and (2) Athena Monroy, a close friend in whom Rob often confided the most intimate details of his

22   past, including his experiences at CYA, see Ex. 45 ¶¶ 1, 6, 9-13.  Mr. McConnell alleges that counsel

23   was ineffective for failing to conduct an adequate investigation and that he suffered prejudice as a

24   result.   These additional witnesses would have corroborated and amplified the day-to-day physical

25   and sexual violence to which Rob was exposed during the period of his incarceration, as well as

26   provided an account of the attempted rape by a fellow inmate Rob suffered at age seventeen that prior

27   counsel's investigation failed to uncover.  See Ex. 52 ¶ 17.

28   237.   Though they had already collected some information regarding Rob's experiences in CYA,

87

1  and could easily have accessed further information from additional witnesses, trial counsel did

2  nothing to develop this information.  More specifically, trial counsel were ineffective when they failed

3  to retain an expert that could explain the CYA's serious institutional problems and their relevance to

4  Rob's psychological profile.  Undersigned counsel retained such an expert, Daniel E. Macallair, an

5  expert on youth correctional systems with over twenty years of experience.  Ex. 439 at 1 & Apps.

6  A-B.  Had trial counsel consulted with Mr. Macallair or a similar expert they would have learned the

7  following:

8                                    **Conditions at County Facilities**

9  238.    Mr. Macallair would have described the conditions at the facilities to which Rob was sent

10 even before his formal commitment to the California Youth Authority.  The Santa Clara County

11 James Ranch ("James Ranch"), where Rob was housed in November 1988, was described as "unsafe

12 and chaotic" in the years before its renovation in 2006.  Ex. 439 at 2-3; see also Exs. 171, 175.  Its

13 dormitory, especially at night, was understaffed and "a constant battleground for gang warfare, abuse

14 and violence."  Ex. 439 at 3.  Riots were common and required police in riot gear to subdue the

15 out-of-control ward population and to restore order.  Ex. 439 at 3.  Michael Simms, a former manager

16 of James Ranch, described to Mr. Macallair the difficulties in monitoring wards in other areas of the

17 facility given the many youths housed therein and few staff members in the facility.  Ex. 439 at 3

18 (internal footnotes omitted).  Mr. Simms also explained that before 2006 the facility de-emphasized

19 therapy and utilized a correctional model of programming.   Ex. 439 at 3-4 (internal footnotes

20 omitted).  Conditions at the James Ranch were sufficiently dire that in 2006, the Santa Clara County

21 Probation Department implemented an overhaul of the facility, citing "'a 40% failure rate among

22 wards in the ranches, a high number of incidents that occurred at the ranches, the feeling that the old

23 Ranch didn't promote the growth of detained youth, and a high recidivism upon return to their

24 homes.'" Ex. 439 at 3.

25 239.    The Harold Holden Boys' Ranch, where Rob was intermittently housed in June and July 1988,

26 was similar in design to the James Ranch and likely suffered from the same high levels of violence.

27 Ex. 439 at 2; see also Exs. 144, 146 at 1-2.  Mr. Macallair would have explained that Rob's early

28 escapes from boys' ranches and his returns to juvenile hall as a ranch failure were not unexpected, as

1 both were common among wards, as were high recidivism rates even among youths that were able

2 to complete their programs.  Ex. 439 at 4.

3 **Failure to Place Wards in Facilities Equipped to Meet Their Needs**

4 240.     Mr. Macallair would have described the persistent failure of state and county authorities to

5 place Rob in facilities equipped to address his identified therapeutic needs.  In an August 12, 1988

6 evaluation, Dr. Greg Salerno, Ph.D., recommended that Rob "be placed at a therapeutic group home

7 with daily structure and counseling aimed at helping him deal with behavior and characterological

8 problems."  Ex. 439 at 4-5 (internal quotation marks omitted); see also Ex. 158 at 3 (Salerno Report).

9 This internal probation recommendation was not followed.  Instead, Rob was sent to CYA's Northern

10 Youth Correctional Reception Center and Clinic (NCRCC) in August 1988 for an additional

11 psychological assessment.  Ex. 439 at 5; see also Ex. 161.  At NCRCC, Dr. Marilyn E. Rocha, Ph.D.,

12 a CYA staff psychologist, again recommended that Rob be placed at a secure, structured county

13 facility to receive therapeutic services in a report dated September 28, 1988.  Ex. 439 at 5; see also Ex.

14 163 at 4 (Rocha Report).  On October 4, 1988, a CYA caseworker also recommended a residential

15 treatment facility placement.  Ex. 439 at 5; see also Ex. 164 at 5.

16 241.     Subsequently, in early 1989, Rob was placed in the McDowell Group Homes ("McDowell"),

17 a facility that was already the subject of multiple reports describing the wholly substandard services

18 provided there.  Ex. 439 at 5-6;  see also Ex. 181.  Records amply reflect the inadequate and

19 inappropriate care residents received at McDowell both before and after Rob's tenure there.  In 1984,

20 the facility's house parents left their employment amid accusations of slapping wards, grabbing them

21 by [their] neck, and pushing them and using offensive language.  Ex. 439 at 5.  In 1986, a staff worker

22 was fired after refusing to allow a ward to call his probation officer and used force to stop him from

23 doing so.  Ex. 439 at 5-6.  In 1992, the facility's house-father was terminated after drinking with

24 residents, failing to control marijuana usage among residents, and allowing residents to fistfight.  Ex.

25 439 at 5.  McDowell's physical deficiencies were also well-documented.  Ex. 439 at 6.  After

26 voluntarily surrendering its license in 1992, the facility reopened in 1994, but without much

27 improvement.  Reports noted additional physical deficiencies and an allegation of sexual abuse

28 against one of their employees.  Ex. 439 at 6.  The facility shut down again in 2000.  Ex. 439 at 6.

242.   Mr. Macallair would have explained that Rob's various placements before his formal commitment to CYA were likely based solely on his age and the availability of a bed, not on his specific needs. Ex. 439 at 6. Mr. Maccalair explained:

> Probation officers' decisions were often made based on ease of placement; there was no science to juvenile placement in California, contrary to standards in the professional literature in the field.  Instead, placement was determined largely based on available bed space, which in turn might depend upon the probation officer's relationship with the individual group home.  Probation officers were constantly being assigned new juveniles by the courts to place and probation officers were constantly seeking bed spaces.  It was availability that mattered, as opposed to quality or relevance to the services the minor needed.

Ex. 439 at 6-7.

243.   Mr. Macallair would have explained other ways in which juvenile placement policies in Santa Clara County were outmoded, contrary to professional norms and diminished, if not extinguished, Rob's ability to succeed at his placements:

> During the time of Mr. McConnell's juvenile incarceration there were huge California county-by-county disparities in juvenile placement policies, with Santa Clara County often cited as among California's worst in its reliance on custodial or correctional institutions. . . .  Santa Clara County's reliance on institutional care was well known at the time of Mr. McConnell's probation wardship in the late 1980's.  The County did not adhere to contemporary standards in the field.  Additionally, it was well recognized that placing a child who had been traumatized early in life in the juvenile justice system and subjecting the child to incarceration in high security detention centers and congregate residential care[] is contrary to basic standards of individualized intervention and effective practice.  It is clear that Mr. McConnel[l]'s case was handled in a routine manner by the Santa Clara County Probation Department.  The Santa Clara County juvenile justice system did not seek to maximize community-based options, but rather often utilized the state correctional facilities to address the concerns of public safety.
>
> . . . .
>
> Also established and accepted in the field at the time was the concept of therapeutic foster care, i.e., that it was desirable for the state to place a child with behavioral difficulties in a high level foster care setting with therapeutic services and a "no ejection" policy.  A "no eject" policy eliminates the cycle of removal and abandonment, another negative dynamic which occurred with Mr. McConnell.  A therapeutic foster home is given a rich cycle of resources to stabilize the juvenile in that one particular home.  The program may incorporate reunification with the parents but does not have to do so.  The therapeutic foster home concept was well known in California at the time and many county child welfare systems were moving toward it, unlike Santa Clara County.

Ex. 439 at 7-8 (internal footnotes omitted).

244.   This theme of Rob's placement in facilities based on criteria other than which would best meet his special needs repeated itself after Rob was sent to NCRCC a second time in January 1990. Exs.

224, 439 at 12.  Although Rob's therapeutic needs had already been well established in prior evaluations, including one by its own staff psychologist, CYA actually had "few provisions . . . for meeting the individual needs of each ward" and "no capacity to implement a true individualized treatment plan."  Ex. 439 at 12.  As a result, ward placement decisions were based other factors, primarily age, gender, and criminal sophistication.  Ex. 439 at 12.

245.    Rob's first placement after his second stint in NCRCC was not to a small group home that could provide the intense therapy his psychological evaluations indicated was necessary, but to large-capacity facility, the Karl Holton Youth Correctional Facility ("Karl Holton").  Ex. 439 at 14; see also Exs. 370 at 1. This facility, designed to hold 350 youths in seven fifty-bed living units, held 479 during the period of Rob's confinement there in March-September 1990.  Ex. 439 at 14.  It was at Karl Holton that the records first indicate that Rob was being threatened by various gangs.  See Ex. 439 at 14-15.  These gang threats required Rob to fight other inmates constantly in order to defend and protect himself during the entire period of confinement.  See Ex. 52 ¶ 11.

246.    On September 14, 1990, Rob was transferred to the Preston Youth Correctional Facility ("Preston"), another mega-facility with a design capacity of 720 and a actual population of 863.  Ex. 439 at 15; see also Ex. 370 at 1.  The design of this facility – open dormitories in which inmates are triple-bunked in groups of one hundred, overseen by control stations staffed by two guards during the day and only one at night – "creates an atmosphere of fear and uneasiness amongst wards [by] foster[ing] a sense of constant surveillance[] without the immediate protection by staff from assault." Ex. 439 at 15-16.  The pattern of housing Rob in large-capacity facilities continued unabated.  From Preston, Rob was transferred to N.A. Chaderjian Youth Correctional Facility ("Chad"), a newly opened facility with a 600-person capacity known for its especially high levels of violence because of its untrained guard population.  Ex. 439 at 19; see also Ex. 370 at 1.

247.    Despite Chad's shortcomings, Rob showed some signs of improvement.  A January 22, 1992 report noted:

> McConnell interacts well with the Northern Hispanics, Southern Hispanics and the Black wards.  He has complete[ly] detached himself from gang activities and is not considered by staff to be a management problem.  McConnell's neutral position with all wards has been helpful to staff on Mojave Hall, as staff are able to use McConnell to assist in passing out meals to wards in their rooms without any incidents. . . .  On

> the type of a program that Mojave Hall has, with most wards not being able to program in mixed groups, McConnell has been a great asset to staff . . . basically because McConnell can program with all groups without incidents of negative or aggressive behavior.

Ex. 439 at 19 (alterations in original); see also Exs. 310 (January 22, 1992 report), 301 at 4 (September 13, 1991 report noting that Rob's behavior had begun to stabilize).

248.    Notwithstanding Rob's improvement at Chad, Rob was transferred to yet another facility, the Ventura Youth Correctional Facility ("Ventura") on February 6, 1992. Ex. 439 at 19; see also Ex. 370 at 1.  This placement went against an earlier recommendation that Rob not be put in a Southern California facility because of gang complications. Ex. 439 at 19-20.  Within two weeks of his arrival at Ventura, Rob was attacked by four wards. Ex. 439 at 20; see also Exs. 311 at 2 (describing injuries sustained in attack).  As a result of this attack, Rob was transferred almost immediately back to the Karl Holton facility, where his behavior again began to digress.  Ex. 439 at 20-21; see also Ex. 370 at 1.

249.    Over the next three months, Rob was shuffled between numerous CYA facilities (including Karl Holton, Chad, Preston, and DeWitt Nelson) before landing at Youth Training School ("YTS") in July 1992. Ex. 439 at 21-22.  This facility, designed to hold 1,200 youths, housed more than 1,600 during the time Rob was housed there. Ex. 439 at 22.  For all intents and purposes, YTS was a prison for children.  According to a 1986 report,

> the cellblocks and dayrooms are . . . devoid of pretense.  Everything is stripped down and bolted to the floor, and the clash of the cell locking system clashes with the noise created by too many young men confined in too small a space. . . . With no dormitories, the facility has over a thousand individual cells, 300 of which have recently had an extra bunk added to accommodate two inmates.  Security measures are more blatant here than elsewhere within the Youth Authority.  Guards who form Tactical Teams used to break up disturbances don helmets and uniforms and drill openly in front of the inmates.

Ex. 439 at 22 (internal quotation marks omitted; second alteration in original).  Upon his arrival, Rob was placed on protective custody and remained isolated in his cell for most of his nine-month stay at YTS before being discharged from CYA .  Ex. 439 at 22.

### The Effects of Overcrowding

250.    Mr. Macallair would have explained that CYA's reliance on large-capacity facilities like those to which Mr. McConnell was sent far exceeded the modern standards of institutional design

1 | established by the American Correctional Association. Ex. 439 at 9-10.  Even if filled only to their

2 | designed capacity, these facilities were contrary to the goal of rehabilitation. Ex. 439 at 10.  However,

3 | at the time of Rob's confinement, the facilities were often operating well above their intended

4 | capacity, further diminishing the possibility of serving their intended function. See Ex. 439 at 10

5 | (noting that in 1990, the CYA system was operating at 153% of capacity). Such overcrowding

6 | "increased stress levels and promoted high rates of violence due to extreme lack of privacy, the

7 | necessity for constant vigilance, and the absence of rehabilitative programming." Ex. 439 at 10.

8 | 251.    Mr. Macallair would have explained that the CYA's reliance on large-capacity facilities, and

9 | then overpopulating them, promoted a culture of institutional violence and gang conflict. Ex. 439 at

10 | 11 (internal quotation marks omitted).  On the other hand, CYA studies that long pre-dated Rob's

11 | period of confinement noted the efficacy of smaller facilities. Ex. 439 at 11 (internal quotation marks

12 | omitted; alterations in original).  For example, one study found an eighty percent decrease in violent

13 | offenses just by reducing living units from fifty beds to thirty-seven. Ex. 439 at 11.  In recognition

14 | of the dramatic improvements that follow from smaller juvenile care facilities, other states had

15 | already abolished their large institutions. Ex. 439 at 10.  Despite its own studies proving the same,

16 | California had made no effort to implement a system of smaller facilities, instead relying on isolation

17 | and time adds to control ward behavior, both "methods that have continuously proven ineffective."

18 | Ex. 439 at 11.

### The CYA's Culture of Violence and Sexual Assault

20 | 252.    Mr. Macallair would have described the CYA's deeply ingrained culture of violence and

21 | sexual assault.  Wards who were subject to abuse by other wards really had no option other than to

22 | fight back or submitting to victimization which ensured repeated physical, sexual, and emotional

23 | exploitation, while reporting incidents to staff ensured retaliation from other wards. Ex. 439 at 17.

24 | A 2003 lawsuit alleged that CYA staff failed to prevent ward-on-ward violence and in some cases

25 | exacerbated the situation:

26 |         Rape, sexual assault, and sexual harassment are common within the CYA.
   Some wards are housed in the same living facility as others who have previously raped
27 |   or sexually assaulted them.   Staff are routinely indifferent to wards' pleas for
   protection from those who have assaulted them. . . .  In addition to their failure to
28 |   prevent ward-on-ward violence, CYA staff have encouraged, permitted, and/or

1    provided wards with the opportunity to fight one another.

2    Ex. 439 at 16. Even when not actively encouraging ward-on-ward violence, CYA staff were

3    ill-equipped to prevent it as most fights occurred in areas known as the "blinds," areas where it is easy

4    to hide from staff. Ex. 439 at 18; see also Ex. 268 (CYA report in which Rob admitted to fighting

5    in the blind).

6    253.    Mr. Macallair would have explained that Rob's adoption of a gang persona while in CYA –

7    even if he never actually joined a gang or was accepted as a member of any gang, see Ex. 52 ¶¶ 8-11

8    – was likely an effort to obtain a small measure of protection from other inmates. Ex. 439 at 13-14.

9    Prior to entering the system, Rob had never exhibited any gang orientation. Exs. 164 at 5, 439 at 12.

10   Through his prior experiences in juvenile hall and boys' ranches, upon entry into CYA, Rob was

11   aware that "[w]ithout the protection of a gang, general population wards were exposed to random acts

12   of violence, victimization, and sexual assault throughout their institutional stays," and so he did his

13   best to shield himself from abuse by claiming gang allegiances. Ex. 439 at 13; see also Ex. 378 at

14   5 (article in West magazine in which Rob explained upon entry into the system that he "did [his] best

15   to fit in," including by adopting a gang persona).

16                    **Inadequate Mental Health Treatment Programs**

17   254.    Mr. Macallair would have explained that CYA mental health treatment programs "suffered

18   from inadequate resources, lack of coordination, and untrained staff." Ex. 439 at 26. Wards were

19   rarely, if ever, seen by trained licensed professionals: in most CYA institutions, there was one

20   psychologist for every 200-300 youths in the general population. Ex. 439 at 27. Group counseling

21   sessions run by staff "tended to be futile and ineffective because displays of emotion were seen as

22   signs of weakness" that could lead to further victimization. Ex. 439 at 27. In addition, CYA treatment

23   programs did not incorporate parents or family members and provided no community follow-up or

24   program transition other than standard parole supervision. Ex. 439 at 27. Even wards like Rob with

25   long-identified therapeutic needs received no serious counseling and treatment, and were offered none

26   upon release.

27   255.    Based on the above findings, Mr. Macallair concludes that the criminogenic effects of the

28   CYA were deleterious to Mr. McConnell:

94

Mr. McConnell's swift movement though the standard continuum of care was typical of Santa Clara County Probation Department procedure, which heavily relied on the CYA as an option, contrary to best practices known at the time. It is my opinion that Mr. McConnell's experience in the CYA contributed to his later criminality. For those who were institutionalized for an extended period, such as Mr. McConnell, this criminogenic effect is often aggravated. CYA wards quickly learn that violence and retaliation are a necessary and legitimate means of ensuring self-protection in the institutional environment. This culture of violence and aggression is promoted by the structures that are designed to contain it. [¶]

. . . .

All of the bureaucracies involved relied on historical practices that were known to be substandard at the time of Mr. McConnell's incarceration. The overwhelming theme throughout all of Mr. McConnell's interactions with the state and county agencies is one of convenience where the bureaucracies developed recommendations utilizing antiquated practices rather than employing the best practices that existed at the time. The insufficient responses developed to address Mr. McConnell's adolescent needs ultimately failed him, resulting in his to release to Santa Clara County as a 21-year-old man without well-developed personal and life skills.

See Ex. 439 at 1, 28-29 (emphases added). Mr. McConnell therefore alleges that he suffered prejudice from trial counsel's failure to enlist expert assist regarding the effects of his confinement in CYA as it related to mental health background, which was relevant to the question of whether he was capable of representing himself as counsel and whether there was mitigation evidence that should have been presented at the penalty hearing.

### D. Trial Counsel Were Ineffective Before and During the Hearing on Mr. McConnell's Motion to Represent Himself.

256. Mr. McConnell alleges that trial counsel were ineffective in encouraging him to file a motion to represent himself at his capital trial. On March 26, 2003, Ms. Pusich sent a letter to Mr. McConnell acknowledging his suicidal ideation and his personality disorders and how they prevented him from making rational decisions in his case. Ex. 66. However, later that same day, after consulting with Mr. Specchio, Ms. Pusich wrote a letter to Mr. McConnell encouraging him to go through with his wishes to fire counsel and represent himself:

At this point we think you should make the request to represent yourself, if that is what you want to do. We remain ready to assist you in your defense, and I am not making this suggestion because we are unwilling. However, you have mentioned considering this several times.

. . . .

Honestly, I think this is one of your worst ideas, among myriad bad choices in the past two years. But, I am also tired of hearing about it. If you want our help, you've got it. If you don't, bring the motion, get the result, then get on with it.

95

Ex. 67.  Mr. McConnell alleges that counsels' advice to represent himself was ineffective as it was made out of frustration, was made despite counsels' knowledge of Mr. McConnell's personality disorders, and was done without spending sufficient time with him to convince him that he was better served by being represented by counsel.  Moreover, effective trial counsel would never advise a capital client to represent himself under any circumstances, particularly in circumstances such as the instant case where counsel knew that Mr. McConnell reacted negatively to perceived abandonment and also would be placed in a position to cross-examine his victim.  Mr. McConnell alleges that trial counsels' advice was a substantial factor in his decision to represent himself.

257.    Mr. McConnell alleges that trial counsel were ineffective for failing to notify the trial court of the mental health issues in Mr. McConnell's background that impeded his ability to represent himself.  At the hearing on his motion to represent himself, the following colloquy occurred between Mr. McConnell and the trial court:

> THE COURT: Do you have any past mental-health history?
>
> THE DEFENDANT: None.
>
> THE COURT: Do you know what I mean by that?  Anything as far as counseling or medical treatment in regards to mental health issues?
>
> THE DEFENDANT: Just the standard through being in custody, in juvenile hall. Later on as an adult, you know, the standard stuff that they ask you, and then, you know, you're examined or whatever.  But there's never been any findings you know, negative.

5/30/03 TT at 17.  When trial counsel were asked whether they had anything to say with respect to Mr. McConnell's representations, counsel responded that they did not.  See id. at 23.

258.    Mr. McConnell alleges that trial counsel had actual knowledge of mental health information regarding Mr. McConnell that impeded his ability to represent himself.  Trial counsel had notice of Mr. McConnell's obsession with the state's victim witness, April Robinson, and the fact that his focus was to establish provocation on her part.  A memorandum authored by trial counsel after their meetings with Mr. McConnell showed that it was initially the defense's strategy to cross-examine Ms. Robinson about prior bad acts to discredit her as a witness.  Ex. 449. Even after counsel decided not to purse that defense, their letters to Mr. McConnell still showed that he had a singular fixation on Ms. Robinson that was influencing his decisions about trial strategy.  Counsel accused Mr.

1   McConnell of insisting on a trial "because your mind is still being driven by your obsession with

2   April." Ex. 65.

3   259.   Trial counsel had notice from their interactions with Mr. McConnell that he was suffering

4   from suicidal ideation that prevented him from representing his own interests.  In a March 12, 2003,

5   letter, counsel told Mr. McConnell that "[y]ou could be suicidal, which is itself a symptom of serious

6   mental illness.  If that is the case, I can safely rely on my position, meaning no disrespect to yours,

7   because your goal – to die – is unacceptable to me." Ex. 65.  A letter from counsel to Mr. McConnell,

8   dated March 26, 2003, acknowledged that Mr. McConnell's suicidal ideation was a symptom of

9   mental illness and that his obsession was driving his trial strategy: "Being suicidal is a common

10  indicator of mental illness.  No blameworthiness is involved.  And no mentally ill person is going to

11  be running your defense."  Ex. 66.

12  260.   Trial counsel had actual knowledge from their interactions with Mr. McConnell that his

13  Borderline personality disorder was causing him to contradict himself and to make decisions that were

14  not in his interests.  In a letter dated March 26, 2003, trial counsel acknowledged that Mr. McConnell

15  was incapable of consistently acting in his own best interests:

16          You are a constant contradiction.   At times you appear to have almost
        boundless patience, like when you were in Pennsylvania.   Then the negative
17      controlling part of your mind takes over, and no amount of logic or reason will deter
        you from choices that hurt you.  I am disappointed when you do things that hurt you.
18      I continue to be amazed, though, that you are not.  Sometimes you talk about
        understanding that you make choices that hurt you, then later wish you had not.  But,
19      you don't seem to be able to keep from doing it over and over.

20  Ex. 66 at 2.  Given counsel's actual knowledge of Mr. McConnell's mental health background and

21  personality disorders, it was ineffective for them to advise him to go forward with his motion to

22  represent himself.

23  261.   Mr. McConnell alleges that trial counsels' failure to conduct an adequate investigation into

24  Mr. McConnell's mental health prevented them from making the trial court aware of information

25  showing that he could not represent himself.  As explained above, trial counsel failed to adequately

26  investigate mitigation evidence by obtaining information regarding the full extent of Mr. McConnell's

27  background of abuse and neglect as a child.  Counsel also failed to adequately interview mitigation

28  witnesses to document the deterioration in Mr. McConnell's mental state at the time period leading

1   up to the offense.  Without conducting an adequate investigation, counsel was not in a position to

2   understand the full extent of Mr. McConnell's mental illness.  Furthermore, counsel failed to

3   adequately prepare a mental health expert to evaluate Mr. McConnell, to assist them with their

4   interactions with him, and to testify regarding his inability to represent himself.

5   262.    Mr. McConnell alleges that trial counsel were ineffective in allowing him to represent himself

6   before going forward with a neuropsychological evaluation.  Approximately one week before the

7   Faretta hearing, on May 23, 2003, the trial investigator sent a memo to trial counsel recommending

8   that a mental health expert "interview Rob and specifically look for signs that may warrant

9   neurocognitive testing." Ex. 452. As explained by the investigator, "[n]eurocognitive testing shows

10  subtle deficits or changes in brain functioning."  Id.  The investigator recommended that

11  neuropsychological testing be conducted.  See id.  However, no neuropsychological testing of Mr.

12  McConnell was ever conducted before the Faretta hearing or before the entry of his plea or sentencing

13  hearing.  Mr. McConnell hereby incorporates by reference the allegations contained above regarding

14  the indications of organic impairment, and the potential etiology of alcohol exposure in utero, Ex.

15  451, that could have been presented if trial counsel had conducted an adequate mitigation

16  investigation and followed through with their investigator's advice to do neuropsychological testing

17  on Mr. McConnell before permitting him to proceed at the Faretta hearing.  Ex. 451.  Mr. McConnell

18  alleges that trial counsel was ineffective in failing to make the trial court aware of the fact that no

19  neuropsychological testing had been conducted, for objecting to Mr. McConnell's request to represent

20  himself on this ground, and for failing to conduct such testing to show that Mr. McConnell was not

21  capable of representing himself.

22  263.    Mr. McConnell alleges that trial counsel were ineffective in allowing him to represent himself

23  while a discovery request was pending.  Directly after the Faretta hearing and Mr. McConnell's guilty

24  plea, trial counsel informed the court that "there is a request for discovery outstanding. Mr. Helzer

25  advised this morning that they wanted to wait and see who counsel would be before they provided

26  it." 5/30/03 TT at 55.  Mr. McConnell alleges that it was ineffective for trial counsel to raise the issue

27  of the outstanding discovery request before allowing him to proceed with the Faretta hearing.  As

28  explained above, Mr. McConnell alleges that he suffered prejudice from trial counsel's failure to

1   bring the outstanding discovery issue to the court's attention before proceeding with the hearing,

2   because some of the information related to the conflict of interest faced by trial counsel.   Mr.

3   McConnell alleges that trial counsel's subsequent actions in redacting the discovery received by the

4   state to redact all information that related to the conflict shows that the conflict of interest adversely

5   affected the representation, 7/10/03 TT at 30, and that Mr. McConnell suffered prejudice from trial

6   counsel's failure to object to proceeding with the <u>Faretta</u> hearing while the discovery request was

7   pending.

8   264.    Mr. McConnell alleges that trial counsel did not have a strategic justification for failing to

9   notify the trial court of the mental health issues in Mr. McConnell's background that impeded his

10  ability to represent himself.   As explained above, trial counsel had actual knowledge of Mr.

11  McConnell's suicidal ideation, mental illness, and personality disorders that prevented him from

12  representing his own interests.   In a letter dated July 8, 2003, counsel explained that her failure to

13  raise an objection based on the mental health issues in Mr. McConnell's background at the <u>Faretta</u>

14  hearing was done in order to maintain his respect and trust:

15          It is your life.  It is your decision.  I respect you and your right to make the
        decision.  If I did not I would have tried to raise the mental health issues to block your
16      pleas.  I wanted to, but I could not honestly argue you were incompetent.  I also
        decided it was more important to maintain your trust.  That decision may cost you
17      your life, and it troubles me still.  Probably always will.

18  Ex. 68 at 3.  Mr. McConnell alleges that reasonably effective trial counsel would have made the trial

19  court aware of Mr. McConnell's mental health issues that prevented him from adequately representing

20  himself.  Trial counsels' failure to make an adequate record at the <u>Faretta</u> hearing was not based on

21  a legitimate strategic consideration: while appointed to represent Mr. McConnell, counsel were

22  obligated under their duty of loyalty to make the court aware of issues that counsel knew impeded his

23  ability to represent himself.  Mr. McConnell hereby incorporates the allegations of Claim One(C)

24  regarding trial counsel's failure to seeks assistance from a mental health expert to present evidence

25  regarding Mr. McConnell's inability to represent himself as if fully set forth herein.  Trial counsels'

26  decision to maintain a rapport with Mr. McConnell as standby counsel at the expense of advocating

27  his interests at the hearing was  deficient performance.

28          **E.      <u>Prejudice</u>**

265.    Mr. McConnell alleges that there is a reasonable probability that he would have been found incompetent to represent himself if trial counsel had performed effectively.  Mr. McConnell alleges that a person whose intention is to secure the state's assistance in committing suicide is not competent to represent himself at trial.  Mr. McConnell hereby incorporates the allegations set forth above regarding his history of mental illness, suicidal ideation, and suicide attempts as it fully set forth herein.  Mr. McConnell alleges that he suffered prejudice from counsels' ineffectiveness because it deprived him of a full record which would have caused the trial court to conclude that he was not competent to represent himself.

266.    Mr. McConnell alleges that there is a reasonable probability that the trial court would have denied his motion to represent himself if trial counsel had performed effectively.  Independent of the issue of competency, if trial counsel had performed effectively by informing the trial court of Mr. McConnell's mental health issues and his intent to harm his own interests, it would have caused the trial court to conclude that he should not represent himself.  Mr. McConnell hereby incorporates the allegation of Claim Two regarding the trial court's inadequate canvass and failure to appoint counsel when it became apparent that counsel was necessary.  In combination, Mr. McConnell alleges that he suffered prejudice from trial counsels' ineffectiveness as an adequate record would have convinced the trial court that the assistance of counsel was necessary because counsel would have already made the court aware of the problems that would arise from Mr. McConnell's self-representation.  Such a record would have given the trial court specific guidelines for establishing conditions on Mr. McConnell's self-representation that would have been triggered when the issues counsel should have brought to the court's attention came up at his trial.

267.    Mr. McConnell alleges that there is a reasonable probability that he would not have made the decision to represent himself if trial counsel had performed effectively.  Mr. McConnell hereby incorporates the allegations above regarding trial counsels' knowledge of his mental illness, personality disorders and their ineffective communications with him during the pre-trial period.  Mr. McConnell alleges that he would not have chosen to represent himself if trial counsel had a sufficient understanding of his mental health issues and had refrained from instilling in him a sense of futility regarding his prospects.

268.     Mr. McConnell alleges that his self-representation which occurred due to a conflict of interest faced by trial counsel constitutes a constructive denial of counsel and is prejudicial per se.  Mr. McConnell further alleges that the use of standby counsel who had an actual conflict of interest is prejudicial per se and rendered his penalty proceeding fundamentally unfair.

269.     Mr. McConnell alleges that the state court's disposition of his claim was contrary to, and an unreasonable application of, clearly established law.  Mr. McConnell further alleges that the state court's disposition of his claim was an unreasonable determination of the facts in light of the evidence presented.

**CLAIM TWO**

Mr. McConnell alleges that his guilty plea, conviction, and death sentence are invalid under the federal constitutional guarantees of due process, effective assistance of counsel, and a reliable sentence due to the trial court's invalid <u>Faretta</u> canvass and the court's failure to subsequently appoint counsel when it became apparent that counsel's assistance was necessary, which reduced the proceedings to a sham and a farce.  U.S. Const. amends. V, VI, VIII, XIV.

**SUPPORTING FACTS**

1.   The trial court violated Mr. McConnell's federal constitutional rights by failing to adequately canvass him concerning his ability to represent himself and by failing to appoint counsel at various times during the proceedings when it became clear that Mr. McConnell was incapable of representing his own interests, which in turn reduced the proceedings to a sham and a farce.  Mr. McConnell alleges that the trial court's canvass was inadequate because the court failed to adequately question him regarding the mental health issues in his background and failed to resolve a conflict of interest relating to trial counsel before granting his motion to represent himself.  Mr. McConnell alleges that the trial court failed to appoint counsel before the sentencing hearing when it became apparent that Mr. McConnell intended to pursue a course of action that was detrimental to this interests.  Mr. McConnell further alleges that the trial court improperly failed to honor its conditional order by permitting counsel to examine Mr. McConnell's ex-girlfriends at the penalty hearing.  Mr. McConnell alleges that the resulting penalty hearing was reduced to a sham and a farce in violation of his federal constitutional rights.

    **A.      The Trial Court Conducted an Inadequate Faretta Canvass of Mr. McConnell**.

2.   The hearing on Mr. McConnell's motion to represent himself revealed that he did not have any experience with legal proceedings.  When the trial court inquired about "your prior experience with legal proceedings," Mr. McConnell responded that he had "[p]ractically none."  5/30/03 TT at 16.  Mr. McConnell further explained that he had never been through a full trial before:

> I – most cases prior were misdemeanors, things of that nature.  And California is a lot
> different.  Most of that stuff is – before arraignment the DA is offering 90 days, just
> take it.  I mean, I've never really taken anything to trial.  Just most cases resolved
> ahead of time.  There's too much, you know, court calendar space and – not much.

1   Id. at 16-17.  Mr. McConnell subsequently acknowledged that "I lack the – a law degree and the legal

2   skills necessary to conduct a full blown trial.  But the more I thought about it – and again I'm

3   referring to pleading guilty – I knew that once that decision is made, that's why I wanted to do them

4   both on the same day."  Id.

5   3.      Mr. McConnell alleges that the trial court failed to sufficiently canvass Mr. McConnell

6   regarding the outcome of his prior mental health diagnoses.  At the hearing on his motion to represent

7   himself, the following colloquy occurred between Mr. McConnell and the trial court:

8         THE COURT: Do you have any past mental-health history?

9         THE DEFENDANT: None.

10        THE COURT: Do you know what I mean by that?  Anything as far as counseling or
          medical treatment in regards to mental health issues?

11

12        THE DEFENDANT: Just the standard through being in custody, in juvenile hall.
          Later on as an adult, you know, the standard stuff that they ask you, and then, you

13        know, you're examined or whatever.  But there's never been any findings you know,
          negative.

14  5/30/03 TT at 17.  When trial counsel were asked whether they had anything to say with respect to

15  Mr. McConnell's representations, counsel responded that they did not.  See id. at 23.  Mr. McConnell

16  hereby incorporates the allegations of Claim One regarding trial counsels' ineffectiveness before and

17  during the Faretta hearing as if fully set forth herein.  The trial court failed to ask any follow up

18  questions of Mr. McConnell to determine what mental health professionals had concluded in his

19  childhood and pre-trial mental health evaluations.

20  4.      If the trial court had adequately canvassed Mr. McConnell about prior mental evaluations, it

21  would have discovered that Mr. McConnell was not capable of representing himself.  As alleged more

22  fully in Claim One, Mr. McConnell's behavioral and psychological problems began at a young age.

23  When he was a mere seven years old, he was labeled "an impulsive and emotionally disturbed child

24  whose poor judgment and ability to control himself might well lead to his being injured or otherwise

25  endangered when left without appropriate supervision." Ex. 10 at 5-6.  As a teenager in California

26  Youth Authority, Mr. McConnell was described as  "unable to use this insight before the fact in order

27  to gain control of his behavior and to avoid confrontations with those in authority and with peers.'"

28  Ex. 14 at 4.  After his arrest for the instant offense, Mr. McConnell received two psychological

evaluations which revealed that

> Mr. McConnell may tend to be impulsive and emotionally labile. ... He may be seen as distant, cold, and somewhat egocentric and controlling by those who know him socially. ... The profile suggests that he is generally irresponsible and has had difficulty fulfilling significant roles such as occupational or educational achievement. He described himself as easily distractible and is likely prone to some degree of inattention at this time. ... Although he tended to downplay his experience of PTSD symptoms during the interview, many aspects of his personality are consistent with the experience of severe abuse and neglect.

Ex. 21.  Mr. McConnell alleges that the trial court erred in failing to ask him appropriate follow up questions regarding the details of his mental health diagnoses which would have shown that he was not capable of acting in his own best interests.

5.     The trial court was aware that Mr. McConnell's decision to represent himself was due to his need for control which arose from his mental illness and personality disorders.  Eight months after being charged with the offense, Mr. McConnell filed a motion to represent himself on the ground that he and his attorneys were "at odds as to how [his] penalty defense should be conducted." Ex. 25.  Mr. McConnell stated that "I believe it is my right to choose how to present any evidence in mitigation. I can only accomplish this if I am in charge of the binding decisions of my defense."  Id.  At the hearing on the motion, Mr. McConnell reiterated this concern for being in control of his case – "And I feel that, you know, right now I'm not in control, and tactical decisions are told to me, but they are ultimately decided by my current counsel.  And I'm telling them one thing, and their intentions are good and based on their knowledge of the law, but I have that right, and I want to make the decisions for myself." 5/30/03 TT at 4.

> It's about me knowing myself what's best for me and what mitigating evidence I may present. Again I'm referring to that because that's my intent, because I know myself best.  And I respect my counsel thus far and the job they've done.  But they don't know my past, they don't know – we're at odds as to how my penalty defense should be conducted.

See id. at 13.  Mr. McConnell alleges that his statements to the trial court should have prompted additional questioning from the court regarding whether Mr. McConnell's need for control of his case was due to any mental health issues in his background.

6.     Mr. McConnell alleges that the trial court's canvass was deficient due to the fact that he did not inquire whether he intended to seek a favorable result before the jury.  As alleged in detail below,

1    if the trial court had asked Mr. McConnell whether he intended to seek a favorable sentence before

2    the jury, it would have learned that Mr. McConnell intended to pursue a course of action that was

3    detrimental to his interests.  See Ex. 23 ("I wish I could have the PD represent me on a case I was

4    trying to win.").

5    7.      Mr. McConnell alleges that the trial court erred in granting his motion to represent himself

6    before permitting him to consult with outside counsel regarding trial counsels' conflict of interest.

7    At the hearing, the trial court granted the motion for self-representation before resolving whether it

8    believed that trial counsel was subject to a conflict of interest that affected thier actions leading up

9    to the hearing and would affect their ability to act as standby counsel.  5/30/03 TT at 38.  The trial

10   court also did not provide Mr. McConnell with the opportunity to have counsel appointed to explain

11   to him the conflict of interest faced by his attorneys and how it related to their incentive to have him

12   represent himself and plead guilty to the capital offense.  Counsel also was not provided to explain

13   the importance of the impeachment information in the possession of the public defender's office in

14   order to obtain a valid waiver of Mr. McConnell's right to use that information for impeachment

15   purposes.  Mr. McConnell alleges that the trial court's failure to appoint counsel for him to explain

16   the conflict of interest and the suppression of impeachment information from the public defender's

17   office invalidates his decision to represent himself and to plead guilty.

18   **B.    The Trial Court Improperly Failed to Appoint Counsel Before the**
     **Sentencing Hearing When it was Apparent that Counsel Was Necessary.**

19   8.      Mr. McConnell alleges that the trial court should have reconsidered its decision to allow him

20   to represent himself when he immediately expressed an interest in pleading guilty at the Faretta

21   hearing without any negotiations from the state.  During the hearing, Mr. McConnell expressed an

22   interest in pleading guilty to all the charges without receiving any negotiations from the state.  5/30/03

23   TT at 9-10.  According to Mr. McConnell, "the district attorney, the State, they have overwhelming

24   evidence in which to convict me, which I've already stated." Id. at 10.  In response, the trial court told

25   Mr. McConnell that his decision to plead guilty was separate from his decision to represent himself.

26   See id. at 11.

27   9.      Mr. McConnell alleges that the trial court should have reconsidered its decision to allow him

28

1    to represent himself when it became apparent that he intended to pursue a course of action that was

2    detrimental to his interests.  Specifically, after his motion to represent himself was granted and his

3    guilty plea was taken, Mr. McConnell expressly waived the motion previously filed by trial counsel

4    requesting a change of venue.  See 5/30/03 TT at 56-57; 8/21/03 TT at 5.  However, the trial court

5    did not ask any questions of Mr. McConnell regarding whether the decision to waive the motion was

6    based on a strategic consideration, a misunderstanding, or solely to harm his legal interests and to

7    obtain a death sentence.  See 7/10/03 TT at 30-31.  Within one week, Mr. McConnell filed a motion

8    to withdraw the motion previously filed by trial counsel to strike the robbery and burglary aggravating

9    circumstances wherein Mr. McConnell revealed additional incriminating facts about the offense. Ex.

10   70 at 2. At a hearing on the motion, the court granted Mr. McConnell's motion without inquiring

11   whether there was a strategic consideration for his actions or whether the motion was filed with the

12   intention to harm his interests.  See 7/10/03 TT at 26; 8/21/03 TT at 5.  At the same hearing, Mr.

13   McConnell did not object to the admission into evidence of any of the crime scene photographs when

14   the motion previously filed by trial counsel regarding photographs was considered.  See id. at 35-36.

15   10.     On his sentencing for the kidnaping and sexual assault offenses, Mr. McConnell also

16   demonstrated that he did not intend to represent his own interests.  Specifically, the prosecutor made

17   the following improper comments to the judge during the sentencing hearing:

18          I am reminded of a saying that a lot of prosecutors used when they are speaking to
            juries, and it's: When you case a play in hell, you rarely get angels for actors.
19
            Well, we got no angel here.  And this certainly was hell for the victims.  And
20          it's hell for the victims that survived.

21          And Mr. McConnell deserves no sympathy, he deserves nothing in the way of
            leniency.  He's a vengeful and evil person, and he deserves absolutely everything you
22          can give him when you sentence him on this case.

23   7/10/03 TT at 24.  Mr. McConnell hereby incorporates the allegations of Claim Nine relating to

24   prosecutorial misconduct as if fully set forth herein.  In response, Mr. McConnell stated merely that

25   "I agree with everything they said." 7/10/03 TT at 25.   Mr. McConnell alleges that the trial court

26   should have appointed counsel when it became apparent that he did not intend to contest the state's

27   case against him.

28

**C.**     **The Trial Court Failed to Abide by Its Conditional Order to Appoint Counsel When Mr. McConnell Made a Proper Request that Counsel Be Appointed for the Limited Purpose of Allowing Him to Examine His Ex-Girlfriends.**

11.     Mr. McConnell alleges that the trial court deprived him of the assistance of counsel by failing to permit stand-by counsel to represent him when it became apparent that counsel was necessary for assistance.   In his motion to represent himself, Mr. McConnell represented that his decision to represent himself was conditioned on his ability to have the assistance of counsel if it became necessary:

> Although this is a complex case, I believe I can manage the penalty phase on my own. Furthermore, if I need assistance or were to be disruptive in any manner, I agree to accept 'standby counsel' and have them take over.

Ex. 69.  At the hearing on the motion to represent himself, the trial court and Mr. McConnell both clarified that the court would appoint standby counsel to represent him if he needed counsels' assistance:

> I see that even over defendant's objection standby counsel may be appointed to either help you in the event that you need assistance, you become disruptive, you need to be replaced.
>
>       So what I wanted to say is that I don't object to it.  I don't feel that I need standby counsel.  But to please the Court I'm saying: Hey, this is not a tactic.  It's not for delay and make a mockery of the proceedings.  And then we have to go through this big game and appoint counsel.  It was to say: Hey, I'm serious, but if you feel that I need it, I'll accept it.
>
> THE COURT: And do you understand even in the middle of a trial or even in the middle of a penalty phase I could say: No, I want counsel to step in.  Do you understand that?
>
>                                               . . . .
>
> THE COURT: The concept of me saying: Mr. Specchio or Miss Pusich or Mr. Malone, please step in.   I mean, I can make that call at any time during the proceedings.  Do you understand that?
>
> THE DEFENDANT: I understand that.

5/30/03 TT at 21-22.  Mr. McConnell alleges that he had the right to rely upon the trial court's representations that counsel would be appointed to represent him if it became necessary.

12.     Mr. McConnell alleges that the trial court failed to follow its own conditions when it did not appoint standby counsel to represent him when it became apparent that Mr. McConnell needed the assistance of counsel.  In a hearing before trial, Mr. McConnell requested that standby counsel cross-

examine the state's victim witness, April Robinson, due to his concern that him doing the cross-examination could frighten her and prejudice him before the jury.  See 8/21/03 TT at 31-32.  However, the trial court denied Mr. McConnell's request without honoring its prior commitment to appoint counsel if it became necessary.  See id.  The trial court did not make any finding that Mr. McConnell's request was made in bad faith.  On the contrary, Mr. McConnell's request was made for a legitimate reason to minimize prejudice to himself and to preserve the dignity of the court proceedings.

**D.   The Trial Court's Failure to Appoint Counsel to Examine Mr. McConnell's Ex-Girlfriends Reduce the Proceedings to a Sham and a Farce.**

13.   Mr. McConnell alleges that he suffered prejudice from the trial court's failure to permit standby counsel to cross-examine April Robinson.  Mr. McConnell's final question of Ms. Robinson on cross-examination, and her final answer, are illustrative:

> Q    Miss Robinson, if I were to look you in the eye right now and say, "April, I am truly sorry for everything I have put you and the Pierce family through," why wouldn't you believe that?
>
> A    Because everything that comes out of your mouth is bullshit.
>
> Q    That's an answer. That's all I have.

8/26/03 a.m. TT at 75. In particular, Mr. McConnell's attempts to shift the blame for the murder to Ms. Robinson could only have damaged his interests before the jury:

> Q    Miss Robinson, if I could return your attention back to our conversation on August 7th, please. At some point do you recall me telling you that I was there as a payback for what you and Brian did to me?
>
> A    I'm sorry, can you repeat the question?
>
> Q    At some point do you recall me saying I was here in your house as payback for what I had thought you and Brian had done to me?
>
> A    I believe so.
>
> Q    Do you recall saying to me: I knew it, Rob. I knew you'd come back?
>
> A    Yes.
>
> Q    You do?
>
> A    Yes, I do.
>
> Q    What did you mean by that?

108

1      A      Because you wouldn't let it go.

2      Q      Continue.

3      A      That's all I have to say.

4      Q      If you didn't feel guilty about something you had done to me, why would you be waiting for me to come back and retaliate?

8/26/03 a.m. TT at 35-36.  In fact, Mr. McConnell came right out and asked Ms. Robinson "Do you feel partly responsible for any of the events that led to this tragedy?"  8/26/03 a.m. TT at 53.

14.      Mr. McConnell's psychological deficits rendered him incapable of focusing on the relevant issues, compelling him, instead, to focus on irrelevant facts that were clearly harmful to his case. Mr. McConnell's cross-examination of his victim and ex-girlfriend April Robinson makes clear that his primary concern in representing himself was in drawing out information from Ms. Robinson about their relationship and her feelings for him, whether or not such information was helpful, or even relevant, to the jury's sentencing decision.

     Q      Do you recall me telling you about me moving to Las Vegas?

     A      Yes.

     Q      What do you remember about that?

     A      I believe telling you not to go.

     Q      Say what again.

     A      Telling you not to go.

     Q      You told me not to go?

     A      Yes.

MR. HELZER: Your Honor, we all heard it. I mean –

THE COURT: I agree.

MR. McCONNELL: I didn't hear it. I thought she said I was telling her not to go. You mean telling me not to go to Las Vegas, or I was telling you not to leave the apartment?

     A      Telling you not to go to Las Vegas.

     Q      And why was that?

     A      I don't know. I was confused at that time, very confused when I met you, confused when everything was happening between you and Matt. I was very confused.

1   I had a lot of issues, and I didn't use my mind, in a few situations. It could have been
2   my fault when you came over there that night, maybe. I was just a very confused
    person at the time.

3   Q       And so was I. I appreciate your honesty on that. Earlier you had said that it was
    all lies. You just told me you loved me to tell me what I wanted to hear, and now
4   you're saying that you did not want me to leave town so we could stay together.
    Would that be your testimony? Which one was it?

5
    MR. HELZER: Your Honor, there is a question out there unanswered. Is that your
6   testimony? Did she previously – can she answer that?

7   THE COURT: You can answer that question.

8   THE WITNESS: I am confused with which question. Could you repeat the question,
    please?

9
    MR. McCONNELL: That was a compound question, sorry. Earlier you had testified
10  that you had just lied to me, you told me you loved me when you didn't mean it. Is
    that true?

11
    A Yes.
12
    Q With regards to me moving to Las Vegas, you said you didn't want me to. Is that
13  also true?

14  A       Correct.

15  Q       So which one is it? I mean, how did you really feel about me? I mean was I
    bothering you, or did you really want to be with me? Did I force you to stay with me?
16
    A       You wouldn't let me go. I don't know. When I told you I loved you is when
17  we would fight, and that was at the time when you were starting to get physical, and
    I would tell you that so you would stop. When I didn't want you to go to Las Vegas,
18  it didn't mean that I loved you, I just didn't want you to go at that time.

19  Q       Why is that?

20  A       I don't know, I was weak.

21  Q       Mr. Helzer asked you yesterday: If Mr. McConnell was to say he was sorry,
    would you believe him. Do you recall that?
22
    A       Yes.
23
    Q       What was your response?
24
    A       No.
25
    Q       What makes you feel that way?
26
    A       Because you're not sorry.
27
    Q       That calls for speculation. Why do you  feel that?
28

1    A    As I said before, actions speak louder than words. And the actions that you
         showed this past year, there is no remorse. So, no, I would not believe you if
2        you said you were sorry.

3   8/26/03 a.m. TT at 68-71.  See also 8/26/03 a.m. TT at 92 ("I don't think you're stupid.  I had to see

4   something in you to want to be with you; right?"); 8/26/03 a.m. TT at 94 ("If I was such a bad person,

5   what did you ever see in me?"); 8/26/03 a.m. TT at 96 ("Now Mr. Helzer brought up the March, 2001

6   breakup, and asked if you thought you had a right to break up, and you said yes.  Did we continue to

7   see each other on and off after that?").

8   15.   What is worse, Mr. McConnell was clearly delusional about the nature of his past

9   relationships, and when cross-examining both Ms. Robinson and Ms. Rose, he would get caught up

10  on trivial details that he believed demonstrated what a good person he was, but that in actuality cast

11  him in a very negative light.  For example, the following occurred when Mr. McConnell was cross-

12  examining Ms. Rose:

13   Q.    Okay. So all in all, I mean, we– would you characterize it as a happy, fun
         relationship up until some of the things with April came about?
14
15   A.    No, I would not.

     Q.    No? Okay. You said I called you a dead bitch.
16
17   A.    Yes.

     Q.    And I would do you worse than April. Is that–
18
19   A.    Yes.

     Q.    What was the context of that?
20
21   A.    Because I was kicking you out of my home. You had no job, no car, no place
         to live. And you had just started working over at Mitsubishi.

22   Q.    Okay. Now, in your mind had you ever treated me badly?

23   A.    No, I have not.

24   Q.    So why--you recall I said that you did me worse than April. I'm just trying to
         understand that, if you never did anything to me.
25
26   A.    Those were the words that came out of your mouth as I was driving you to
         Mitsubishi.

27  8/26/03 p.m. TT at 73.  In response to Mr. McConnell's questions about the many nice things he

28  supposedly did for Ms. Rose, the prosecutor asked on redirect whether there was a price to pay to Mr.

McConnell when he did nice things.  8/26/03 p.m. TT at 76.  Mr. McConnell followed up on this

question on redirect as follows:

> Q.      You made mention of price to pay. Can you elaborate on that, since you just
> repeated what the DA said?
>
> A.      Anything that I would do that I was out of line to  you, there was a price to
> pay, which means that I would need  to have to do other things: Let you borrow my
> car, tell me to be quiet on things, not to talk about other things.  There are prices to
> pay.
>
> Q. So you must have been out of line quite a lot according to you.

8/26/03 p.m. TT at 77.

16.     Despite the fact that Mr. McConnell pleaded guilty to all counts, his focus in preparing his

penalty phase defense was clearly in trying to shift the blame to the victims and establish that he acted

with provocation.  See Ex. 27 ("The state wants to make it seem like I just stalked and killed without

provocation.  They want to prove a one-sided history of all negative points. . . . We both threatened

each other, I just acted on my threats.").

17.     Mr. McConnell continued to try to shift the blame to the victims by trying to establish that

some of the sexual acts were consensual, asking Ms. Robinson whether she had ever consented to the

use of handcuffs, provoking the state to argue that "[h]e pled guilty to the crime of sexual assault, the

Court knows that, and the Court can take notice of that. That was a non-consensual act of violence.

Any consensual act concerning sex that they may have had on a previous occasion, especially in view

of her testimony that they hadn't even seen each other for months, is not relevant." 8/26/03 a.m. TT

at 7.   He also tried to establish that she willingly went with him to California, asking her such

questions as "Was taking your car to California your idea?", id. at 7; "Did you ever see me remove

[the gun] from the holster?" id. at 8; "Did I ever point the gun at you?" id. at 8; "During the stops you

described yesterday during our drive from Sun Valley to San Francisco, did I threaten you with a gun

or the knife at any time during that drive?" id. at 9; "Did you ask anyone for help [when we stopped

in Truckee]?", id. at 9; "Try to leave a note [when we stopped in Truckee]?" id. at 9; "Did you really

drive to California because you thought you could save Brian?" id. at 11.  8/26/03 a.m. TT at 23 ("So

you never lied to me, then? . . . It's mutual, we both lied to each other; correct?").  These questions

were highly inflammatory, and much more likely to turn the jurors against Mr. McConnell than to

1  garner their sympathy.

2  18.    Mr. McConnell tried to establish that Ms. Robinson provoked him to commit the instant

3  offense by violating a restraining order she had against him long before this offense occurred. Mr.

4  McConnell argued as follows:

5

6  Some of the things I wanted to show, were that I would openly admit, yes, I violated
some of the terms of the orders, as well as Ms. Robinson, and I want to see if she
would admit that, and part of my mitigation was it was a provocation, that I did not

7  randomly choose these people. I probably overreacted drastically, obviously. Nobody
deserved what I did. But there was a provocation, and there was a back and forth. And

8  I have another witness who had a TPO against me, and I am bringing that person in
as well, to show that she left me alone, and I respected the terms of that order, and I

9  never violated that.

10  8/26/03 a.m. TT at 27.   The state appropriately responded that "Now what we're getting into is that

11  somehow he's asserting that there was, I guess, a justification for this murder? Well, Your Honor, the

12  time for that was at the guilt phase.    If he thought there was justification, something that would have

13  led him to have a defense, that's at the guilt phase.  That has no relevancy now."  8/26/03 a.m. TT at

14  28. The State's objection was sustained as to the restraining order, but Mr. McConnell continued to

15  ask Ms. Robinson questions intended to demonstrate that the murder was in some way her fault:

16      Q     Miss Robinson, if I could return your attention back to our conversation on
              August 7th, please. At some point do you recall me telling you that I was there

17            as a payback for what you and Brian did to me?

18      A     I'm sorry, can you repeat the question?

19      Q     At some point do you recall me saying I was here in your house as payback for
              what I had thought you and Brian had done to me?

20
        A     I believe so.

21
        Q     Do you recall saying to me: I knew it, Rob. I knew you'd come back?

22
        A     Yes.

23
        Q     You do?

24
        A     Yes, I do.

25
        Q     What did you mean by that?

26
        A     Because you wouldn't let it go.  I knew and Brian knew you were going to

27            come back and hurt one of us, or both of us.

28      Q     Continue.

113

1     A     That's all I have to say.

2

3     Q     If you didn't feel guilty about something you had done to me, why would you be waiting for me to come back and retaliate?

4  8/26/03 a.m. TT at 35-36.

5  19.    Mr. McConnell then attempted to establish that Ms. Robinson had threatened him and his

6  friends in the past, and that those threats somehow established provocation.  See  8/26/03 a.m. TT at

7  37-40 ("Did you ever threaten me? . . . When we were still dating, did you ever leave threatening

8  messages on my answering machine? . . . Did you ever threatened [sic] any of my friends with

9  physical violence? . . . Once again, will you admit to making threats against me? .. . Ms. Robinson,

10  did you ever threaten any of my friends with physical violence? . . . Do you recall an incident where

11  you came over to my house and threw a Sierra Mist soda all over of a girlfriend's – of mine – car?");

12  8/26/03 a.m. TT at 52 ("I have already admitted to the death threats I made against you and Brian.

13  Did you take them seriously?. . . So why do you think someone else would feel any different if they

14  were also threatened? . . . Why should I feel any less threatened by your threats, but mine are so

15  outrageous?"); 8/26/03 a.m. TT at 53 ("As you sit here today, can you honestly say that you never

16  provoked me in any manner, starting from the day we met at the Ramada?").  By trying to get Ms.

17  Robinson – the woman he raped and whose fiancé he killed – to admit that she provoked him to

18  commit the instant offense Mr. McConnell inflamed the passions of the jury against him.

19  20.    Mr. McConnell tried to establish that Mr. Pierce provoked him to commit the instant offense

20  by threatening him in November 2001 – nearly a year before the offense occurred. 8/27/03 p.m. TT

21  at 42 ("So you don't recall Brian telling me to come on over right now so he can shoot me with his

22  shotgun? . . . I asked if he ever threatened me, and you said no.  Then you just said he challenged me

23  to fight man to man."); 8/27/03 p.m. TT at 89 (Mr. McConnell – "I probably threatened [Mr. Pierce]

24  first.  In fact, I believe I did.  But there were threats back and forth.  And, you know, at some point

25  there was an issue of fighting.  And the honest truth is, you know, he wouldn't fight.").  In response

26  to Mr. McConnell's questions regarding whether Mr. Pierce ever provoked him, Ms. Robinson

27  testified that "You just wouldn't leave us alone, you kept coming and provoking it," to which Mr.

28  McConnell replied "And I admit that; I did.  But was it also a back and forth?"  8/26/03 a.m. TT at

44-45.  Ms. Robinson testified that Mr. McConnell "would never show up" to fight Mr. Pierce. 8/26/03 a.m. TT at 45.  In response,  Mr. McConnell attempted to elicit testimony regarding an incident where he did show up to fight Mr. Pierce, telling the court in front of the jury, "Now she's already admitted he threatened me, I threatened him.  Then she said I would never show up and fight.  Well I'm bringing up an incident. Yes, it's going to be damaging to me, I don't care.  So what?" 8/26/03 a.m. TT at 47.

21.      Mr. McConnell then attempted to show that he fought one of Ms. Robinson's friends, Jason, because Mr. Pierce was the one who would never show up to fight.  8/26/03 a.m. TT at 48 ("So obviously I did fight Jason; is that correct? . . . Isn't it true this escalated because Brian would never meet me and fight with fists, instead of what you were saying, I would never meet him?").  Mr. McConnell then proceeded to elicit testimony regarding another incident where he showed up at someone's house in a jealous rage looking for Ms. Robinson.  8/26/03 a.m. TT at 61 ("Do you recall the night where I did show up at Matt's house?"); 8/26/03 a.m. TT at 63 ("Now back to the incident where I showed up at Matt's house.  I challenge him to fight, would that be correct?. . . . Now I'm trying to get to a point here.  On that night, Matt and I had a confrontation; is that correct?").

22.      Mr. McConnell focused on facts that were irrelevant to the jury's penalty decision, and asked badgering and irrelevant questions of Ms. Robinson that would have inflamed the jury.  For example, Mr. McConnell tried to establish that Ms. Robinson broke up with him only a few days before she began dating Brian, rather than a couple of months as she originally testified. 8/26/03 a.m. TT at 12-13; see also 8/26/03 a.m. TT at 17 ("Isn't it true that after we broke up, within a matter of days you two were essentially spending the night?").  Mr. McConnell asked Ms. Robinson "Isn't it true one evening [Brian] spent the night on the couch while you and I were in the bedroom?" 8/26/03 a.m. TT at 14.  Mr. McConnell asked Ms. Robinson whether she was currently employed at a topless club, because in his mind that somehow established that she was not as traumatized by the death of her fiancé as she claimed.  8/26/03 a.m. TT at 19-22.  Mr. McConnell told Ms. Robinson in front of the jury "You say you're not stupid, but you don't even know what recollection means."  8/26/03 a.m. TT at 90.

23.      The other main focus of Mr. McConnell's defense was in trying to establish that he had a good

character based on trivial and inconsequential actions he took with regard to the victims. See Ex. 27 ("The D.A. is going to open the door with PBA's so I want simple cross q's such as: If Rob was such a bad person, what did you ever see in him? Didn't Rob buy you gifts? Buy you clothes, food, give you money? I took her to her dad's house in Hawthorne and bought and prepared Thanksgiving dinner . . . I never cheated on her.  Also, I think there is relevance to a few things.  The fact that I tried to walk away ahead of time.  She told me to stay.  The fact that Brian and I were friends at one time and she assured me they were just 'friends' during our relationship I see relevance there.").  Mr. McConnell explained his idea of mitigating evidence to the court:

> I mean, they are showing I am just this monster and bad guy. I have to show there's redeeming qualities. And that [April Robinson] knows me, and she can attest to, if she will, and I know she will be a hostile witness, but I think you'd have to admit: Well, what did you ever see in me? And did we have fun sometimes?

8/26/03 a.m. TT at 106. See also 8/26/03 a.m. TT at 114 ("Did I treat you to a good time when I took you out to dinner on occasion?").  For example, Mr. McConnell's idea of mitigation was showing the jury that he was not a bad person because, after he kidnaped Ms. Robinson and the two were en route to California, he stopped at a convenience store and convinced a gas station attendant to give him a box of leftover donuts, which he then gave to Ms. Robinson.  8/26/03 a.m. TT at 93 ("Do you recall these were leftover donuts from the day, and I said: Hey, can I give these to my girlfriend? That's what I said? . . . So I was getting those for you; correct? . . . I gave them to you; right? . . . But I had no concern for your welfare? You know, if you were hungry? . . .  And that's all I'm trying to show, is that there is two sides to different people.  Not all of it was bad.  There are some good, redeeming qualities as well.  This wasn't all tragic. . . .").

24.     Mr. McConnell tried to establish that he possessed a good character because when he kidnaped Ms. Robinson, he allowed her to move her handcuffed hands in front of her body, rather than forcing her to leave them behind her back.  8/26/03 a.m. TT at 23 ("Now going back to August 7[th], initially you said the handcuffs were behind you; is that correct? . . . "Do you recall how they got to the front? . . . "I allowed you to put them in front of you; correct?").  He further tried to establish that he was not a bad person because when he kidnaped Ms. Robinson, he allowed her to smoke cigarettes 8/26/03 a.m. TT at 24 ("Do you recall asking for your cigarettes?").  He tried to establish

1  that he was not a bad person because he engaged in small talk with Ms. Robinson while she was

2  handcuffed. 8/26/03 a.m. TT at 24 ("Yesterday you testified we had a 20-minute conversation? . . .

3  So some of the conversation was pleasant; correct?").  He tried to establish that he was not a bad

4  person because, at one point after he kidnaped her Ms. Robinson started crying, and he attempted to

5  console her and promised not to kill her for the sake of her father.  8/26/03 a.m. TT at 72-74.  Mr.

6  McConnell then tried to get Ms. Robinson to admit that he was a sympathetic person based on the fact

7  that he pleaded guilty to the instant offense.   8/26/03 a.m. TT at 74-75 ("So do you admit that I have

8  a sympathetic side, and I may be actually genuinely apologetic?").  On re-cross, Mr. McConnell tried

9  to establish that he wasn't a bad guy because he did not kill Ms. Robinson. 8/26/03 a.m. TT at 88 ("So

10  I didn't kill you that day, August 7th? . . . I had the opportunity to take your life at the house and I

11  never did, and you're saying you escaped?").

12      A    You had the chance to take my life at the house, and you didn't, and you just
    – I don't know, I think that your plan wasn't going the way you wanted it to.

13

14      I think that you were going to kill me, but something stopped you at that point,
but I know for a fact that you were not going to let me come back to Reno to meet
with Brian, because you knew if I went back to Reno, Brian – I would have seen Brian

15  deceased.

16      I know that you – at some time you were going to take my life. That's why I
escaped.

17

18      Q    You're right, that was the plan, but I still had feelings for you, so I did not.

    My question was: I had the opportunity but I didn't. I mean, is that correct?

19  You're still here.

20      A    That was your choice.

21  8/26/03 a.m. TT at 89.

22  25.    That Mr. McConnell was incapable of representing himself is also made clear by the witnesses

23  he called and testimony he elicited during his case in chief.  His first witness was Cassandra Gunther,

24  one of his ex-girlfriends who he had threatened to murder if she aborted their child. 8/27/03 p.m. TT

25  at 17 ("And he grabbed something out of the closet, and he pointed it at my forehead and told me that

26  I was not worthy of having his child anyway, so he didn't know why he didn't just kill me now.");

27  8/27/03 p.m. TT at 25-26 ("You had threatened my life because I told you that I was going to have

28  an abortion.  And you told me point blank with that thing to my head that I was going to have that

1  baby whether I liked it or not, and I wasn't worthy enough to be the mother of your child."). Mr.

2  McConnell essentially called Ms. Gunther to testify that he harassed her so much when she was

3  pregnant with their child that she decided she wanted nothing to do with him, so she convinced him

4  to sign over his parental rights, and because she left him alone, he respected her wishes that he have

5  no contact whatsoever with the child.  See 8/27/03 p.m. TT at 9 ("That's the way I wanted it.  I

6  wanted her to have absolutely nothing to do with you.").

7  26.       Just as he had with his other ex-girlfriend witnesses, Mr. McConnell focused on trivial details

8  of their relationship that in his mind made him seem like a good person, but that in the minds of

9  anyone else were aggravating and inflammatory.

10
11
   Q.       Did we have a dating relationship after that? Did it turn romantic?

12    A.       We had a sexual relationship. I didn't feel that it was anything more than that basis.
         I didn't feel a romantic relationship, no.

13    Q.       So it was just sex according to you.

14    A.       At first, yes.

15    Q.       Okay. Can you explain that, "At first," and then what?

16    A.       Well, it was just– I don't feel that there was really any relationship. I feel
         it was a relationship that was forced, that I was forced to stay in. I don't consider it
17       that it was dating.

18  8/27/03 p.m. TT at 5.  Mr. McConnell elicited testimony from her that he was "pressuring [her] to

19  keep the baby" which made her "extremely uncomfortable," and that "mainly after the threats and

20  constant harassment [she] decided that [she] didn't want anything to do with [Mr. McConnell.]"

21  8/27/03 p.m. TT at 7.  Mr. McConnell then elicited testimony from her that after she heard about the

22  instant offense she was "horrified . . . [b]ecause I thought that you were going to go on a rampage and

23  start looking for my daughter and myself.  And that's related to threats against my life that you made

24  previously.  Told my father that – on a phone call conversation that no matter where I went or what

25  I did I would never be safe and that you would find me.  So, yes, I was terrified."  8/27/03 p.m. TT

26  at 10.

27       **E.       Mr. McConnell Was Incapable of Eliciting Mitigation Evidence Regarding His
         Childhood and Family Background.**

28

27.     Mr. McConnell's psychological deficits, which were precipitated in large part by his mother, prevented him from eliciting meaningful and helpful testimony about her and his upbringing.   For example, when cross-examining his half-brother Darren Bakondi about their mother, Mr. McConnell could not help but say she was "no good," and called her a "piece of shit" in front of the jury. 8/26/03 p.m. TT at 133.   While that statement may well be true, it certainly was not likely to make the jury sympathetic toward Mr. McConnell, hearing him call his mother such a derogatory name.   Mr. McConnell got so upset at any discussion of his mother, that he could not ask enough meaningful questions to give the jury a good sense of the neglect he suffered, and how that impacted his development.   For example, when he was cross-examining Mr. Monroy about his mother, Mr. McConnell got choked up and had to stop questioning for a moment.

Q.     Now, us being friends, you're familiar with some of  my background, upbringing?

A.     Yes.

Q.     You made the reference to my mom.

A.     Yes.

Q.     I don't like her, do I?

A.     No.

Q.     To the best of your recollection, why?

A.     Precisely that. The upbringing.

Q.     What's that?

A.     Precisely that. The upbringing. She wasn't a model mother.

Q.     Okay. I spent a lot of time in group homes and things like that?

A.      Yes.

Q.      I lost my train of thought.

MR. MCCONNELL: One second, Your Honor.

8/26/03 p.m. TT at 98-99. During his own testimony, Mr. McConnell was also incapable of providing the jury with the kind of information about his mother and his childhood that would be likely to convince them that he deserved mercy. 8/26/03 p.m. TT at 79 ("As you may have heard, I didn't have

the best upbringing.  You've heard testimony about my mom and our lack of a relationship, if you

will.  I don't want to get into the specifics of that.  We just didn't get along.").

28.    Mr. McConnell's decision to testify, and the things that he said during his testimony, further

demonstrate why he was incompetent to represent himself, and why this penalty hearing was a sham

and a farce.

> I'm not going to make any excuses for what I did. A lot of us have had bad experiences growing up, abuse or otherwise. So I didn't want to bring in any experts or anything to that nature. I just figured I have a duty to answer for what I did.

> And originally I have made statements that I would not show any remorse in public, I would not do anything to gain favor with the jury, because anything I say I feel like I can't win. If I say I'm sorry, it's a tactic. You know, you weren't sorry then, but you're sorry now all of a sudden. If I just sit there, then, you know, look, he's still – he has no remorse.

> I will say this off the top. I have – I will not ask you for any leniency. I will not ask you for a specific sentence. You know the district attorney is asking for death. Everything I'm saying now is for the benefit of the Robinson and Pierce family.

8/27/03 p.m. TT at 79. Most of what Mr. McConnell testified to was harmful to his case, rather than

helpful. 8/27/03 p.m. TT at 81 ("But in the back of my mind I still have a way of dealing with things

in a violent manner.  I know it's not acceptable, but that's – it was in my nature."); 8/27/03 p.m. TT

at 88 ("And the DA is right.  It doesn't justify what I did.  Nothing does, you know."); 8/27/03 p.m.

TT at 91 ("And I provoked, yes, I did, but I felt there was a back and forth. Once again, does it justify

murder? No.  Nothing justifies cold-blooded, premeditated, first-degree murder, which is what I

did."); 8/27/03 p.m. TT at 92 ("I came back with a plan to murder.  I did.  When I crossed country,

I came back, this is about revenge.  I'm going to get these people, Brian, April.  And there was

another roommate named Jason.  And in my mind the war is on.  The words have been said.  The

threats on both sides.  So I am justified in whatever I do because, you know, they shouldn't have

messed with me; they shouldn't have talked shit to me.").  Mr. McConnell even testified to the

gruesome details of his offense.  See e.g. 8/27/03 p.m. TT at 93-94 ("At some point on August 7[th] I

did all the things they said. . . . At the time I felt a sense of accomplishment, like I'm following the

plan.  I'm going to wait for April.  I'm going to get these people.  You know, she's mine now.  You

know, and – maybe in some weird sense, you know, now we'll be together again.  This guy is out of

the picture.").  The last part of Mr. McConnell's testimony demonstrates clearly why he should never

1   have been allowed to represent himself, and why allowing him to do so reduced his penalty hearing

2   to a sham and a farce.

3           Personally I know I'm speaking to you, but I really don't care what none of
    you think. If you're going to sentence me to death, so be it. That's not what this is

4   about. You know, this is about me wanting to tell the whole side of the story. I think
    that if the victim's family and everybody, they have the courage to get up here, and I

5   should have to be subject to the same scrutiny. I expect a brutal cross-examination, or
    whatever. You know, that's fine. I have to answer to what I did, I believe.

6                                       . . . .

7           And, you know, they don't know that. They're thinking of the monster this,
    and he did that. Yeah, I am all that. Okay. But what: these people don't see – And, you

8   know, I've made these comments, you know, "You know, I'm not going to get up
    here, break down and cry. I'm not going to.  Please don't kill me," you know.  Now

9   that I'm up here, I might cry. It's different when you're sitting here.

10          And I am sorry. But I'm not going to ask for leniency or remor – [sic] a lighter
    sentence or – I stand by that. Do what you've got to do, what you feel is right. That's

11  your decision. But, I want my victim's family to know, you  know, that I am sorry, that
    whether they believe that or not.

12                                      . . . .

13          But I was formerly represented by Miss Maizie Pusich and the Public
    Defender's Office. They wanted to show certain things about my upbringing that I did

14  not want, because I don't feel that anything justifies murder. I  don't think – I mean,
    I'm up here talking about mitigating. I mean, what's the point? I mean, I killed a

15  person. He's not coming back. I mean, I don' t even know why I'm doing this other
    than just to tell them what – how I really feel.  And I think I have to answer for that.

16
            But I ultimately said, "You know, I'm just going to  represent myself, you

17  know." It's bad enough I've got to see, you know, what I did in my face, and I have
    to see the impact I had on these people, without seeing my own family come up here

18  and break down. And I'm trying to play the tough, you know, inmate-defendant, sit
    here. Everybody is looking at me, you know. And I'm sitting up here today and  seeing

19  what I did and the effect I had. And I'm doing everything I can not to cry.

20          And it's the hardest thing to – it's hard to – to – I don't know what else. I
    mean, I'm the one who is going to burn in hell. I mean, you know, I know that.

21  Personally, I mean, I believe in the death penalty. I'll say that. When I was a citizen,
    when I was on the street, absolutely, you  know. And after – I would give me a death

22  sentence. That's a fact. I will say that.

23                                      . . . .

24          But I will say this. If my death will ease your  pain, then – then – then sentence
    me to death. I mean, and –  I will – I will – I will waive all my appeals, and I will die

25  in about a year or so. And if that is what they want, come in and witness that.

26          You know, it's been hard for me. I just – I can't admit that. I'm not supposed
    to, you know, being this tough inmate, like I said.

27          But I heard Pam McCoy earlier say about his birthday and – Back to the guilty
    plea. I know I'm jumping around. I feel everybody watching. When – I believe

28  Mother's Day was May 11th. I think it was a Sunday. And like I said, I – the funniest

                                        121

1    thing, I didn't even think about my own mom. I'm watching this Mother's Day
2    commercial, and the flowers, and for some reason I thought about Brian's mom. And
     once again I broke down right there, you know. And I just: Like I've got to spend the
3    rest of my life like this? Man, I hope I get the death penalty. This is just – you know,
     spending the  next 30, 40 years in a room this way? You know. And I have to admit
4    I didn't want to say this until after, but you know what? A lot of this stuff, I – you
     know, they may be experienced attorneys, but I personally believe that I – that I could
5    beat them at – I mean, you know, as far as – I mean, it's not about winning, but, you
     know, what I mean is I don't care about the death penalty, me personally, but I want
6    to – I want to accept responsibility for what I did. I want to let the people know,
     whether they believe me or not, and make that record. And that's about all I can do.

7    8/27/03 p.m. TT at 94-103; see also 8/27/03 a.m. TT at 47 ("Well I'm bringing up an incident.  Yes,

8    it's going to be damaging to me, I don't care.  So what?").  Mr. McConnell's diatribe about wanting

9    the death penalty demonstrates why allowing him to represent himself completely undercut his right

10   to a fair trial.

11        **F.        Prejudice**

12   29.    Mr. McConnell alleges that he was not competent to represent himself at the penalty hearing.

13   Mr. McConnell alleges that a person whose intention is to secure the state's assistance in committing

14   suicide is not competent to represent themself at trial.   Mr. McConnell alleges that his self-

15   representation at the penalty hearing while incompetent is prejudicial per se.  In the alternative, Mr.

16   McConnell alleges that his self-representation at the penalty hearing had a substantial and injurious

17   effect on the verdict.

18   30.    Mr. McConnell alleges that his representation of himself at the penalty hearing reduced the

19   proceedings to a sham and a farce.   The Due Process Clause is intended to protect both Mr.

20   McConnell's interests in obtaining a fair adjudication and the state's interests in maintaining the

21   dignity and decorum of the court proceedings.   Mr. McConnell alleges that his representation of

22   himself rendered his trial fundamentally unfair and reduced the proceedings to a sham and a farce.

23   Mr. McConnell further alleges that his self-representation had a substantial and injurious effect on

24   the jury's penalty verdict.

25   31.    Mr. McConnell alleges that the denial of the counsel constitutes structural error and is

26   prejudicial per se.  Mr. McConnell alleges that the deficiencies in the Faretta canvass, his

27   representation by conflicted counsel before and during the hearing, the court's violation of its own

28   conditions of self-representation, and its failure to reconsider its order when it became apparent that

1  counsel was necessary deprived Mr. McConnell of his right to counsel and prevented meaningful

2  adversarial testing.  In the alternative, Mr. McConnell alleges that there is a reasonable probability

3  of a more favorable outcome if he had received the assistance of conflict free counsel to represent him

4  at the penalty hearing.

5  32.     Mr. McConnell alleges that the state court's disposition of his claim was contrary to, and an

6  unreasonable application of, clearly established federal law.  Mr. McConnell further alleges that the

7  state court's disposition of his claim was an unreasonable determination of the facts in light of the

8  evidence presented.

**CLAIM THREE**

Mr. McConnell's death sentence is invalid under federal constitutional guarantees of due process, equal protection, and a reliable sentence because the Nevada Supreme Court failed to strike the felony murder aggravating circumstances as required under federal law as it has with similarly-situated litigants. U.S. Const. amends V, VIII, XIV.

**SUPPORTING FACTS**

1.    Mr. McConnell alleges that the felony-murder aggravators are invalid because they could have formed the basis for his guilty plea.  In its information, the state alleged that Mr. McConnell committed first degree murder by one of two means: premeditated, deliberate murder with malice aforethought, or murder in the course of a burglary, which was proven by means of entering the home with the intent to kill.  Ex. 33.  Mr. McConnell pleaded guilty to the murder as charged and no election was made between premeditated murder and felony murder by burglary.  See 5/30/03 TT at 50-52.  Two aggravating circumstances, that the murder occurred in the commission of a burglary, and that the murder occurred in the commission of a robbery, were improperly based upon the predicate felony-murder rule, upon which the state sought and obtained a first-degree murder conviction.  The Nevada Supreme Court improperly refused to strike the invalid felony aggravators, in violation of Mr. McConnell's constitutional rights.

2.    The Nevada Supreme Court in McConnell v. State, 120 Nev. 1043, 102 P.3d 606 (2004), held that Nevada's definition of felony murder did not afford constitutional narrowing. Id. at 1045, 102 P.3d at 622.  Accordingly, the court deemed it "impermissible under the United States and Nevada Constitutions to base an aggravating circumstance in a capital prosecution on the felony upon which a felony murder is predicated."  Id., 120 Nev at 1069.  Despite this ruling, the McConnell court declined to apply the rule to Mr. McConnell himself:

> In charging McConnell with first-degree murder, the State alleged two theories: deliberate, premeditated murder and felony murder during the perpetration of a burglary. McConnell was advised of both theories when he pleaded guilty. During his testimony, McConnell admitted that he had premeditated the murder: "Nothing justifies cold-blooded, premeditated, first-degree murder, which is what I did." His other testimony and the evidence as a whole overwhelmingly supported this admission. McConnell's conviction for first-degree murder is therefore soundly based on a theory of deliberate, premeditated murder. Consequently, our ensuing analysis and decision do not invalidate the use of the felony aggravating circumstances in this

1   case.

2   Id., 120 Nev. at 1066.  The testimony and evidence on which the Court based its decision were

3   adduced during the penalty phase of trial, after Mr. McConnell had pleaded guilty.

4   3.      At the time of his entry of plea, Mr. McConnell did not make any factual admissions which

5   would distinguish his crime between the alternate theories of premeditated and felony murder. 5/30/03

6   TT at 41-57.  The trial court did not request Mr. McConnell to plead guilty to premeditated murder;

7   in fact, the court went so far as to inform Mr. McConnell that "there's a second theory that the State

8   has informed you of in the Information, and that is that on the 7th day of August, 2002 and the 8th day

9   of August, 2002, you did willfully and unlawfully kill and murder Brian Lee Pierce, a human being,

10  during the perpetration of a burglary . . . . Do you understand that a jury could find either of these two

11  theories [premeditated murder or felony murder]?"  5/30/03 TT at 50.  In response, Mr. McConnell

12  simply pleaded guilty to "murder with the use of a deadly weapon." 5/30/03 TT at 52.  Accordingly,

13  there was no indication during the guilty plea canvass as to whether Mr. McConnell intended to plead

14  guilty to premeditated or felony murder.

15  4.      The Nevada Supreme Court's reliance on evidence outside the plea colloquy to validate an

16  otherwise invalid sentence was contrary to, and involved an unreasonable application of, clearly

17  established federal law.  It has long been settled that when a case is submitted on alternative theories

18  the unconstitutionality of any of the theories requires that the conviction be set aside.  Where a

19  general verdict may have rested on a ground that is forbidden by the Constitution, Stromberg v.

20  California, 283 U.S. 359 (1931) prevents a reviewing court from presuming that the jury convicted

21  on an alternative theory permitted by the Constitution, merely because the evidence was sufficient to

22  support the constitutional ground.  The Nevada Supreme Court here did exactly what Stromberg and

23  its progeny forbids by speculating that Mr. McConnell pleaded guilty to premeditated murder merely

24  because it found the evidence sufficient to support that possibility.  Because it is unclear from the plea

25  canvass whether Mr. McConnell pleaded guilty to felony murder, the Court was compelled to strike

26  the felony-murder aggravators. Under clearly established federal law, it was improper for the Nevada

27  Supreme Court to refuse to strike aggravating factors which were otherwise unconstitutional because

28  it found evidence in other parts of the record to indicate that the conviction might have rested on an

1   independent, constitutional ground.

2   5.      Clearly established federal law principles of substantive due process and the right to be free

3   from cruel and unusual punishments allow a criminal defendant facing a potential death sentence to

4   accept responsibility in the penalty phase in order to garner mercy from the jury in an attempt avoid

5   a death sentence.   Mr. McConnell's right to present mitigation evidence of his acceptance of

6   responsibility in an attempt to avoid a death sentence was violated when the Nevada Supreme Court

7   used his acceptance of responsibility to bootstrap his otherwise invalid guilty plea.   The court

8   therefore violated his due process and Eighth Amendment rights by burdening his attempt to present

9   mitigation evidence.

10   6.      The Nevada Supreme Court's refusal the strike the felony murder aggravators in McConnell's

11   case, after striking them under nearly identical circumstances in another capital case case, was

12   contrary to, or involved an unreasonable application of, clearly established federal equal protection

13   principles.   The equal protection clause prohibits a state from affording one person the benefit of a

14   ruling while denying it to another.   In Cary Williams' capital case, the Nevada Supreme Court held

15   that:

16           In charging Williams with murder, the State alleged theories of premeditated
         murder and of felony murder based on the burglary.   Williams pleaded guilty to first
17       degree murder.   The sentencing panel found as one aggravating circumstance that he
         committed Katherine's murder during the perpetration of a burglary.   As it is unclear
18       from the plea canvass upon which theory or theories of murder Williams pleaded
         guilty, we conclude that the burglary aggravating circumstance must be stricken
19       pursuant to McConnell.

20   Ex. 81 at 6-7. Mr. McConnell's case is identical to Williams: the state charged both premeditated and

21   felony murder, Mr. McConnell pleaded guilty, and it is unclear from the plea canvass upon which

22   theory of murder he pleaded guilty. Clearly established federal law guarantees equal protection under

23   the law, and the Nevada Supreme Court unreasonably denied Mr. McConnell his right to equal

24   protection by striking the felony aggravators in Mr. Williams' case while refusing to strike them in

25   Mr. McConnell's case, and by referring to facts outside the plea canvass in Mr. McConnell's case

26   while limiting their review to the plea canvass in Mr. Williams' case.

27   7.      The Nevada Supreme Court's refusal to strike the invalid felony murder aggravators had a

28   substantial and injurious effect on the outcome of the proceedings. If the invalid aggravators had been

stricken as clearly established federal law required, the only remaining aggravator would be mutilation.  Mr. McConnell hereby incorporates the allegations of Claim Four regarding the improper aggravating circumstance of mutilation as if fully set forth herein.  Under state law, each aggravating circumstance adds its own weight to the sentencing calculus making the offense more aggravated and heinous.  In addition, statutory aggravating circumstances are weighed against mitigation before a defendant is considered eligible for the death penalty.  The sentencing panel's consideration of an invalid aggravating circumstance during the weighing process is therefore prejudicial to the penalty verdict.  These statutory and constitutional protections under state law are necessary to ensure that the death penalty is imposed in a manner consistent with the design of the federal constitution.

8.      In the absence of an aggravating circumstance, Mr. McConnell can demonstrate that he is actually innocent of the death penalty because he can show by clear and convincing evidence that no reasonable fact finder would have found him eligible for the death penalty.  Mr. McConnell's death sentence is therefore invalid and this Court must grant the writ vacating his sentence.

9.      Mr. McConnell alleges that the state court's disposition of his claim was contrary to, and an unreasonable application of, clearly established law.  Mr. McConnell further alleges that the state court's disposition of his claim was an unreasonable determination of the facts in light of the evidence presented.

1 **CLAIM FOUR**

2       Mr. McConnell's death sentence is invalid under the federal constitutional guarantees of due

3 process, equal protection, appellate review, and a reliable sentence due to the invalidity of the

4 mutilation aggravating circumstance in Mr. McConnell's case, both facially and as applied.  U.S.

5 Const. amends. V, VIII, XIV.

6 **SUPPORTING FACTS**

7 1.      Nevada's "mutilation" aggravating circumstance is unconstitutionally vague and overbroad

8 and is invalid as applied to Mr. McConnell.  See Nev. Rev. Stat. § 200.033(8) (permitting eligibility

9 for the death penalty when "[t]he murder involved torture or mutilation of the victim.").  The jury

10 instruction given in Mr. McConnell's case is equally vague and overbroad, creating an impermissible

11 risk that the jury's sentencing determination is arbitrary and capricious.  Jury instruction number 12

12 provided the following definition of mutilation for the jury:

>      'Mutilate' means to cut off or permanently destroy a limb or essential part of the body or to cut off or alter radically so as to make imperfect.

>      In order for mutilation to be found as an aggravating circumstance, there must be mutilation of the victim beyond the act of killing.

16 Ex. 28 at 12.

17 2.      Clearly established federal law requires that sentencing schemes channel the sentencer's

18 discretion by clear and objective standards that provide specific and detailed guidance, and that make

19 rationally reviewable the process for imposing a sentence of death.  Under clearly established

20 Supreme Court precedent, this Court must assess the facial validity of an aggravating factor to

21 determine whether it sufficiently narrows the discretion of sentencers, and then consider whether the

22 state's highest court has adopted a single and consistent narrowing construction that satisfies the

23 requirements the Eighth and Fourteenth Amendments impose.  Using this approach, it is clear that

24 the "mutilation" aggravating factor violates the constitution because it is facially vague and overbroad

25 and the Nevada Supreme Court has failed to adopt a single, let alone sufficiently narrow, construction

26 of the factor.

27      **A.**     **The Definition of the "Mutilation" Aggravating Circumstance is Vague and Overbroad on its Face.**

3.     On its face, the term "mutilation" applies to conduct in the course of any murder, thus rendering it both unconstitutionally vague and overbroad.  Webster's Dictionary defines mutilation as the "deprivation of a limb or essential part esp. by excision." at 1493 (emphasis added).  Black's Law Dictionary explains that "mutilation" means "[i]n criminal law, the depriving a man of the use of any of those limbs which may be useful to him in fight, the loss of which amounts to mayhem." Black's Law Dictionary, 6th ed. at 1020.  Black's Law Dictionary, in turn, defines "mayhem" as "a type of injury which permanently rendered the victim less able to fight offensively or defensively; it might be accomplished either by the removal of . . . or by the disablement of, some bodily member useful in fighting."  Id. at 979 (emphasis added).

4.     The definition of "mutilation" is impermissible because it overlaps with the murder itself.  To commit murder, a person will necessarily "depriv[e] another of an "essential part" of his body.  Every murder will "permanently render[] the victim less able to fight," thereby satisfying the definition of "mutilation" under its plain meaning.  Since the sentencer fairly could conclude that the aggravating circumstance applies to every person convicted of murder, the circumstance is constitutionally infirm.

5.     Only two other states make punishable by death the mutilation of a victim, and the relevant aggravating factors in these states are more specific than the one in Nevada.[5]  Nevada's aggravator facially applies to every murder, since every murder necessarily involves mutilation under its plain meaning.  Under these circumstances, the "mutilation" aggravating circumstances violates the Eighth and Fourteenth Amendments.

**B.     The Instruction for "Mutilation" Provided to Sentencers, and Approved By the Nevada Supreme Court, Fails to Limit Their Discretion and Allows Them to Impose the Death Penalty Arbitrarily and Capriciously.**

6.     The definition of "mutilation" in the jury instructions courts give to sentencers is, like its plain meaning, vague and overbroad.  Courts instruct sentencers that "[t]he term mutilate means to cut off

---

[5]     Unlike the Nevada provision, the Tennessee death penalty statute explicitly requires an intent element.  It provides for death eligibility where "[t]he defendant knowingly mutilated the body of the victim after death."  Tenn. Code Ann. § 39 (204) (13) (emphasis added).

The "mutilation" aggravating circumstance in Indiana also has a narrower scope than the aggravator in Nevada, providing for death eligibility where "[t]he defendant burned, mutilated, or tortured the victim while the victim was alive."  Ind. Code Ann. § 9 (b) (11) (emphasis added).

or permanently destroy a limb or essential part of the body or to cut off or alter radically so as to make imperfect." Deutscher v. State, 95 Nev. 669, 677, 601 P.2d 407, 412-13 (1979), vacated on other grounds, 500 U.S. 901 (1991) (emphasis added). The instruction is unconstitutional because it overlaps with the murder itself.  By definition, the infliction of death involves "permanently destroy[ing]" or "alter[ing] radically" an "essential part of the body."[6]  Indeed, if one considers "vital functions" an essential part of the body, as one must, the definition of "death" in both Webster's Dictionary and Black's Law Dictionary virtually mirrors the definition of "mutilation" in the instruction: "death" is defined in Webster's, at 581, as "the ending of all vital functions," and in Black's, at 400, as involving the "permanent cessations of all vital functions and signs." Both "death" and "mutilation," then, involve the permanent cessation, or destruction, of an essential part, or vital function.  Sentencers can conclude, therefore, that any person who commits murder also mutilates the victim.

7.    The instruction also violates the Constitution because it does not require sentencers to find an intent to mutilate.  It is unconstitutional to permit sentencers to find a person eligible for the death penalty using an aggravating circumstance arising out of the crime itself that does not contain a mens rea requirement.  Sentencers can find "mutilation" in every murder case because both "mutilation" and "murder" involve the destruction of an essential part of the body.  They need not make any other finding because there is no intent element in the instruction.  By creating such a large class of death eligible persons, the instruction wholly fails to provide sentencers with any objective criteria to determine an appropriate punishment or principled way in which to distinguish those who deserve the death penalty from those who do not.  Thus, the instruction violates the Eighth and Fourteenth Amendments.

8.    The instruction also violates substantive due process principles by basing death eligibility on a factor that does not relate to the individual culpability of the person.  It is difficult to imagine, for

---

[6] Webster's Dictionary defines "essential" as "something essential: as a: something basic or fundamental esp. belonging to or forming part of the minimal indispensable body, character, or structure of a thing; . . . something necessary, indispensable. . . ."  Webster's at 777.  This definition is virtually synonymous as that for "vital," which is defined as "concerned with or necessary to the maintenance of life; esp: performing an essential role in the living body. . . ."  Id. at 2558.

130

instance, how a person who leaves behind a relatively clean murder scene by intentionally killing a person with a precision-type weapon is less culpable than one who leaves a grisly looking murder scene by killing with a knife or rock.   It is equally unclear that a person who inflicts more violence than necessary because he does not realize that the victim is dead or is suffering from a rage is more culpable than one who carefully inflicts the fatal wounds.  Such disorganized murders are usually less premeditated and are the result of the mental illness of the perpetrator, and it violates substantive due process principles to base death eligibility on a factor that is more common in less culpable murderers.

**C.** **The Nevada Supreme Court Has Failed to Adopt a Narrow Construction Of "Mutilation" in Any Case it has Reviewed, thus Rendering the Aggravating Circumstance Unconstitutionally Vague and Overbroad.**

9.    The Nevada Supreme Court has failed to adopt a sufficiently narrow construction of the "mutilation" factor.   The court has never defined the term "mutilation" or explained the factors sencencers can consider in their determination of whether the defendant mutilated the victim.  Rather than adopt a single narrow construction of the factor on appeal, the Nevada Supreme has adopted an ad hoc approach to its review of the aggravator, upholding it whenever it is found by the sentencer. The result is that the aggravating factor has become a catch-all provision, permitting sentencers to find that it exists in every murder case: of the approximately 80 capital cases in Nevada, sentencers have found the aggravating circumstance in at least 43.[7]   Therefore, as a practical matter, the

---

[7]A search on Westlaw reveals that sentencers found that the aggravating circumstance under Nev. Rev. 200.033(8) applied in at least 43 separate capital trials.  See Chappell v. State, 972 P.2d 838 (1998); Middleton v. State, 968 P.2d 296 (1998); Bolin v. State, 114 Nev. 503, 960 P.2d 784 (1998); Phenix v. State, 114 Nev. 116, 954 P.2d 739 (1998); Calambro II v. State, 114 Nev. 106, 952 P.2d 946 (1998); Smith II v. State, 114 Nev. 33, 953 P.2d 264 (1998); Rippo v. State, 113 Nev. 1239, 946 P.2d 1017 (1997); Chambers v. State, 113 Nev. 974, 944 P.2d 805 (1997); Jones II  v. State, 113 Nev. 454, 937 P.2d 55 (1997); Crump v. State, 102 Nev. 158, 716 P.2d 1387 (1997); Browne v. State, 113 Nev. 305, 933 P.2d 187 (1997); Evans v. State, 112 Nev. 1172, 926 P.2d 265 (1996); Kirksey v. State, 112 Nev. 980, 923 P.2d 1102 (1996); Gutierrez v. State, 112 Nev. 788, 920 P.2d 987 (1996); Domingues v. State, 112 Nev. 683, 917 P.2d 1364 (1996); Wesley v. State, 112 Nev. 503, 916 P.2d 793 (1996); McKague v. State, 112 Nev. 159, 912 P.2d 255 (1996); Smith I v. State, 110 Nev. 1094, 881 P.2d 649 (1994); Calambro I v. State, 111 Nev. 1015, 900 P.2d 340 (1995); Jones I v. State, 110 Nev. 730, 877 P.2d 1052 (1994); Pertgen v. State, 110 Nev. 554, 875 P.2d 361 (1994); Canape v. State, 109 Nev. 864, 859 P.2d 1023 (1993); Libby v. State, 109 Nev. 905, 859 P.2d 1050 (1993); Parker v. State, 109 Nev. 383, 849 P.2d 1062 (1993); Redmen v. State, 108 Nev. 227, 828 P.2d 395 (1992); Sechrest v. State, 108 Nev. 158, 826 P.2d 564 (1992); Beets v. State, 107 Nev. 957, 821 P.2d 1044 (1991); Kirksey v. State, 107 Nev. 499, 814 P.2d 1008 (1991);

131

1    mutilation factor fails to perform a constitutional narrowing function.

2    10.    Since the construction the Nevada Supreme Court has adopted is the same as the instruction,

3    it suffers from the same constitutional problems.  As applied, the Nevada Supreme Court has adopted

4    the broadest possible definition of "mutilation," permitting sentencers to find it based solely on the

5    wounds which caused the victim's death.

6        a.    In Jones v. State, 113 Nev. 454, 937 P.2d 55, 68 (1997), for instance, the Nevada

7    Supreme Court upheld the finding of mutilation based solely on the victim's fatal stab wounds.  The

8    evidence indicated that the knife wounds were inflicted at the same time and in the same area of the

9    upper torso and arms and there was testimony that some of the wounds were defensive.  There was

10   neither evidence of a prolonged death nor the calculated placement of any knife wound.  There was,

11   moreover, no indication that the defendant either intended to disfigure the victim's body or to kill her.

12   Nonetheless, the court in Jones labeled the fatal wounds mutilation. Id. at 68.

13       b.    Similarly, in Browne v. State, 113 Nev. 305, 933 P.2d at 187 (1997), the court upheld

14   a finding of "mutilation" where the victim suffered multiple blunt force trauma even though the

15   trauma was what caused the death.  The evidence in Browne indicated that the victim suffered

16   significant trauma to the head.  Id. at 190.  It was unclear, however, which of the head injuries caused

17   the victim's death.  Paraphrasing one of the witnesses, the court nevertheless upheld the finding of

18   mutilation because the victim had suffered "more trauma than necessary to cause death."  Id.  These

19   and other cases permit sentencers to find that the fatal wound also constitutes mutilation.[8]  It is also

20

21   Jimenez v. State, 106 Nev. 769, 801 P.2d 1366 (1990); Robins v. State, 106 Nev. 611, 798 P.2d 558
     (1990); Baal v. State, 106 Nev. 69, 787 P.2d 391 (1990); Flanagan v. State, 105 Nev. 135, 771 P.2d
22   588 (1989); Lopez v. State, 105 Nev. 68, 769 P.2d 1276 (1989); Williams v. State, 103 Nev. 227,
     737 P.2d 508 (1987); Moran v. State, 103 Nev. 138, 734 P.2d 712 (1987); Cavanaugh v. State, 102
23   Nev. 478, 729 P.2d 481 (1986); Hill v. State, 102 Nev. 377, 724 P.2d 734 (1986); Summers v. State,
     102 Nev. 195, 718 P.2d 676 (1986); Rogers v. State, 101 Nev. 457, 705 P.2d 664 (1985); Neuschafer
24   v. State, 101 Nev. 331, 705 P.2d 609 (1985); McKenna v. State, 101 Nev. 338, 705 P.2d 614 (1985);
     Ybarra v. State, 100 Nev. 167, 679 P.2d 797 (1984); Deutscher v. State, 95 Nev. 669, 601 P.2d 407
25   (1979).

26        [8]  See also Calambro v. State, 114 Nev. 106, 952 P.2d 946 (1998) (upholding
     mutilation factor on ground that victim suffered repeated blows in spite of fact that these were same
27   blows that inflicted death); Parker v. State, 109 Nev. 383, 849 P.2d 1062 (1993) (concluding that
     mutilation existed where victim suffered multiple blows to the head, destroying brain, even though
28   these same wounds were cause of death), cert. denied, 510 U.S. 1000 (1993); Jimenez v. State, 106

1   improper to find the factor based on the fact that these same acts were unnecessary, as this finding

2   is the same as the <u>mens rea</u> for malice murder.   In other words, any murder will necessarily involve

3   mutilation and any murderer will be death eligible under the Nevada Supreme Court's definition of

4   the factor.

5   11.     The Nevada Supreme Court therefore upholds the finding of "mutilation" whenever it

6   concludes that the murder created a gruesome or disturbing scene.  The High Court has ruled,

7   however, that states are not permitted to make punishable by death killings which merely create

8   "gruesome" murder scenes.  Such a construction makes the application of the factor, and eligibility

9   for the death penalty, depend entirely on the sensibilities of sentencers and judges in their unfettered

10  discretion. This presents the same constitutional problem unconstitutional aggravating circumstances

11  like "depravity of mind" and "heinous, atrocious, and cruel" present: the subjective views of

12  sentencers, with the accompanying risks of caprice, arbitrariness, and randomness, will determine

13  who is eligible for the death penalty.  By failing to provide sentencers with a principled way to

14  distinguish among people convicted of murder, the Nevada Supreme Court's construction of the

15  "mutilation" provision violates the Eighth and Fourteenth Amendments.

16      **D.     The Mutilation Aggravator Is Invalid As Applied to Mr. McConnell.**

17  12.      Mr. McConnell's case highlights the inability of the mutilation aggravator to create a

18  principled distinction between cases deserving of death and those undeserving.  The only thing that

19  makes Mr. McConnell death eligible (after the unconstitutional felony murder aggravators are

20  stricken) is the fact that, after the victim was already dead, Mr. McConnell removed some of the

21  bullets from the victim's body and placed a knife in his chest.  If Mr. McConnell had murdered the

22  victim and simply left the bullets and not inserted a knife into the victim's body, he would not be

23  eligible for the death penalty.  This does not create a principled distinction between crimes deserving

24  of death and those that are not.   Furthermore, the amount of damage done to the victim's body post-

25  mortem was insufficient to justify a finding of mutilation under any reasonable definition of the term.

26  13.      The Nevada Supreme Court's rejection of this claim on direct appeal was contrary to, or

27

28  Nev. 769, 801 P.2d 1366 (1990) (per curiam) (holding that multiple stab wounds causing murder
    also constituted mutilation).

involved an unreasonable application of, clearly established federal law.  As explained in detail above, clearly established federal law prohibits the arbitrary and capricious infliction of the death penalty, and requires states to create principled distinctions within the law between crimes that deserve the death penalty and those that do not. As applied to Mr. McConnell, the mutilation aggravating factor fails to sufficiently narrow the discretion of the sentencer to impose the death penalty, resulting in the arbitrary and capricious imposition of the death penalty.

14.     The jury's finding of the invalid mutilation aggravating circumstance had a substantial and injurious effect on the outcome of the penalty proceedings.  The only other two aggravators found by the jury– robbery and burglary– are based on the circumstances of the offense and are now invalid, in any event, thus the only remaining aggravator is mutilation.  Mr. McConnell hereby incorporates the allegations of Claim Three regarding the invalid felony aggravating circumstances as if fully set forth herein.  Under state law, each aggravating circumstance adds its own weight to the sentencing calculus making the offense more aggravated and heinous.  In addition, statutory aggravating circumstances are weighed against mitigation before a defendant is considered eligible for the death penalty.  The sentencing panel's consideration of an invalid aggravating circumstance during the weighing process is therefore prejudicial to the penalty verdict.  These statutory and constitutional protections under state law are necessary to ensure that the death penalty is imposed in a manner consistent with the design of the federal constitution.

15.     Without the mutilation aggravator, Mr. McConnell would not be eligible for the death penalty. Mr. McConnell can therefore demonstrate that he is actually innocent of the death penalty because he can show by clear an convincing evidence that no reasonable factfinder would have found him death eligible in the absence of the invalid aggravating circumstance.  Mr. McConnell's death sentence is therefore invalid and this Court must grant the writ vacating his sentence.

16.     Mr. McConnell alleges that the Nevada Supreme Court's disposition of his claim was contrary to, and an unreasonable application of, clearly established law.  Mr. McConnell further alleges that the Nevada Supreme Court's disposition of his claim was an unreasonable determination of the facts in light of the evidence presented.

**CLAIM FIVE**

Mr. McConnell's death sentence is invalid under federal constitutional guarantees of due process, equal protection, and a reliable sentence due to the jury's finding of death eligibility based upon the burglary aggravating circumstance, which was predicated upon an intent to commit murder when entering a building.  U.S. Const. amends. V, VIII, XIV.

**SUPPORTING FACTS**

1.    The burglary aggravating circumstance is invalid in Mr. McConnell's case because it is based upon an intent to commit murder when entering a building.  Under Nevada's capital punishment scheme, the jury must convict Mr. McConnell of first-degree murder, find a statutory aggravating circumstance beyond a reasonable doubt, and weigh the aggravating circumstance(s) against any mitigation presented before Mr. McConnell is eligible for the death penalty.  Each of these three distinct steps are necessary to narrow the class of persons eligible for the death penalty under the state and federal constitutions.  The use of the burglary aggravating circumstance in cases where the only relevant intent is to commit murder undermines the operation of these statutory protections and therefore violates Mr. McConnell's constitutional rights.

2.    On September 9, 2002, the state filed a notice of intent to seek the death penalty which alleged the burglary aggravating circumstance based upon Mr. McConnell's purported intent to commit the crime of murder when entering April Robinson's residence.  Ex. 34 at 2.  In closing argument, the state emphasized that Mr. McConnell's alleged act of entering April's residence with the intent of murdering Brian Pearce was an aggravating circumstance.  The state argued,

> I first want to talk about burglary. Was this crime, this murder of Brian, committed during the course of a burglary?
>
> Do you find that the defendant went into that home on August 7th, 2002, with an intent? When he walked through this door, what was his intent?
>
> Well, you know a lot of what his intent was, because he told you. Before he took the stand the evidence was there. And after he got off the stand, it was absolutely unrebutted that he went into that house with a couple of focused intentions. He went into that house to murder Brian; and April, but he changed his mind.
>
> Lisa, who took the stand, Lisa Rose, told you about a year before she had heard from the defendant he was going to do that. Remember, she was going to call Secret Witness? She did twice, she said, got ahold of April? A year before.

1          He prepared for it, he got his clothes, his special clothes, he got his gun, he got
2  his ammo that he spoke so affectionately about. Do you recall the details of the
   ammo? Deep, penetrating [B]lack Talon.

3          He pled guilty, and in that plea admitted  the premeditation. This was read to
4  you: Willfully, unlawfully and with malice aforethought, deliberation and
   premeditation, kill and murder Brian Lee Pierce.

5          There is no doubt, when he walked through  that front door of that home, he
6  intended to kill. And when he walked through that door with that intent,   he
   committed burglary. That proves this aggravator  beyond a reasonable doubt.

7  8/28/03 a.m. TT at 32 -33. Thus, the prosecution used the very same mens rea both to define burglary

8  and to elevate intentional murder to capital eligible murder.

9  3.     Clearly established federal law prohibits the arbitrary charging of a capital offense based

10  solely on the fact that an intentional murder was committed in a building instead of outdoors.  If a

11  burglar intends only murder, that intent cannot be used to both define the burglary and at the same

12  time bootstrap the murder into a capital offense.  To do so would not narrow the class of those eligible

13  for the death penalty, but would widen it.  As a matter of constitutional law, Mr. McConnell's

14  eligibility for the death penalty cannot turn on conduct that simply enabled the intended murder and

15  had no point of its own.  The burglary aggravating circumstance is therefore invalid as applied in Mr.

16  McConnell's case.

17  4.     The jury's finding of the invalid burglary aggravating circumstance had a substantial and

18  injurious effect on the penalty verdict.  Under state law, each aggravating circumstance adds its own

19  weight to the sentencing calculus making the offense more aggravated and heinous.  In addition,

20  statutory aggravating circumstances are weighed against mitigation before a defendant is considered

21  eligible for the death penalty.  The sentencing panel's consideration of an invalid aggravating

22  circumstance during the weighing process is therefore prejudicial to the penalty verdict.  These

23  statutory and constitutional protections under state law are necessary to ensure that the death penalty

24  is imposed in a manner consistent with the design of the federal constitution.  The jury's consideration

25  of the invalid burglary aggravating circumstance, therefore, invalidates Mr. McConnell's  death

26  sentence.

27  5.     Mr. McConnell alleges that the Nevada Supreme Court's disposition of his claim was contrary

28  to, and an unreasonable application of, clearly established law.  Mr. McConnell further alleges that

1   the state court's disposition of his claim was an unreasonable determination of the facts in light of the

2   evidence presented.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CLAIM SIX**

Mr. McConnell's conviction and death sentence are invalid under the federal constitutional guarantees of due process, effective assistance of counsel, and freedom from self-incrimination due to the invalidity of his guilty plea.  U.S. Const. amends. V, VI & XIV.

**SUPPORTING FACTS**

1.      On May 30, 2003, the state district court conducted a hearing on the issue of whether Mr. McConnell should be allowed to represent himself in trial proceedings on the death penalty case against him. 5/30/03 TT at 5, et seq.  Following a canvass during which the court explored the perils and pitfalls of self-representation, Mr. McConnell was granted the right to represent himself.  Id. at 25. Mr. McConnell stood before the court as a proper person litigant and expressed the desire to enter guilty pleas to the charges of first degree murder, sexual assault and first degree kidnapping lodged against him.

2.      The court immediately proceeded to personally canvass Mr. McConnell as to the knowing and voluntary nature of his guilty pleas, ultimately determining to accept the pleas. Id. at 42-52.  No guilty plea memorandum was executed or filed.  No discussion of the penalty of lifetime supervision was placed on the record.  Further, the plea canvass reveals no discussion of the fact that probation was not available for any of the offenses to which Mr. McConnell proffered his guilty pleas.  As to the charge of first degree murder, Mr. McConnell was informed that the state was seeking to prove his guilt on alternative theories of premeditated murder and/or felony murder. Mr. McConnell did not acknowledge which theory of guilt on the charge was true.

3.      The district court failed to discuss a multitude of issues related to the consequences of Mr. McConnell's guilty pleas.  Specifically, the court never informed Mr. McConnell that probation was unavailable for any of his offenses, or that lifetime supervision would result from the sexual assault conviction.  Mr. McConnell was never informed that he could be fined for his offenses, or face mandatory administrative assessments.  The court never informed him of the imposition of a restitution amount in his judgments.  The court did not inform him of the mandatory minimum terms of imprisonment he faced.  The court did not inform him that his sentences might run consecutive or concurrent.  It did not inform him that there would be a pre-sentence report and recommendation

1   prepared relative to the sexual assault and kidnapping charges that would recount his criminal history

2   and might contain hearsay.

3   4.      Similarly, regarding the waiver of his constitutional rights, the district court did not inform

4   Mr. McConnell that waiving his right to self-incrimination included waiving the right to refuse to

5   testify at trial, on which even the prosecution would not be allowed to comment to the jury.  The court

6   did not inform Mr. McConnell that waiving his right to a jury trial included waiver of an impartial

7   jury and waiver of a trial free of excessive pretrial publicity prejudicial to the defense.  Moreover,

8   there was no discussion of whether Mr. McConnell was waiving his right to appeal his sexual assault

9   and kidnaping convictions by pleading guilty.

10   5.      Finally, regarding the voluntariness of his pleas, the plea canvass does not discuss whether

11   Mr. McConnell was under the influence of intoxicating liquor, a controlled substance, or other drug

12   which would in any manner impair his ability to comprehend or understand the proceedings

13   surrounding his entry of his plea.  Such an inquiry might have yielded an explanation for why he was

14   pleading guilty to capital murder, sexual assault and kidnaping without the benefit of counsel or a

15   written plea agreement.  Without the coverage of those important consequences and waivers, the

16   totality of the record fails to reflect that Mr. McConnell entered a voluntary and knowing set of guilty

17   pleas.

18   6.      The Nevada Supreme Court's adverse ruling regarding the validity of Mr. McConnell's guilty

19   plea was contrary to, and involved an unreasonable application of, clearly established federal law.

20   Clearly established federal law holds that a guilty plea operates as a waiver of important rights, and

21   is valid only if done voluntarily, knowingly, and intelligently, with sufficient awareness of the

22   relevant circumstances and likely consequences.  Mr. McConnell simply could not have been aware

23   of the relevant circumstances and consequences because there were too many issues the trial court

24   failed to address.  Mr. McConnell was not aware that lifetime supervision would result from his

25   sexual assault conviction, that fines and fees would be assessed against him, that he faced mandatory

26   minimum sentences for his crimes, that those sentences could run consecutively rather than

27   concurrently, that  he was waiving his right to refuse to testify, that he was waiving his right to trial

28   free from prejudicial publicity, or that he was waiving his right to appeal his sexual assault and

kidnaping convictions.  When viewed together, it is clear that too many issues were omitted from discussion at the plea canvass to support a finding that Mr. McConnell's guilty plea was knowingly and intelligently made.

7.      The trial court's failure to fully apprise Mr. McConnell of the circumstances and consequences of his guilty plea had a substantial and injurious effect on the outcome of the proceedings.  If Mr. McConnell had been fully informed of the consequences of his pleas, he would not have pleaded guilty.   Accordingly, Mr. McConnell's conviction is invalid and this Court must grant the writ vacating his conviction and death sentence.

8.      Mr. McConnell alleges that the Nevada Supreme Court's disposition of his claim was contrary to, and an unreasonable application of, clearly established law.  Mr. McConnell further alleges that the Nevada Supreme Court's disposition of his claim was an unreasonable determination of the facts in light of the evidence presented.

**CLAIM SEVEN**

Mr. McConnell's death sentence is invalid under federal constitutional guarantees of due process, confrontation, effective assistance of counsel, equal protection, and a reliable sentence due to the trial court's error in denying Mr. McConnell's request for April Robinson's pre-sentence report, and in curtailing the cross-examination of Ms. Robinson. U.S. Const. amends. V, VI, VIII & XIV.

**SUPPORTING FACTS**

1.      Clearly established federal law grants Mr. McConnell the right to present a defense and cross-examine witnesses against him.  Here, the trial court violated these rights when it refused Mr. McConnell's request for a copy of April Robinson's pre-sentence report, which Mr. McConnell intended to use to impeach Ms. Robinson's testimony at the penalty hearing.  The trial court also improperly curtailed Mr. McConnell's ability to ask legitimate questions of Ms. Robinson on cross-examination.

2.      Prior to trial, Mr. McConnell moved for production of a parole and probation report (PSI) that had been completed for a probation violation hearing relative to Ms. Robinson, who had been on probation for statutory rape and marijuana possession since 1997. 7/10/03 TT at 31-34. The defense argued that "some of the allegations that were raised against Mr. McConnell were raised by her with her probation officer when she was facing possible disciplinary action for violating its terms, and that's why we wanted to reach the information, to see if we could verify that." Id. At 32.  The prosecutor informed the court that the information was not relevant because Ms. Robinson was

> not going to testify about the sexual assault, she's going to testify about a couple of things that Mr. McConnell said to her during the course of her torture – not torture, during the course of her ordeal, and that's probably all.  She's going to corroborate some of the statements Mr. McConnell made in his motion, to get the robbery aggravator back in.  And that's going to be her entire purpose for testifying in front of the jury.

 7/10/03 TT at 33. The trial court took the issue under advisement and, after reviewing the PSI in camera, stated on the record that, "I have denied the request to turn over the presentence investigation to Mr. McConnell because Ms. Robinson's conviction was discharged pursuant to 453, et cetera. And because of that, Mr. McConnell, she is no longer – my words – no longer a felon because she went through the process of the diversion pursuant to 453." 8/21/03 TT at 2. In its written order denying

1   Mr. McConnell's request for disclosure of Ms. Robinson's PSI, the trial court found "that Ms.

2   Robinson's conviction was discharged and the Defendant cannot use the Presentence Investigation

3   Report or conviction during questioning of April Robinson."   Ex. 76 at 3.   Then, despite the

4   prosecutor's promise to the trial court that she would not be testifying about the sexual assault or the

5   kidnap, Ms. Robinson was led through both of those events in excruciating detail for 23 pages of

6   transcribed testimony.  8/26/03 a.m. TT at 56-79.  Despite the state violating its promise not to ask

7   about the sexual assault, Mr. McConnell was unable to impeach Ms. Robinson's credibility with the

8   PSI because the court refused to give him a copy.

9   3.      The trial court erred in denying Mr. McConnell's request to use the PSI for legitimate

10  impeachment purposes.   The trial court denied the request for the PSI on the ground that the

11  underlying conviction had been discharged, thus Ms. Robinson could not be impeached with the

12  felony conviction, however, Mr. McConnell never sought to impeach her with the conviction.   Mr.

13  McConnell intended to use the PSI to demonstrate that Ms. Robinson had a motive to fabricate

14  allegations against Mr. McConnell because she was on probation and faced possible revocation.   The

15  fact remains that while she was on probation, and while she had a motive to do whatever the state

16  wanted her to do, she accused Mr. McConnell of wrongdoing, and Mr. McConnell had a

17  constitutional right to impeach her on this basis.

18  4.      The trial court further erred in preventing Mr. McConnell from questioning Ms. Robinson

19  about her probation, or about alleged violations of the restraining order she had against Mr.

20  McConnell.  Every time Ms. Robinson gave an answer during cross examination alluding to either

21  the TPO or her probation, and Mr. McConnell asked follow-up questions, the trial court shut the issue

22  off completely.  During cross-examination, Mr. McConnell asked Ms. Robinson "Yesterday you also

23  made mention of the fact that I waited until your TPO expired.  Do you remember that?"  8/27/03 a.m.

24  TT at 25.  The state objected that the issue was irrelevant.  Id. at 26.  Mr. McConnell argued that "I

25  violated some of the terms of the orders, as well as Ms. Robinson, and I want to see if she would

26  admit that."   Id. at 27.  The trial court sustained the objection, stating "as far as any questions in

27  regards to TPO and any questions in regard to probation, I don't want you to ask them.  In regards to

28  probation, I have already said my reasons, as far as she did what she did, and she did the deferment

1  program, and she is completely exonerated according to the law." Id. at 34.  Ms. Robinson later

2  mentioned during her cross-examination that she "had gotten arrested November 1st for having the

3  gun in my home." 8/27/03 a.m. TT at 51.  In response, Mr. McConnell asked "why were you

4  arrested," and the state objected. Id.  The trial court sustained the objection before the state even

5  finished explaining the basis for the objection. Id.  Mr. McConnell then asked whether the gun was

6  confiscated and why, to which Ms. Robinson replied "[the gun] was legal; I wasn't." Id.  Mr.

7  McConnell asked what she meant by that, and the state objected, stating "[i]t was taken because she

8  was on probation, it shouldn't have been there, end of hunt." Id. at 52.  The trial court again sustained

9  the objection. Id.  During recross-examination, Mr. McConnell asked Ms. Robinson "[s]o after

10  March 6, we never saw each other again; is that what you're saying?" Id. at 96. The state objected

11  that "we might be going to another TPO matter." Id. at 97.  Mr. McConnell explained that "it's not

12  one incident.  And I'm not trying to impeach her for purpose of felony conviction or– I'm not even

13  talking about probation.  However, I have a police report which she signed which is perjury, penalties

14  of perjury, and I would say if you lie on a police report and say one thing, I can impeach on that, I

15  believe." Id. at 100.   The trial court again sustained the objection. Id. at 104.

| | |
|---|---|
| Mr. McConnell: | Now it seems like if it doesn't fit into what they want, I can't prove mitigators, they want this August 7, brutal, premeditated, and I have to show there was a history before that, which happens to include TPO's and probation.  And I am trying to dance around those, but they are linked, and you can't talk about one without the other. |
| The Court: | Probation is out. |
| Mr. McConnell: | And I never brought that up, she did.  She brought up TPO yesterday. |
| The Court: | I am saying to you that I think you have brought up your mitigators in regards to emotional distress.  You have.  And that's why I am saying it's cumulative. |

24  Id. at 104-105.  Thus, Mr. McConnell was completely prevented from confronting Ms. Robinson

25  regarding the TPO and her probation, and also precluded from presenting his defense related to those

26  issues.

27  5.     The trial court's refusal to disclose Ms. Robinson's PSI to Mr. McConnell, or to allow him

28  to question her about her probation and restraining order, had a substantial and injurious effect on the

1  jury's verdict.  Ms. Robinson was clearly the state's star witness, and her credibility was extremely

2  important to the state's case.  The pre-sentence report and Mr. McConnell's line of questioning

3  regarding Ms. Robinson's violation of the restraining order were relevant cross-examination questions

4  to establish that she had an incentive to shade her testimony in the state's favor at the time her

5  statements were made.

6  6.      The state court's rejection of these claims was contrary to, or involved an unreasonable

7  application of, clearly established federal law.  Clearly established federal law grants a criminal

8  defendant the right to cross-examine witnesses against him, and Mr. McConnell was deprived of this

9  right.  Clearly established federal law also prohibits the state from withholding material exculpatory

10  and impeachment evidence, but Ms. Robinson's PSI was material impeachment evidence which the

11  state withheld from Mr. McConnell.  Accordingly, Mr. McConnell's death sentence is invalid and this

12  Court must grant the writ vacating his sentence.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CLAIM EIGHT

Mr. McConnell's death sentence is invalid under federal constitutional guarantees of due process, equal protection, a jury trial, and a reliable sentence because the trial court gave the jury erroneous and unconstitutional jury instructions.  U.S. Const. amends. V, VI, VIII, XIV.

## SUPPORTING FACTS

### A.   Jury Instructions Failing to Require that Mitigation be Outweighed by Statutory Aggravation Beyond a Reasonable Doubt

1.    Mr. McConnell's constitutional rights were violated because the jury was erroneously instructed concerning the constitutionally-required burden or proof for finding Mr. McConnell death eligible.  One instruction told the jury that "[t]he jury may impose a sentence of death only if one or more aggravating circumstances are found, and any mitigating circumstance or circumstances which are found do not outweigh the aggravating circumstance or circumstances."  Ex. 28 at 6.  Another instruction stated that "[i]f you find unanimously and beyond a reasonable doubt that at least one aggravating circumstance exists and each of you determines that any mitigating circumstances do not outweigh the aggravating, the Defendant is eligible for a death sentence."  Ex. 28 at 20.

2.    Under Nevada law, the maximum penalty a person can receive based solely on a conviction for first degree murder is life without the possibility of parole.  Eligibility for the death penalty requires two factual findings: (1) the existence of one or more statutory aggravating circumstances, and (2) that the mitigation evidence does not outweigh the aggravating circumstances.  See NRS 175.554(3). Clearly established federal law requires that any fact that increases a punishment beyond the statutory maximum be found beyond a reasonable doubt by the jury.  Mr. McConnell's jury was never instructed that it had to find the second element of death-eligibility – that the mitigating evidence did not outweigh the aggravating circumstances – beyond a reasonable doubt.

3.    The weighing process performed by the sentencer is entirely idiosyncratic; the weighing process does not depend on the number of aggravating or mitigating factors; the jurors may give any factor whatever weight they determine is appropriate. No entity other than the jury can perform the necessary weighing, and the failure to instruct the jury on the standard by which it was required to find this death-eligibility factor is prejudicial per se.

145

4.      Failure to instruct the jury on the burden of proof-beyond-a-reasonable-doubt violated Mr. McConnell's rights to due process of law and a reliable sentence, and constituted structural error which is reversible per se.  Alternatively, the failure of the jury instruction to require that aggravating circumstances outweigh mitigating circumstances beyond a reasonable doubt had a substantial and injurious effect on the penalty phase verdict.

5.      The Nevada Supreme Court's rejection of this claim was contrary to, or involved an unreasonable application of, clearly established federal law. The Nevada Supreme Court held  that "[n]othing in the plain language of [the statutes] requires a jury to find, or the State to prove, beyond a reasonable doubt that no mitigating circumstances outweighed the aggravating circumstances in order to impose the death penalty," and "[s]imilarly, this court has imposed no such requirement." Ex. 9 (McConnell v. State, 125 Nev. __, 212 P.3d 307, 314-15 (2009)).  While the court's first statement regarding the text of the statute may be accurate, both the statute and the Nevada Supreme Court's interpretation of it are nonetheless constrained by the federal constitution, thus it is precisely because the plain language of the statute fails to require proof beyond a reasonable doubt that the statute is unconstitutional.  The court's second holding regarding its own case law is simply wrong: the court has, in fact, held that the aggravators must be found by the jury to not be outweighed by mitigation beyond a reasonable doubt before the death penalty can be imposed.  See Johnson v. State, 118 Nev. 787, 802-803, 59 P.3d 450, 460 (2002).  Regardless of what the state court has held in the past, recent and controlling Supreme Court case law requires any and all death eligibility factors to be found by the jury beyond a reasonable doubt.

**B**.      **Jury Instruction Improperly Forbidding the Jury from Considering Sympathy**

6.      Mr. McConnell's jury was improperly instructed that "a penalty verdict may never be influenced by sympathy, prejudice or public opinion." Ex. 28 at 2.  By forbidding the sentencer from taking sympathy into account, this language on its face precluded the jury from considering evidence concerning Mr. McConnell's character and background, thus effectively negating the constitutional mandate that all mitigating evidence be considered.  A reasonable likelihood accordingly exists that this instruction denied Mr. McConnell the individualized sentencing determination that state and federal constitutions require.

146

7.     The flaw in this instruction is that it did not preclude the jury's consideration of "mere sympathy"– that is, the sort of sympathy that would be totally divorced from the evidence adduced during the sentencing phase – but rather precluded consideration of all sympathy, including any sympathy warranted by the evidence.  Because the jury in this case was told not to consider any sympathy – rather than "mere" sympathy – it is reasonably likely that the jury at Mr. McConnell's trial understood that when making a moral judgment about his culpability, it was forbidden to take into account any evidence that evoked a sympathetic response.

8.     The giving of the unconstitutional "anti-sympathy" instruction substantially and injuriously affected the process to such an extent as to render Mr. McConnell's sentence fundamentally unfair and unconstitutional.

**C.     Reasonable Doubt Instruction**

9.     During the sentencing phase of Mr. McConnell's trial, the trial court provided the following instruction to the jury on the concept of reasonable doubt:

> A reasonable doubt is one based on reason.  It is not a mere possible doubt, but is such a doubt as would govern or control a person in the more weighty affairs of life.  If the minds of the jurors, after the entire comparison and consideration of all the evidence, are in such condition that they can say they feel an abiding conviction of the truth of the charge, there is not a reasonable doubt.  Doubt to be reasonable must be actual, not mere possibility or  speculation.

Ex. 28 at 7.

10.     This instruction inflates the constitutional standard of doubt necessary for acquittal, and giving this instruction created a reasonable likelihood that the jury would convict and sentence based on a lesser standard of proof than the constitution requires.

11.     The principal defect of the instruction is the second sentence: reasonable doubt "is not mere possible doubt, but is such a doubt as would govern or control a person in the more weighty affairs of life."  This language is an appropriate characterization of the degree of certainty required to find proof beyond a reasonable doubt, rather than the standard of reasonable doubt itself.  This language is also an historical anomaly; as far as can be discerned, no other state currently uses this language in its reasonable doubt instruction, and the few states that previously used it have since disapproved it.

12.     The final sentence of the instruction is also constitutionally infirm.  That sentence states "[d]oubt to be reasonable must be actual, not mere possibility or speculation."  This language is functionally identical to language condemned by the United States Supreme Court and, when read in combination with the "govern or control" language, creates a reasonable likelihood that the jury would convict and sentence based on a lesser standard of proof than the constitution requires.

13.     The characterization of the proof standard as an "abiding conviction of the truth of the charge" does not cure the defects of the inaccurate statements of the reasonable doubt standard.  That term is not linked to any language suggesting a proper definition of the proof standard, and the immediately preceding reference to the unconstitutional "govern or control" standard in fact links the "abiding conviction" language to a standard of proof that is impermissibly low.  In short, the instruction does nothing to dispel the false notion that the jurors could have an "abiding conviction" as to guilt if the reasonable doubts they harbored were not sufficient to "govern or control" their actions.

14.     The reasonable doubt instruction permitted the jury to convict and sentence Mr. McConnell based on a lesser quantum of evidence than the constitution  requires. This structural error is per se prejudicial, and no showing of specific prejudice is required.

### C.     Equal and Exact Justice Instruction

15.     The trial court erred in instructing the jury:

> Now you will listen to the arguments of counsel and Mr. McConnell who will endeavor to aid you to reach a proper verdict by refreshing in your minds the evidence and by showing the application thereof to the law; but whatever counsel may say, you will bear in mind that it is your duty to be governed in your deliberation by the evidence as you understand it and remember it to be and the law as given you in these instructions, with the sole, fixed and steadfast purpose of doing equal and exact justice between the Defendant and the State of Nevada.

Ex. 28 at 22.

16.     By informing the jury that it must provide "equal and exact justice between the defendant and the State of Nevada," the giving of this instruction created a reasonable likelihood that the jury would not apply the presumption of innocence in favor of Mr. McConnell, and would thereby convict and sentence based on a lesser standard of proof than the constitution requires.

17.     The defect in this instruction is in the final clause: jurors are told to deliberate "with the sole,

148

fixed and steadfast purpose of doing equal and exact justice between the defendant and the State of Nevada." This "equal and exact" language improperly and unnecessarily quantifies the proportion of "justice" to be allocated between the defendant and the State. While it would be proper to instruct the jury that it should attempt to do "justice" between the parties by following the burden of proof instructions – assuming that the burden of proof instructions were proper, which here they were not – the quantitative element of justice injected by the "equal and exact" language creates a reasonable likelihood that a juror will ignore the constitutionally mandated presumption of innocence, and instead view the parties on an "equal" footing, as if this were a civil case. In fact, this instruction finds its genesis in the civil law, where the parties are on an "equal footing" and where it accurately states the burden of proof.

18.     This sort of structural error is per se prejudicial, and no showing of specific prejudice is required. In the alternative, the equal and exact justice jury instruction had a substantial and injurious effect on the jury's verdict.   The equal and exact justice jury instruction had a substantial and injurious effect on the verdict by allowing the jury to convict Mr. McConnell based on a lower standard of proof than required by state and federal law.

19.     Mr. McConnell alleges that the Nevada Supreme Court's disposition of his claim was contrary to, and an unreasonable application of, clearly established law. Mr. McConnell further alleges that the Nevada Supreme Court's disposition of his claim was an unreasonable determination of the facts in light of the evidence presented.

1 **CLAIM NINE**

2      Mr. McConnell's death sentence is invalid under federal constitutional guarantees of due

3 process, equal protection, and a reliable sentence due to the prosecutorial misconduct that occurred

4 throughout the proceedings. U.S. Const. amends. V, VIII & XIV.

5 **SUPPORTING FACTS**

6 1.      Clearly established federal law prevents the state from obtaining a death sentence by inflaming

7 the passions and prejudices of the jury. The prosecutor committed misconduct during Mr.

8 McConnell's trial by intentionally inflaming the passions and prejudices of the jurors through

9 improper argument and introduction of improper evidence.  The prosecutor told the court during one

10 pre-trial hearing that "Your Honor, everything I – or we present during this penalty phase will be, to

11 quote Mr. McConnell, to piss off the jury . . . . But we're going to try to prejudice him with this jury."

12 8/21/03 TT at 26, 28. The prosecutor argued during Mr. McConnell's sentencing for the sexual

13 assault and kidnaping that "When you cast a play in hell, you rarely get angels for actors.  Well, we

14 got no angel here.  And this certainly was hell for the victims.  And it's hell for the victims that

15 survived.  And Mr. McConnell deserves no sympathy, he deserves nothing in the way of leniency.

16 He's a vengeful and evil person, and he deserves absolutely everything that you can give him when

17 you sentence him on this case."  7/10/03 TT at 24.

18 2.      The prosecution committed misconduct when it introduced audio recordings of telephone calls

19 and drawings made by Mr. McConnell on certain pieces of discovery.  The prosecutor admitted that

20 the purpose of introducing the tape was "to try to prejudice him with this jury, and that's the purpose

21 of the tape." 8/21/03 TT at 28. This is an improper purpose for introducing any evidence.  The

22 prosecutor intentionally inflamed the passions of the jury by asking Mr. McConnell whether he

23 "struck out of the dark like a terrorist," 8/27/03 p.m. TT at 123, when the trial concluded less than two

24 weeks before the second anniversary of the September 11, 2001, attacks. The prosecutor also inflamed

25 the passions of the jurors by asking Mr. Bakondi whether Mr. McConnell told him to "[l]eave it to

26 a wop to bring a knife to a gun fight."  8/26/03 p.m. TT at 130.

27 3.      In addition to presenting and repeatedly referring to inflammatory and prejudicial evidence,

28 the prosecutor also used his closing argument as an opportunity to inflame the passions and prejudices

1   of the jury. Mr. McConnell testified at the sentencing phase, and expressed remorse for the killing of

2   Brian Pierce.  8/27/03 p.m. TT at 93-97, 101-102.  The state, however, argued that,

3   > He was so focused on trying to sell you on his remorse yesterday concerning Brian,
> that for all intents and purposes, he left her out.  Did you notice it?  What about April
4   > who lost a fiancé?  To be quite candid, a future with a nice family.  What about what
> he did in that house to her, and the terror he put her through?  She's not worth his
5   > remorse.  Ladies and gentlemen, he's not worth your compassion.

6   8/28/03 a.m. TT at 49.  The prosecutor used Mr. McConnell's expressions of remorse for what he

7   did to Mr. Pierce to highlight Mr. McConnell's failure to express remorse for what he did to Ms.

8   Robinson to inflame the passions and prejudices of the jury.  The prosecutor further attempted to

9   inflame the passions of the jurors by encouraging them to sentence Mr. McConnell to death based on

10  what he did to Ms. Robinson:

11  > [T]hink of April, having been anally raped, vaginally raped; and then told to orally
> copulate him, to swallow the semen. Think of that. Think of her being kidnapped,
12  > thinking she's going to be killed driving up the hill, and he says, as he touches her
> shoulder, tenderly, 'April, I know your dad just lost your mom. I won't kill you.'
13
14  8/28/03 a.m. TT at 46.  The prosecutor improperly referred to facts outside the evidence and

    attempted to inflame the passions and prejudices of the jurors by referring to Mr. McConnell's
15
    "seven" legacies of tragedy.  8/28/03 a.m. TT at 44.  There is no evidence in the record to explain
16
    what was meant by seven legacies of tragedy, but the implication was that Mr. McConnell was guilty
17
    of more crimes than the jury knew about, and that he should be sentenced to death for all of these
18
    tragedies, not just those he was convicted of.  The prosecutor also gave his personal opinion when
19
    trying to inflame the passions of the jurors, stating "What do I agree with that [Mr. McConnell] said?
20
    Brian was a good man." 8/28/03 a.m. TT at 41.  Thus, the prosecutor's entire closing argument was
21
    intended to inflame the passions and prejudices of the jurors against Mr. McConnell so they would
22
    be more likely to impose a death sentence.
23
    4.      Furthermore, the state committed misconduct when it violated a promise it made not to elicit
24
    "other matter" testimony from April Robinson.  The defense moved for production of a parole and
25
    probation report that had been completed for a probation violation hearing relative to Ms. Robinson,
26
    the victim of sexual assault to which Mr. McConnell pleaded guilty, on felony charges of her own.
27
    7/10/03 TT at 31-34. The defense argued that the information contained in the report was relevant
28

1    impeachment material relating to Ms. Robinson, in that she may have accused Mr. McConnell of

2    violent behavior in order to avoid revocation of parole on her own charges and because she was

3    expected to testify in the penalty phase of the capital case. Id.  The prosecutor informed the court that

4    the information was not relevant because Ms. Robinson was

5             not going to testify about the sexual assault, she's going to testify about a couple of
           things that Mr. McConnell said to her during the course of her torture – not torture,
6             during the course of her ordeal, and that's probably all.  She's going to corroborate
           some of the statements Mr. McConnell made in his motion, to get the robbery
7             aggravator back in.  And that's going to be her entire purpose for testifying in front
           of the jury.

8    7/10/03 TT at 33. The trial court accepted the state's representations that "Ms. Robinson will testify

9    at the penalty phase only to what occurred during the course of torture and will not testify as to the

10   sexual assault," and relied on them in denying Mr. McConnell's request for Ms. Robinson's pre-

11   sentence report. Ex. 76 at 2-3.  Then, despite the prosecutor's promise to the trial court that she would

12   not be testifying about the sexual assault or the kidnaping, Ms. Robinson was led through both of

13   those events in excruciating detail for twenty-three pages of transcribed testimony.  8/26/03 a.m. TT

14   at 56-79.  While these events occurred on the same day as the murder, they were not part of it.  The

15   murder of Mr. Pierce was completed well before Ms. Robinson entered the house, and there was

16   nothing about the sexual assault and kidnaping of Ms. Robinson that was intertwined with the murder.

17   Thus, because the murder of Brian Pierce was transactionally separate from the offenses against Ms.

18   Robinson, the state was bound by its representations that it would not elicit testimony about the

19   offenses against Ms. Robinson.  The details of the offenses against Ms. Robinson, graphically and

20   extensively probed on direct examination, served no other purpose than to inflame the passions and

21   prejudices of the jury against Mr. McConnell.

22   5.       By engaging in a consistent pattern of prosecutorial misconduct, the state rendered Mr.

23   McConnell's penalty hearing fundamentally unfair.  The state's case centered around inflaming the

24   passions and prejudices of the jury against Mr. McConnell.  The prosecutorial misconduct committed

25   therefore had a substantial and injurious effect on the jury's penalty verdict.

26   6.       The Nevada Supreme Court's rejection of these claims of prosecutorial misconduct was

27   contrary to, and involved an unreasonable application of, clearly established federal law.  When all

28

152

the prosecutorial misconduct is viewed together, it is clear that the state obtained a death sentence against Mr. McConnell by repeatedly inflaming the passions and prejudices of the jury.   Mr. McConnell's death sentence is therefore invalid and this Court must grant the writ vacating his sentence.

**CLAIM TEN**

Mr. McConnell's death sentence is invalid under federal and state constitutional guarantees of due process of law, a reliable sentence, equal protection, and the prohibition against cruel and unusual punishments because the trial court erroneously allowed the State to introduce unduly prejudicial, lengthy, and irrelevant victim impact statements, thereby rendering Mr. McConnell's trial fundamentally unfair and his sentence unreliable.  U.S. Const. amends. V, VI, VIII, XIV.

**SUPPORTING FACTS**

1.      Although no per se bar prevents admission of victim impact statements in capital prosecutions, due process precludes admission of these statements where they render the trial fundamentally unfair. Specifically, clearly established federal law prohibits victims from characterizing or opining about the crime, the defendant, and the appropriate punishment.  Courts have also recognized that so-called "holiday" arguments are inappropriate, and have no purpose other than to arouse the jurors' emotions.   "Holiday" arguments are generally made to arouse jurors' passions and prejudices and are inadmissible

2.      In this case, the prosecutor did not refer to the holidays himself but he coaxed these references from the family members of the victim.  The victim impact statements were replete with references to birthdays and holidays and the fact that the wedding of Mr. Pierce had been scheduled for that very Saturday. 8/27/03 a.m. TT at 16, 18, 25, 26, 27, 29. The victim's step-mother testified that she "won't have [Mr. Pierce's] college graduation to go to, won't have his wedding to go to," id. at 16, "I was so looking forward to his wedding.  They were planning to get married this month, as a mater of fact.", id. at 18.  The victim's biological mother testified that Mr. Pierce and Ms. Robinson "wanted to get married in [her] backyard, and their wedding was supposed to be last Saturday," id. at 25, "We have enough people in our family to meet at least once a month with everyone, with birthdays and holidays.  And I don't know what it's going to be like from here on out, but this past year, there were holidays where I didn't want to go . . . and his birthday, I was so upset because I had no way to celebrate. I had to go sit in a cemetery and be angry that this is the way I had to spend my son's birthday," id. at 26-27.

3.      The prosecutor also elicited improper testimony from the victims regarding their opinions and

1   characterization of Mr. McConnell.  The victim's step-mother characterized Mr. McConnell as "cruel

2   and mean," 8/27/03 a.m. TT at 1.  Of the insensitive sentiments Mr. McConnell expressed in a letter

3   to Ms. Robinson, the prosecutor asked "Does that sound like Robert, the defendant, this kind of

4   thing?" 8/25/03 p.m. TT at 81.  The prosecutor specifically asked Ms. Robinson how she perceived

5   Mr. McConnell's crimes against her:

6       Q.    Did you find that as much comforting as you did another threat? Or how did
    you perceive that?

7       A.    I did not believe him, because he changes.  Like he cares one minute, and then
    the next minute he's set on to do something else, and that's what is confusing

8            about him.

9   8/26/03 a.m. TT at 82; <u>see</u> <u>also</u> 8/26/03 a.m. TT at 83 ("Do you view that as a sympathetic gesture?").

10

11       Q.    You were questioned about whether he is sorry or not, and you have given
    your answers. I want  to show you Exhibit 26A: "So don't patronize me or try

12            to coerce or bribe or threaten to testify against me.  You want to get out, I
    don't. I could care less about anything else that I'm charged with. I enjoy my

13            victim's pain and suffering. It makes my job that  much more."
    Is that more the defendant you know?

14       A.    Yes.
        Q.    As far as the duress we have heard about,  let me read 24A: "Also, the longer

15            I stayed out there,  the angrier I got, thinking about my unfinished business out
    here. Nobody is going to do what these jackoffs did and just walk away. Tell

16            everyone I'm  happy. I knew what I was getting into.
    Is that more consistent, as opposed to the sympathy we have heard today?

17       A.    Yes.

18   8/26/03 a.m. TT at 86-87.

19   4.    In a pretrial hearing, the prosecutor promised the court that he would discuss with the victim

20   impact witnesses what they could and could not say. 8/21/03 TT at 14. The prosecutor said:

21       I'm just saying there's no need, Your Honor, to have a special hearing to bring in
    victim witnesses witnesses – victim-impact witnesses and tell them what the law sets

22       forth.  That is really the  responsibility of the prosecution to meet with those
    individuals and to discuss what they can and cannot do.  And I'm representing to the

23       court we will do that.

24   <u>Id.</u>  As the testimony outlined above makes clear, however, the prosecutor did not keep his promise.

25   Mr. McConnell hereby incorporates the allegations of Claim Nine regarding prosecutorial misconduct

26   as if fully set forth herein.

27   5.    The Nevada Supreme Court's rejection of this claim was contrary to, and involved an

28   unreasonable application, of clearly established federal law.  While victim-impact testimony is

permitted at capital penalty proceedings under federal due process standards, such evidence must be excluded if it renders the proceeding fundamentally unfair. Furthermore, admission of a victim's family members' characterizations and opinions about the crime, the defendant, and the appropriate sentence is prohibited by clearly established federal law. The testimony of the three victim-impact witnesses was replete with references to special occasions when the family would no longer have Mr. Pierce's presence, and characterizations of Mr. McConnell as a mean and unsympathetic person. Admitting the testimony of these witnesses rendered Mr. McConnell's trial fundamentally unfair because these presentations were unduly prejudicial and irrelevant.

6.     The admission of this prejudicial and irrelevant victim impact evidence had a substantial and injurious effect on the penalty phase verdict. Accordingly, Mr. McConnell's death sentence is invalid and this Court must grant the writ vacating his sentence.

**CLAIM ELEVEN**

Mr. McConnell's death sentence is invalid under the federal constitutional guarantees of due process, equal protection, and a reliable sentence due to insufficient notice of the state's case in aggravation.  U.S. Const. amends. V, VIII, XIV.

**SUPPORTING FACTS**

1.      On September 9, 2002, the state filed its Notice of Intent to Seek Death Penalty and alleged the three aggravating circumstances at issue in this case. Ex. 34.  Specifically, the state alleged that the murder was committed in the course of a burglary and that the burglary occurred when Mr. McConnell entered the home with the intent to kill the occupants.  The state also alleged that the murder occurred in the course of a robbery and that the robbery occurred when Mr. McConnell took Mr. Pierce's credit cards and fled and, finally, the state alleged that mutilation occurred.

2.      On January 13, 2003, a notice of facts in aggravation was filed.  Ex. 35.  This notice set forth the same three aggravating circumstances and included a list of witnesses who would testify to the "admissible statements made by the defendant involving his activity prior to the homicide and after the homicide" and included his plans to enter and kill the occupants of the house, his search of the house for money and his taking of Mr. Pierce's credit cards and placing the knife in Mr. Pierce's body after killing him.

3.      On July 31, 2003, the state filed an Amended Notice of Facts in Aggravation. Ex. 36.  This notice included a list of witnesses who would testify to the oral and written statements of Mr. McConnell involving his activities prior to, during and after the murder, including his plans to enter the house and kill the residents, his search of the house for money and his taking of Mr. Pierce's credit cards and that the knife was stabbed into Mr. Pierce after he died from gunshot wounds.

4.      Nevada Supreme Court Rule 250 states, in relevant part, that:

> (c) Notice of intent after filing of indictment or information.  No later than 30 days after the filing of an information or indictment, the state must file in the district court a notice of intent to seek the death penalty.  The notice must allege all aggravating circumstances which the state intends to prove and allege with specificity the facts on which the state will rely to prove each aggravating circumstance.
>
> (d) Late notice of intent.  Upon a showing of good cause, the district court may grant a motion to file a late notice of intent to seek the death penalty or of an amended notice alleging additional aggravating circumstances.  The state must file the motion within 15 days after learning of the grounds for the notice or amended notice.  If the

court grants the motion, it shall also permit the defense to have a reasonable continuance to prepare to meet the allegations of the notice or amended notice.  The court shall not permit the filing of an initial notice of intent to seek the death penalty later than 30 days before trial is set to comments.

Supreme Court Rules, Rule 250, subsections (c) and (d)

5.     In this case, the notice of intent indicated the three aggravating circumstances presented at the penalty phase by the state.   The only fact in support of the burglary aggravator was that Mr. McConnell entered with the intent to kill the occupants of the home.   In its closing argument, however, the state argued the burglary occurred when Mr. McConnell entered the house with the intent to kill (as alleged in the notice), when he entered with the intent to steal (not alleged – no notice), when he entered with the intent to rob (not alleged – no notice), and when he entered with the intent to commit sexual assault (not alleged, no notice, no facts in support of entry with intent to commit sexual assault). 8/28/03 TT at 33-35.  All these arguments were made without any notice to Mr. McConnell that they would be made.   In addition, the state specifically promised the trial court and Mr. McConnell that Ms. Robinson would not even be questioned about the sexual assault, 7/10/03 TT at 33, yet she was questioned in considerable detail on this matter.  Mr. McConnell hereby incorporates the allegations of Claim Nine alleging prosecutorial misconduct in violating their agreement not to present this evidence as if fully set forth herein.

6.     This failure to give notice proper notice of the facts upon which the aggravating circumstance would be based is a violation of Supreme Court Rule 250.   Mr. McConnell alleges that the state court's rules in death penalty cases create a constitutionally protected liberty interest that cannot be taken away without violating his rights to due process of law.   Under state law, the state's violation of the notice provisions of SCR 250 are strictly enforced without any reference to the absence of prejudice.

7.     The state's failure to provide adequate notice of its facts in aggravation had a substantial and injurious effect on the jury's verdict, and rendered the proceeding fundamentally unfair.  Accordingly, Mr. McConnell's death sentence is invalid and this Court must grant the writ vacating his sentence.

8.     The Nevada Supreme Court's rejection of this claim was contrary to, or involved an unreasonable application of, clearly established federal law.   The court rejected this claim on the

158

1   ground that Mr. McConnell had failed to demonstrate prejudice.  Mr. McConnell did not receive

2   notice that the state intended to argue that the burglary aggravator could rest on an intent to commit

3   robbery or sexual assault until the prosecutor's closing argument, leaving him with absolutely no

4   opportunity to present evidence contradicting those theories.  In addition, the Nevada Supreme

5   Court's disposition of Mr. McConnell's claim constitutes a violation of federal equal protection

6   guarantees given the court's holding in prior published cases that the state's violation of the notice

7   provisions in SCR 250 cannot be disregarded on the theory that he did not suffer prejudice.  In prior

8   published authority, the court held that a violation of the notice provisions would be enforced

9   regardless of the lack of prejudice in order to ensure that the state's compliance with the rules.  Mr.

10  McConnell alleges that the Nevada Supreme Court's failure to apply its prior rulings regarding strict

11  compliance with the notice provisions of SCR 250 violates federal equal protection guarantees by

12  treating him dissimilarly to other similarly situated litigants.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CLAIM TWELVE**

Mr. McConnell's death sentence is invalid under state and federal constitutional guarantees of due process, equal protection, and a reliable sentence due to the trial court's failure to bifurcate the penalty hearing, and the resulting improper admission of other bad act evidence prior to the jury determining whether Mr. McConnell was death eligible.  U.S. Const. amends. V, VIII, XIV.

**SUPPORTING FACTS**

1.      After the murder, and while in custody, Mr. McConnell made some telephone calls which were audio-taped by the state and drew some pictures related to the murder of Brian Pierce which were confiscated by the state.  See 8/21/03 TT at 25-30; 8/26/03 p.m. TT at 112-118; State's Exhibits 24-28.  Mr. McConnell objected to the admission of the telephone calls and the drawings made by him while in custody because the items did nothing to prove any of the alleged aggravating circumstances, and the prejudicial impact of the items outweighed their probative value. 8/21/03 TT at 25-30.  Mr. McConnell also asked the court to bifurcate the penalty hearing pursuant to Ring v. Arizona, 536 U.S. 584 (2002), to ensure that the jury did not consider this "other matter" evidence when determining his death eligibility. 1/10/03 TT at 5-6.  The trial court ruled these items admissible, but refused to bifurcate the penalty hearing.  1/10/03 TT at 6; 8/21/03 TT at 30. The evidence presented was incredibly inflammatory, was more prejudicial than probative, and was not relevant to any of the statutory aggravating circumstances.  The trial court's refusal to bifurcate the penalty hearing resulted in the jury considering this other matter evidence when determining whether Mr. McConnell was death eligible, thus violating his constitutional rights and entitling him to a new sentencing hearing.

2.      Clearly established federal law requires a state's capital sentencing scheme to genuinely narrow the class of persons eligible for the death penalty.  NRS 175.552 purports to perform its narrowing function by requiring the state to prove two things before a defendant becomes eligible for the death penalty: first, the state must convince the jury unanimously and beyond a reasonable doubt that at least one enumerated aggravating circumstance exists, and second, the state must convince each juror individually that the mitigation evidence does not outweigh the statutory aggravating circumstances.  Under the statutory scheme, "other matter" evidence is not admissible for use by the

jury in determining the existence of aggravating circumstances or in weighing them against mitigating circumstances. Such use of this evidence would undermine the constitutional narrowing process which the enumeration and weighing of specific aggravators is designed to implement.  Thus, under Nevada law, other matter evidence is admissible for only one purpose: for jurors to consider in deciding on an appropriate sentence after they have determined whether the defendant is nor is not eligible for death.  However, where the penalty phase is not bifurcated, all of the state's evidence in aggravation– both statutory and other matter evidence– are presented to the jury at the same time during the same proceeding, meaning the jury may consider all the evidence when determining death eligibility, thus completely eviscerating the narrowing function NRS 175.552 was intended to serve.

3.      The volume of other matter evidence presented in this case was substantial and it was enormously prejudicial.  The state's other matter evidence consisted of (1) a tape recording of a telephone call from Mr. McConnell to a friend stating that "I called [Brian Pierce's] mom and said your son begged like a coward," "that's my only joy is to torment [the victim's family] thru trial," "It's up to me if I wanna do twenty years, five, four, so, like I got control [of the appeals process] in that way," "I just kill people from here on out," "I'm killin people, that's just how it is, it's a free for all, what are they gonna do, kill me again? Give me another life?" "everybody [on death row] is killers so it is cool, get to see a few other celebrities," "it was fun [killing the victim]," "I was gonna cut dude's head off but I didn't have time," Ex. 71 (State's Trial Exhibit 28 (tape)); (2)  a picture of Mr. Pierce on which Mr. McConnell had drawn a bullet aimed at his head, markings across his throat, and the words, "fuckin' coward" and "see you in hell faggot," Ex.72 (State's Trial Ex. 49); (3) a letter in which Mr. McConnell wrote "Tell everyone I'm happy.  I knew what I was getting into."  Ex. 73 (State's Trial Exhibit 24, 24a, 25a); (4) a letter in which Mr. McConnell wrote "I enjoy my victim's pain and suffering.  It makes my job worth it that much more" and "I'm a ruthless piece of shit who's going to get what I deserve."  Ex. 74 (State's Trial Exhibit 26, 26a); and (5) a letter to April Robinson in which Mr. McConnell wrote "I hope this letter finds you before you kill yourself.  Just think – now you can be with your mom and Brian forever!" "Tell [the victim's sister] black doesn't make her look any thinner.  Her [sic] and Brian were both fat fucks.  And you thought I was overweight? No wonder your sex life was unsatisfactory.  I see you hadn't had sex with his punk ass in 5 days.  Maybe him

1  [sic] and Matt were more than just friends." "Just think, Brian would still be alive if you had locked

2  that window! How does that really make you feel April? Late at night, alone, when you cry yourself

3  to sleep," and "all debts are paid." Ex 75 (State's Trial Exhibit 27).

4  4.     The prejudicial effect of the "other matter" evidence was exacerbated by the prosecutor's

5  closing argument in which he urged the jury to consider the "other matter" evidence when

6  determining the existence of the aggravators:

7  >           Now his comments and his reference in his materials that he pinned up in his
>  jail cell, his comment to his father, if you recall the phone call,  is: I would have cut
8  >  his head off, if I had time. And if you look at the photograph -- I don't know if you can
>  see that. Let me see if that will come in. See the marks on the neck? Now his comment
9  >  and this picture isn't evidence of mutilation. Saying you're going to cut  somebody's
>  head off is not mutilation. But it certainly tells you the intent that this defendant had
10 >  in respect to the body of Brian Pierce.
>           And what was that intent? Well, there were two things, two types of
11 >  mutilation, two things you could find mutilation actually occurred.

12  8/28/03 a.m. TT at 37.  Thus, in the same breath the prosecutor recognized that the other matter

13  evidence was not evidence of mutilation and also urged the jury to consider it when determining

14  whether the State had proven the mutilation aggravator.

15  5.     The failure to bifurcate the penalty hearing had a substantial and injurious effect on the penalty

16  verdict.  As explained above, the sheer volume and prejudicial nature of the "other matter" evidence

17  was such that there is an impermissible risk that the jury considered it in determining whether Mr.

18  McConnell was eligible for the death penalty.  In addition, the prosecutor's attempt to conflate the

19  "other matter" evidence with jury's consideration of whether the statutory aggravating circumstances

20  were proven exacerbates the prejudice suffered by Mr. McConnell.

21  6.     The Nevada Supreme Court's rejection of this claim was contrary to, and involved an

22  unreasonable application of, clearly established federal law.  The court ignored clearly established

23  federal law requiring states to narrow the class of death eligible offenders and channel the jury's

24  discretion by clear and objective standards.  Where the death penalty statute allows the jury to

25  consider only certain kinds of evidence when determining death eligibility, but the trial court allows

26  the jury to hear all the evidence at once, whether admissible or not in determining death eligibility,

27  the narrowing function of the statute is usurped and the clear and objective standards the statute was

28  intended to provide are eliminated.  Most of the evidence presented to the jury was other matter

1   evidence, and very little evidence related to the aggravating and mitigating factors, yet the jury was

2   expected, after it had heard all the evidence together, to separate out evidence relevant to death

3   eligibility and ignore the rest of the evidence until death eligibility had been determined.  Because it

4   is more likely than not that the jury considered other matter evidence when determining death

5   eligibility, the statute did not perform it's narrowing function, and clearly established federal law was

6   violated.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CLAIM THIRTEEN**

Mr. McConnell's death sentence is invalid under the state and federal constitutional guarantees to a fair and impartial jury, due process, a reliable sentence, and equal protection due to errors committed by the trial court and the state during voir dire in systemically removing all death scrupled jurors from the venire. U.S. Const. amends V, VI, VIII, XIV.

**SUPPORTING FACTS**

1.      Capital defendants have the right to be sentenced by an impartial jury. The state may not infringe this right by eliminating from the venire those whose scruples against the death penalty would not substantially impair the performance of their duties.  The systematic removal of those in the venire opposed to the death penalty leads to a jury woefully short of that impartiality to which Mr. McConnell entitled under the Sixth and Fourteenth Amendments.  Because a person who opposes the death penalty, no less than one who favors it, can make the discretionary judgment entrusted to him by the state, a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty.

2.      In Mr. McConnell's case, the questioning was so cursory and perfunctory that there is insufficient evidence on the record to demonstrate that death scrupled venire members were substantially impaired in the performance of their duties. This court cannot be satisfied that Mr. McConnell received a fair an impartial jury because the voir dire proceedings were reduced to a sham and a farce by the complete lack of rehabilitation of death scrupled venire members.

3.      During voir dire, venire member Warren volunteered that he was not comfortable with the death penalty because he is Roman Catholic. 8/25/03 a.m. TT at 53.  The court asked whether anyone else felt the same way, to which venire member Harris stated that she did not believe in the death penalty but that she had no problem with the other sentences.  Id. at 54.  Venire member Balleweg also responded that she did not believe in the death penalty.  Id.  The court then opened the proceedings up to questioning by the state, and remarked that "[o]f course Mr. McConnell will have some."  Id. All three were asked as a group whether they could ever impose the death penalty and all three responded that they could not, so the State moved to excuse them for cause.  Id. at 54-56.  Mr.

McConnell failed to ask any questions, and the court excused all three for cause. <u>Id.</u> at 56.   Venire member Vera then stated that he could impose the death penalty only if it was his family. <u>Id.</u> at 58. The court asked if the State wanted to ask any questions, the State declined, and the court excused Vera without even asking whether Mr. McConnell had any questions. <u>Id.</u>  Venire member Olson stated that he is a nurse and that because of his faith and line of work he would not impose the death penalty. <u>Id.</u> at 62.   The court asked whether he would impose it in any case, he responded that he would not, and the court excused him without soliciting any questions from either the state or Mr. McConnell. <u>Id.</u>  Venire member Lierna stated "it's not that I don't believe in the death penalty, but I don't think I feel comfortable being part of making that decision." <u>Id.</u> at 63.   The court asked her to clarify, and she stated that she did not feel she could "make a decision like that ... because of religious beliefs." <u>Id.</u>  The court gave the state the opportunity to question her, and Lierna stated that there was a case where she could give the death penalty. <u>Id.</u> at 64. Mr. McConnell declined the opportunity to ask her any questions. <u>Id.</u> at 65. The court said that not wanting to serve as a juror was not a reason to get out of jury duty, and Lierna said she would be fine. <u>Id.</u>  Venire member Kliener stated that she did not believe in the death penalty. <u>Id.</u> at 70.   The court asked her "under any circumstances," she said no, not under any circumstances, and on the basis of that one question – without allowing the state or Mr. McConnell to ask any questions – the court excused her. <u>Id.</u>  Venire member Casella stated that she had "a moral objection to the death penalty." <u>Id.</u> at 94.   Again, the court simply asked her whether it was "under all circumstances" and excused her based on her answer to that one question without giving Mr. McConnell the opportunity to rehabilitate her. <u>Id.</u>

4.        The court then opened the voir dire up to questioning by the state.  The state asked some of the venire members individually if they could sign a verdict form sentencing Mr. McConnell to death. <u>Id.</u> at 129.   Venire member Macias responded that he could not. <u>Id.</u> at 130.   The court asked if he could impose death in any case and he responded that he could not, so the court excused him without further questioning. <u>Id.</u> at 131.   Venire member Ward stated that he did not believe he could sign the verdict form, and the state asked whether there was any case where he could, to which he responded that "[i]t's a very difficult question to answer.   And one in which I wish I had more time to contemplate, but I'll say no." <u>Id.</u>  The state again asked whether he could ever sentence anyone to

death, and he responded "I do not believe so." Id.  Without allowing Mr. McConnell the opportunity to ask questions, and without any attempts to rehabilitate, the court excused him for cause.  Id.

5.      With no other venire members objecting to the death penalty, the court opened voir dire up for questioning by Mr. McConnell who asked a total of two questions of the entire venire:  "Anyone here going to impose a harsher penalty because I am representing myself? Anyone here would automatically impose a death sentence if I decide not to testify?"  Id. at 136.  Mr. McConnell passed the panel for cause, and the state used its first peremptory to challenge the one venire member remaining who had scruples about the death penalty but was not stricken for cause – venire member Lierna.  Id. at 139.  Thus, every single death-scrupled juror was removed from the venire without any attempt at rehabilitation by either Mr. McConnell or the court.

6.      The removal of every death-scrupled juror from Mr. McConnell's jury had a substantial and injurious effect on the process to such an extent as to render Mr. McConnell's sentence fundamentally unfair and unconstitutional.  In addition, the exclusion of even juror for cause who was qualified to serve is prejudicial per se.  Mr. McConnell's death sentence is therefore invalid and this Court must grant the writ vacating his sentence.

7.      Mr. McConnell alleges that the state court's disposition of his claim was contrary to, and an unreasonable application of, clearly established law.  Mr. McConnell further alleges that the state court's disposition of his claim was an unreasonable determination of the facts in light of the evidence presented.

**CLAIM FOURTEEN**

Mr. McConnell's death sentence is invalid under state and federal constitutional guarantees of due process, a fair and impartial jury, and a reliable sentence due to the trial court's failure to enforce the statutory admonishments, and due to the jury's misconduct in deliberating before the close of the evidence.  U.S. Const. amends. V, VI, VIII, & XIV.

**SUPPORTING FACTS**

1.    The trial court is under a duty to admonish the jury at each adjournment that they are not permitted to deliberate until the "cause is finally submitted to them."  NRS 175.401.  On the third day of Mr. McConnell's trial, before Mr. McConnell had even begun presenting his case, the jury submitted a question during the lunch break.  8/27/03 a.m. TT at 34.  The jury wanted to know when the photographs depicting the other matter evidence presented against Mr. McConnell had been taken. Id.  When the jury returned after lunch, rather than reminding the jury of the admonition and attempting to enforce it, the court simply answered the jury's question.  8/27/03 p.m. TT at 3.

2.    The jury's submission of the question is direct evidence that they were "conversing among themselves" and forming or expressing opinions about the case prior to the close of the evidence in clear contravention of the admonition.  Clearly, the court must have some ability to enforce the admonition or else it has no significance.  Mr. McConnell's right to a fair trial was violated by the jury's misconduct.  In addition, the state-law grant of a jury trial vests in the defendant a life and liberty interest in a verdict that is a product of the process state law requires.  Furthermore, as the Nevada Supreme Court held in Valdez v. State, 124 Nev. 97, 196 P. 3d 465, 474 (2008), where the jury decides the defendant's sentence "without the necessary information or instructions [it] render[s] the sentencing determination arbitrary and capricious, in violation of the Eighth Amendment." Accordingly, Mr. McConnell is entitled to a new trial where the admonition is enforced and the jury is held not to deliberate or discuss the case until they are told to do so.

3.    The trial court's failure to enforce the admonition, and the jury's deliberation prior to the close of evidence, had a substantial and injurious effect on the outcome of the proceedings, rendering the process fundamentally unfair.  Accordingly, Mr. McConnell's death sentence is invalid and this Court must grant the writ vacating his sentence.

167

4.      Mr. McConnell further alleges on information and belief that juror Everett Logan committed misconduct in failing to disclose his knowledge of, and interactions with, state witness April Robinson.  Mr. McConnell alleges on information and belief that Mr. Logan knew Ms. Robinson due to his employment as a vendor at National Cash Register and that he had seen her while she was working at a men's club.  Mr. McConnell alleges that he suffered prejudice due to Mr. Logan's failure to disclose this fact during voir dire or at any other point in time given that Ms. Robinson's employment at the men's club was an issue that was raised during her cross-examination, and that Mr. Logan had inside information about her employment there that he did not disclose.

5.      Mr. McConnell alleges that the state court's disposition of his claim was contrary to, and an unreasonable application of, clearly established law.  Mr. McConnell further alleges that the state court's disposition of his claim was an unreasonable determination of the facts in light of the evidence presented.

**CLAIM FIFTEEN**

Mr. McConnell's conviction and death sentence violate federal constitutional guarantees of due process, a reliable sentence, freedom from self incrimination, and equal protection because Mr. McConnell's <u>Faretta</u> hearing, plea hearing, sentencing and review on direct appeal were conducted before state judicial officers whose tenure in office was not dependent on good behavior but was rather dependent on popular election, and who failed to conduct fair and adequate appellate review. U.S. Const. amends. V, VI, VIII, & XIV.

**SUPPORTING FACTS**

**A.    The Nevada Supreme Court's Review of Mr. McConnell's Sentence Was Unconstitutional.**

1.    Section 177.055(2) of the Nevada Revised Statutes requires the Nevada Supreme Court to review each death sentence to determine whether there was sufficient evidence to support the aggravating factors found by the sentencing body and whether Mr. McConnell's death sentence was imposed under the influence of passion and prejudice. The Eighth Amendment requirement of reliability likewise mandates such a review.  U. S. Const. Amend. VIII; <u>see</u> <u>Gregg v. Georgia</u>, 428 U.S. 153, 195 (1976); Nev. Const. Art. 1. The Nevada Supreme Court has never enunciated the standards it applies in conducting its review under this statute. <u>See, e.g.,</u> <u>Jones v. State</u>, 107 Nev. 632, 637, 817 P.2d 1179, 1182 (Nev. 1991) (acknowledging the mandated review but not discussing the standards used).  The complete absence of standards renders the purported review unconstitutional under federal due process standards.  <u>See</u> <u>Harris ex rel. Ramseyer v. Blodgett</u>, 853 F. Supp. 1239, 1291 (W.D. Wash. 1994) ("It is necessary to due process that all participants in a sentence review operate under the same rules so that the noble purpose of a sentence review will be reliably and constitutionally carried out."), <u>aff'd</u>, 64 F.3d 1434 (9th Cir. 1995); <u>cf.</u> <u>Campbell v. Blodgett</u>, 997 F.2d 512, 523, n.13 (9th Cir. 1992) (detailing the uniform standards for mandatory review of issues other than proportionality under Washington law).

2.    Due to the complete absence of any standards that could rationally direct the conduct of the litigation or control the outcome, Mr. McConnell could not possibly litigate the issue of the excessiveness of his sentence, or whether the sentence was imposed under the influence of passion

1  and prejudice, to his prejudice. In fact, Mr. McConnell's case is no more egregious than other cases

2  in which Nevada juries did not impose the death penalty, or where the State did not even seek the

3  death penalty or agreed to negotiate it away. Compare Evans v. State, 28 P.3d 498, 117 Nev. 609

4  (2001) (four murders where original jury found three aggravating factors, including torture or

5  mutilation and sentenced Evans to death) with State v. Evans, Clark County Case No. C-116071,

6  sentencing agreement filed February 4, 2003 (state's agreement to sentences of life without possibility

7  of parole for four murders, following reversal of the death sentence for new penalty hearing), and

8  State v. Powell, Clark County Case No. C-148936, verdicts, November 15, 2000 (jury verdicts for

9  life without possibility of parole for same four murders as in Evans case, with three aggravating

10  factors as to each murder and no mitigating factors cited), and State v. Strohmeyer, No. C144577,

11  Court Minutes, September 8, 1998 (minutes of changes of plea to guilty in return for withdrawal of

12  notice of intent to seek death sentence and imposition of four consecutive sentences of life without

13  possibility of parole, in case involving kidnaping, sexual assault and strangulation murder of

14  seven-year-old girl), and State v. Rodriguez, Clark County Case No. C-130763, verdicts, May 7, 1996

15  (jury verdicts of life without possibility of parole for two murders, each with four aggravating factors

16  where the only mitigating factor cited by the jury was "mercy"), and Ducksworth v. State, 113 Nev.

17  780, 942 P.2d 157 (1997) (jury verdicts of life without possibility of parole for two defendants, based

18  on two murders with total of thirteen aggravating factors, including robbery, sexual assault, and

19  torture or mutilation); and State v. Daniels, Clark County Case No. C-126201, verdicts, November

20  1, 1995 (jury verdicts of life without possibility of parole for two murders, each with four aggravating

21  circumstances).

22        **B.**  **Because Nevada Judges are Elected, They Cannot Provide a Fair Trial**
23                 **Before a Fair Tribunal as the Due Process Clause of the Constitution**
               **Mandates.**

24  3.  Nevada Supreme Court justices are popularly elected and thus face the possibility of removal

25  if they make a controversial and unpopular decision. This situation renders the Nevada judiciary

26  insufficiently impartial under the federal due process clause to preside over a capital case,

27  compounding the constitutional inadequacy of the Nevada Supreme Court's review.  See Caperton

28  v. A.T. Massey Coal Co., 129 S. Ct. 2252, 2259 (2009) ("A fair trial in a fair tribunal is a basic

requirement of due process.") (internal citations omitted).   At the time of the adoption of the Constitution, which is the benchmark for the protection afforded by the due process clause, see, e.g., Medina v. California, 505 U.S. 437, 445-46 (1992), English judges qualified to preside in capital cases had tenure during good behavior.

4.      The tenure of judges during good behavior was firmly established by the time of the adoption of the Constitution. Almost a hundred years earlier, in 1700, a provision requiring that "Judges' Commissions be made quamdiu se bene gesserint . . . ." was considered sufficiently important to be included in the Act of Settlement, see W. Stubbs, Select Charters 531 (5th ed. 1884); and in 1760, a statute ensured judges' tenure despite the death of the sovereign, which had formerly voided their commissions. See W. Holdsworth, History of English Law 195 (7th ed., A. Goodhart and H. Hanbury rev. 1956). Blackstone quoted the view of King George III, in urging the adoption of this statute, that the independent tenure of the judges was "essential to the impartial administration of justice; as one of the best securities of the rights and liberties of his subjects; and as most conducive to the honor of the crown." W. Blackstone, Commentaries on the Laws of England *258 (1765). The Framers of the Constitution, who included the protection of tenure during good behavior for federal judges under Article III of the Constitution, would not likely have taken a looser view of the importance of this due process requirement than King George III. In fact, the Framers used the grievance that the king had made the colonial "judges dependent on his will alone, for the tenure of their offices" to partly justify the Revolution. The Declaration of Independence para. 11 (U.S. 1776); see Smith, An Independent Judiciary: The Colonial Background, 124 U. Pa. L. Rev. 1104, 1112-52 (1976). At the time of the Constitution's adoption, none of the states permitted judicial elections. Smith, supra, at 1153-55.

5.      The absence of any such protection for Nevada judges results in a denial of federal due process in capital cases because the possibility of removal and, at minimum, of a financially draining campaign for making an unpopular decision are threats that "offer a possible temptation to the average [person] as a judge . . . not to hold the balance nice, clear and true between the state and the [capitally] accused," Tumey v. Ohio, 273 U.S. 510, 532 (1927). See Beets v. State, 107 Nev. 957, 976, 821 P.2d 1044, 1057-58 (1991) (Young, J., dissenting) ("Nevada has a system of elected judges. If recent campaigns are an indication, any laxity toward a defendant in a homicide case would be a serious, if

1    not fatal, campaign liability.").  (See Legislative Comm'n Subcomm. to Study the Death Penalty and

2    Related DNA Testing Tr., Feb. 21, 2002 (Justice Rose noting that lesson of election campaign,

3    involving allegation that justice of Supreme Court "wanted to give relief to a murderer and rapist,"

4    was "not lost on the judges in the State of Nevada, and I have often heard it said by judges, 'a judge

5    never lost his job by being tough on crime.'").)

6    6.      The recent removal of a Nevada Supreme Court justice for participating in an unpopular

7    decision establishes this point. See Sherman Fredrick, Voters like R-J's Ideas - - Guess Who Hates

8    That?, Las Vegas Rev. J., Nov. 12, 2006; Editorial, Brian Greenspun on Tuesday's Victories Amid

9    a Judicial Warning, Las Vegas Sun, Nov. 9, 2006; Carri Geer Thevenot, Supreme Court's Becker Falls

10   to Saitta - - Douglas Retains Seat - - Political Consultant Says Justice Hurt by Guinn v. Legislature

11   Ruling in 2003, Las Vegas Rev. J., Nov. 8, 2006; Editorial, Nancy Becker Must be Removed - -

12   Supreme Court Justice Backed Guinn v. Legislature Travesty, Las Vegas Rev. J., Nov. 5, 2006;

13   Editorial, Nancy Becker has the Right Stuff - - State Supreme Court Justice has Faithfully and

14   Honestly Interpreted the Constitution, Las Vegas Sun, Oct. 22, 2006; Jeff German, Far Right Targets

15   Justice Becker - - Supreme Court Vote on Tax Increase was Right Thing to do, She Says, Las Vegas

16   Sun, Oct. 15, 2006; Jon Ralston, Campaign Ad Reality Check, Las Vegas Sun, Oct. 3, 2006; Jon

17   Ralston, Jon Ralston is Impressed at the Clarity and Brevity Displayed by Lawyer-Politicians, Las

18   Vegas Sun, Sept. 22, 2006; Michael J. Mishak, Libertarian Lawyer has More Issues Up His Sleeve

19   - - Waters' Next Targets: Campaign Funds, Real Estate Tax, Las Vegas Sun, Sept. 16, 2006; Sam

20   Skolnik, Who Owns Whom is Supreme Theme - - Becker, Saitta Race is Rife with Accusations, Las

21   Vegas Sun, Aug. 27, 2006.

22   7.      Considering all these factors, the death sentence imposed in Mr. McConnell's case is not

23   constitutionally reliable under the Eighth and Fourteenth Amendments.  Mr. McConnell further

24   alleges that the proceedings in his case which were conducted by a tribunal lacking impartiality is

25   prejudicial per se.  Accordingly, Mr. McConnell's death sentence is invalid and this Court must grant

26   the writ vacating his conviction and sentence.

27   8.      Mr. McConnell alleges that the Nevada Supreme Court's disposition of his claim was contrary

28   to, and an unreasonable application of, clearly established law.  Mr. McConnell further alleges that

172

1  the Nevada Supreme Court's disposition of his claim was an unreasonable determination of the facts

2  in light of the evidence presented.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CLAIM SIXTEEN**

Mr. McConnell's conviction and sentence of death are invalid under the federal constitutional guarantees of due process, equal protection, the right to meaningful appellate review, and the right to effective assistance of counsel because Mr. McConnell's direct appeal counsel was ineffective. U.S. Const. amends. V, VI, VIII, XIV.

**SUPPORTING FACTS**

1. Mr. McConnell alleges that direct appeal counsel was subject to a conflict of interest that adversely affected their representation. Mr. McConnell was represented on appeal by Cheryl Bond from the Washoe County Public Defender's Office. As explained in Claim One, trial counsel was subject to an actual conflict of interest due to their prior representation of April Robinson and a jailhouse informant who provided information against Mr. McConnell. Mr. McConnell hereby incorporates the allegations of Claim One as if fully set forth herein. Mr. McConnell alleges that the conflict had an adverse affect on his case because it (1) improperly influenced trial counsel's decision making processes regarding Mr. McConnell's motion to represent himself and plead guilty, and (2) caused trial counsel to suppress material exculpatory and impeachment information from Mr. McConnell that could have been used to impeach Ms. Robinson. Mr. McConnell alleges that the conflict of interest itself was an impediment external to the defense which prevented him from raising the conflict issue on direct appeal. Mr. McConnell further alleges that the conflict adversely affected him due to counsel's failure to raise Claim Seven on direct appeal which related to the trial court's failure to permit Mr. McConnell to adequately confront and cross-examine Ms. Robinson at the penalty hearing. Mr. McConnell alleges that there was a reasonable probability of a more favorable outcome if appeal counsel had raised the conflict issue.

2. Mr. McConnell suffered ineffective assistance of counsel on direct appeal because counsel failed to raise substantial and cognizable federal constitutional issues, and failed to raise all available grounds, on his appeal to the Nevada Supreme Court. Specifically, direct appeal counsel was ineffective for failing to challenge the jury instructions on death eligibility because they diluted the state's burden of proof (Claim Eight); failing to argue that it was prejudicial to have elected judges decide his case (Claim Fifteen); failing to argue that all death scrupled jurors were improperly

174

removed from the venire (Claim Thirteen); failing to argue that Mr. McConnell was incapable of representing himself (Claim Two); failing to argue that his guilty plea was invalid (Claim Six); failing to challenge the facial invalidity of the mutilation aggravating circumstance (Claim Four); and failing to argue cumulative error (Claim Seventeen). These substantial and cognizable constitutional issues are raised as claims in the instant petition, and Mr. McConnell hereby incorporates by reference the factual allegations as if set forth here in full.

3.      There was no strategic reason designed to effectuate Mr. McConnell's best interest that would justify appellate counsel's failure to thoroughly review the record, and to assert and litigate these clearly meritorious claims on Mr. McConnell's behalf. Had appellate counsel raised these issues, there is a reasonable probability that the Nevada Supreme Court would have reversed Mr. McConnell's conviction and ordered a new trial or, at a minimum, reformed his sentence to a sentence less than death.

4.      Mr. McConnell alleges that the Nevada Supreme Court's disposition of his claim was contrary to, and an unreasonable application of, clearly established law.  Mr. McConnell further alleges that the Nevada Supreme Court's disposition of his claim was an unreasonable determination of the facts in light of the evidence presented.

**CLAIM SEVENTEEN**

Mr. McConnell's conviction and death sentence are invalid under the federal constitutional guarantees of due process, equal protection, the effective assistance of counsel, a fair tribunal, an impartial jury, and a reliable sentence due to the cumulative errors in the admission of evidence and instructions, misconduct by state officials and witnesses, and the systematic deprivation of Mr. McConnell's right to the effective assistance of counsel.  U.S. Const. Amends. V, VI, VIII & XIV.

**SUPPORTING FACTS**

1.      Each of the claims specified in this Petition requires vacation of the conviction or death sentence.  Mr. McConnell incorporates each and every factual allegation contained in this Petition as if fully set forth herein.

2.      The cumulative effect of the errors demonstrated in this amended petition was to deprive the proceedings against Mr. McConnell of fundamental fairness and to result in a constitutionally unreliable sentence.  Whether or not any individual error requires the vacation of the judgment or sentence, the totality of these multiple errors and omissions resulted in substantial prejudice to Mr. McConnell.  Singly and in combination, these constitutional violations had a substantial and injurious effect on the trial and verdict.

3.      Mr. McConnell alleges that the Nevada Supreme Court's disposition of his claim was contrary to, and an unreasonable application of, clearly established law.  Mr. McConnell further alleges that the Nevada Supreme Court's disposition of his claim was an unreasonable determination of the facts in light of the evidence presented.

176

**CLAIM EIGHTEEN**

Mr. McConnell's death sentence is invalid under the federal and federal constitutional guarantees of due process, equal protection, and a reliable sentence because execution by lethal injection violates the constitutional prohibition against cruel and unusual punishment.  U.S. Const. amends. V, VIII & XIV.

**SUPPORTING FACTS**

    A.    **Lethal Injection Constitutes Cruel and Unusual Punishment**

1.    Nevada law requires that execution be inflicted by an injection of a lethal drug. Nev. Rev. Stat. § 176.355 (1).

2.    The Nevada Department of Corrections did not release a redacted copy of its "Confidential Execution Manual," last revised February 2004, until April, 2006.  See Ex. 77.  The execution manual specifies that execution by lethal injection will be carried out using five grams of sodium thiopental, a barbiturate typically used by anesthesiologists to induce temporary anesthesia; 20 milligrams of Pavulon, a paralytic agent; and 160 milliequivalents of potassium chloride, a salt solution that induces cardiac arrest. Id. at 8;  See also, Ex. 78 ¶ 10. Sodium Pentothal is a brand name for the generic drug sodium thiopental. Pavulon is a brand name for the generic drug pancuronium bromide.

3.    Competent physicians cannot administer the lethal injection because the ethical standards of the American Medical Association prohibit physicians from participating in an execution other than to certify that a death has occurred. (American Medical Association, House of Delegates, Resolution 5 (1992)), Ex. 80.  Thus, the lethal injection is not administered by competent medical personnel.

4.    Competent physicians are precluded from administering the drugs sodium thiopental, pancuronium bromide, and potassium chloride in lethal injection procedures because these substances are not approved by the Food and Drug Administration as a safe and effective means for administering executions in human beings.  For example, sodium thiopental is not approved in any manner for administration on human beings.  Rather, federal law restricts injection of sodium thiopental to anesthetic uses on dogs and cats only "by or on the order of a licensed veterinarian."  See 21 C.F.R. §§ 522.2444a(c)(1), (3), 522.2444b(c)(1), (3).  The Department of Corrections' use of these drugs in violation of the Food and Drug Act allows state prison officials to make unapproved

1  use of drugs distributed in interstate commerce.

2  5.      Lethal injection conducted by untrained personnel using the three drugs specified by Nevada's

3  protocol creates an unnecessary risk of undue pain and suffering because Nevada's procedures for

4  inducing and maintaining anesthesia fall below the medical standard of care for the use of anesthesia

5  prior to conducting painful procedures.  See Ex. 78 ¶¶ 14-15, 18.  The humaneness of execution by

6  lethal injection is dependent upon the proper administration of the anesthetic agent, sodium

7  thiopental. In the surgical arena, general anesthesia can be administered only by physicians trained

8  in anesthesiology or nurses who have completed the necessary training to be Certified Registered

9  Nurse Anesthetists (CRNAs).  Id. ¶ 23. Nevada's execution manual does not specify what, if any,

10  training in anesthesiology the person(s) administering the lethal injection must have. If the untrained

11  executioner fails to successfully deliver a quantity of sodium thiopental sufficient to achieve adequate

12  anesthetic depth, the inmate will feel the excruciating pain of the subsequent injections of

13  pancuronium bromide and potassium chloride. Id. ¶ 17; Leonidas G. Koniaris, *et al.*, Inadequate

14  Anaesthesia in Lethal Injection for Execution, 365 The Lancet  1412-14 (2005); see Ex. 79.

15  According to Dr. Mark Heath, a board-certified anaesthesiologist who has reviewed NDOC's redacted

16  Execution Manual,

17
18  > [i]f an inmate does not receive the full dose of sodium thiopental because of errors or
problems in administering the drug, the inmate might not be rendered unconscious and
unable to feel pain, or alternatively might, because of the short-acting nature of
sodium thiopental, regain consciousness during the execution.

19
20  See Ex. 798.  Moreover, according to Dr. Heath,

21
22
23  > [i]f sodium thiopental is not properly administered in a dose sufficient to cause the
loss of consciousness for the duration of the execution procedure, then it is my
opinion held to a reasonable degree of medical certainty that the use of pancuronium
places the condemned inmate at risk for consciously experiencing paralysis,
suffocation and the excruciating pain of the intravenous injection of high dose
potassium chloride.

24  Id.

25  6.      Nevada's lethal injection procedure is vulnerable to many potential errors in administration

26  that would result in a failure to administer a quantity of sodium thiopental sufficient to induce the

27  necessary anesthetic depth. The risk of error is compounded by Nevada's use of inadequately trained

28  personnel. Id. ¶¶ 21-22. The potential errors include: errors in preparing the sodium thiopental

solution (because sodium thiopental has a relatively short shelf-life in liquid form, it is distributed as a powder and must be mixed into a liquid solution prior to the execution, id. ¶ 19), errors in labeling the syringes, errors in selecting the syringes during the execution, errors in correctly injecting the drugs into the IV, leaks in the IV line, incorrect insertion of the catheter, migration of the catheter, perforation, rupture, or leakage of the vein, excessive pressure on the syringe plunger, errors in securing the catheter, and failure to properly flush the IV line between drugs. Id. ¶ 22.

7.     Nevada's lethal injection protocol further falls below the standard of care for administering anesthesia because it prevents any type of effective monitoring of the inmate's condition or whether he is anesthetized or unconscious.  Id. ¶ 26. In Nevada, during the injection of the three drugs, the executioner is in a room separate from the inmate and has no visual surveillance of the inmate.

> Accepted medical practice dictates that trained personnel monitor the IV lines and the flow of anesthesia into the veins through visual and tactile observation and examination. The lack of any qualified personnel present in the chamber during the execution thwarts the execution personnel from taking the standard and necessary measures to reasonably ensure that the sodium thiopental is properly flowing in to the inmate and that he is properly anesthetized prior to the administration of the pancuronium and potassium.

Id. The American Society of Anesthesiologists requires that "[q]ualified anesthesia personnel . . . be present in the room throughout the conduct of all general anesthetics" due to the "rapid. changes in patient status during anesthesia." Id. at Attachment D (American Society of Anesthesiologists, Standards for Basic Anesthetic Monitoring).

8.     Nevada's lethal injection protocol fails to account for the foreseeable circumstance that the executioner(s) will be unable to obtain intravenous access by a needle piercing the skin and entering a superficial vein suitable for the reliable delivery of drugs.  See Ex. 78 ¶ 33. Inability to access a suitable vein is often associated with past intravenous drug use by the inmate. However, medical conditions such as diabetes or obesity, individual characteristics such as heavily pigmented skin or muscularity, and the nervousness caused by impending death can impede peripheral IV access. See Deborah W. Denno, When Legislatures Delegate Death: the Troubling Paradox Behind State Uses of Electrocution and Lethal Injection and What it Says About Us, 63 Ohio St. L.J. 63, 109-10 (2002). Typically, when the executioner is unable to find a suitable vein, the executioner resorts to a "cut down," a surgical procedure used to gain access to a functioning vein. When performed by a non-

179

1   physician, the risks are great. When deep incisions are made there is a risk of rupturing large blood

2   vessels causing a hemorrhage, and if the procedure is performed on the neck, there is a risk of cardiac

3   dysrhythmia (irregular electrical activity in the heart) and pneumothorax (which induces the sensation

4   of suffocation). In addition, a cut-down causes severe physical pain and obvious emotional stress.

5   This procedure should take place only in a hospital or other appropriate medical setting and should

6   be performed only by a qualified physician with specialized training in that area. See   Ex. 80.

7   Nevada's execution manual recognizes that a "sterile cut-down tray" may be required equipment "if

8   necessary," see Ex. 77 at 7, but does not specify who determines when a cut down is necessary, how

9   that determination is made, or the training or qualifications of the personnel who would perform such

10   a cut down.

11          **B.          Nevada's Execution Protocol Is Cruel and Unusual**

12   9.      The United States Supreme Court considered the constitutionality of the Kentucky execution

13   protocol in Baze v. Rees, 553 U.S. 35 (2008).  The plurality holding in Baze, which upheld the

14   constitutionality of a lethal injection execution protocol, specifically relied upon the detailed and

15   codified guidelines for execution adopted by Kentucky.  553 U.S. at 62-63.  To the extent that the

16   Kentucky execution protocol was constitutional, it was because the extensive guidelines adopted by

17   Kentucky ensured that a lethal injection execution did not inflict unnecessary pain and suffering.  Id.

18   10.     No Nevada court has ever reviewed the Nevada execution protocol, in light of Baze, to ensure

19   that a lethal injection execution did not inflict unnecessary pain and suffering.  To the extent that any

20   previous holding of the Nevada Supreme Court is in conflict with Baze, see, e.g., McConnell v. State,

21   120 Nev. 1043, 102 P.3d 606 (2004), Baze will control.  U.S. Const. art. VI (Supremacy Clause).

22   11.     A constitutional challenge to the lethal injection protocol will prevail upon proof that the

23   protocol created a demonstrated risk of severe pain and that the risk is objectively intolerable.  Baze,

24   553 U.S. 50.  The plurality stated:

25                 Our cases recognize that subjecting individuals to a risk of future harm—not
        simply actually inflicting pain—can qualify as cruel and unusual punishment. To
26      establish that such exposure violates the Eighth Amendment, however, the conditions
        presenting the risk must be "sure or very likely to cause serious illness and needless
27      suffering," and give rise to "sufficiently imminent dangers."  We have explained that
        to prevail on such a claim there must be a "substantial risk of serious harm,"
28      an "objectively intolerable risk of harm" that prevents prison officials from pleading

1    that they were "subjectively blameless for purposes of the Eighth Amendment."

2    Id. at 49-50 (internal citations omitted).  No court ever considered whether the Nevada execution

3    protocol satisfied this standard.

4    12.    Nevada's execution protocol does not specify what, if any, training in anesthesiology the

5    person(s) administering the lethal injection must have.  If an untrained or unskilled executioner failed

6    to deliver sufficient sodium thiopental to ensure adequate anesthetic depth, the inmate will feel the

7    excruciating pain of the subsequent injections of pancuronium bromide and potassium chloride.[9]  The

8    failure to ensure that a person properly trained and practiced in the institution of intravenous lines,

9    and the administration of anesthetic drugs through such lines, creates a subjective risk of serious harm

10   and is objectively intolerable.  Moreover, the failure to adopt and practice appropriate execution

11   procedures to assess and ensure the appropriate anesthetic depth creates a substantial risk of serious

12   harm that is objectively intolerable.

13   13.    In Baze, the Supreme Court noted the dangers associated with the inadequate administration

14   of sodium thiopental in a state sponsored execution:

15       failing a proper dose of sodium thiopental that would render the prisoner unconscious,
         there is a substantial, constitutionally unacceptable risk of suffocation from the
16       administration of pancuronium bromide and pain from the injection of potassium
         chloride.

17

18   Id. at 53.  The plurality noted that this danger, under the Kentucky execution protocol, was not

19   substantial:

20       If, as determined by the warden and deputy warden through visual inspection, the
         prisoner is not unconscious within 60 seconds following the delivery of the sodium
21       thiopental to the primary IV site, a new 3-gram dose of thiopental is administered to
         the secondary site before injecting the pancuronium and potassium chloride. . . .
22           . . . .

23       Kentucky has put in place several important safeguards to ensure that an adequate
         dose of sodium thiopental is delivered to the condemned prisoner.  The most
24       significant of these is the written protocol's requirement that members of the IV team
         must have at least one year of professional experience as a certified medical assistant,

25

26           [9]    A majority of the Supreme Court appeared to agree that an injection of
     pancuronium bromide or potassium chloride after no, or insufficient, sodium thiopental was cruel
27   and unusual punishment.  Compare Baze, 553 U.S. 35, 53 (2008) (Roberts, C.J., plurality op.) with
     id. at 72-73 (Stevens, J., concurring in the judgment) and id. at 107-08 (Breyer, J., concurring) and
28   id. at 113-14 (Ginsburg, J., dissenting).

phlebotomist, EMT, paramedic, or military corpsman. . . . Kentucky currently uses a phlebotomist and an EMT, personnel who have daily experience establishing IV catheters for inmates in Kentucky's prison population. . . . Moreover, these IV team members, along with the rest of the execution team, participate in at least 10 practice sessions per year. . . .  These sessions, required by the written protocol, encompass a complete walk-through of the execution procedures, including the siting of IV catheters into volunteers.

. . . .

In addition, the presence of the warden and deputy warden in the execution chamber with the prisoner allows them to watch for signs of IV problems, including infiltration. Three of the Commonwealth's medical experts testified that identifying signs of infiltration would be "very obvious," even to the average person, because of the swelling that would result. . . .  Kentucky's protocol specifically requires the warden to redirect the flow of chemicals to the backup IV site if the prisoner does not lose consciousness within 60 seconds. . . . In light of these safeguards, we cannot say that the risks identified by petitioners are so substantial or imminent as to amount to an Eighth Amendment violation.

Id. at 45, 55-56 (internal citations omitted).  It was the safeguards instituted by Kentucky to ensure that sodium thiopental rendered the inmate unconscious which ultimately satisfied the constitutional requirements.

14.     The safeguards in the Kentucky execution protocol, relied upon by the plurality in Baze, are absent from the Nevada execution protocol.  Nevada's execution protocol only required that "appropriate medical services personnel" perform a venipuncture. Ex. 77. The "execution checklist" attached to a previous execution protocol suggests Nevada contracts with the Carson City Fire department to provide emergency services personnel to assist in an execution.  However, the Nevada execution protocol does not designate the training and experience of those personnel and never designates what responsibilities these personnel will have in an execution.  After the venipuncture, the "medical services personnel will then leave the execution chamber." Id.  The protocol does not designate who will administer the lethal substances, who will determine whether the lethal substances were appropriately administered, or who is responsible to determine when a condemned inmate requires further sedation.  The Nevada execution protocol does not designate the training for any of the execution team members.  Finally, the Nevada execution protocol does not require a regular or routine "walk through of the execution procedures, including the siting of IV catheters into volunteers." Cf. Baze, 553 U.S. at 45, 55-56.  Nevada's protocol offers little or no safeguards to eliminate the substantial or imminent risks an inmate will suffer excruciating pain of an injection of

182

1   pancuronium bromide and potassium chloride.

2   15.     The Nevada execution protocol provides that, after the lethal substances are administered, "the

3   attending physician or designee and coroner shall then determine whether it was sufficient to cause

4   death.   If the injections are determined to be insufficient to cause death, the third set of lethal

5   injections shall be administered."  Ex.77 at 9.  Therefore, under the Nevada execution protocol, an

6   inmate who was never appropriately rendered unconscious, suffering the painful effects of the lethal

7   chemicals, will be evaluated by a physician or coroner after an undesignated amount of time, and will

8   possibly suffer further painful lethal injections.  Such a protocol unquestionably poses a substantial

9   risk of serious harm.

10  16.     If terror, pain, or disgrace are "superadded" to punishment, such punishment  violates the

11  Eighth Amendment.  See Baze, 553 U.S. at 96-97 (Thomas, J., concurring).  Under the Nevada

12  execution protocol, an inmate must be administered a strong sedative four hours before his scheduled

13  execution and again one hour prior to execution.  Ex.77 at 9.  The medication is not voluntary–it is

14  mandatory for all inmates scheduled to be executed.  Such a requirement adds only disgrace and insult

15  to an otherwise extreme punishment, and is cruel and unusual.  The mandatory sedation clouds the

16  inmate's senses, muddles his thoughts, and interferes with his ability to communicate with the warden

17  or execution team.  The forced sedation strips from the condemned inmate his last opportunity to

18  acknowledge family or friends, to express remorse to the victims, and denies the inmate any dignity

19  in death.   The forced sedation only serves to inflict further terror, pain and/or disgrace and is

20  constitutionally intolerable.

21  17.     The Baze plurality suggested that alternative methods of execution will support an argument

22  that an execution protocol is unconstitutional:

23          Instead, the proffered alternatives must effectively address a "substantial risk
        of serious harm." . . . To qualify, the alternative procedure must be feasible, readily
24      implemented, and in fact significantly reduce a substantial risk of severe pain.  If a
        state refuses to adopt such an alternative in the face of these documented advantages,
25      without a legitimate penological justification for adhering to its current method of
        execution, then a State's refusal to change its method can be viewed as "cruel and
26      unusual" under the Eighth Amendment.

27  553 U.S. at 52 (internal citations omitted).  Mr. McConnell proffers alternative procedures in

28  requiring sufficient training, expertise or certification of execution team members, dispensing with

the use of pancuronium bromide, and requiring reliable safeguards.

18.     These alternatives are feasible, readily implemented, and significantly reduce the risk of severe pain.  The adoption of training, expertise or certification requirements similar to that in the Kentucky protocol is feasible and readily implemented.  Nevada should require those who practice venipuncture in Nevada executions to be qualified and experienced.  Nevada should ensure that persons within the execution chamber be trained and experienced in the determination and maintenance of consciousness.  If technical procedures or equipment are available to ensure an inmate is unconscious before the administration of pancuronium bromide or potassium chloride, Nevada should use or adopt these resources.  Nevada execution team members should regularly walk through the execution procedures, including venipuncture.  Finally, Nevada can discontinue the use of pancuronium bromide or potassium chloride in the execution protocol, causing death solely with the use of sodium thiopental.  The adoption of such safeguards will easily and significantly reduce the risk of severe pain.

19.     If the inmate is not adequately anesthetized by the successful administration of sodium thiopental, he will suffer the pain of the remaining two injections. The choice of "potassium chloride to cause cardiac arrest needlessly increases the risk that a prisoner will experience excruciating pain prior to execution" because the "[i]ntravenous injection of concentrated potassium chloride solution causes excruciating pain." See Ex. 78 ¶ 12. The inmate would be consciously aware and feel the pain of the potassium-induced fatal heart attack. Id.

20.     Pancuronium bromide, the second drug in the lethal injection process, is a paralytic agent that paralyzes all voluntary muscles. This includes paralysis of the diaphragm and other respiratory muscles, which causes the inmate to cease breathing. Pancuronium "does not affect sensation, consciousness, cognition, or the ability to feel pain or suffocation." Id. ¶ 37 (emphasis added). If the inmate is not adequately anesthetized prior to the pancuronium injection, the pancuronium will cause the inmate to consciously experience a "torturous suffocation" lasting "at least several minutes." Id. ¶¶ 39-40.

21.     Pancuronium is "unnecessary" and "serves no legitimate purpose" in the execution process because both sodium thiopental and potassium chloride, if properly administered in the doses

1  specified in the execution manual, are adequate to cause death.  Id.  ¶¶ 37, 44. Pancuronium

2  "compounds the risk that an inmate may suffer excruciating pain during his execution" because it

3  masks any physical manifestations of pain that an inadequately anesthetized inmate would feel during

4  pancuronium-induced suffocation and potassium-induced cardiac arrest.  Id. ¶¶ 37, 42. "[U]sing

5  barbiturates [such as sodium thiopental] and paralytics [such as pancuronium] to execute human

6  beings poses a serious risk of cruel, protracted death" because "[e]ven a slight error in dosage or

7  administration can leave a prisoner conscious but paralyzed while dying, a sentient witness of his or

8  her own slow, lingering asphyxiation." Chaney v. Heckler, 718 F.2d 1174, 1191 (D.C. Cir. 1984),

9  reversed on other grounds, 470 U.S. 84 (1985) (citing Royal Commission on Capital Punishment,

10 1949-1953 Report (1953)). By paralyzing the inmate and preventing physical manifestations of pain,

11 pancuronium places a "chemical veil" on the lethal injection process that precludes observers from

12 knowing whether the prisoner is experiencing great pain  See  Ex.78  ¶ 44; Adam Liptak, Critics Say

13 Execution Drug May Hide Suffering, N.Y. Times (Oct. 7, 2003).

14 22.      Nevada's lethal injection protocol falls below the standard of care for euthanizing animals.

15 The American Veterinary Medical Association (AVMA) allows euthanasia by potassium chloride,

16 but mandates that animals be under a surgical plane of anesthesia prior to the administration of

17 potassium.  See 78 at 680-81 (Attachment B [American Veterinary Medical Association, 2000 Report

18 of the American Veterinary Medical Association Panel on Euthanasia]). "It is of utmost importance

19 that personnel performing this technique are trained and knowledgeable in anesthetic techniques, and

20 are competent in assessing anesthetic depth appropriate for administration of potassium chloride

21 intravenously." Id. at 681. "A combination of pentobarbital [a barbiturate similar to, but longer acting

22 than, sodium thiopental] with a neuromuscular blocking agent is not an acceptable euthanasia agent."

23 Id. at 680. Nevada is one of at least thirty states that prohibit the use of neuromuscular blocking

24 agents in euthanizing animals, either expressly or by mandating the use of a specific euthanasia agent

25 such as pentobarbital. See Ala. Code § 34-29-131; Alaska Stat. § 08.02.050; Ariz. Rev. Stat. Ann.

26 § 11-1021; Cal. Bus. & Prof. Code § 4827; Colo. Rev. Stat. § 18-9-201; Conn. Gen. Stat. § 22-344a;

27 Del. Code Ann. tit. 3, § 8001; Fla. Stat. § 828.058; Ga. Code Ann. § 4-11-5.1; 510 Ill. Comp. Stat.

28 70/2.09; Kan. Stat. Ann. § 47-1718(a); La. Rev. Stat. Ann. § 3:2465; Me. Rev. Stat. Ann. tit. 17, §

1044; Md. Code Ann., Crim. Law, § 10-611; Mass. Gen. Laws ch. 140, § 151A; Mich. Comp. laws § 333.7333; Mo. Rev. Stat. § 578.005(7); Neb. Rev. Stat. § 54-2503; Nev. Rev. Stat. Ann. § 638.005; N.J. Stat. Ann. § 4:22-19.3; N.Y. Agric. & Mkts. Law § 374; Ohio Rev. Code Ann. § 4729.532; Okla. Stat. tit. 4, § 501; Ore. Rev. Stat. § 686.040(6); R.I. Gen. Laws § 4-1-34; S.C. Code Ann. § 47-3-420; Tenn. Code Ann. § 44-17-303; Tex. Health & Safety Code Ann. § 821.052(a); W. Va. Code § 30-10A-8; Wyo. Stat. Ann. § 33-30-216.  Nevada's lethal injection statute would violate state law if applied to a dog.  The consistent trend in professional norms and statutory regulation of animal euthanasia places the method currently practiced by Nevada outside the bounds of evolving standards of decency.

23.     There have been numerous documented cases of botched lethal injection executions that have produced prolonged and unnecessary pain, including:

**Charles Brooks, Jr.** (December 7, 1982, Texas): The executioner had a difficult time finding a suitable vein. The injection took seven minutes to kill. Witnesses stated that Mr. Brooks "had not died easily." See Deborah W. Denno, Getting to Death: Are Executions Unconstitutional?, 82 Iowa L. Rev. 319, 428-29 (1997) ("Denno-1" ); Deborah W. Denno, When Legislatures Delegate Death: the Troubling Paradox Behind State Uses of Electrocution and Lethal Injection and What it Says About Us, 63 Ohio St. L.J. 63, 139 (2002) ("Denno-2" ).

**James Autry** (March 14, 1984, Texas): Mr. Autry took ten minutes to die, complaining of pain throughout. Officials suggested that faulty equipment or inexperienced personnel were to blame. See Denno-1 at 429; Denno-2 at 139.

**Thomas Barefoot** (October 30, 1984, Texas): A witness stated that after emitting a "terrible gasp," Mr. Barefoot's heart was still beating after the prison medical examiner had declared him dead. See Denno-1 at 430; Denno-2 at 139.

**Stephen Morin** (March 13, 1985, Texas): It took almost forty five minutes for technicians to find a suitable vein, while they punctured him repeatedly, and another eleven minutes for him to die. See Denno-1 at 430; Denno-2 at 139; Michael L. Radelet, Some Examples of Post-Furman Botched Executions, Death Penalty Information Center, available at http://www.deathpenalty info.org/some-examples-post-furman-botched-executions ("Radelet").

**Randy Woolls** (August 20, 1986, Texas): Mr. Woolls had to assist execution technicians in finding an adequate vein for insertion. He died seventeen minutes after technicians inserted the needle. See Denno-1 at 431; Denno-2 at 139; Radelet; Killer Lends A Hand to Find A Vein for Execution, L.A. Times, Aug. 20, 1986, at 2.

**Elliot Johnson** (June 24, 1987, Texas): Mr. Johnson's execution was plagued by repetitive needle punctures and took executioners thirty five minutes to find a vein. See Denno-1 at 431; Denno-2 at 139; Radelet; Addict Is Executed in Texas For Slaying of 2 in Robbery, N.Y. Times, June 25, 1987, at A24.

**Raymond Landry** (December 13, 1988, Texas): Executioners "repeatedly probed" Mr. Landry's veins with syringes for forty minutes. Then, two minutes after the injection process began, the syringe came out of his vein, "spewing deadly chemicals toward startled witnesses." A plastic curtain was pulled so that witnesses could not see the execution team reinsert the catheter into Mr. Landry's vein. "After [fourteen] minutes, and after witnesses heard the sound of doors opening and closing, murmurs and at least one groan, the curtain was opened and Landry appeared motionless and unconscious." Mr. Landry was pronounced dead twenty four minutes after the drugs were initially injected. See Denno-1 at 431-32; Denno-2 at 139; Radelet.

**Stephen McCoy** (May 24, 1989, Texas): In a violent reaction to the drugs, Mr. McCoy "choked and heaved" during his execution. A reporter witnessing the scene fainted. See Denno-1 at 432; Denno-2 at 139; Radelet.

**George Mercer** (January 6, 1990, Missouri): A medical doctor was required to perform a surgical "cutdown" procedure on Mr. Mercer's groin. See Denno-1 at 432; Denno-2 at 139.

**George Gilmore** (August 31, 1990, Missouri): Force was used to stick the needle into Mr. Gilmore's arm. See Denno-1 at 433; Denno-2 at 139.

**Charles Coleman** (September 10, 1990, Oklahoma): Technicians had difficulty finding a vein, delaying the execution for ten minutes. See Denno-1 at 433; Denno-2 at 139.

**Charles Walker** (September 12, 1990, Illinois): There was a kink in the IV line, and the needle was inserted improperly so that the chemicals flowed toward his fingertips instead of his heart. As a result, Mr. Walker's execution took eleven minutes rather than the three or four contemplated by the State's protocols, and the sedative chemical may have worn off too quickly, causing excruciating pain. When these problems arose, prison officials closed the blinds so that witnesses could not observe the process. See Denno-1 at 433- 34; Denno-2 at 139; Radelet; Niles Group Questions Execution Procedure, United Press International, Nov. 8, 1992.

**Maurice Byrd** (August 23, 1991, Missouri): The machine used to inject the lethal dosage malfunctioned. See Denno-1 at 434; Denno-2 at 140.

**Rickey Rector** (January 24, 1992, Arkansas): It took almost an hour for a team of eight to find a suitable vein. Witnesses were separated from the injection team by a curtain, but could hear repeated, loud moans from Mr. Rector. See Denno-1 at 434-35; Denno-2 at 140; Radelet; Joe Farmer, Rector's Time Came, Painfully Late, Arkansas Democrat Gazette, Jan. 26, 1992, at 1B; Marshall Frady, Death in Arkansas, The New Yorker, Feb. 22, 1993, at 105.

**Robyn Parks** (March 10, 1992, Oklahoma): Mr. Parks violently gagged, jerked, spasmed and bucked in his chair after the drugs were administered. A news reporter witness said his death looked "painful and inhumane." See Denno-1 at 435; Denno-2 at 140; Radelet.

**Billy White** (April 23, 1992, Texas): Mr. White's death required forty seven minutes because executioners had difficulty finding a vein that was not severely damaged from years of heroin abuse. See Denno-1 at 435-36; Denno-2 at 140; Radelet.

**Justin May** (May 7, 1992, Texas): Mr. May groaned, gasped and reared against his restraints during his nine minute death. See Denno-1 at 436; Denno-2 at 140; Radelet;

187

Robert Wernsman, <u>Convicted Killer May Dies</u>, Item (Huntsville, Tex.), May 7, 1992, at 1; Michael Graczyk, <u>Convicted Killer Gets Lethal Injection</u>, Herald (Denison, Tex.), May 8, 1992.

**John Gacy** (May 10, 1994, Illinois): The lethal injection chemicals solidified, blocking the IV tube. The blinds were closed for ten minutes, preventing witnesses from watching, while the execution team replaced the tubing. <u>See</u> Denno-1 at 435; Denno-2 at 140; Radelet; Scott Fornek and Alex Rodriguez, <u>Gacy Lawyers Blast Method: Lethal Injections Under Fire After Equipment Malfunction</u>, Chi. Sun-Times, May 11, 1994, at 5; Rich Chapman, <u>Witnesses Describe Killer's 'Macabre' Final Few Minutes</u>, Chi. Sun-Times, May 11,1994, at 5; Rob Karwath and Susan Kuczka, <u>Gacy Execution Delay Blamed on Clogged IV Tube</u>, Chi Trib., May 11, 1994, at 1 (Metro Lake Section).

**Emmitt Foster** (May 3, 1995, Missouri): Seven minutes after the lethal chemicals began to flow into Mr. Foster's arm, the execution was halted when the chemicals stopped circulating. With Mr. Foster gasping and convulsing, blinds were drawn so witnesses could not view the scene. Death was pronounced thirty minutes after the execution began, and three minutes later the blinds were reopened so the witnesses could view the corpse. According to the coroner, the problem was caused by the tightness of the leather straps that bound Mr. Foster to the execution gurney. Mr. Foster did not die until several minutes after a prison worker finally loosened the straps. <u>See</u> Denno-1 at 437; Denno-2 at 140; Radelet; <u>Witnesses to a Botched Execution</u>, St. Louis Post- Dispatch, May 8, 1995, at 6B; Tim O'Neill, <u>Too-Tight Strap Hampered Execution</u>, St. Louis Post-Dispatch, May 5,1995, at B1; Jim Slater, <u>Execution Procedure Questioned</u>, Kansas City Star, May 4, 1995, at C8.

**Ronald Allridge** (June 8, 1995, Texas): Mr. Allridge's execution was conducted with only one needle, rather than the two required by the protocol, because a suitable vein could not be found in his left arm. <u>See</u> Denno-1 at 437; Denno- 2 at 140.

**Richard Townes** (January 23, 1996, Virginia): It took twenty two minutes for medical personnel to find a vein. After repeated unsuccessful attempts to insert the needle through the arms, the needle was finally inserted through the top of Mr. Townes' right foot. <u>See</u> Denno-1 at 437; Denno-2 at 140; Radelet.

**Tommie Smith** (July 18, 1996, Indiana): It took one hour and nine minutes for Mr. Smith to be pronounced dead after the execution team began sticking needles into his body. For sixteen minutes, the team failed to find adequate veins, and then a physician was called. Mr. Smith was given a local anesthetic and the physician twice attempted to insert the tube in Mr. Smith's neck. When that failed, an angio-catheter was inserted in Mr. Smith's foot. Only then were witnesses permitted to view the process. The lethal drugs were finally injected into Mr. Smith forty nine minutes after the first attempts, and it took another twenty minutes before death was pronounced. <u>See</u> Denno-1 at 438; Denno-2 at 140; Radelet.

**Luis Mata** (August 22, 1996, Arizona): Mr. Mata remained strapped to a gurney with the needle in his arm for one hour and ten minutes while his attorneys argued his case. When injected, his head jerked, his face contorted, and his chest and stomach sharply heaved. <u>See</u> Denno-1 at 438; Denno-2 at 140.

**Scott Carpenter** (May 8, 1997, Oklahoma): Mr. Carpenter gasped, made guttural sounds, and shook for three minutes following the injection. He was pronounced dead eight minutes later. <u>See</u> Denno-2 at 140; Radelet; Michael Overall and Michael Smith, <u>22-Year-Old Killer Gets Early Execution</u>, Tulsa World, May 8, 1997, at A1.

**Michael Elkins** (June 13, 1997, South Carolina): Liver and spleen problems had caused Mr. Elkins's body to swell, requiring executioners to search almost an hour – and seek assistance from Mr. Elkins – to find a suitable vein. See Denno-2 at 140; Radelet; Killer Helps Officials Find A Vein At His Execution, Chattanooga Free Press, June 13, 1997, at A7.

**Joseph Cannon** (April 23, 1998, Texas): It took two attempts to complete the execution. Mr. Cannon's vein collapsed and the needle popped out after the first injection. He then made a second final statement and was injected a second time behind a closed curtain. See Denno-2 at 141; Radelet; [First] Try Fails to Execute Texas Death Row Inmate, Orlando Sent., Apr. 23, 1998, at A16; Michael Graczyk, Texas Executes Man Who Killed San Antonio Attorney at Age 17, Austin American-Statesman, Apr. 23, 1998, at B5.

**Genaro Camacho** (August 26, 1998, Texas): Mr. Camacho's execution was delayed approximately two hours when executioners could not find a suitable veins in his arms. See Denno-2 at 141; Radelet.

**Roderick Abeyta** (October 5, 1998, Nevada): The execution team took twenty five minutes to find a vein suitable for the lethal injection. See Denno-2 at 141; Radelet; Sean Whaley, Nevada Executes Killer, Las Vegas Rev.-J., Oct. 5, 1998, at 1A.

**Christina Riggs** (May 3, 2000. Arkansas): The execution was delayed for eighteen minutes when prison staff could not find a vein. Radelet.

**Bennie Demps** (June 8, 2000, Florida): It took the execution team thirty three minutes to find suitable veins for the execution. "They butchered me back there," said Mr. Demps in his final statement. "I was in a lot of pain. They cut me in the groin; they cut me in the leg. I was bleeding profusely. This is not an execution, it is murder." The executioners had no unusual problems finding one vein, but because the Florida protocol requires a second alternate intravenous drip, they continued to work to insert another needle, finally abandoning the effort after their prolonged failures. See Denno-2 at 141; Radelet; Rick Bragg, Florida Inmate Claims Abuse in Execution, N.Y. Times, June 9, 2000, at A14; Phil Long and Steve Brousquet, Execution of Slayer Goes Wrong; Delay, Bitter Tirade Precede His Death, Miami Herald, June 8, 2000.

**Bert Hunter** (June 28, 2000, Missouri): In a violent reaction to the drugs, Mr. Hunter's body convulsed against his restraints during what one witness called "a violent and agonizing death." See Denno-2 at 141; Radelet; David Scott, Convicted Killer Who Once Asked to Die is Executed, Associated Press, June 28, 2000.

**Claude Jones** (December 7, 2000, Texas): Mr. Jones's execution was delayed thirty minutes while the execution team struggled to insert an IV. One member of the execution team commented, "They had to stick him about five times. They finally put it in his leg." Radelet.

**Joseph High** (November 7, 2001, Georgia): For twenty minutes, technicians tried unsuccessfully to locate a vein in Mr. High's arms. Eventually, they inserted a needle in his chest, after a doctor cut an incision there, while they inserted the other needle in one of his hands. Mr. High was pronounced dead one hour and nine minutes after the procedure began. See Denno-2 at 141; Radelet.

**Sebastian Bridges** (April 21, 2001, Nevada): Mr. Bridges spent between twenty and twenty five minutes on the execution bed, with the intravenous line inserted, continuously agitated, asserting his innocence, the injustice of executing him, and the

189

injustice of requiring him to sign a habeas corpus petition, and to suffer prolonged delay, in order to have the unconstitutionality of his conviction recognized by the court system. He remained agitated after the execution process began, so the sedative drugs appeared not to take effect and he died while apparently still conscious and shouting about the injustice of his execution.

**Joeseph L. Washoe** (May 2, 2006, Ohio): It initially took executioners twenty two minutes to find a suitable vein in Mr. Washoe's left arm for insertion of the catheter. As the injection began, the vein collapsed. After an additional thirty minutes, the execution team succeeded in placing a catheter in Mr. Washoe's right arm. However, the team again tried to inject the drugs into the left arm, where the vein had already collapsed. These difficulties prompted Mr. Washoe to sit up, tell the executioners that "It don't work," and to ask "Can you just give me something by mouth to end this?" Mr. Washoe was finally pronounced dead ninety minutes after the execution began. Radelet; Andrew Walsh-Huggins, IV Fiasco Led Killer to Ask for Plan B, Associated Press, May 12, 2006.

**Angel Diaz** (December 13, 2006, Florida): After the initial injection, Mr. Diaz grimaced, face contorted, gasping for air for at least ten to twelve minutes. Prison officials administered a second injection, and thirty four minutes passed before they declared Mr. Diaz dead. Shortly thereafter, Governor Jeb Bush halted all executions and selected a committee "to consider the humanity and constitutionality of lethal injections." See Radelet; Terry Aguayo, Florida Death Row Inmate Dies Only After Second Chemical Dose, N.Y. Times, Dec. 15, 2006; Adam Liptak and Terry Aguayo, After Problem Execution, Governor Bush Suspends the Death Penalty in Florida, N.Y. Times, Dec. 16, 2006; Ellen Kreitzberg and David Richter, But Can it be Fixed? A Look at Constitutional Challenges to Lethal Injection Executions, 47 Santa Clara L. Rev. 445, 445-46 (2007).

**Christopher Newton** (May 24, 2007, Ohio): Executioners stuck Mr. Newton at least ten times before getting the shunts in place and injecting the needles. It then took over two hours for Mr. Newton to die. Officials blamed the delay on Newton's weight – 265 pounds. See Radelet; Ohio Lethal Injection Takes 2 Hours, 10 Tries, Associated Press, May 24, 2007.

**John Hightower** (June 26, 2007, Georgia): It took prison officials almost an hour to complete Mr. Hightower's execution, forty minutes of which they spent trying to locate an usable vein. See Radelet; Lateef Mungin, Triple Murderer Executed After 40-Minute Search for Vein, Atlanta J.-Constitution, June 27, 2007.

**Curtis Osborne** (June 4, 2008, Georgia): Executioners took thirty five minutes to find a suitable vein. After they administered the drugs, it took an additional fourteen minutes before the in-chamber doctors pronounced Mr. Osborne's death. See Radelet; Rhonda Cook, Executioners had Trouble Putting Murderer to Death: For 35 Minutes, They Couldn't Find Good Vein for Lethal Injection, Atlanta J.-Constitution, June 27, 2007.

**Rommell Broom** (Sept. 15, 2009, Ohio): After two hours, executioners terminated their efforts to find a suitable vein in Mr. Broom's arms and legs despite his attempts to assist them in finding a good vein. "Broom said he was stuck with needles at least [eighteen] times, the pain so intense he cried and screamed out." Upon ordering the execution to stop, Governor Ted Strickland announced that he would seek physicians' advice on "how the man could be killed more efficiently." Executioners blamed Mr. Broom's extensive use of intravenous drugs for their difficulties. Mr. Broom is currently litigating whether a second execution attempt would constitute cruel and

unusual punishment. <u>See</u> Radelet; Andrew Welsh-Huggins, <u>Judge: Ohio Inmate's Execution Appeal Has Limits</u>, Associated Press, Dec. 9, 2009.

24.     Nevada's execution protocol is similar to the lethal injection protocol employed in California prior to the recent litigation in <u>Morales v. Hickman</u>, 415 F. Supp. 2d 1037 (N.D. Cal. February 14, 2006), aff'd, 438 F.3d 926 (9th Cir. 2006), <u>cert. denied</u>, 546 U.S. 1163 (2006). <u>See</u> Ex. 77 ¶ 7. The use of sodium thiopental, pancuronium bromide, and potassium chloride without the protections imposed in <u>Morales</u> to ensure adequate administration of anesthesia poses an unreasonable risk of inflicting unnecessary suffering.

25.     Moreover, Ohio has recently successfully employed a single drug protocol in its executions without any of the risks feared by the respondents in <u>Baze</u>. <u>See</u> <u>Baze</u>, 553 at 56-57. Thus, there is no reason to continue to use the three drug protocol, which a majority of the Supreme Court concluded may, under certain circumstances, constitute cruel and unusual punishment. <u>See</u> n.12, <u>supra</u>.

26.     Mr. McConnell alleges that the Nevada Supreme Court's disposition of his claim was contrary to, and an unreasonable application of, clearly established law. Mr. McConnell further alleges that the Nevada Supreme Court's disposition of his claim was an unreasonable determination of the facts in light of the evidence presented.

**PRAYER FOR RELIEF**

For the reasons stated above, this Court should issue a writ of habeas corpus and vacate Mr. McConnell's sentence, and grant him a new trial and sentencing hearing.

DATED this 6th day of October 2010.

Respectfully submitted

*/s/ David S. Anthony*
DAVID S. ANTHONY
Assistant Federal Public Defender


*/s/ Albert Sieber*
ALBERT SIEBER
Assistant Federal Public Defender

Attorneys for Petitioner

192

## **VERIFICATION**

Under penalty of perjury, the undersigned declare that they are counsel for the Mr. McConnell named in the foregoing petition and knows the contents thereof; that the pleading is true of their own knowledge except as to those matters stated on information and belief and as to such matters they believe them to be true.

By submitting this verification on Mr. McConnell's behalf, and submitting the accompanying verification of Mr. McConnell, counsel does not represent, concede or imply that Mr. McConnell is in fact competent to assist in the litigation of this matter.

Dated this 6th day of October 2010.




*/s/ David S. Anthony*
David S. Anthony
Assistant Federal Public Defender

1

## CERTIFICATE OF ELECTRONIC SERVICE

2

      In accordance with Rule 5(b)(2)(E) of the Federal Rules of Civil Procedure, the undersigned

3

hereby certifies that on the 6th day of October 2010, a true and correct copy of the foregoing

4

**EXHIBITS TO AMENDED PETITION FOR WRIT OF HABEAS CORPUS PURSUANT TO**

5

**28 U.S.C. § 2254 BY A PERSON IN STATE CUSTODY** was served by the United States District

6

Court, CM/ECF electronic filing system to:

7

8

        Catherine Cortez Masto
        Attorney General of Nevada

9

        Troy C. Jordan
        Deputy Attorney General

10

        tjordan@ag.nv.gov

11

12

13

14

                          */s/ Katrina Manzi*
                          An Employee of the Federal Public Defenders Office

15

16

17

18

19

20

21

22

23

24

25

26

27

28