# EXHIBIT 38

# EXHIBIT 38

Westlaw.

28 P.3d 498
117 Nev. 609, 28 P.3d 498
(Cite as: 117 Nev. 609, 28 P.3d 498)

Page 1

H

Supreme Court of Nevada.
Vernell Ray EVANS, Appellant,
v.
The STATE of Nevada, Respondent.
No. 35641.

July 24, 2001.

Petitioner was convicted in the Eighth Judicial District Court, Clark County, Jeffrey D. Sobel, J., of one count of burglary and four counts of first-degree murder, and received four death sentences. Petitioner appealed. The Supreme Court, Steffen, C.J., 112 Nev. 1172, 926 P.2d 265, affirmed. Petitioner sought writ of habeas corpus. The District Court, Jeffrey D. Sobel, J., denied the petition. Petitioner appealed. In an en banc decision, the Supreme Court, Becker, J., held that: (1) child was competent to testify as eyewitness to murders when she was four; (2) prosecutor's rebuttal closing argument asking the jury if it had the intestinal fortitude to do its legal duty was highly improper in the penalty phase; (3) prosecutor's rebuttal closing argument that the jury could consider evidence of the petitioner's other crimes before deciding eligibility for the death penalty was improper; (4) attorneys rendered ineffective assistance and prejudiced the petitioner by not challenging the argument; (5) erroneous admission of prosecution witnesses' irrelevant testimony about their fears did not require reversal; (6) closing argument in guilt phase did not require reversal; and (7) attorneys' failure to object to inadmissible evidence and inadequate indictment did not prejudice the petitioner.

Affirmed in part, reversed in part, and remanded.

Maupin, C.J., concurred in part, dissented in part, and file opinion joined by Leavitt, J.

West Headnotes

[1] Criminal Law 110 ⬅1575

110 Criminal Law
    110XXX Post-Conviction Relief
        110XXX(C) Proceedings
            110XXX(C)1 In General
                110k1574 Petition or Motion
                    110k1575 k. In General. Most Cited Cases
A defendant seeking post-conviction relief cannot rely on conclusory claims for relief, but must support any claims with specific factual allegations that, if true, would entitle him or her to relief.

[2] Criminal Law 110 ⬅1652

110 Criminal Law
    110XXX Post-Conviction Relief
        110XXX(C) Proceedings
            110XXX(C)3 Hearing and Determination
                110k1651 Necessity for Hearing
                    110k1652 k. In General. Most Cited Cases
A defendant is not entitled to an evidentiary hearing on a motion for post-conviction relief if the allegations are belied or repelled by the record.

[3] Habeas Corpus 197 ⬅486(1)

197 Habeas Corpus
    197II Grounds for Relief; Illegality of Restraint
        197II(B) Particular Defects and Authority for Detention in General
            197k482 Counsel
                197k486 Adequacy and Effectiveness of Counsel
                    197k486(1) k. In General. Most Cited Cases
Claims of ineffective assistance of counsel are properly presented in a timely, first post-conviction petition for a writ of habeas corpus. U.S.C.A. Const.Amend. 6.

[4] Criminal Law 110 ⬅1440(1)

110 Criminal Law
    110XXX Post-Conviction Relief

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

110XXX(A) In General
110k1435 Consideration Despite Waiver or Other Bar
110k1440 Counsel
110k1440(1) k. In General. Most Cited Cases

The failure on direct appeal to raise a claim of ineffective assistance of counsel does not constitute a waiver of the claim for purposes of post-conviction proceedings; such a claim is generally not appropriate for review on direct appeal. U.S.C.A. Const.Amend. 6.

**[5] Criminal Law 110 ☞1134.47(3)**

110 Criminal Law
110XXIV Review
110XXIV(L) Scope of Review in General
110XXIV(L)4 Scope of Inquiry
110k1134.47 Counsel
110k1134.47(3) k. Effective Assistance. Most Cited Cases
(Formerly 110k1134(3))

A claim of ineffective assistance of counsel presents a mixed question of law and fact, subject to independent review. U.S.C.A. Const.Amend. 6.

**[6] Criminal Law 110 ☞1882**

110 Criminal Law
110XXXI Counsel
110XXXI(C) Adequacy of Representation
110XXXI(C)1 In General
110k1879 Standard of Effective Assistance in General
110k1882 k. Deficient Representation in General. Most Cited Cases
(Formerly 110k641.13(1))

"Deficient performance" by an attorney is representation that falls below an objective standard of reasonableness. U.S.C.A. Const.Amend. 6.

**[7] Criminal Law 110 ☞1883**

110 Criminal Law
110XXXI Counsel

110XXXI(C) Adequacy of Representation
110XXXI(C)1 In General
110k1879 Standard of Effective Assistance in General
110k1883 k. Prejudice in General. Most Cited Cases
(Formerly 110k641.13(1))

To show prejudice from attorney's alleged ineffective assistance, the claimant must show a reasonable probability that, but for counsel's errors, the result of the trial would have been different. U.S.C.A. Const.Amend. 6.

**[8] Criminal Law 110 ☞1871**

110 Criminal Law
110XXXI Counsel
110XXXI(C) Adequacy of Representation
110XXXI(C)1 In General
110k1871 k. Presumptions and Burden of Proof in General. Most Cited Cases
(Formerly 110k641.13(1))

Judicial review of a lawyer's representation is highly deferential, and a defendant must overcome the presumption that a challenged action might be considered sound strategy. U.S.C.A. Const.Amend. 6.

**[9] Criminal Law 110 ☞1870**

110 Criminal Law
110XXXI Counsel
110XXXI(C) Adequacy of Representation
110XXXI(C)1 In General
110k1870 k. In General. Most Cited Cases
(Formerly 110k641.13(1))

A court reviewing a claim of ineffective assistance of counsel must try to avoid the distorting effects of hindsight and evaluate the conduct under the circumstances and from counsel's perspective at the time. U.S.C.A. Const.Amend. 6.

**[10] Criminal Law 110 ☞1929**

110 Criminal Law

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

110XXXI Counsel
110XXXI(C) Adequacy of Representation
110XXXI(C)2 Particular Cases and Issues
110k1921 Introduction of and Objections to Evidence at Trial
110k1929 k. Hearsay. Most Cited Cases
(Formerly 110k641.13(6))

Attorney's alleged ineffective assistance by failing to prevent the admission of hearsay evidence of motive for murder did not prejudice the defendant in light of other evidence of the motive. U.S.C.A. Const.Amend. 6.

**[11] Witnesses 410 ⬅⟶40(1)**

410 Witnesses
410II Competency
410II(A) Capacity and Qualifications in General
410k40 Age and Maturity of Mind
410k40(1) k. In General. Most Cited Cases

Young child who was four at the time of the crimes and six at the time of trial was competent to testify as eyewitness to murders in her apartment; she readily admitted whenever she did not know or could not remember something and did not appear to make up information just to answer a question, her basic account of the crimes remained coherent and consistent, even under cross-examination, and her testimony on where the victims were shot was consistent with the evidence.

**[12] Witnesses 410 ⬅⟶40(1)**

410 Witnesses
410II Competency
410II(A) Capacity and Qualifications in General
410k40 Age and Maturity of Mind
410k40(1) k. In General. Most Cited Cases

A child is competent to testify if he or she is able to receive just impressions and relate them truthfully.

**[13] Witnesses 410 ⬅⟶40(1)**

410 Witnesses
410II Competency
410II(A) Capacity and Qualifications in General
410k40 Age and Maturity of Mind
410k40(1) k. In General. Most Cited Cases

**Witnesses 410 ⬅⟶45(2)**

410 Witnesses
410II Competency
410II(A) Capacity and Qualifications in General
410k45 Obligation of Oath
410k45(2) k. Children. Most Cited Cases

Courts must evaluate a child's competency on a case-by-case basis, but relevant considerations include (1) the child's ability to receive and communicate information; (2) the spontaneity of the child's statements; (3) indications of coaching and rehearsing; (4) the child's ability to remember; (5) the child's ability to distinguish between truth and falsehood; and (6) the likelihood that the child will give inherently improbable or incoherent testimony.

**[14] Criminal Law 110 ⬅⟶1153.12(2)**

110 Criminal Law
110XXIV Review
110XXIV(N) Discretion of Lower Court
110k1153 Reception and Admissibility of Evidence
110k1153.12 Opinion Evidence
110k1153.12(2) k. Competency of Witness. Most Cited Cases
(Formerly 110k1153(2))

The Supreme Court will not disturb a finding of competency of a witness absent a clear abuse of discretion.

**[15] Witnesses 410 ⬅⟶40(1)**

410 Witnesses

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

28 P.3d 498
117 Nev. 609, 28 P.3d 498
(Cite as: 117 Nev. 609, 28 P.3d 498)

Page 4

410II Competency
    410II(A) Capacity and Qualifications in General
        410k40 Age and Maturity of Mind
            410k40(1) k. In General. Most Cited Cases
A child's testimony supports a finding of competency as a witness if it is clear, relevant, and coherent.

**[16] Witnesses 410 ⚖═▶46**

410 Witnesses
    410II Competency
        410II(A) Capacity and Qualifications in General
            410k46 k. Character and Conduct in General. Most Cited Cases
Inconsistencies in testimony go to the weight of the evidence, not the competency of the witness.

**[17] Criminal Law 110 ⚖═▶1170.5(1)**

110 Criminal Law
    110XXIV Review
        110XXIV(Q) Harmless and Reversible Error
        110k1170.5 Witnesses
            110k1170.5(1) k. In General. Most Cited Cases
Any error in failing to examine child under age ten before she testified was not prejudicial since she was a competent witness.

**[18] Witnesses 410 ⚖═▶40(1)**

410 Witnesses
    410II Competency
        410II(A) Capacity and Qualifications in General
        410k40 Age and Maturity of Mind
            410k40(1) k. In General. Most Cited Cases
Evidence failed to establish contamination of child witness' testimony during the roughly two years that passed between the murders and the trial, even though the child had spoken with several people

about her experience; nothing in the child's behavior or statements or in the words or conduct of anyone else indicated that the testimony was deliberately or inadvertently tainted.

**[19] Criminal Law 110 ⚖═▶1992**

110 Criminal Law
    110XXXI Counsel
        110XXXI(D) Duties and Obligations of Prosecuting Attorneys
        110XXXI(D)2 Disclosure of Information
            110k1992 k. Materiality and Probable Effect of Information in General. Most Cited Cases
    (Formerly 110k700(2.1))
Evidence withheld by the prosecutor is "material" for purposes of the *Brady* interpretation of the due process clause, if there is a reasonable probability that the result would have been different if it had been disclosed; such a reasonable probability is shown when the nondisclosure undermines confidence in the outcome of the trial. U.S.C.A. Const.Amend. 14.

**[20] Habeas Corpus 197 ⚖═▶294**

197 Habeas Corpus
    197I In General
        197I(C) Existence and Exhaustion of Other Remedies
        197k290 Appeal, Error, or Other Direct Review of Conviction
            197k294 k. Trial. Most Cited Cases
Supreme Court's prior decision on direct appeal rejecting claim that the state withheld material evidence was the law of the case barring reconsideration on appeal from denial of petition for writ of habeas corpus.

**[21] Constitutional Law 92 ⚖═▶4597**

92 Constitutional Law
    92XXVII Due Process
        92XXVII(H) Criminal Law
        92XXVII(H)4 Proceedings and Trial
            92k4592 Disclosure and Discovery

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

92k4597 k. Other Issues and Applications. Most Cited Cases
(Formerly 92k268(5))

**Criminal Law 110 &=>1997**

110 Criminal Law
110XXXI Counsel
110XXXI(D) Duties and Obligations of Prosecuting Attorneys
110XXXI(D)2 Disclosure of Information
110k1993 Particular Types of Information Subject to Disclosure
110k1997 k. Evidence Incriminating Others. Most Cited Cases
(Formerly 110k700(3))
State's alleged failure to provide information on an investigation of defendant's possible co-conspirators did not violate its due process obligations under *Brady* in murder prosecution; the defendant only speculated that material exculpatory information existed, and he failed to allege the nondisclosure of specific information that linked other suspects to the crimes and indicated that the defendant was not involved. U.S.C.A. Const.Amend. 14.

**[22] Constitutional Law 92 &=>4594(3)**

92 Constitutional Law
92XXVII Due Process
92XXVII(H) Criminal Law
92XXVII(H)4 Proceedings and Trial
92k4592 Disclosure and Discovery
92k4594 Evidence
92k4594(2) Particular Items or Information, Disclosure of
92k4594(3) k. In General. Most Cited Cases
(Formerly 92k268(5))

**Criminal Law 110 &=>1999**

110 Criminal Law
110XXXI Counsel
110XXXI(D) Duties and Obligations of Pro-

secuting Attorneys
110XXXI(D)2 Disclosure of Information
110k1993 Particular Types of Information Subject to Disclosure
110k1999 k. Impeaching Evidence. Most Cited Cases
(Formerly 110k700(3))
Information that murder victim had acted as an informant in other cases was not material without at least some evidence that this activity had generated actual threats against her, and, thus, the state had no due process duty under *Brady* to disclose the information. U.S.C.A. Const.Amend. 14.

**[23] Criminal Law 110 &=>2004**

110 Criminal Law
110XXXI Counsel
110XXXI(D) Duties and Obligations of Prosecuting Attorneys
110XXXI(D)2 Disclosure of Information
110k2002 Information Within Knowledge of Prosecution
110k2004 k. Duty to Locate Information. Most Cited Cases
(Formerly 110k700(3))
The state has no duty to compile information or pursue an investigative lead simply because it could conceivably develop evidence helpful to the defense.

**[24] Homicide 203 &=>1026**

203 Homicide
203IX Evidence
203IX(D) Admissibility in General
203k1012 Subsequent Incriminating or Exculpatory Circumstances
203k1026 k. Subornation of Witnesses or Jurors. Most Cited Cases
(Formerly 203k174(4))
Prosecution witness' testimony that she was reluctant to cooperate with prosecutors because the defendant had threatened her twice and she feared him was relevant to guilt in murder prosecution and was admissible without a hearing required by stat-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

28 P.3d 498
117 Nev. 609, 28 P.3d 498
(Cite as: 117 Nev. 609, 28 P.3d 498)

Page 6

ute on admitting evidence of collateral acts to prove character. N.R.S. 48.045, subd. 2.

**[25] Witnesses 410 ⬤➝360**

410 Witnesses
   410IV Credibility and Impeachment
     410IV(B) Character and Conduct of Witness
       410k360 k. Rebuttal of Evidence Impeaching Character. Most Cited Cases
Testimony by prosecution witnesses about their fears was irrelevant in murder prosecution; since the state had initiated every inquiry into delay and reluctance on the part of the witnesses, their testimony was not relevant to rebut any impeachment by the defense.

**[26] Criminal Law 110 ⬤➝1170.5(1)**

110 Criminal Law
   110XXIV Review
     110XXIV(Q) Harmless and Reversible Error
      110k1170.5 Witnesses
       110k1170.5(1) k. In General. Most Cited Cases
Erroneous admission of prosecution witnesses' irrelevant testimony about their fears did not prejudice the defendant in a murder prosecution; one witness disclaimed any fear of the defendant, and the other witness was an inmate who only referred to the general risk of retaliation from other inmates.

**[27] Criminal Law 110 ⬤➝1170.5(1)**

110 Criminal Law
   110XXIV Review
     110XXIV(Q) Harmless and Reversible Error
      110k1170.5 Witnesses
       110k1170.5(1) k. In General. Most Cited Cases
Erroneous admission of prosecution witnesses' irrelevant testimony about their fears did not require reversal of murder conviction; although one witness had expressed fear of harm by the defendant, the defense impeached her on cross-examination by showing that she continued to live with the defend-

ant after the murders and professed her love for him up until shortly before the trial, and the source of the other witness' fear was unspecified.

**[28] Criminal Law 110 ⬤➝417(14)**

110 Criminal Law
   110XVII Evidence
     110XVII(M) Declarations
      110k416 Declarations by Third Persons
       110k417 In General
        110k417(14) k. Statements Corroborating or Impeaching Testimony of Witness. Most Cited Cases

**Witnesses 410 ⬤➝414(2)**

410 Witnesses
   410IV Credibility and Impeachment
     410IV(F) Corroboration
      410k414 Competency of Corroborative Evidence
       410k414(2) k. Former Statements Corresponding with Testimony. Most Cited Cases
Evidence that prosecution witness made telephone calls implicating defendant in murders was inadmissible hearsay as a prior consistent statement offered in the absence of an express or implied charge against the witness of recent fabrication or improper influence or motive. N.R.S. 51.035, subd. 2(b).

**[29] Criminal Law 110 ⬤➝1929**

110 Criminal Law
   110XXXI Counsel
     110XXXI(C) Adequacy of Representation
      110XXXI(C)2 Particular Cases and Issues
       110k1921 Introduction of and Objections to Evidence at Trial
        110k1929 k. Hearsay. Most Cited Cases
   (Formerly 110k641.13(6))
Attorneys' allegedly ineffective failure to object to inadmissible hearsay that prosecution witness had made telephone calls implicating defendant did not

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

28 P.3d 498
117 Nev. 609, 28 P.3d 498
**(Cite as: 117 Nev. 609, 28 P.3d 498)**

prejudice the defendant in a murder prosecution.
U.S.C.A. Const.Amend. 6.

**[30] Criminal Law 110 ⟶368(3)**

110 Criminal Law
  110XVII Evidence
    110XVII(E) Res Gestae
      110k362 Res Gestae; Excited Utterances
        110k368 Acts and Statements of Third
Persons
          110k368(3) k. Subsequent to Com-
mission of Crime. Most Cited Cases
Child eyewitness' statements to her mother about
murders were admissible hearsay as excited utter-
ances made soon after witnessing the murders.
N.R.S. 51.095.

**[31] Witnesses 410 ⟶410**

410 Witnesses
  410IV Credibility and Impeachment
    410IV(F) Corroboration
      410k410 k. Right to Corroborate Im-
peached or Contradicted Witness. Most Cited Cases
The state may counter impeachment of its witnesses
by presenting evidence supporting their credibility.
N.R.S. 51.035, subd. 2(b).

**[32] Criminal Law 110 ⟶2174**

110 Criminal Law
  110XXXI Counsel
    110XXXI(F) Arguments and Statements by
Counsel
      110k2164 Rebuttal Argument; Responsive
Statements and Remarks
        110k2174 k. Comments on Evidence
or Witnesses. Most Cited Cases
    (Formerly 110k726)
State's rebuttal closing argument that defended the
police investigation and praised witnesses for testi-
fying despite facing risks and receiving no benefits
did not vouch for the credibility of the witnesses,
but was a reasonable response to defendant's argu-
ment challenging the quality of the police investig-

ation and the credibility of the state's witnesses.

**[33] Criminal Law 110 ⟶2098(1)**

110 Criminal Law
  110XXXI Counsel
    110XXXI(F) Arguments and Statements by
Counsel
      110k2093 Comments on Evidence or Wit-
nesses
        110k2098 Credibility and Character of
Witnesses; Bolstering
          110k2098(1) k. In General. Most
Cited Cases
    (Formerly 110k720(5))

**Criminal Law 110 ⟶2142**

110 Criminal Law
  110XXXI Counsel
    110XXXI(F) Arguments and Statements by
Counsel
      110k2140 Comments on Character or
Conduct
        110k2142 k. Character, Conduct, or
Appearance of Prosecutor. Most Cited Cases
    (Formerly 110k722.2)
The prosecution may not vouch for the credibility
of a witness either by placing the prestige of the
government behind the witness or by indicating that
information not presented to the jury supports the
witness's testimony.

**[34] Criminal Law 110 ⟶2117**

110 Criminal Law
  110XXXI Counsel
    110XXXI(F) Arguments and Statements by
Counsel
      110k2102 Inferences from and Effect of
Evidence
        110k2117 k. Homicide and Assault
with Intent to Kill. Most Cited Cases
    (Formerly 110k720(9))

**Criminal Law 110 ⟶2132(6)**

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

28 P.3d 498
117 Nev. 609, 28 P.3d 498
(Cite as: 117 Nev. 609, 28 P.3d 498)

Page 8

110 Criminal Law
  110XXXI Counsel
    110XXXI(F) Arguments and Statements by Counsel
      110k2129 Comments on Accused's Silence or Failure to Testify
        110k2132 Comments on Failure of Accused to Testify
          110k2132(6) k. Reference to Failure to Produce Witness or Evidence as Comment on Failure to Testify. Most Cited Cases
    (Formerly 110k721(6))
Prosecutor's closing argument that no evidence existed for defendant's claim that other persons might have committed the murders did not shift the burden of proof to the defendant and did not call attention to defendant's failure to testify. U.S.C.A. Const.Amend. 5.

**[35] Criminal Law 110 €═2136**

110 Criminal Law
  110XXXI Counsel
    110XXXI(F) Arguments and Statements by Counsel
      110k2134 Comments on Failure to Present Evidence or Witnesses
        110k2136 k. Comments by Prosecution on Failure of Accused to Present Evidence. Most Cited Cases
    (Formerly 110k721.5(1))
Generally, prosecutorial comment on the failure of the defense to present witnesses or evidence impermissibly shifts the burden of proof.

**[36] Criminal Law 110 €═2086**

110 Criminal Law
  110XXXI Counsel
    110XXXI(F) Arguments and Statements by Counsel
      110k2084 Statements Regarding Applicable Law
        110k2086 k. In Particular Prosecutions. Most Cited Cases
    (Formerly 110k717)

**Criminal Law 110 €═2171**

110 Criminal Law
  110XXXI Counsel
    110XXXI(F) Arguments and Statements by Counsel
      110k2164 Rebuttal Argument; Responsive Statements and Remarks
        110k2171 k. Statements Regarding Applicable Law. Most Cited Cases
    (Formerly 110k726)
Prosecutor's closing argument that a reasonable doubt governing a person in the more weighty affairs of life could apply to choosing a spouse, a college, or an occupation was improper despite defendant's improper argument that "weighty affairs of life" could include deciding whether to end life support for a badly injured child or parent; the prosecutor's remedy was to object to defense counsel's remarks as impermissible elaboration on the definition of "reasonable doubt," not to commit the same error in response.

**[37] Criminal Law 110 €═789(2)**

110 Criminal Law
  110XX Trial
    110XX(G) Instructions: Necessity, Requisites, and Sufficiency
      110k789 Reasonable Doubt
        110k789(2) k. Sufficiency of Definitions of Reasonable Doubt in General. Most Cited Cases

**Criminal Law 110 €═2085**

110 Criminal Law
  110XXXI Counsel
    110XXXI(F) Arguments and Statements by Counsel
      110k2084 Statements Regarding Applicable Law
        110k2085 k. In General. Most Cited Cases
    (Formerly 110k717)
District courts and attorneys should not to attempt

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

28 P.3d 498
117 Nev. 609, 28 P.3d 498
**(Cite as: 117 Nev. 609, 28 P.3d 498)**

to quantify, supplement, or clarify the statutorily prescribed standard for reasonable doubt. N.R.S. 175.211, subd. 1.

**[38] Criminal Law 110 ⊂⟩789(12)**

110 Criminal Law
   110XX Trial
      110XX(G) Instructions: Necessity, Requisites, and Sufficiency
         110k789 Reasonable Doubt
            110k789(12) k. Doubt Which Would Influence Action in Private Affairs. Most Cited
It is improper to compare reasonable doubt to decisions such as choosing a spouse, buying a house, or changing jobs. N.R.S. 175.211, subd. 1.

**[39] Criminal Law 110 ⊂⟩2197**

110 Criminal Law
   110XXXI Counsel
      110XXXI(F) Arguments and Statements by Counsel
         110k2191 Action of Court in Response to Comments or Conduct
            110k2197 k. Statements Regarding Applicable Law. Most Cited Cases
      (Formerly 110k730(5))
Prosecutor's improper closing argument that a reasonable doubt governing a person in the more weighty affairs of life could apply to choosing a spouse, a college, or an occupation was harmless in murder prosecution where the jury received the proper written instruction on reasonable doubt.

**[40] Criminal Law 110 ⊂⟩2085**

110 Criminal Law
   110XXXI Counsel
      110XXXI(F) Arguments and Statements by Counsel
         110k2084 Statements Regarding Applicable Law
            110k2085 k. In General. Most Cited Cases

(Formerly 110k717)
Defense attorneys and prosecutors should not explain, elaborate on, or offer analogies or examples based on the statutory definition of "reasonable doubt"; they may only argue that evidence and theories in the case before the jury either amount to or fall short of that definition. N.R.S. 175.211, subd. 1.

**[41] Criminal Law 110 ⊂⟩2152**

110 Criminal Law
   110XXXI Counsel
      110XXXI(F) Arguments and Statements by Counsel
         110k2145 Appeals to Sympathy or Prejudice
            110k2152 k. Attacks on Accused. Most Cited Cases
      (Formerly 110k723(1))
Prosecutor's guilt-phase closing argument that the defendant was an "evil magnet" was not improperly inflammatory and did not disparage legitimate defense tactics.

**[42] Sentencing and Punishment 350H ⊂⟩1780(2)**

350H Sentencing and Punishment
   350HVIII The Death Penalty
      350HVIII(G) Proceedings
         350HVIII(G)3 Hearing
            350Hk1780 Conduct of Hearing
               350Hk1780(2) k. Arguments and Conduct of Counsel. Most Cited Cases
Prosecutor's penalty-phase closing argument could state that the penalty hearing was for retribution and deterrence, not rehabilitation, the defendant forfeited his right to live by killing four people in a systematic way, and the death penalty could never be appropriate if not this case.

**[43] Sentencing and Punishment 350H ⊂⟩1780(2)**

350H Sentencing and Punishment

28 P.3d 498
117 Nev. 609, 28 P.3d 498
(Cite as: 117 Nev. 609, 28 P.3d 498)

350HVIII The Death Penalty
350HVIII(G) Proceedings
350HVIII(G)3 Hearing
350Hk1780 Conduct of Hearing
350Hk1780(2) k. Arguments and Conduct of Counsel. Most Cited Cases
A prosecutor in a penalty-phase hearing may discuss general theories of penology, such as the merits of punishment, deterrence, and the death penalty.

**[44] Criminal Law 110 ☞2103**

110 Criminal Law
110XXXI Counsel
110XXXI(F) Arguments and Statements by Counsel
110k2102 Inferences from and Effect of Evidence
110k2103 k. In General. Most Cited Cases
(Formerly 110k720(6))
A prosecutor's statements indicative of opinion, belief, or knowledge are unobjectionable when made as a conclusion from the evidence introduced at trial.

**[45] Sentencing and Punishment 350H ☞1780(2)**

350H Sentencing and Punishment
350HVIII The Death Penalty
350HVIII(G) Proceedings
350HVIII(G)3 Hearing
350Hk1780 Conduct of Hearing
350Hk1780(2) k. Arguments and Conduct of Counsel. Most Cited Cases

**Sentencing and Punishment 350H ☞1789(9)**

350H Sentencing and Punishment
350HVIII The Death Penalty
350HVIII(G) Proceedings
350HVIII(G)4 Determination and Disposition
350Hk1789 Review of Proceedings to

Impose Death Sentence
350Hk1789(9) k. Harmless and Reversible Error. Most Cited Cases
Prosecutor's penalty-phase closing argument deploring "an era of mindless, indiscriminate violence" perpetrated by persons who "believe they're a law unto themselves" and characterizing the defendant as such inappropriately invoked circumstances beyond the case at hand, but was not extreme and did not, standing alone, divert the jury from its proper task of sentencing the defendant for his own crimes.

**[46] Sentencing and Punishment 350H ☞1780(2)**

350H Sentencing and Punishment
350HVIII The Death Penalty
350HVIII(G) Proceedings
350HVIII(G)3 Hearing
350Hk1780 Conduct of Hearing
350Hk1780(2) k. Arguments and Conduct of Counsel. Most Cited Cases
Prosecutor's rebuttal closing argument asking the jury if it had the resolve, determination, courage, intestinal fortitude, and sense of commitment to do its legal duty was highly improper in the penalty phase of a capital murder prosecution; the words were designed to stir the jury's passion and appeal to partiality.

**[47] Sentencing and Punishment 350H ☞1780(2)**

350H Sentencing and Punishment
350HVIII The Death Penalty
350HVIII(G) Proceedings
350HVIII(G)3 Hearing
350Hk1780 Conduct of Hearing
350Hk1780(2) k. Arguments and Conduct of Counsel. Most Cited Cases
Prosecutor's rebuttal closing argument that the jury could consider evidence of the defendant's other crimes before deciding eligibility for the death penalty was improper in penalty phase of capital murder prosecution despite the defendant's incom-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

28 P.3d 498
117 Nev. 609, 28 P.3d 498
(Cite as: 117 Nev. 609, 28 P.3d 498)

plete argument which failed to tell the jurors that they could also consider the other evidence if they decided that death was not an appropriate sentence; the prosecutor's argument did not cure the omis- sion.

**[48] Sentencing and Punishment 350H ☞1645**

350H Sentencing and Punishment
    350HVIII The Death Penalty
      350HVIII(C) Factors Affecting Imposition in General
        350Hk1645 k. In General. Most Cited
Before a jury in a capital case may consider other matter relevant to the sentence, such as other crimes evidence, it must decide if the defendant is eligible for the death penalty. N.R.S. 175.552, subd. 3.

**[49] Sentencing and Punishment 350H ☞1780(3)**

350H Sentencing and Punishment
    350HVIII The Death Penalty
      350HVIII(G) Proceedings
        350HVIII(G)3 Hearing
          350Hk1780 Conduct of Hearing
            350Hk1780(3) k. Instructions. Most Cited Cases
An instruction to guide the jury's consideration of evidence at the penalty hearing, as set out in case, is required in penalty phase of capital prosecution.

**[50] Sentencing and Punishment 350H ☞1645**

350H Sentencing and Punishment
    350HVIII The Death Penalty
      350HVIII(C) Factors Affecting Imposition in General
        350Hk1645 k. In General. Most Cited

**Sentencing and Punishment 350H ☞1652**

350H Sentencing and Punishment
    350HVIII The Death Penalty

350HVIII(C) Factors Affecting Imposition in General
      350Hk1652 k. Aggravating Circum-stances in General. Most Cited Cases

**Sentencing and Punishment 350H ☞1653**

350H Sentencing and Punishment
    350HVIII The Death Penalty
      350HVIII(C) Factors Affecting Imposition in General
        350Hk1653 k. Mitigating Circumstances in General. Most Cited Cases
In deciding on an appropriate sentence in a capital case, the jury will consider three types of evidence for its appropriate purposes: evidence relevant to the existence of aggravating circumstances, evid-ence relevant to the existence of mitigating circum-stances, and other evidence against the defendant. N.R.S. 175.552, subd. 3.

**[51] Sentencing and Punishment 350H ☞1652**

350H Sentencing and Punishment
    350HVIII The Death Penalty
      350HVIII(C) Factors Affecting Imposition in General
        350Hk1652 k. Aggravating Circum-stances in General. Most Cited Cases
In determining unanimously whether any aggravat-ing circumstance has been proven beyond a reason-able doubt, the jury in a capital case may consider only evidence relevant to that aggravating circum-stance and may not consider other evidence against the defendant. N.R.S. 175.552, subd. 3.

**[52] Sentencing and Punishment 350H ☞1653**

350H Sentencing and Punishment
    350HVIII The Death Penalty
      350HVIII(C) Factors Affecting Imposition in General
        350Hk1653 k. Mitigating Circumstances in General. Most Cited Cases
In determining individually whether any mitigating circumstance exists in a capital case, the jury may

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

consider only evidence relevant to that mitigating circumstance and may not consider other evidence against the defendant. N.R.S. 175.552, subd. 3.

**[53] Sentencing and Punishment 350H ⬡1658**

350H Sentencing and Punishment
   350HVIII The Death Penalty
      350HVIII(C) Factors Affecting Imposition in General
         350Hk1658 k. Manner and Effect of Weighing or Considering Factors. Most Cited Cases
In determining individually whether any mitigating circumstances outweigh any aggravating circumstances, the jury in a capital case may consider only evidence relevant to any mitigating and aggravating circumstances and may not consider other evidence against the defendant. N.R.S. 175.552, subd. 3.

**[54] Sentencing and Punishment 350H ⬡1658**

350H Sentencing and Punishment
   350HVIII The Death Penalty
      350HVIII(C) Factors Affecting Imposition in General
         350Hk1658 k. Manner and Effect of Weighing or Considering Factors. Most Cited Cases
If the jury in a capital case finds unanimously and beyond a reasonable doubt that at least one aggravating circumstance exists and each juror determines that any mitigating circumstances do not outweigh the aggravating, the defendant is eligible for a death sentence.

**[55] Sentencing and Punishment 350H ⬡1658**

350H Sentencing and Punishment
   350HVIII The Death Penalty
      350HVIII(C) Factors Affecting Imposition in General
         350Hk1658 k. Manner and Effect of Weighing or Considering Factors. Most Cited Cases
When the jury finds the defendant eligible for the death penalty, it must consider all three types of evidence (evidence relevant to the existence of aggravating circumstances, evidence relevant to the existence of mitigating circumstances, and other evidence against the defendant) and still has the discretion to impose a sentence less than death. N.R.S. 175.552, subd. 3.

**[56] Sentencing and Punishment 350H ⬡1786**

350H Sentencing and Punishment
   350HVIII The Death Penalty
      350HVIII(G) Proceedings
         350HVIII(G)4 Determination and Disposition
            350Hk1786 k. Unanimity. Most Cited Cases
The jury in a capital case must decide on a sentence unanimously, whether the sentence is death or imprisonment.

**[57] Sentencing and Punishment 350H ⬡1786**

350H Sentencing and Punishment
   350HVIII The Death Penalty
      350HVIII(G) Proceedings
         350HVIII(G)4 Determination and Disposition
            350Hk1786 k. Unanimity. Most Cited Cases
If the jury in a capital case does not decide unanimously that at least one aggravating circumstance has been proven beyond a reasonable doubt or if at least one juror determines that the mitigating circumstances outweigh the aggravating, the defendant is not eligible for a death sentence.

**[58] Sentencing and Punishment 350H ⬡40**

350H Sentencing and Punishment
   350HI Punishment in General
      350HI(C) Factors or Purposes in General
         350Hk40 k. In General. Most Cited Cases
Upon determining that the defendant is not eligible for death, the jury must, in determining a sentence other than death, consider evidence relevant to the

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

28 P.3d 498
117 Nev. 609, 28 P.3d 498
**(Cite as: 117 Nev. 609, 28 P.3d 498)**

Page 13

existence of aggravating circumstances, evidence relevant to the existence of mitigating circumstances, and other evidence against the defendant. N.R.S. 175.552, subd. 3.

**[59] Criminal Law 110 ☞1962**

110 Criminal Law
   110XXXI Counsel
      110XXXI(C) Adequacy of Representation
         110XXXI(C)2 Particular Cases and Issues
            110k1958 Death Penalty
               110k1962 k. Argument and Comments. Most Cited Cases
     (Formerly 110k641.13(7))

**Criminal Law 110 ☞1969**

110 Criminal Law
   110XXXI Counsel
      110XXXI(C) Adequacy of Representation
         110XXXI(C)2 Particular Cases and Issues
            110k1966 Appeal
               110k1969 k. Raising Issues on Appeal; Briefs. Most Cited Cases
     (Formerly 110k641.13(7))
Defendant's trial and appellate counsel rendered ineffective assistance and prejudiced the defendant by not challenging the prosecutor's improper rebuttal closing argument that the jury could consider evidence of the defendant's other crimes before deciding eligibility for the death penalty. U.S.C.A. Const.Amend. 6; N.R.S. 175.552, subd. 3.

**[60] Sentencing and Punishment 350H ☞1616**

350H Sentencing and Punishment
   350HVIII The Death Penalty
      350HVIII(A) In General
         350Hk1613 Requirements for Imposition
            350Hk1616 k. Avoidance of Arbitrariness or Capriciousness. Most Cited Cases

**Sentencing and Punishment 350H ☞1617**

350H Sentencing and Punishment
   350HVIII The Death Penalty

      350HVIII(A) In General
         350Hk1613 Requirements for Imposition
            350Hk1617 k. Existence of Limit on Sentencer's Discretion. Most Cited Cases

**Sentencing and Punishment 350H ☞1618**

350H Sentencing and Punishment
   350HVIII The Death Penalty
      350HVIII(A) In General
         350Hk1613 Requirements for Imposition
            350Hk1618 k. Narrowing Class of Eligible Offenders. Most Cited Cases
The federal constitution requires a capital sentencing process to genuinely narrow the class of persons eligible for the death penalty; thus, a sentencing scheme must direct and limit the sentencer's discretion to minimize the risk of arbitrary and capricious action and must provide a principled basis for the sentencer to distinguish defendants who deserve capital punishment from those who do not. U.S.C.A. Const.Amend. 8.

**[61] Criminal Law 110 ☞649(4)**

110 Criminal Law
   110XX Trial
      110XX(B) Course and Conduct of Trial in General
         110k649 Adjournments Pending Trial
            110k649(4) k. For Consultation of Counsel or Preparation of Defense. Most Cited
State's disclosure during trial of defendant's letter asking witness to change her testimony did not entitle the defendant to a continuance of the trial, but was appropriately remedied by postponing the cross-examination of a prosecution witness and the testimony of two other key witnesses; the refusal to grant a continuance did not prejudice the defendant since he failed to specify how the cross-examination of any witnesses was inadequate and merely claimed that concern about the letter distracted his counsel's attention from effectively cross-examining the state's witnesses.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

28 P.3d 498
117 Nev. 609, 28 P.3d 498
(Cite as: 117 Nev. 609, 28 P.3d 498)

Page 14

**[62] Criminal Law 110 ☞627.8(6)**

110 Criminal Law
 110XX Trial
  110XX(A) Preliminary Proceedings
   110k627.5 Discovery Prior to and Incident to Trial
   110k627.8 Proceedings to Obtain Disclosure
    110k627.8(6) k. Failure to Produce Information. Most Cited Cases
The district court has broad discretion in fashioning a remedy for violation of discovery statute, and it does not abuse its discretion absent a showing that the state acted in bad faith or that the nondisclosure caused substantial prejudice to the defendant which was not alleviated by the court's order. N.R.S. 174.295, subds. 1, 2.

**[63] Criminal Law 110 ☞1935**

110 Criminal Law
 110XXXI Counsel
  110XXXI(C) Adequacy of Representation
   110XXXI(C)2 Particular Cases and Issues
    110k1921 Introduction of and Objections to Evidence at Trial
    110k1935 k. Impeachment or Contradiction of Witnesses. Most Cited Cases
  (Formerly 110k641.13(6))
Defense attorneys rendered deficient performance by failing to impeach prosecution witness with two felony convictions-grand theft in California and attempted possession of a stolen vehicle in Nevada. U.S.C.A. Const.Amend. 6.

**[64] Criminal Law 110 ☞1935**

110 Criminal Law
 110XXXI Counsel
  110XXXI(C) Adequacy of Representation
   110XXXI(C)2 Particular Cases and Issues
    110k1921 Introduction of and Objections to Evidence at Trial
    110k1935 k. Impeachment or Contradiction of Witnesses. Most Cited Cases

 (Formerly 110k641.13(6))
Defense attorneys' deficient performance by failing to impeach prosecution witness with two felony convictions did not prejudice the defendant, where other witnesses gave the same testimony that the defendant made incriminating admissions about the murders. U.S.C.A. Const.Amend. 6.

**[65] Habeas Corpus 197 ☞293**

197 Habeas Corpus
 197I In General
  197I(C) Existence and Exhaustion of Other Remedies
   197k290 Appeal, Error, or Other Direct Review of Conviction
    197k293 k. Evidence and Witnesses; Arrest and Search. Most Cited Cases
Supreme Court's decision on direct appeal from conviction was the law of the case barring reconsideration of habeas corpus claim on the admissibility of a federal sentence against a suspect in the murders.

**[66] Sentencing and Punishment 350H ☞1756**

350H Sentencing and Punishment
 350HVIII The Death Penalty
  350HVIII(G) Proceedings
   350HVIII(G)2 Evidence
    350Hk1755 Admissibility
     350Hk1756 k. In General. Most Cited Cases
Federal court conviction of murder suspect, an alleged co-perpetrator, for drug trafficking was irrelevant in penalty phase of capital murder prosecution, although a jury may consider the punishments imposed on co-defendants.

**[67] Indictment and Information 210 ☞83**

210 Indictment and Information
 210V Requisites and Sufficiency of Accusation
  210k83 k. Principals in Second Degree. Most Cited Cases
Information alleging that the defendant aided and

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

28 P.3d 498
117 Nev. 609, 28 P.3d 498
**(Cite as: 117 Nev. 609, 28 P.3d 498)**

abetted four murders needed to specify how he did so. N.R.S. 173.075, subds. 1, 2.

**[68] Criminal Law 110 ⟳1130(2)**

110 Criminal Law
   110XXIV Review
     110XXIV(I) Briefs
      110k1130 In General
       110k1130(2) k. Specification of Errors. Most Cited Cases

**Criminal Law 110 ⟳1167(1)**

110 Criminal Law
   110XXIV Review
     110XXIV(Q) Harmless and Reversible Error
      110k1167 Rulings as to Indictment or Pleas
       110k1167(1) k. Indictment or Information in General. Most Cited Cases
Vagueness in information which failed to specify how the defendant aided and abetted four murders was not shown to prejudice the defendant; he failed to give citations to the record to substantiate his claim that the state varied its theory of the case according to the whims of its witnesses, and the state's basic theory did not change that the defendant let another man into the victims' apartment and the two, acting together, fatally shot the victims.

**[69] Courts 106 ⟳91(1)**

106 Courts
   106II Establishment, Organization, and Procedure
     106II(G) Rules of Decision
      106k88 Previous Decisions as Controlling or as Precedents
       106k91 Decisions of Higher Court or Court of Last Resort
        106k91(1) k. Highest Appellate Court. Most Cited Cases
District court correctly declined to review or adjudicate claims about Supreme Court's handling of death penalty cases; doing so would require the dis-

trict court to exercise supervisory and appellate review over the functioning and decisions of the Supreme Court.

**[70] Courts 106 ⟳100(1)**

106 Courts
   106II Establishment, Organization, and Procedure
     106II(H) Effect of Reversal or Overruling
      106k100 In General
       106k100(1) k. In General; Retroactive or Prospective Operation. Most Cited Cases
Supreme Court's *Byford* decision on instruction concerning premeditation and deliberation did not apply retroactively.

**[71] Habeas Corpus 197 ⟳273**

197 Habeas Corpus
   197I In General
     197I(C) Existence and Exhaustion of Other Remedies
      197k273 k. Exhaustion and Procedural Default, in General. Most Cited Cases
Supreme Court's alleged error on direct appeal was not good cause to overcome procedural bars to habeas corpus claims.

**[72] Courts 106 ⟳99(7)**

106 Courts
   106II Establishment, Organization, and Procedure
     106II(G) Rules of Decision
      106k99 Previous Decisions in Same Case as Law of the Case
       106k99(7) k. Different Courts or Judges, Rulings By. Most Cited Cases
Unless a federal court concludes that a determination by the State Supreme Court is erroneous, the parties and district court should respect the law of the case as pronounced by the Supreme Court.

**[73] Criminal Law 110 ⟳1901**

110 Criminal Law

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

28 P.3d 498
117 Nev. 609, 28 P.3d 498
**(Cite as: 117 Nev. 609, 28 P.3d 498)**

Page 16

110XXXI Counsel
    110XXXI(C) Adequacy of Representation
      110XXXI(C)2 Particular Cases and Issues
        110k1901 k. Jury Selection and Composition. Most Cited Cases
    (Formerly 110k641.13(2.1))
Attorneys' allegedly deficient performance by failing to ask potential jurors whether they would always impose the death penalty on a defendant convicted of first-degree murder did not prejudice the defendant, where the potential jurors filled out a questionnaire asking that question and the district court excused any who answered that they would. U.S.C.A. Const.Amend. 6.

**[74] Criminal Law 110 ⟶1922**

110 Criminal Law
    110XXXI Counsel
      110XXXI(C) Adequacy of Representation
        110XXXI(C)2 Particular Cases and Issues
        110k1921 Introduction of and Objections to Evidence at Trial
          110k1922 k. In General. Most Cited Cases
    (Formerly 110k641.13(6))
Even if attorneys made an unreasonable tactical decision to elicit testimony that the defendant was an ex-felon, that information did not prejudice the defendant in a capital murder prosecution. U.S.C.A. Const.Amend. 6.

**[75] Criminal Law 110 ⟶1891**

110 Criminal Law
    110XXXI Counsel
      110XXXI(C) Adequacy of Representation
        110XXXI(C)2 Particular Cases and Issues
        110k1891 k. Preparation for Trial. Most Cited Cases
    (Formerly 110k641.13(2.1))

**Criminal Law 110 ⟶1906**

110 Criminal Law
    110XXXI Counsel

110XXXI(C) Adequacy of Representation
    110XXXI(C)2 Particular Cases and Issues
      110k1906 k. Witness Lists. Most Cited Cases
    (Formerly 110k641.13(6))
Attorneys' allegedly ineffective failure to challenge the prosecutor's endorsement of witnesses and to prepare adequately for the examination of witnesses was not shown to prejudice the defendant, where he failed to specify how his counsel could have better cross-examined the state's witnesses. U.S.C.A. Const.Amend. 6.

**[76] Criminal Law 110 ⟶1931**

110 Criminal Law
    110XXXI Counsel
      110XXXI(C) Adequacy of Representation
        110XXXI(C)2 Particular Cases and Issues
        110k1921 Introduction of and Objections to Evidence at Trial
          110k1931 k. Experts; Opinion Testimony. Most Cited Cases
    (Formerly 110k641.13(6))
A defendant claiming ineffective assistance from the failure to call expert witnesses should have alleged specifically what these experts could have done to make a different result reasonably probable. U.S.C.A. Const.Amend. 6.

**[77] Criminal Law 110 ⟶1955**

110 Criminal Law
    110XXXI Counsel
      110XXXI(C) Adequacy of Representation
        110XXXI(C)2 Particular Cases and Issues
      110k1952 Sentencing in General
        110k1955 k. Presentation of Evidence Regarding Sentencing. Most Cited Cases
    (Formerly 110k641.13(7))
A defendant claiming ineffective assistance from the failure to prepare defendant's mother and two sisters for the penalty phase so that they could provide more mitigating evidence should have alleged with specificity what that evidence would have been. U.S.C.A. Const.Amend. 6.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

28 P.3d 498
117 Nev. 609, 28 P.3d 498
(Cite as: 117 Nev. 609, 28 P.3d 498)

**[78] Habeas Corpus 197 ☞287.1**

197 Habeas Corpus
   197I In General
      197I(C) Existence and Exhaustion of Other Remedies
         197k287 Appeal, Error, or Other Direct Review
            197k287.1 k. In General. Most Cited Cases
Post-conviction habeas claims that are independent of ineffective assistance claims and that could have been raised on direct appeal are waived. U.S.C.A. Const.Amend. 6; N.R.S. 34.810.

**[79] Habeas Corpus 197 ☞824**

197 Habeas Corpus
   197III Jurisdiction, Proceedings, and Relief
      197III(D) Review
         197III(D)1 In General
            197k824 k. Assignment of Errors and Briefs. Most Cited Cases
Statement in opening brief, on appeal from denial of habeas relief, that trial counsel were ineffective "for the reasons set forth" in the issues raised in the rest of the brief was an unacceptable, conclusory, catchall attempt to assert ineffective assistance of counsel. U.S.C.A. Const.Amend. 6.

**[80] Habeas Corpus 197 ☞275.1**

197 Habeas Corpus
   197I In General
      197I(C) Existence and Exhaustion of Other Remedies
         197k275 Particular Issues and Problems
            197k275.1 k. In General. Most Cited Cases

**Habeas Corpus 197 ☞294**

197 Habeas Corpus
   197I In General
      197I(C) Existence and Exhaustion of Other Remedies
         197k290 Appeal, Error, or Other Direct Review of Conviction
            197k294 k. Trial. Most Cited Cases
Habeas corpus claim concerning jury instruction on the possible guilt of other persons was procedurally barred in the absence of an allegation of ineffective assistance of counsel or cause for failing to raise the claim at trial or on direct appeal. U.S.C.A. Const.Amend. 6; N.R.S. 34.810.

**[81] Criminal Law 110 ☞1186.1**

110 Criminal Law
   110XXIV Review
      110XXIV(U) Determination and Disposition of Cause
         110k1185 Reversal
            110k1186.1 k. Grounds in General. Most Cited Cases
The cumulative effect of multiple errors may violate a defendant's constitutional right to a fair trial even though errors are harmless individually.

**[82] Habeas Corpus 197 ☞461**

197 Habeas Corpus
   197II Grounds for Relief; Illegality of Restraint
      197II(B) Particular Defects and Authority for Detention in General
         197k461 k. Grounds in General. Most Cited Cases
Cumulative deficient performance in response to admission of hearsay, inadmissible evidence of some prosecution witnesses' fear, inadmissible evidence of prior consistent statements, prosecutor's mischaracterization of the reasonable doubt standard, testimony by prosecution witness with a criminal history, and inadequate information alleging aiding and abetting did not prejudice the defendant in the guilt phase of a capital murder prosecution, and thus did not warrant habeas relief; three witnesses testified that the defendant made incriminating admissions, and a child eyewitness knew one killer by a name linked to the defendant. U.S.C.A. Const.Amend. 6.
**505*610** JoNell Thomas, Las Vegas, for Appellant.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Frankie Sue Del Papa, Attorney General, Carson City, Stewart L. Bell, District Attorney, James Tufteland, Chief Deputy District Attorney, Clark County, for Respondent.

**\*617** BEFORE THE COURT EN BANC.

### OPINION

BECKER, J.:

In 1994 appellant Vernell Ray Evans was convicted of burglary and four counts of first-degree murder and sentenced to death. This court affirmed his conviction and sentence. He then filed a post-conviction petition for a writ of habeas corpus, which the **\*618** district court denied without holding an evidentiary hearing. Evans appeals.

The overarching issue is whether any of Evans's claims warranted an evidentiary hearing. We conclude that a hearing is not necessary to assess the claims, and we affirm the district court's order insofar as it upholds Evans's conviction. However, we conclude that his trial and appellate counsel were ineffective in failing to challenge arguments made by the prosecutor during the penalty phase of the trial. We therefore reverse the district court's order in part, vacate Evans's death sentence, and remand for a new penalty hearing.

### FACTS

In September 1994, a jury convicted Evans of burglary and four counts of first-degree murder. After a penalty hearing, the jury found that the mitigating circumstances did not outweigh the aggravating circumstances and imposed four death sentences. The district judge also entered a consecutive ten-year prison term for the burglary conviction. This court affirmed Evans's judgment of conviction in *Evans v. State*,[FN1] from which the following facts are largely taken.

FN1. 112 Nev. 1172, 926 P.2d 265 (1996).

Around 1:00 a.m. on May 1, 1992, officers of the Las Vegas Metropolitan Police Department responded to a report of a shooting at a Wardelle Street apartment. They discovered four people shot to death: Jermaine Woods, Steven Walker, Lisa Boyer, and Samantha Scotti. Scotti and her eighteen-month-old son, Francois, were residents of the apartment.

Four-year-old Adriana Ventura (Adriana) and her mother and infant sister also resided at the apartment. Adriana witnessed the murders and testified at trial to the following. Two men entered the apartment carrying guns. Adriana referred to the men as "Scary Eyes" and "Little Ray." The intruders first shot the two men already in the apartment, Woods and Walker. They then shot Scotti, who was in the bathroom, and Boyer, who was in the bedroom. Adriana could not remember how many times the two women were shot or which one of the intruders fired the shots, and she did not see how the men left the apartment. Sometime thereafter, Adriana's mother, Alicia Ventura (Ventura), called the apartment. Adriana answered and told her mother that Scotti was dead. After that, Adriana went to the apartment next door and told the neighbor that everyone had been killed.

Adriana testified that she did not know "Scary Eyes," but she had seen "Little Ray" before at the apartment. Adriana was unable to identify Evans as "Little Ray" either in court or in a **\*619** lineup at the jail. However, Ventura testified that Adriana usually referred to Evans as either "Little Ray" or "Uncle Ray."

**\*\*506** Ventura testified that earlier that day (April 30) four men had shown up at the apartment when she, Scotti, and Walker were there. Two of the men were members of a gang at odds with Walker's gang, and one of the men called Scotti a "snitch bitch" and wanted to fight her. Eventually the four men left. Boyer also arrived at the apartment while the four men were there. She was trying to get away

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

28 P.3d 498
117 Nev. 609, 28 P.3d 498
(Cite as: 117 Nev. 609, 28 P.3d 498)

from her boyfriend, Everett Flowers, who had recently put a gun to her head and threatened to kill her.

Between 7:00 and 7:30 p.m., Ventura received a telephone call from Evans. Evans warned her about living with Scotti, who was a "snitch bitch" and was going to "get it some day." Ventura told Scotti about the call, but Scotti was unfazed, having received threats before.

At 10:30 p.m. Ventura left with her infant daughter for a friend's apartment to do laundry. Around midnight, Ventura spoke to Scotti on the phone. Scotti sounded normal and asked Ventura to bring some rock cocaine back to the apartment. Ventura obtained the cocaine and called back about thirty minutes later. Her daughter Adriana answered the telephone and said that Uncle Ray had come in and shot everybody. Ventura told Adriana to take Francois and go to the apartment next door.

Jeffery Grice, who lived in the apartment next door to the crime scene, testified that he heard apparent gunshots that night. Fifteen minutes later, Adriana pounded on Grice's door. When he let her in, she said, "They're all dead.... Uncle Ray-Ray came in, and they shot them all dead."

Shirannah Rice testified that Evans had admitted his involvement in the murders to her in a conversation on November 8, 1992. Evans told Rice that Scotti had been working for the police and had set up "Double R" (a nickname of Richard Powell's) in a drug deal and Double R went to jail. Double R therefore wanted to kill Scotti upon his release. They chose the night following the Rodney King verdicts because the police were occupied with riots in West Las Vegas. Evans said that he went to Scotti's apartment and was let in. After leaving the door unlocked, Evans signaled from the window, and his partner came in armed. Evans first shot Walker and then Woods. Evans then went to the bedroom where he and his partner shot Boyer. Next, they went into the bathroom and shot Scotti numerous times. Evans said they wanted to make

her suffer. In another conversation a few months later, Evans told Rice that he was concerned Adriana could be a witness as she got older and that "they had better get her out of town if they know what's best for her."

Tina Jackson testified that Evans made admissions to her in November 1992. Evans told her that he knew Ventura had been **620** talking to her about the crimes and that he "did do it." He showed her a gun and bullets and said they were for her if she said anything. A few days later, Evans approached Jackson, pushed her against a wall, and warned her again to keep her mouth shut. Afraid of Evans, Jackson soon left the Las Vegas area.

Laboratory tests revealed that projectiles recovered from the heads of Woods and Walker were consistent with bullets fired from a .38 special or a .357 magnum. Two projectiles from Scotti's body came from the same .38 special or .357 magnum used to kill the two men, and another was consistent with a 9-millimeter weapon. All three projectiles fired into Boyer were consistent with the 9-millimeter used to shoot Scotti.

A palm print lifted from a closet door in the apartment matched Evans's left palm. Other prints were matched to Flowers. Both Evans and Flowers had lived in the apartment but had moved out weeks before.

Joseph Salley, the father of Ventura's younger daughter, testified as a rebuttal witness regarding admissions made to him by Evans. In July 1992, with Evans present, Powell and Flowers told Salley about the murders. Powell described how Evans had shot Walker, Salley's "homey." At some point during this discussion, Evans jumped up and exclaimed that he was a "born killer." Two weeks later, Salley met Powell and Evans to purchase crack cocaine from them. Evans told Salley that he better pay Powell after selling the cocaine or: "I'll have to do you like I did your homeys." Evans also said **507** that Walker and Woods had been in the wrong place at the wrong time because the intended

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

victims were "two bitches."

At the conclusion of the guilt phase of trial on September 10, 1994, the jury found Evans guilty of burglary and four counts of first-degree murder. The penalty phase commenced on September 26, 1994.

The State presented evidence that Evans had a 1992 felony conviction for leaving the scene of an accident, had a 1989 felony conviction for battery with the use of a deadly weapon, and was facing drug trafficking and parole violation charges. Members of the victims' families testified about their losses.

In mitigation, Evans offered his youthful age and the testimony of psychiatrist Dr. Norton Roitman and of family members. Dr. Roitman testified that although Evans was not mentally ill, he suffered from anxiety illness. His family testified that he was not a bad person and asked for mercy on his behalf. Evans also exercised his right of allocution. Although he did not specifically take responsibility for the murders, he said that he had made mistakes in his life and would change them if he could. He expressed concern*621 for his family and daughter and asked the jury to consider giving him a life sentence.

The jury returned death penalty verdicts on all four counts of first-degree murder. The jurors found beyond a reasonable doubt three aggravating circumstances on each murder count. They found all four murders were committed by a person previously convicted of a felony involving the use or threat of violence and by a person who knowingly created a great risk of death to more than one person. For the murder of Scotti, they also found the murder involved torture, depravity of mind, or the mutilation of the victim. They found that the other three murders were committed to avoid or prevent a lawful arrest. The jurors also found that the aggravating circumstances were not outweighed by mitigating circumstances.

Evans filed a motion for a new trial, which was denied. He separately appealed the judgment of conviction and the denial of his motion for a new trial. This court affirmed his conviction and dismissed the appeal of the denial of his motion.[FN2]

> FN2. *Id.*; *Evans v. State*, Docket No. 29936, 113 Nev. 1622, 970 P.2d 1102 (Order Dismissing Appeal, November 20, 1997).

In May 1998, Evans petitioned the district court in proper person for a post-conviction writ of habeas corpus. In August 1999, appointed counsel filed a supplemental petition. The district court denied the petition without holding an evidentiary hearing.

### DISCUSSION

*The right to an evidentiary hearing and the application of procedural bars*

Evans contends that the district court erred in denying his petition without holding an evidentiary hearing and allowing him to conduct discovery.

[1][2] A defendant seeking post-conviction relief cannot rely on conclusory claims for relief but must support any claims with specific factual allegations that if true would entitle him or her to relief.[FN3] The defendant is not entitled to an evidentiary hearing if the allegations are belied or repelled by the record.[FN4]

> FN3. *Pangallo v. State*, 112 Nev. 1533, 1536, 930 P.2d 100, 102 (1996), *limited on other grounds by Hart v. State*, 116 Nev. 558, 562-63, 1 P.3d 969, 972 (2000).

> FN4. *Id.*

[3][4] Further, a court must dismiss a habeas petition if it presents claims that either were or could have been presented in an earlier proceeding, unless the court finds both cause for failing to present*622 the claims earlier or for raising them again and actual prejudice to the petitioner.[FN5] CLAIMS OF

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

28 P.3d 498
117 Nev. 609, 28 P.3d 498
(Cite as: 117 Nev. 609, 28 P.3d 498)

INEFFECTive assistance of counsel are properly presented in a timely, first post-conviction petition for a writ of habeas corpus. Because such a claim is generally not appropriate for review on direct appeal, the failure to raise it "on direct appeal does not constitute **508 a waiver of the claim for purposes of post-conviction proceedings." [FN6]

    FN5. NRS 34.810.

    FN6. *Daniels v. State,* 100 Nev. 579, 580, 688 P.2d 315, 316 (1984), *modified on other grounds by Varwig v. State,* 104 Nev. 40, 752 P.2d 760 (1988).

*Claims of ineffective assistance of counsel*

Evans contends that his trial and appellate counsel were ineffective in numerous ways.

*The standard of review*

[5][6][7] A claim of ineffective assistance of counsel presents a mixed question of law and fact, subject to independent review.[FN7] To establish ineffective assistance of counsel, a claimant must show both that counsel's performance was deficient and that the deficient performance prejudiced the defense.[FN8] Deficient performance is representation that falls below an objective standard of reasonableness.[FN9] To show prejudice, the claimant must show a reasonable probability that but for counsel's errors the result of the trial would have been different.[FN10]

    FN7. *Kirksey v. State,* 112 Nev. 980, 987, 923 P.2d 1102, 1107 (1996).

    FN8. *Id.* (citing *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)).

    FN9. *Id.*

    FN10. *Id.* at 988, 923 P.2d at 1107.

[8][9] Judicial review of a lawyer's representation is highly deferential, and a defendant must overcome the presumption that a challenged action might be considered sound strategy.[FN11] The reviewing court must try to avoid the distorting effects of hindsight and evaluate the conduct under the circumstances and from counsel's perspective at the time.[FN12]

    FN11. *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052.

    FN12. *Kirksey,* 112 Nev. at 987-88, 923 P.2d at 1107.

*Failing to prevent the admission of hearsay evidence*

[10] At trial Gregory Robertson testified for the State that Richard Powell offered him $10,000 in October 1991 to kill Scotti because *623 Scotti had set Powell up to be arrested for a drug offense. The State offered this as evidence of the motive for the murder. The district court admitted the evidence against Evans under NRS 51.035(3)(e) as a statement by his co-conspirator during the course and in furtherance of the conspiracy.

Evans contends that his trial and appellate counsel were ineffective in failing to argue that there was no evidence that a conspiracy existed when Powell made the statement. In denying Evans's post-conviction petition, the district court acknowledged that it was error to admit evidence of Powell's statement but the error was harmless. The State does not dispute that it failed to show that a conspiracy existed when the statement was made, but it maintains that it was not critical evidence. Evans argues that the hearsay statement was highly prejudicial because it was the only evidence to explain why he would want to kill Scotti.

Powell's statement was not the sole evidence of motive. Shirannah Rice also testified that Evans admitted that he helped kill Scotti because Scotti had informed on Powell. We conclude that even if

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

28 P.3d 498
117 Nev. 609, 28 P.3d 498
(Cite as: 117 Nev. 609, 28 P.3d 498)

counsel had succeeded in excluding the hearsay statement there was no reasonable probability of a different result.

*Failing to challenge the competency of a young witness to testify*

Evans contends that his counsel were ineffective in failing to challenge the competency of Adriana Ventura to testify. The district court concluded that the voir dire of Adriana and her subsequent testimony demonstrated she was competent.

[11] Adriana Ventura was four at the time of the murders and six when she testified. At trial, the prosecutor first questioned Adriana about her family, the difference between the truth and lies, and the need to tell the truth. Adriana then testified regarding the murders.

According to Evans, before her trial testimony Adriana testified at a preliminary hearing,**509 a grand jury hearing, and a federal sentencing hearing and was questioned repeatedly about the crimes by her mother, neighbors, a detective, a child psychologist, and the media. Her grandfather allowed reporters to tape her telling her story on several occasions. Evans argues that there was great potential that the child's testimony was contaminated, particularly by her mother.

Evans also asserts that Adriana's testimony shows that she was not competent to testify. For example, she was unable to remember whether she lived in a house or an apartment at the time of the murders or the name of the other child who was present. *624 Evans also claims that Adriana could not remember whether the murderers left through the door or jumped out of a window, but this claim is mistaken. Adriana actually said they could have done either, but she did not know because she did not watch them leave. Our review of Adriana's trial testimony shows that she readily admitted whenever she did not know or could not remember something and did not appear to make up information just to answer a question. For example, she had apparently told de-

fense counsel before trial that each killer had shot a specific victim. She acknowledged this on cross-examination but maintained, as she had on direct examination, that she actually did not know who shot whom. The material facts which Adriana did remember and provide, such as where each victim was when shot, were consistent with the evidence at the crime scene.

[12][13][14][15][16] A child is competent to testify if he or she is able to receive just impressions and relate them truthfully.[FN13] Courts must evaluate a child's competency on a case-by-case basis, but relevant considerations include:

> FN13. *Felix v. State,* 109 Nev. 151, 173, 849 P.2d 220, 235 (1993).

(1) the child's ability to receive and communicate information; (2) the spontaneity of the child's statements; (3) indications of "coaching" and "rehearsing;" (4) the child's ability to remember; (5) the child's ability to distinguish between truth and falsehood; and (6) the likelihood that the child will give inherently improbable or incoherent testimony.[FN14]

> FN14. *Id.*

This court will not disturb a finding of competency absent a clear abuse of discretion.[FN15] A child's testimony supports a finding of competency if it is clear, relevant, and coherent.[FN16] Inconsistencies in the testimony go to the weight of the evidence.[FN17]

> FN15. *Lanoue v. State,* 99 Nev. 305, 307, 661 P.2d 874, 874 (1983).

> FN16. *Id.*

> FN17. *Wilson v. State,* 96 Nev. 422, 423-24, 610 P.2d 184, 185 (1980).

We conclude that Adriana's testimony indicates that she was competent. Her basic account of the crimes remained coherent and consistent, even under

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

cross-examination. Her testimony reflected none of the serious problems-inability to differentiate between fact and fantasy, confusion between truth and falsehood, inherently improbable testimony, suggestions of coaching, inability to recall recent events-which in other cases have prompted this court to overturn the district court's finding of competency.[FN18]

> FN18. *See Felix,* 109 Nev. at 174-75, 849 P.2d at 236-37; *Lanoue,* 99 Nev. at 307, 661 P.2d at 875.

[17] ***625** Evans also contends that the district court violated this court's directive requiring trial courts to examine a child under ten years of age before permitting her to testify. He cites this court's decision in *Felix v. State,*[FN19] which stands for this rule. However, at least part of the foundation for the rule no longer exists. *Felix* followed a line of authority that relied on former NRS 48.030(2), which provided that children under ten years of age could not be witnesses if they appeared " incapable of receiving just impressions of the facts ... or of relating them truly." [FN20] Nevada's statutes no longer treat ****510** the competency of witnesses younger than ten as a special case. Even assuming the rule still retains its full force, the district court's failure to examine Adriana before she testified was prejudicial only if she indeed lacked competency. We conclude that her testimony shows she was competent.

> FN19. 109 Nev. at 175, 849 P.2d at 236.

> FN20. *See Shuff v. State,* 86 Nev. 736, 738, 476 P.2d 22, 23 (1970); *Martin v. State,* 80 Nev. 307, 310, 393 P.2d 141, 143 (1964).

[18] Nevertheless, Evans's allegations regarding possible contamination of Adriana's testimony arguably warranted an evidentiary hearing. Roughly two years had passed since the crimes occurred, and she had apparently talked with a number of people about the murders. On the other hand, the mere fact that Adriana spoke with people about her experi-

ence does not establish that her testimony was improperly influenced. Evans has not pointed to any particular behavior by Adriana or to inconsistencies in her statements-or to any words or conduct by anyone else-that indicate her testimony was deliberately or inadvertently tainted. Evans stresses that a detective suspected that Adriana's mother, Ventura, knew that Scotti was going to be murdered, but he does not explain why this suggests that Ventura manipulated her daughter's account of the crimes. We conclude that the district court could have reasonably found that Evans's allegations on this issue were insufficient to warrant an evidentiary hearing.

Adriana was competent to testify; therefore, counsel's failure to challenge her competency was not deficient or prejudicial.

*Failing to uncover exculpatory information allegedly withheld by the State*

Evans asserts that the State had a variety of exculpatory information which it did not disclose to him in violation of *Brady v. Maryland.*[FN21] Alternatively, he argues his counsel were ineffective in not uncovering this information independently.

> FN21. 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

[19] ***626** *Brady* and its progeny require a prosecutor to disclose material evidence favorable to the defense; evidence is material if there is a reasonable probability that the result would have been different if it had been disclosed.[FN22] Such a reasonable probability is shown when the nondisclosure undermines confidence in the outcome of the trial.[FN23]

> FN22. *See Jimenez v. State,* 112 Nev. 610, 618-19, 918 P.2d 687, 692 (1996).

> FN23. *Kyles v. Whitley,* 514 U.S. 419, 434, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995).

[20] Evans first complains that the State withheld information that Joseph Salley testified for the State

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

28 P.3d 498
117 Nev. 609, 28 P.3d 498
**(Cite as: 117 Nev. 609, 28 P.3d 498)**

in return for witness protection benefits. This court considered this claim in dismissing Evans's appeal in 1997. The doctrine of the law of the case precludes reconsidering it.[FN24]

> FN24. *See Pertgen v. State,* 110 Nev. 554, 557-58, 875 P.2d 361, 363 (1994).

[21] Next, Evans complains that the State provided no information on "an investigation of Ventura and her possible involvement in these murders" or "the continued investigation of Flowers." These claims fall short of alleging specifically that the State had exculpatory information. Evans speculates that material exculpatory information exists, but he does not describe it. The evidence at trial showed that Evans and at least one other person committed the crimes. The State did not conceal that it also suspected Everett Flowers and Richard Powell of the murders, and Evans presented evidence and argument at trial that Flowers had a violent relationship with and, not long before the murders, had threatened to kill one of the victims-his girlfriend, Lisa Boyer. Thus, to undermine confidence in the trial's outcome, Evans would have to allege the nondisclosure of specific information that not only linked Flowers, or Ventura, to the crimes but also indicated that Evans was not involved. He has not done so.

Evans also speculates that the State had information that Scotti was an informant in other cases but did not disclose it to the defense. He argues such information would have shown that other people had a motive to kill her. During post-conviction proceedings, the district court ordered discovery on this issue. In denying the habeas petition, the court concluded that the State did not have a **511 list of such cases and did not have a duty to create exculpatory information for the defense where none existed. We accept the court's finding that the State did not have the information sought by Evans.

[22][23] *627 In this claim, Evans has described a line of inquiry possibly helpful to the defense. To prepare his defense, he had a right to pursue this inquiry by means of discovery and obtain any information the State might have had on Scotti's other informant activities. But information that Scotti had acted as an informant in other cases, without at least some evidence that this activity had generated actual threats against her, would not implicate the State's affirmative duty to disclose potentially exculpatory information to the defense because such information must be material.[FN25] SCOTTI'S MERE ACTINg as an informant in other cases does not reach this level. Evans seems to assume that the State has a duty to compile information or pursue an investigative lead simply because it could conceivably develop evidence helpful to the defense, but he offers no authority for this proposition, and we reject it.[FN26]

> FN25. *See, e.g., Mazzan v. Warden,* 116 Nev. 48, 73 n. 6, 993 P.2d 25, 40 n. 6 (2000).

> FN26. *See United States v. Harvey,* 756 F.2d 636, 643 (8th Cir.1985) (upholding denial of appellants' request that witnesses view a particular lineup because government has no obligation to create potentially exculpatory evidence where none exists).

Next, Evans claims that the State failed to inform him of statements made by several witnesses before trial which varied from their trial testimony. This claim is belied by the record for the most part, and Evans's general allegations fail to identify any significant inconsistencies.

Evans's claims of *Brady* violations did not warrant an evidentiary hearing, and his alternative claims of ineffective assistance of counsel similarly fail to sufficiently allege either deficient performance or prejudice.

*Failing to challenge the State's elicitation of evidence that witnesses were fearful*

Evans contends his counsel were ineffective in failing to challenge evidence elicited by the State that

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

28 P.3d 498
117 Nev. 609, 28 P.3d 498
**(Cite as: 117 Nev. 609, 28 P.3d 498)**

Page 25

five witnesses were fearful.

[24][25] Tina Jackson testified that she was reluctant to cooperate with prosecutors because Evans had threatened her twice and she feared him. Shirannah Rice testified that she did not contact police when Evans first told her about the murders because she was afraid he could harm her or her family members. Rice's mother testified that she feared someone might harm her daughter for cooperating with police; however, she feared gang activity, not Evans. Joseph Salley testified that he was nervous and afraid *628 to be a witness. And Gregory Robertson, an inmate, testified that he was concerned about his safety because he was considered a snitch.

Evans cites *Lay v. State,* where this court adopted from federal courts the holding that "the prosecution's references to, or implications of, witness intimidation by a defendant are reversible error unless the prosecutor also produces substantial credible evidence that the defendant was the source of the intimidation." [FN27] In *Lay,* the references to witness intimidation were not direct references to intimidation or threats by Lay.[FN28] Most referred to fears that Lay's fellow gang members might retaliate against witnesses.[FN29] Although most of the references were irrelevant to the case, the court concluded they were not misconduct requiring reversal.[FN30] Questions about reluctance and fright were relevant to one witness whom the defense impeached with his prior statement to police that he could not identify the shooter.[FN31]

> FN27. 110 Nev. 1189, 1193, 886 P.2d 448, 450-51 (1994).

> FN28. *Id.* at 1193-94, 886 P.2d at 451.

> FN29. *Id.* at 1194, 886 P.2d at 451.

> FN30. *Id.*

> FN31. *Id.*

Evans also relies on NRS 48.045(2), which prohib-

its evidence of collateral acts as proof of a person's character but allows such evidence to prove motive, opportunity, or other relevant issues. Before admitting collateral-act evidence, the district court must determine outside the presence of the jury that: **512 the act is relevant to the crime charged; it is proven by clear and convincing evidence; and the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice.[FN32]

> FN32. *Tinch v. State,* 113 Nev. 1170, 1176, 946 P.2d 1061, 1064-65 (1997).

We conclude that no error occurred in admitting Jackson's testimony. First, her testimony provided substantial credible evidence under *Lay* that Evans threatened her. Second, we consider NRS 48.045(2) to be inapposite. Evidence that after a crime a defendant threatened a witness with violence is directly relevant to the question of guilt.[FN33] Therefore, evidence of such a threat is neither irrelevant character evidence nor evidence of collateral acts requiring a hearing before its admission.[FN34]

> FN33. *Abram v. State,* 95 Nev. 352, 356-57, 594 P.2d 1143, 1145 (1979).

> FN34. *Cf. Salgado v. State,* 114 Nev. 1039, 1042, 968 P.2d 324, 326 (1998).

The testimony of the other four witnesses regarding their fears was improper because it was irrelevant. The State asserts that the testimony was relevant because it explained why they did not contact police sooner and why there were minor inconsistencies in their statements. This assertion is unpersuasive: the State offers no authority, no reference to the record, and no analysis to support*629 it. It appears that the State initiated every inquiry into delay and reluctance on the part of the witnesses; therefore, such inquiry was not relevant to rebut any impeachment by the defense in this area.

[26] Not all the testimony was equally critical, however. Rice's mother expressly disclaimed any fear of Evans, and Robertson only referred to the

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

general risk of retaliation from other inmates. We perceive no prejudice to Evans by their expressions of fear.

[27] The source of Salley's fear remained unspecified, dampening but not wholly avoiding potential prejudice to Evans: jurors could have assumed Salley felt threatened by Evans and/or Richard Powell and Everett Flowers, whose conversation he testified to. And as noted, Rice explicitly stated her fear of Evans. Therefore, the evidence that Salley and Rice were afraid was potentially prejudicial to Evans, but we conclude that under *Lay* it was not reversible misconduct. In particular, we note that trial counsel seriously impeached Rice's allegation of fear by revealing on cross-examination that she continued to live with Evans for some time after the murders and then kept in touch with him and professed her love for him up until shortly before the trial. Trial and appellate counsel should have challenged admission of the evidence of the witnesses' fear, but Evans has not shown a reasonable probability of a different result had they done so.

*Failing to challenge the State's bolstering of its witnesses*

Evans claims that the State improperly elicited evidence of prior consistent statements and other evidence to bolster the credibility of its witnesses and improperly vouched for its witnesses in closing argument. We conclude that some of the State's actions were improper but that counsel's failure to respond did not prejudice Evans.

[28][29][30] The State improperly elicited evidence that Shirannah Rice made telephone calls to detectives implicating Evans in the murders. A witness's prior consistent statements are inadmissible hearsay, unless offered to rebut an express or implied charge against the witness of recent fabrication or improper influence or motive.[FN35] But the evidence here was not so prejudicial that there was a reasonable probability of a different result without it.[FN36] *630 Evans also contests Alicia

Ventura's testimony about her daughter Adriana's statements, but this evidence was admissible under NRS 51.095 because Adriana's statements were excited utterances made soon after she witnessed the murders.

> FN35. *See* NRS 51.035(2)(b).

> FN36. *Cf. Patterson v. State,* 111 Nev. 1525, 1533-34, 907 P.2d 984, 989-90 (1995) (concluding that admission of prior consistent statements was harmless error where the independent evidence of guilt rose above the minimal).

**513** [31] The prosecutor elicited other evidence to bolster the credibility of several witnesses, but nearly all of this evidence was elicited after the defense had attacked the witnesses' veracity or competency. The State may counter impeachment of its witnesses by presenting evidence supporting their credibility.[FN37] Evans cites a small amount of evidence that may have bolstered Rice's credibility before the defense impeached her veracity. Assuming the evidence was improper, we conclude it had no effect on the trial's outcome.

> FN37. *Cf. Barrett v. State,* 105 Nev. 356, 359, 776 P.2d 538, 539-40 (1989) (where defendant attacked character of State's witness, State was entitled to present opinion testimony that witness was truthful).

[32][33] During the rebuttal closing argument, the prosecutor defended the police investigation and praised Rice, Tina Jackson, and Joseph Salley for testifying despite facing risks and receiving no benefits. Evans complains that this constituted improper vouching for the credibility of these witnesses. We disagree. The prosecution may not vouch for the credibility of a witness either by placing the prestige of the government behind the witness or by indicating that information not presented to the jury supports the witness's testimony.[FN38] Here, defense counsel in closing argument extensively challenged the quality of the police investiga-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

tion in this case and the credibility of the State's witnesses. The prosecutor's remarks were a reasonable response to this challenge. He did not suggest that there was unpresented evidence to support the witnesses' testimony, nor did he place the prestige of his office behind the witnesses.

> FN38. *Lisle v. State,* 113 Nev. 540, 553, 937 P.2d 473, 481 (1997), *clarified on other grounds by* 114 Nev. 221, 954 P.2d 744 (1998).

*Failing to challenge prosecutorial misconduct during closing argument in the guilt phase*

Evans alleges that four instances of prosecutorial misconduct occurred during closing argument in the guilt phase and that his counsel were ineffective in failing to challenge them.

[34][35] First, in responding to defense counsel's argument that Anthony Collins or other persons might have committed the murders, the prosecutor asked, "where's the evidence?" Evans claims this *631 improperly shifted the burden of proof to the defense. Generally, prosecutorial comment on the failure of the defense to present witnesses or evidence impermissibly shifts the burden of proof.[FN39] However, this court held that a prosecutor was justified in commenting on a defendant's failure to call a person to testify where the defendant had "injected [the person] into the testimony as an alibi witness." [FN40] The Ninth Circuit has held that as long as a prosecutor's remarks do not call attention to a defendant's failure to testify, it is permissible to comment on the failure of the defense to counter or explain evidence presented.[FN41] Here, Evans injected the theory that someone else had committed the murders, and the prosecutor's remarks did not call attention to Evans's failure to testify. Therefore, the prosecutor could properly argue that the defense failed to substantiate its theory with supporting evidence.

> FN39. *Whitney v. State,* 112 Nev. 499, 502, 915 P.2d 881, 883 (1996).

> FN40. *Colley v. State,* 98 Nev. 14, 16, 639 P.2d 530, 532 (1982).

> FN41. *U.S. v. Lopez-Alvarez,* 970 F.2d 583, 596 (9th Cir.1992).

[36] Second, in discussing the definition of reasonable doubt as a doubt which would govern a person "in the more weighty affairs of life," [FN42] the prosecutor said such affairs included choosing a spouse, a college, or an occupation. Defense counsel had argued that weighty affairs of life could include deciding whether to end life support for a badly injured child or parent, and the district court concluded that the prosecutor's assertion was a permissible response.

> FN42. *See*NRS 175.211(1).

[37][38][39][40] Defense counsel's remarks were improper, but did not justify the prosecutor's mischaracterization of reasonable doubt. **514 This court has repeatedly cautioned the district courts and attorneys not to attempt to quantify, supplement, or clarify the statutorily prescribed standard for reasonable doubt.[FN43] In *Holmes v. State*[FN44] and *Quillen v. State,*[FN45] this court specifically held that it is improper to compare reasonable doubt to decisions such as choosing a spouse, buying a house, or changing jobs. The prosecutor's remedy was to object to defense counsel's remarks as impermissible elaboration on the definition of reasonable doubt, not to commit the same error in response. The error was harmless, however, because the jury received the proper written instruction on reasonable*632 doubt.[FN46] We again caution the defense bar and prosecutors alike not to explain, elaborate on, or offer analogies or examples based on the statutory definition of reasonable doubt. Counsel may argue that evidence and theories in the case before the jury either amount to or fall short of that definition-nothing more.

> FN43. *See, e.g., Holmes v. State,* 114 Nev. 1357, 1366, 972 P.2d 337, 342-43 (1998).

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

FN44. *Id.*

FN45. 112 Nev. 1369, 1382-83, 929 P.2d 893, 902 (1996).

FN46. *See id.* at 1383, 929 P.2d at 902.

Third, in responding to defense counsel's argument that police failed to properly investigate the role of Everett Flowers in the crimes, the prosecutor conceded Flowers's possible involvement, referred to the large homicide file, and stated that the investigation was ongoing. Evans now complains that these remarks argued facts not in evidence. This complaint is frivolous: the facts supported Evans's own strategy of accusing Flowers of the murder and certainly did not prejudice Evans.

[41] Fourth, Evans complains that the prosecution made improper remarks, including that he was an "evil magnet." We conclude that the remarks were not improperly inflammatory and did not disparage legitimate defense tactics.[FN47]

FN47. *See Jones v. State,* 113 Nev. 454, 469, 937 P.2d 55, 65 (1997); *Williams v. State,* 103 Nev. 106, 109-10, 734 P.2d 700, 702-03 (1987).

*Failing to challenge prosecutorial misconduct during closing argument in the penalty phase*

Evans contends that his counsel failed to respond effectively to prosecutorial misconduct during closing argument in the penalty phase. We agree that some of the prosecutor's remarks were erroneous and prejudicial.

[42][43][44] First, the prosecutor made a number of comments that Evans says expressed personal opinion and lacked factual support. The prosecutor offered his view that the penalty hearing was not a rehabilitation hearing and asserted that its purposes were retribution and deterrence of Evans and others. He argued that when a person kills four people in a systematic way as in this case, "in my view,

based upon this evidence, such a person has forfeited the right to continue to live." He also asked when the death penalty could be appropriate if not this case. We perceive no error in these remarks. A prosecutor in a penalty phase hearing may discuss general theories of penology, such as the merits of punishment, deterrence, and the death penalty.[FN48] And statements indicative of opinion, belief, or knowledge are unobjectionable *633 when made as a conclusion from the evidence introduced at trial.[FN49]

FN48. *Jimenez v. State,* 106 Nev. 769, 772, 801 P.2d 1366, 1368 (1990).

FN49. *Parker v. State,* 109 Nev. 383, 392, 849 P.2d 1062, 1068 (1993).

[45] The prosecutor also deplored "an era of mindless, indiscriminate violence" perpetrated by persons who "believe they're a law unto themselves." He argued that Evans "is one of these persons. This is his judgment day." Federal courts have held that it is improper for a prosecutor to urge the jury to convict in order to solve a social problem.[FN50] This court has similarly condemned comments in the penalty phase of a **515 murder prosecution that diverted jurors' attention from their correct task, "which is the determination of the proper sentence for the defendant before them, based upon his own past conduct." [FN51] The remarks here inappropriately invoked circumstances beyond the case at hand, but we believe that they were not extreme and did not, standing alone, divert the jury from its proper task of sentencing Evans for his own crimes.

FN50. *See, e.g., U.S. v. Leon-Reyes,* 177 F.3d 816, 822-23 (9th Cir.1999); *U.S. v. Tulk,* 171 F.3d 596, 599-600 (8th Cir.1999).

FN51. *Collier v. State,* 101 Nev. 473, 478, 705 P.2d 1126, 1129 (1985), *modified on other grounds by Howard v. State,* 106 Nev. 713, 719, 800 P.2d 175, 178 (1990).

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

28 P.3d 498
117 Nev. 609, 28 P.3d 498
**(Cite as: 117 Nev. 609, 28 P.3d 498)**

Page 29

[46] Other prosecutorial remarks were excessive and unacceptable and should have been challenged at trial and on direct appeal. In rebuttal closing, the prosecutor asked, "do you as a jury have the resolve, the determination, the courage, the intestinal fortitude, the sense of commitment to do your legal duty?" Asking the jury if it had the "intestinal fortitude" to do its "legal duty" was highly improper.[FN52] The United States Supreme Court held that a prosecutor erred in trying "to exhort the jury to 'do its job'; that kind of pressure ... has no place in the administration of criminal justice."[FN53] "There should be no suggestion that a jury has a duty to decide one way or the other; such an appeal is designed to stir passion and can only distract a jury from its actual duty: impartiality."[FN54] The prosecutor's words here–"resolve," "determination," "courage," "intestinal fortitude," "commitment," *634 "duty"-were particularly designed to stir the jury's passion and appeal to partiality.

> FN52. Although this court noted a similar argument in *Castillo v. State,* 114 Nev. 271, 279-80, 956 P.2d 103, 109.*corrected by McKenna v. State,* 114 Nev. 1044, 1058 n. 4, 968 P.2d 739, 748 n. 4 (1998), it addressed only the prosecutor's argument on future dangerousness, not the reference to the jury's "duty."

> FN53. *United States v. Young,* 470 U.S. 1, 18, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985).

> FN54. *United States v. Mandelbaum,* 803 F.2d 42, 44 (1st Cir.1986).

[47] The question is whether the prosecutor's improper remarks prejudiced Evans by depriving him of a fair penalty hearing.[FN55] Again, considered alone, perhaps they did not, but the prosecutor erred further. Commenting on penalty phase evidence that Evans was involved in cocaine trafficking and convicted of leaving the scene of a car accident, the prosecutor told the jury:

> FN55. *See Jones,* 113 Nev. at 469, 937 P.2d at 65.

Ms. Erickson argues that you can't consider or discuss that evidence unless you find that aggravating circumstances had been proven beyond a reasonable doubt. And it may be a semantical thing again, but regardless of the punishment you select, it doesn't seem inappropriate to have all the information you can get about the character of a defendant. *I just take issue with the remark that you have to wait until a certain point in the deliberation to consider* that someone has two prior felony convictions, and that he made his living by selling poison. It seems to me regardless of the punishment that ought to be a factor, as reasonable men and women, that you can consider.

(Emphasis added.) This argument was absolutely incorrect.

[48] To determine that a death sentence is warranted, a jury considers three types of evidence: "evidence relating to aggravating circumstances, mitigating circumstances, and 'any other matter which the court deems relevant to sentence.' "[FN56] The evidence at issue here was the third type, "other matter" evidence. In deciding whether to return a death sentence, the jury can consider such evidence only after finding the defendant death-eligible, *i.e.,* after it has found unanimously at least one enumerated aggravator and each juror has found that any mitigators do not outweigh the aggravators.[FN57] Of course, if the jury decides that death is not appropriate, it can still consider "other matter" evidence in deciding on another sentence.[FN58]

> FN56. *Holloway v. State,* 116 Nev. 732, 745, 6 P.3d 987, 996 (2000) (quoting NRS 175.552(3)).

> FN57. *Id.* at 746, 6 P.3d at 997.

> FN58. *Middleton v. State,* 114 Nev. 1089, 1117 n. 9, 968 P.2d 296, 315 n. 9 (1998).

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

**\*\*516** The State contends that the prosecutor was simply amending a statement by defense counsel, who told the jurors that they could not consider the "other matter" evidence introduced by the prosecution**\*635** unless they first found an aggravating circumstance. The State maintains that the prosecutor's argument was therefore proper. We disagree. Defense counsel's argument was incomplete in that she did not tell the jurors that they could also consider the other evidence if they decided that death was not an appropriate sentence.[FN59] However, even if we assume that the prosecutor's improper argument was an attempt to cure the omission, it failed to do so. Instead, it incorrectly informed the jurors that they did not "have to wait until a certain point in the deliberation" to consider the other evidence. This was incorrect and in no way remedied defense counsel's incomplete argument.

> FN59. Defense counsel also incorrectly told the jurors that they could consider the other evidence once they found an aggravating circumstance. Actually, jurors are not to consider such other evidence until after each has weighed any mitigating circumstances against the aggravating circumstances. This misstatement, of course, did not prejudice the State.

Nor does it appear that defense counsel was trying to mislead the jury or somehow gain an unfair advantage when she failed to address the use of "other matter" evidence in the event that the jury rejected death and considered a lesser sentence. She was understandably concerned with the possibility of a death sentence and wished to prevent the other evidence from improperly influencing the jury's finding of statutory aggravating circumstances. Her argument was correct in that regard, as was her concern-the jury returned a death sentence and never reached the stage of considering sentences less than death. Of course, if the prosecutor was concerned that the jury might reach that stage, he had a right to inform the jury of the omission in the defense argument; instead, however, he made an in-

correct argument that introduced affirmative error.

The State also asserts that the jury received proper written instructions. The instructions were accurate as far as they went but did not explain the restricted use of "other matter" evidence. Thus, they did not cure the error introduced by the incorrect argument.[FN60]

> FN60. *Cf. Emmons v. State,* 107 Nev. 53, 60, 807 P.2d 718, 722 (1991) (holding that prosecutor's deliberate solicitation of improper remark was not cured by unspecific instruction cautioning jury to disregard evidence to which objection had been sustained), *overruled on other grounds by Harte v. State,* 116 Nev. 1054, 13 P.3d 420 (2000).

[49][50][51][52][53][54][55][56][57][58]  For future capital cases, we provide the following instruction to guide the jury's consideration of evidence at the penalty hearing:

> In deciding on an appropriate sentence for the defendant, you will consider three types of evidence: evidence relevant **\*636** to the existence of aggravating circumstances, evidence relevant to the existence of mitigating circumstances, and other evidence presented against the defendant. You must consider each type of evidence for its appropriate purposes.

> In determining unanimously whether any aggravating circumstance has been proven beyond a reasonable doubt, you are to consider only evidence relevant to that aggravating circumstance. You are not to consider other evidence against the defendant.

> In determining individually whether any mitigating circumstance exists, you are to consider only evidence relevant to that mitigating circumstance. You are not to consider other evidence presented against the defendant.

> In determining individually whether any mitigat-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

ing circumstances outweigh any aggravating circumstances, you are to consider only evidence relevant to any mitigating and aggravating circumstances. You are not to consider other evidence presented against the defendant.

If you find unanimously and beyond a reasonable doubt that at least one aggravating circumstance exists and each of you determines that any mitigating circumstances do not outweigh the aggravating, the defendant is eligible for a death sentence. At this point, you are to consider all three types of evidence, and you still **517** have the discretion to impose a sentence less than death. You must decide on a sentence unanimously.

If you do not decide unanimously that at least one aggravating circumstance has been proven beyond a reasonable doubt or if at least one of you determines that the mitigating circumstances outweigh the aggravating, the defendant is not eligible for a death sentence. Upon determining that the defendant is not eligible for death, you are to consider all three types of evidence in determining a sentence other than death, and you must decide on such a sentence unanimously.

[59] In this case, we conclude that Evans's trial and appellate counsel were deficient in not challenging the prosecutor's improper argument, and we conclude that Evans was prejudiced as a result. This court has recognized the heightened need for reliability in capital cases and the "tremendous risk that improperly admitted character evidence will influence a jury in setting a punishment for a convicted defendant. This risk is unacceptably high when the defendant has been convicted of murder and faces the death penalty." [FN61] Although the evidence here was not improperly admitted,**637** the prosecutor directed the jury to consider it improperly to determine death eligibility.

FN61. *Flanagan v. State,* 112 Nev. 1409, 1419, 930 P.2d 691, 697 (1996).

[60] The Supreme Court has held that the Constitu-

tion requires a capital sentencing process to "'genuinely narrow the class of persons eligible for the death penalty.'" [FN62] A sentencing scheme must direct and limit the sentencer's discretion to minimize the risk of arbitrary and capricious action.[FN63] It must provide a principled basis for the sentencer to distinguish defendants who deserve capital punishment from those who do not.[FN64] In Nevada, the finding of enumerated aggravators is essential to this narrowing function, and so is the weighing of such aggravators against any mitigating evidence. If the jurors relied prematurely on "other matter" evidence to find or give weight to enumerated aggravators, then the narrowing contemplated by the Nevada statutes and required by the federal Constitution did not occur.[FN65] A new penalty hearing is therefore required.

FN62. *See Arave v. Creech,* 507 U.S. 463, 474, 113 S.Ct. 1534, 123 L.Ed.2d 188 (1993) (quoting *Zant v. Stephens,* 462 U.S. 862, 877, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983)).

FN63. *Id.* at 470, 113 S.Ct. 1534.

FN64. *Id.* at 474, 113 S.Ct. 1534.

FN65. *See Hollaway,* 116 Nev. at 746, 6 P.3d at 997; *Middleton,* 114 Nev. at 1116-17, 968 P.2d at 314-15.

*Failing to respond properly to the midtrial disclosure of an incriminating letter written by appellant*

[61] During the trial the prosecutor provided the defense with a copy of a letter to Shirannah Rice written by Evans. In the letter Evans asked Rice to change her testimony to help him in this case. Defense counsel learned of the letter after they had begun to cross-examine Rice. Rice had given the letter to the prosecutor that morning, the prosecutor did not read it until lunch hour, and then he provided it to the defense. Defense counsel moved for a complete continuance of the trial until the next morning or at least the continuance of Rice's cross-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

28 P.3d 498
117 Nev. 609, 28 P.3d 498
(Cite as: 117 Nev. 609, 28 P.3d 498)

examination and any testimony by Alicia and Adriana Ventura until the next day. The district court granted the latter remedy, and other witnesses testified that afternoon.

Evans claims that the district court abused its discretion in not continuing the trial for the afternoon and that he was prejudiced because concern about the letter distracted his counsel's attention from effectively cross-examining the State's witnesses that afternoon and Alicia and Adriana Ventura the next day. He also claims that his trial counsel were ineffective in failing to convince the **638 court to exclude the evidence. Evans's claim that he was prejudiced remains conclusory; he does not specify how the cross-examination of any witnesses was inadequate. Moreover, the evidence was properly admitted.

[62] NRS 174.295(1) provides that if a party discovers additional material during **518 trial which is subject to discovery, it shall promptly notify the other party or the court of the existence of the material. NRS 174.295(2) provides that if a party fails to comply with discovery provisions, the court may order the discovery of the undisclosed material, prohibit its introduction into evidence, grant a continuance, or "enter such other order as it deems just under the circumstances." The district court has broad discretion in fashioning a remedy under this statute; it does not abuse its discretion absent a showing that the State acted in bad faith or that the nondisclosure caused substantial prejudice to the defendant which was not alleviated by the court's order.[FN66]

FN66. *Langford v. State,* 95 Nev. 631, 635, 600 P.2d 231, 234-35 (1979).

Evans implies that the State may have acted in bad faith: he argues that there is no evidence that the prosecutor did not already know about the letter before it came into his possession. We discern no support for this speculation. Evans also asserts that the letter was a written statement by Evans that was not disclosed to him in violation of NRS 174.235.[FN67]

Assuming that this statute applies here, we conclude that it was complied with.

FN67. NRS 174.235(1) provides in part:

[A]t the request of a defendant, the prosecuting attorney shall permit the defendant to inspect and to copy or photograph any:

(a) Written or recorded statements or confessions made by the defendant, ... within the possession, custody or control of the state, the existence of which is known, or by the exercise of due diligence may become known, to the prosecuting attorney[.]

The record indicates the prosecutor disclosed the letter to the defense as soon as he learned its significance; therefore, no discovery violation occurred. And, despite the unavoidably late disclosure of the letter, no substantial prejudice resulted. The district court provided an appropriate remedy by postponing the cross-examination of the letter's recipient and the testimony of two other key witnesses.

*Failing to adequately impeach the testimony of two witnesses*

Evans claims that his trial counsel failed to investigate Joseph Salley and Alicia Ventura and thus to fully impeach their testimony.

We perceive no prejudicial deficiency in trial counsel's cross-examination of Ventura. In fact, the record shows that Ventura testified*639 to most of the facts which Evans claims his counsel failed to elicit.

[63] Evans complains that his counsel failed to impeach Salley with two felony convictions-grand theft in California and attempted possession of a stolen vehicle in Nevada-and the fact that he lied to police about his identity on numerous occasions. Evans also claims that Salley's criminal history

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

could have been used to establish that he expected to receive benefits from the police in return for his cooperation in this case and to contradict the time period he gave for speaking to Evans. The "time period" claim remains conclusory and unsupported by specific factual allegations, but we conclude that trial counsel were deficient in not impeaching Salley with his criminal history, although counsel did confront Salley forcefully with inconsistencies between his testimony and a prior statement.

[64] The question is whether there was a reasonable probability of a different result if such impeachment had occurred. Salley's testimony-that Evans made two incriminating admissions regarding the murders-was significant, and jurors might have discounted it if they knew he was a felon or suspected he had benefited from testifying. On the other hand, Shirannah Rice and Tina Jackson also testified that Evans made incriminating admissions about the murders. Therefore, we conclude that even if jurors had given Salley's testimony little or no weight, a different result was not reasonably probable.

*Not introducing evidence at the penalty phase of a federal sentence received by a suspect in the murders*

[65] Evans contends that his trial counsel were ineffective for not introducing evidence at the penalty phase that a federal court found that the prosecution failed to prove that Richard Powell was involved in the murders. The doctrine of the law of the case **519 precludes reconsidering this issue.FN68 On direct appeal this court concluded that the evidence was not admissible: "The final decision reached by the federal court with respect to Powell in no way relates to Evans' relative culpability." FN69

FN68. *See Pertgen,* 110 Nev. at 557-58, 875 P.2d at 363.

FN69. *Evans,* 112 Nev. at 1199, 926 P.2d at 282-83.

[66] Evans says that this conclusion was wrong be-

cause in *Flanagan v. State* this court stated that "it was proper and helpful for the *640 jury to consider the punishments imposed on the co-defendants." FN70 *Flanagan* is distinguishable, however, because it involved codefendants all convicted in state court of murder or manslaughter in regard to the same homicides.FN71 Powell's conviction was in federal court for drug trafficking, not for the murders of which Evans was convicted.FN72

FN70. 107 Nev. 243, 248, 810 P.2d 759, 762 (1991), *vacated on other grounds,* 503 U.S. 930, 931, 112 S.Ct. 1463, 1464, 117 L.Ed.2d 609, 610 (1992).

FN71. *See id.* at 251, 810 P.2d 759 (Rose, J., concurring).

FN72. *See Evans,* 112 Nev. at 1198 n. 25, 926 P.2d at 282 n. 25. In fact, Powell was recently convicted in the Eighth Judicial District Court of four counts of first-degree murder for the murders in this case. He did not receive a death sentence. He has appealed to this court in Docket No. 37374.

*Failing to challenge the information for being vague*

[67] Evans complains that the criminal information alleged that he aided and abetted in committing the four murders without specifying how. The information charged that Evans did

wilfully, feloniously, without authority of law and with malice aforethought and premeditation and/or while in the commission of a burglary, kill [each victim], by shooting into her [or his] body with a deadly weapon, to-wit: a firearm, said Defendant acting in concert with and aiding or abetting another person or other persons in the commission of said crime.

An information "must be a plain, concise and definite written statement of the essential facts constituting the offense charged." FN73 It must either spe-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

cify the means by which a charged offense was accomplished or allege that the means are unknown.[FN74] Citing constitutional due process, this court has held that

> FN73. NRS 173.075(1).

> FN74. NRS 173.075(2).

where the prosecution seeks to establish a defendant's guilt on a theory of aiding and abetting, the indictment should specifically allege the defendant aided and abetted, and should provide additional information as to the specific acts constituting the means of the aiding and abetting so as to afford the defendant adequate notice to prepare his defense.[FN75]

> FN75. *Barren v. State,* 99 Nev. 661, 668, 669 P.2d 725, 729 (1983).

[68] The information did not allege any specific acts in regard to aiding and abetting. Thus Evans is correct that the information failed to give him adequate notice of the State's theory of aiding *641 and abetting. However, he must also show that he was prejudiced as a result: "Where a defendant has not been prejudiced by the charging instrument's inadequacy the conviction will not be reversed." [FN76]

> FN76. *Koza v. State,* 104 Nev. 262, 264, 756 P.2d 1184, 1186 (1988).

Evans claims that the State varied its theory of the case "according to the whims of its witnesses," but he fails to substantiate this claim with citations to the record. It appears that the State's basic theory of the case did not vary: it alleged that Evans let another man into the victims' apartment, and the two, acting together, shot the four victims to death. We conclude that Evans has demonstrated no prejudice due to the vagueness of the information.

*Not arguing that this court fails to conduct fair and adequate appellate review*

Evans asserts that this court fails "to conduct fair and adequate appellate review in **520 capital cases generally and in this case specifically." He contends that the court's caseload is so heavy that the justices cannot meaningfully review cases and must rely on staff. Evans further asserts:

> This Court has treated death penalty cases differently from other criminal cases. In enacting [SCR] 250, the Court has created a climate in which death penalty cases are singled out for a more expedited review process, in which capital cases receive fewer attorney resources, fewer appellate court staff resources and less time for preparation than other cases on the court's docket.

He also asserts that this court's review is "limited to reviewing bench memoranda prepared by recent law school graduates." Evans claims that his appellate counsel was ineffective in not making these allegations.

[69] The district court concluded that it lacked jurisdiction to review these allegations. Evans maintains that he simply raised a factual claim which the district court may rule on. We conclude that the district court correctly declined to review or adjudicate these claims. In effect, Evans asked the district court to exercise supervisory and appellate review over the functioning and decisions of this court, in contravention of the order of our judicial system. This court "possesses inherent power to prescribe rules necessary or desirable to handle the judicial functioning of the courts" and is charged with the governance of the district courts, not vice *642 versa.[FN77] AS FOR THE SUBSTANCe of evans's allegationS, we conclude that they lack any merit.

> FN77. *State v. Dist. Ct.,* 116 Nev. 953, 963, 11 P.3d 1209, 1215 (2000); NRS 2.120; *see also*Nev. Const. art. 6, § 6 (limiting the appellate jurisdiction of the district courts to "cases arising in Justices Courts and such other inferior tribunals").

This court does, of course, treat cases involving the

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

death penalty differently from other cases-as required by federal constitutional law. However, this different treatment does not entail less time or fewer resources for review of capital cases. On the contrary, SCR 250 and the internal policies of this court ensure that such cases receive extra resources and heightened scrutiny. For example, SCR 250(6)(c) requires that the entire district court record be sent to this court in every direct capital appeal, while in other appeals we require the parties to omit unessential materials from the record and compile and submit an appendix.[FN78] We try to ensure that capital defendants and appellants receive competent representation by requiring appointed counsel in capital cases to be qualified pursuant to criteria set forth in SCR 250(2). The briefing schedule in capital cases is not rushed as well. SCR 250(6)(e) and (7)(d) provide for a 60-day extension of time to file a brief in any capital appeal upon a showing of good cause, and capital appellants routinely seek and receive such extensions. In fact, in this case Evans sought and received an extension of 60 days to file his opening brief; he later filed an untimely motion for an extension of time to file his reply brief, which we also granted. In addition, this court permitted Evans to file an opening brief of 120 pages and a reply brief of 54 pages, far in excess of the normal 30-page limit for briefs prescribed by NRAP 28(g). All of this contradicts Evans's allegations.

> FN78. *See* NRAP 10(b) and 30.

Further, a recent law school graduate working as a law clerk in chambers could indeed have prepared the initial memo dealing with Evans's direct appeal in 1996, but our review of any case before us has never been limited to reading memos by our staff. A law clerk responsible for analyzing any case receives guidance and scrutiny from the law clerk's justice as well as from other justices and experienced attorneys on this court's central staff. Moreover, for the past few years this court has assigned all capital cases for analysis and recommendation to a team of central staff attorneys with

experience and expertise in death penalty jurisprudence. In any case before us, each justice of this court freely consults any and all parts of the parties' briefs and the record, and we discuss cases directly with the staff attorney or law clerk to whom a case is assigned. We also hear oral argument in nearly all, if not all, direct appeals of capital convictions.

**\*\*521 \*643** All these facts and considerations belie the charge that this court inadequately reviews capital cases or devotes less time and fewer resources to them than to other criminal cases, and in fact the opposite is true.

*The instruction on deliberation and premeditation (and the limited holding in Lozada v. State)*

Evans's counsel argued at trial and on direct appeal that the jury instruction on deliberation and premeditation was erroneous.[FN79] Nevertheless, Evans asserts that his counsel did not fully and competently address the issue. He also asserts that this court erred in deciding the issue on direct appeal and that this error constitutes good cause under *Lozada v. State*[FN80] to raise the issue again in a habeas petition.

> FN79. *See Evans,* 112 Nev. at 1191-92 & n. 22, 926 P.2d at 278 & n. 22.

> FN80. 110 Nev. 349, 871 P.2d 944 (1994).

The jury in this case received the *Kazalyn v. State,* 108 Nev. 67, 825 P.2d 578 (1992) instruction on premeditation and deliberation, which this court recently abandoned in *Byford v. State.*[FN81] Evans does not explain how his counsel were deficient in challenging the jury instruction. Thus this claim lacks specific allegations that if true would warrant relief.

> FN81. 116 Nev. 215, 233-37, 994 P.2d 700, 712-14, *cert. denied,* 531 U.S. 1016, 121 S.Ct. 576, 148 L.Ed.2d 493 (2000).

[70] Evans simply argues that under *Byford* the use

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

of the *Kazalyn* instruction was error and that this court is wrong to refuse to apply *Byford* retroactively. We have held that "with convictions predating *Byford,* neither the use of the *Kazalyn* instruction nor the failure to give instructions equivalent to those set forth in *Byford* provides grounds for relief." [FN82] *Byford* was decided after Evans was convicted and therefore provides him no relief. Relying on *Byford,* Evans also faults his counsel for failing to challenge the constitutionality of Nevada's death penalty scheme as providing at the time of his trial no meaningful distinction between first-and second-degree murder. This is simply the same issue in different clothing, and we reject it.

> FN82. *Garner v. State,* 116 Nev. 770, 789, 6 P.3d 1013, 1025 (2000), *cert. denied,* 532 U.S. 929, 121 S.Ct. 1376, 149 L.Ed.2d 302 (2001).

Incidentally, we note that the proof here that the murders were deliberate and premeditated was ample: the evidence shows that Evans and Powell planned to murder Scotti and that after Evans arrived at the apartment he considered his actions and determined to kill the other adult occupants as well.

[71][72] Evans also tries to extend our decision in *Lozada* inappropriately *644 as authority to circumvent the doctrine of the law of the case. In his briefs, he repeatedly argues that this court erred on direct appeal and therefore good cause exists under *Lozada* to overcome habeas procedural bars. In *Lozada,* this court held that its own error in rejecting a claim of ineffective assistance of counsel in an earlier habeas petition "constitutes an external force which excuses the filing of a successive petition." [FN83] However, this court recognized its error not because it abandoned the doctrine of the law of the case and reconsidered its decision at Lozada's urging. Rather, it did so because the federal courts, in considering Lozada's federal habeas petition, ruled in his favor and contrary to this court's earlier decision. [FN84] Thus, *Lozada* is limited by its facts and does not provide a general license to question this court's holdings: unless a federal court con-

cludes that a determination by this court is erroneous, *Lozada* is inapplicable, and the parties and district court should respect the law of the case as pronounced by this court.

> FN83. 110 Nev. at 357-58, 871 P.2d at 949.

> FN84. *Id.* at 351-52, 871 P.2d at 945.

*Other claims of ineffective assistance of counsel*

After considering the following claims of ineffective assistance of counsel, we conclude that they warrant no relief.

Evans claims that his trial counsel were deficient in failing to file numerous pretrial **522 motions. He provides no supporting argument, so the claims warrant no discussion. [FN85] He also improperly relies in part on reference to his habeas petition. [FN86]

> FN85. *See Byford,* 116 Nev. at 225, 994 P.2d at 707 (this court need not address issues unsupported by cogent argument).

> FN86. *See* NRAP 28(e) (a brief to this court cannot incorporate by reference briefs or memoranda filed in district court).

Evans asserts that his trial counsel did not conduct adequate pretrial investigation and were thus unprepared to cross-examine some witnesses or call others. His claims remain vague, failing to include specific factual allegations that, if true, establish prejudice.

[73] Evans asserts that his counsel were ineffective under *Morgan v. Illinois* [FN87] in not asking potential jurors whether they would always impose the death penalty on a defendant convicted of first-degree murder. Here, unlike in *Morgan,* potential jurors filled out a questionnaire asking that question, and the district court excused any who answered that they would. Therefore, we conclude that Evans has not shown that he was prejudiced.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

28 P.3d 498
117 Nev. 609, 28 P.3d 498
(Cite as: 117 Nev. 609, 28 P.3d 498)

FN87. 504 U.S. 719, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992).

**\*645** Evans complains that his counsel did not challenge a number of bench and in-chambers conferences which were not recorded and took place without his presence. He maintains that at these conferences the district court took substantive actions that violated his constitutional rights. He goes so far as to claim that the district court "refused to allow portions of the trial to be recorded." He fails to substantiate this irresponsible claim in any way. We remind the district courts and attorneys that capital proceedings should be fully reported and transcribed.[FN88] But we conclude that Evans presents absolutely no basis for this court to fear that a substantial or significant portion of the record was omitted or that he has been prejudiced in any way. Evans argues that it is impossible for him to show that the "secret proceedings" were prejudicial precisely because they were unrecorded. However, he has done nothing to support his vague accusations of wrongdoing and prejudice with any discussion of the record or a single affidavit.

FN88. *See* SCR 250(5)(a).

[74] Evans asserts that his trial counsel were ineffective because they elicited testimony that he was an ex-felon. It appears that counsel delved into this information based on tactical decisions. Assuming the decisions were not reasonable, we conclude that the information was not prejudicial.[FN89]

FN89. *Cf. Brown v. State,* 114 Nev. 1118, 1126, 967 P.2d 1126, 1131 (1998) (concluding that joinder of charges that revealed that the defendant was an ex-felon did not have a substantial or injurious effect).

[75] Evans claims that his counsel failed to challenge the prosecutor's endorsement of witnesses and to prepare adequately for the examination of witnesses. The gist of this claim seems to be that the prosecutor's endorsement of witnesses was ex-

cessive and untimely. Evans does not specify how his counsel could have better cross-examined the State's witnesses and thus fails to show prejudice.

[76] Evans contends that his counsel should have called expert witnesses: an expert on urban social and cultural demography; an expert on law enforcement practices; and an expert on the competency of Adriana Ventura to testify. Evans fails to allege specifically what these experts could have done to make a different result reasonably probable.

Evans alleges that his counsel were ineffective because they failed to challenge the validity of a wiretap and the admissibility of wiretap evidence. Assuming that this is not simply a more detailed and precisely focused argument of an issue already **\*646** decided by this court in dismissing Evans's appeal from the denial of his motion for a new trial, his argument still warrants no relief. Wiretap evidence was not admitted at trial, and Evans does not show that the prosecution's knowledge of the evidence prejudiced him.

Evans contends that his trial counsel did not properly investigate and prepare for the **\*\*523** penalty phase. He does not identify any fact they should have discovered or any specific deficiency in the way they handled the penalty phase.

[77] Evans complains that his trial counsel failed to prepare Evans's mother and two sisters for the penalty phase so that they could provide more mitigating evidence. Evans fails to allege with any specificity what that evidence would have been.

Evans claims that his appellate counsel was ineffective in not challenging the district court's refusal to allow individual voir dire of potential jurors. We conclude that this claim has no merit. As authority Evans cites *Hovey v. Superior Court,*[FN90] but he fails to note that this California Supreme Court decision has been abrogated by statute.[FN91]

FN90. 28 Cal.3d 1, 168 Cal.Rptr. 128, 616 P.2d 1301 (1980).

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

FN91. *See Covarrubias v. Superior Court,* 60 Cal.App.4th 1168, 71 Cal.Rptr.2d 91, 92, 94 (1998).

Evans contends that his counsel were ineffective in not arguing on several grounds that Nevada's death penalty scheme is unconstitutional. On direct appeal this court determined that the aggravators found against Evans were sound, and we reject his facial challenge to the scheme.

Evans claims that his was the first capital case for both of his trial counsel and therefore that neither was qualified under SCR 250 to act as first chair at the trial. This claim deserves no consideration: Evans does not cite the record to support it, nor does he indicate specifically how he was preju- diced.

Evans contends that his appellate counsel was ineffective because she failed to file a reply brief on direct appeal to respond to errors in facts and arguments presented in the State's answering brief. He does not identify any such errors and so fails to show any prejudice.

*Waiver of an issue*

[78] A court must dismiss a habeas petition if it presents claims that either were or could have been presented in an earlier proceeding, unless the court finds both cause for failing to present the claims earlier or for raising them again and actual prejudice to the **\*647** petitioner.[FN92] Claims of ineffective assistance of counsel are properly presented in a timely, first post-conviction petition for a writ of habeas corpus. Because such a claim is generally not appropriate for review on direct appeal, the failure to raise it "on direct appeal does not constitute a waiver of the claim for purposes of post-conviction proceedings."[FN93] However, post-conviction habeas claims that are independent of ineffective assistance claims and that could have been raised on direct appeal are waived.[FN94]

FN92. NRS 34.810.

FN93. *Daniels,* 100 Nev. at 580, 688 P.2d at 316.

FN94. *See Kirksey,* 112 Nev. at 998 n. 10, 923 P.2d at 1114 n. 10.

[79] Although this is a post-conviction habeas proceeding, in his briefs to this court Evans focuses directly on perceived errors at his trial and asserts ineffective assistance of counsel in a *pro forma,* perfunctory way. Although these assertions are sometimes barely adequate to state a claim of ineffective assistance, we have dealt with the above claims as such. His opening brief also contains a section that asserts that trial counsel were ineffective "for the reasons set forth" in the issues raised in the rest of the brief. This court will not accept such conclusory, catchall attempts to assert ineffective assistance of counsel. If first-time applicants for post-conviction habeas relief fail to argue specifically that their trial or appellate counsel were ineffective in regard to an issue or to show good cause for failing to raise the issue before, that issue will not be considered, pursuant to NRS 34.810.

[80] Evans claims that jury instruction number 24, on the possible guilt of other persons, erroneously endorsed a conviction based on guilt by association. However, he alleges neither ineffective assistance in this regard nor cause for failing to raise this claim at trial or on direct appeal; therefore, it is procedurally barred. We conclude that it is also patently meritless.

**\*\*524** *Cumulative error*

[81] The cumulative effect of multiple errors may violate a defendant's constitutional right to a fair trial even though errors are harmless individually.[FN95] Evans argues that such an effect exists here.

FN95. *Byford,* 116 Nev. at 241-42, 994 P.2d at 717.

[82] Several of Evans's claims have some merit: the

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

28 P.3d 498
117 Nev. 609, 28 P.3d 498
**(Cite as: 117 Nev. 609, 28 P.3d 498)**

admission of the hearsay statement which did not fall within the co-conspirator **\*648** exception; evidence of some witnesses' fear; evidence of prior consistent statements; mischaracterization of the reasonable doubt standard; failure to impeach Joseph Salley with his criminal history; inadequate notice of aiding and abetting.

The question is: if counsel had effectively responded to these errors, was there a reasonable probability that Evans would not have been convicted of first-degree murder? We conclude that there is no such reasonable probability. Three witnesses-Shirannah Rice, Tina Jackson, and Salley-testified that Evans made incriminating admissions about the murders. Adriana saw the murderers and knew one of them as "Little Ray" or "Uncle Ray," and Ventura explained that Adriana referred to Evans this way. Finally, Evans's own letter to Rice, asking her to change her testimony, provided objective evidence consistent with Evans's guilt. Therefore, we conclude that the incriminating evidence was strong enough that the errors do not undermine confidence in the trial's result.

## CONCLUSION

We affirm the district court's order denying habeas relief insofar as it upholds Evans's conviction. The failure of Evans's trial and appellate counsel to object to the prosecutor's misstatement to jurors of how to employ evidence in the penalty phase constituted ineffective assistance of counsel. We therefore reverse the district court's order in part and vacate Evans's death sentence. We remand this case for a new penalty hearing consistent with this opinion.

YOUNG, J., SHEARING, J., AGOSTI, J., and ROSE, J., concur.MAUPIN, C.J., with whom LEAVITT, J., agrees, concurring in part and dissenting in part.
I would affirm the denial of Evans's petition for post-conviction relief in its entirety.

*Claims of prosecutorial misconduct*

A jury may consider three categories of evidence in determining whether the death penalty is warranted: "evidence relating to aggravating circumstances, mitigating circumstances, and 'any other matter which the court deems relevant to sentence.' " [FN1] The jury may not consider the third or "other" category of evidence in support of the imposition of the death penalty until it has determined "death eligibility," *i.e.*, after it has, at a minimum, unanimously found the existence of at least one statutorily enumerated **\*649** "aggravator." As the majority notes, the "other evidence" may always be considered in a determination of the three non-death penalty sentencing options. The other available penalties include life imprisonment without the possibility of parole, life imprisonment with the possibility of parole, and a fixed term of fifty years imprisonment with parole eligibility after twenty years.

> FN1. *Hollaway v. State,* 116 Nev. 732, 745, 6 P.3d 987, 996 (2000) (quoting NRS 175.552(3)).

The defense attempted to address the "other evidence" against Evans, including evidence that he had been involved in cocaine trafficking and had been convicted of leaving the scene of a car accident:

It [the "other" evidence] is evidence of other bad conduct on Vernell's part, and it cannot be considered by you at all, discussed, or even thought about at all until you decide whether the State has proven beyond a reasonable doubt that an aggravating circumstance exists as to each of the persons-as to each of the victims. You can't even talk about the fact that he pled guilty to this. But if you find that there's an aggravating circumstance, then and only then can this conduct be any influence on your sentencing determination.

**\*\*525** In apparent response, the prosecutor made the following statement during his penalty phase closing argument:

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

[Defense counsel] argues that you can't consider or discuss that evidence unless you find that aggravating circumstances had been proven beyond a reasonable doubt. And it may be a semantical thing again, but *regardless of the punishment you select,* it doesn't seem inappropriate to have all the information you can get about the character of a defendant. I just take issue with the remark that you have to wait until a certain point in the deliberation to consider that someone has two prior felony convictions, and that he made his living by selling poison. It seems to me regardless of the punishment that ought to be a factor, as reasonable men and women, that you can consider.

(Emphasis added.) The majority concludes that this argument erroneously distorts the nature of a death penalty jury's obligations regarding the consideration of "other evidence." According to the State, its argument was not made with regard to the jury's obligation to resolve the existence of statutory aggravating circumstances, *i.e.,* death eligibility, before moving on to other evidence supporting the death penalty. Rather, the State contends the argument was designed to correct an implication in the above-quoted argument by the defense that the jury could never consider such evidence, even on the question of the other available sentences, unless the jury unanimously found the existence of an aggravating circumstance.

**\*650** It is evident that the defense argument was intended to re-assert the principle that the jury could not consider this other information in support of the death penalty until death eligibility had been determined. However, the defense argument did improperly imply that matters beyond the statutory aggravators could not be relied upon by the jury in determining the other potential sentencing alternatives in the absence of an aggravating circumstance. Thus, it was appropriate for the prosecution to correct the misstatement. This notwithstanding, the argument of which Evans complains does, by its terms, seemingly relate to the obligation of the jury to first determine "death eligibility" before consid-

ering other matters with regard to that particular sentence.

It is evident that the above-quoted arguments made on behalf of both sides contained erroneous general statements about mutually exclusive concepts in the sentencing process. However, prior to the prosecutor's statement, the trial judge, the prosecutor himself and defense counsel correctly and repeatedly admonished the jury as to its role and the structure for its determination of penalty.

First, the prospective jurors were oriented during voir dire examination to the rules governing the deliberations over the death penalty. Second, the jury was correctly instructed on the issue:

The jury may impose a sentence of death only if it finds at least one aggravating circumstance has been established beyond a reasonable doubt and further finds that there are no mitigating circumstances sufficient to outweigh the aggravating circumstance or circumstances found.

....

You must first determine unanimously whether or not the state has proved beyond a reasonable doubt that an aggravating circumstance or circumstances exist in this case....

If you find that an aggravating circumstance or circumstances exist, you must then weigh any mitigating factor or factors, which any juror believes has been shown against the aggravating circumstance or circumstances. If you find that the mitigating circumstances outweigh the aggravating circumstances, you are not permitted to consider imposing the death penalty and you must then determine whether the defendant should be sentenced to life imprisonment ....

If you find that the mitigating factors do not outweigh the aggravating circumstances, then and only then may you consider imposing the death penalty.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

28 P.3d 498
117 Nev. 609, 28 P.3d 498
**(Cite as: 117 Nev. 609, 28 P.3d 498)**

Third, defense counsel, during her penalty phase final argument, stressed and read the above-quoted language. Fourth, prior to the arguably improper argument, counsel for the **526 State also quoted and stressed the same instruction.

The prosecutor's statement was made in passing, related to a *651 separate defense argument regarding other penalties, and did not unequivocally address the requirements for imposition of the death penalty. Thus, in my view, the statement did not change the outcome. It should be remembered that, in addition to a very carefully conducted trial, Evans confessed to the murder and his motivations, and a young but competent eyewitness described the literal "execution" of the victims. Thus, I would not remand this matter for a new penalty hearing.[FN2]

> FN2. I agree that the majority's suggested instruction on the use of "other evidence" should serve as a guide in future death penalty litigation.

Nev.,2001.
Evans v. State
117 Nev. 609, 28 P.3d 498

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

# EXHIBIT 39

# EXHIBIT 39

**Home**

Summary
Case Activity
Calendar
  Continuance
  Minutes
Parties
Def. Detail
Next Co-Def.
Charges
Sentencing
Bail Bond
Judgments

District Case
Party Search
Corp. Search
Atty. Search
Bar# Search
ID Search

Calendar Day
Holidays

Help
Comments &
  Feedback
Legal Notice

Case 97-C-144577-C          Just Ct. Case # 97-GJ-00041          **Status** CLOSED

**Plaintiff** State of Nevada                                        **Attorney** Roger, David J.
**Defendant** Strohmeyer, Jeremy                         **Attorney** Colucci, Carmine J.

Judge Villani, Michael                                                  **Dept.**    17

---

Event 09/08/1998 at 09:00 AM                  AT THE REQUEST OF THE COURT

**Heard By** Leavitt, Myron E.

**Officers** SUE DEATON, Court Clerk
LAURIE WEBB, Reporter/Recorder

| Parties | | |
|---|---|---|
| 0000 - S1 | State of Nevada | Yes |
| 000477 | Bell, Stewart L. | Yes |
| 001951 | Leen, Peggy | Yes |
| 0001 - D1 | Strohmeyer, Jeremy | Yes |
| 000886 | Wright, Richard A. | Yes |
| 910154 | Abramson, Leslie H. | Yes |

Prior to Court convening, Ms. Karen Winckler, Esq., FILED Guilty Plea Agreement IN OPEN COURT.

Also present in courtroom, Mr. William Koot, Chief Deputy District Attorney, representing the State.

OUTSIDE PRESENCE OF THE JURY - Court informed Deft Strohmeyer that Court had been told Deft wished to withdraw his pleas of Not Guilty. Colloquy between Court and Deft; Court WILL ALLOW Deft Strohmeyer to WITHDRAW HIS PLEAS OF NOT GUILTY. Mr. Bell stated negotiations are that the State agrees to withdraw the Notice of Intent to Seek Death; Deft agrees to stipulate to the maximum sentences otherwise provided by law and that all four (4) sentences shall run consecutive to each other, Count I - First Degree Murder, sentence shall be Life Without the Possibility of Parole, Count II - First Degree Kidnaping, sentence shall be Life Without the Possibility of Parole, to run consecutive to the sentence imposed for Count I, Count III - Sexual Assault With a Minor Under Sixteen Years of Age With Substantial Bodily Harm, sentence shall be Life Without the Possiblity of Parole, to run consecutive to the sentences imposed for Counts I and II and Count IV - Sexual Assault With a Minor Under Sixteen Years of Age, sentence shall be Life With the Possibility of Parole after a minimum of twenty (20) years are served, to run consecutive to the sentences imposed for Counts I, II and III. Mr. Bell noted there had been a meeting in Chambers between all counsel and the Court and Court had reviewed and agreed with Deft's Guilty Plea Agreement with the State. Court inquired of Deft Strohmeyer if he had reviewed his decision to enter guilty pleas in this matter with his attorneys and family and that he understood exactly what the sentence is as to each Count and that Deft understood the State was no longer seeking the death penalty; Deft Strohmeyer answered yes to each inquiry. Court inquired if Deft realized that he would have to spend the rest of his natural life in prison, due the sentences imposed for Counts I, II and III, notwithstanding the parole eligibility as to Count IV, Deft will never be eligible for parole; Deft acknowledged that he understood he would never be eligible for parole. Court reviewed rights Deft would be giving up by entering into plea agreement; Deft indicated he understood he was giving up those rights. Deft Strohmeyer indicated he had no questions regarding Guilty Plea Agreement he had signed; that he had reviewed the document with his attorneys and fully

what he was signing. DEFT STROHMEYER ARRAIGNED AND PLED GUILTY TO COUNT I - FIRST DEGREE MURDER (F) and COUNT II - FIRST DEGREE KIDNAPING (F). DEFT STROHMEYER ARRAIGNED and PLED GUILTY PURSUANT TO ALFORD TO COUNT

III - SEXUAL ASSAULT WITH A MINOR UNDER SIXTEEN YEARS OF AGE WITH SUBSTANTIAL BODILY HARM (F) and COUNT IV - SEXUAL ASSAULT WITH A MINOR UNDER

SIXTEEN YEARS OF AGE (F). Mr. Bell made an offer of proof as to what facts the State could prove as to Counts III and IV if this matter should go to trial. COURT ACCEPTED DEFT'S PLEAS OF GUILTY AS TO COUNTS I AND II AND DEFT'S PLEAS OF GUILTY PURSUANT TO ALFORD AS TO COUNTS III AND IV and ORDERED matter referred to Division of Parole & Probation for a PSI Report and SET for SENTENCING.

COURT FURTHER ORDERED State's Exhibits marked as "Proposed Exhibits" in this matter TO BE RETURNED to Las Vegas Metropolitan Police Department.

CUSTODY

10-14-98, 9:00 A.M., SENTENCING (DEPT. XII)

---

Due to time restraints and individual case loads, the above case record may not reflect all information to date.

---

Top Of Page

# EXHIBIT 40

# EXHIBIT 40

Westlaw.

942 P.2d 157

Page 1

113 Nev. 780, 942 P.2d 157
(Cite as: 113 Nev. 780, 942 P.2d 157)

H
Ducksworth v. State
Nev.,1997.

Supreme Court of Nevada.
Ronald DUCKSWORTH, Jr. and Carl Lee Martin,
Appellants,
v.
The STATE of Nevada, Respondent.
No. 25415.

July 15, 1997.

Defendant and codefendant were convicted upon
jury verdict in the Eighth Judicial District Court,
Clark County, Sally L. Loehrer, J., of two counts of
murder with use of deadly weapon, two counts of
first-degree kidnapping with use of deadly weapon,
and one count each of burglary with use of deadly
weapon, sexual assault with use of deadly weapon,
and robbery with use of deadly weapon. Defendant
and codefendant appealed. The Supreme Court
held that: (1) trial court's refusal to allow defendant
to call witness at penalty hearing, based on her
indication that she would invoke her Fifth
Amendment rights regarding uncharged murder, did
not violate defendant's right to cross-examine
witness; (2) court's failure to give defendant's
requested penalty phase jury instructions on
aggravating circumstances was not prejudicial; (3)
sufficient evidence supported defendant's
conviction for sexual assault with use of deadly
weapon; (4) evidence did not support defendant's
conviction for kidnapping; and (5) codefendant was
prejudiced by trial court's erroneous failure to sever
joint trial.

Affirmed in part and reversed in part with regard to
defendant; and reversed and remanded with regard
to codefendant.
West Headnotes
[1] Criminal Law 110 700(5)

110 Criminal Law

110XX Trial
110XX(E) Arguments and Conduct of
Counsel
110k700 Rights and Duties of Prosecuting
Attorney
110k700(2) Disclosure or Suppression
of Information
110k700(5) k. Time and Manner of
Disclosure. Most Cited Cases
Prosecution did not improperly withhold evidence
of witness' potential involvement in uncharged
murder, where prosecution disclosed impeaching
evidence to defense counsel on day after witness
disclosed evidence.

[2] Criminal Law 110 662.1

110 Criminal Law
110XX Trial
110XX(C) Reception of Evidence
110k662 Right of Accused to Confront
Witnesses
110k662.1 k. In General. Most Cited
Cases
Trial court's refusal to allow defendant to call
witness at penalty hearing in murder prosecution
did not violate defendant's right to confront and
cross-examine witness regarding witness' alleged
involvement in uncharged murder, where witness
indicated that she would invoke her Fifth
Amendment right in regard to any question about
uncharged murder, and other witnesses had already
provided incriminating evidence against defendant
regarding uncharged murder. U.S.C.A.
Const.Amend. 6.

[3] Homicide 203 1396

203 Homicide
203XII Instructions
203XII(B) Sufficiency
203k1394 Deliberation and Premeditation
203k1396 k. Time. Most Cited Cases
(Formerly 203k286.3)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

113 Nev. 780, 942 P.2d 157
**(Cite as: 113 Nev. 780, 942 P.2d 157)**

Jury instruction on premeditation in murder prosecution, that premeditation is a design, a determination to kill, distinctly formed in mind at any moment before or at any time of killing, was not vague. U.S.C.A. Const.Amend. 14.

**[4] Criminal Law 110 ⚏770(2)**

110 Criminal Law
   110XX Trial
      110XX(G) Instructions: Necessity, Requisites, and Sufficiency
         110k770 Issues and Theories of Case in General
            110k770(2) k. Necessity of Instructions. Most Cited Cases

**Criminal Law 110 ⚏830**

110 Criminal Law
   110XX Trial
      110XX(H) Instructions: Requests
         110k830 k. Erroneous Requests. Most Cited Cases
Defendants are entitled to jury instructions on their theories of case so long as there is some evidence, regardless of how weak or incredible, to support their theories; however, defendant is not entitled to instruction which incorrectly states the law.

**[5] Criminal Law 110 ⚏829(22)**

110 Criminal Law
   110XX Trial
      110XX(H) Instructions: Requests
         110k829 Instructions Already Given
            110k829(22) k. Punishment and Powers of Recommendation to Mercy. Most Cited Cases
Trial court's refusal of defendant's proposed jury instruction concerning sentence for first-degree murder was not error, where proposed instruction was essentially same as instruction given by court.

**[6] Sentencing and Punishment 350H ⚏1789(9)**

350H Sentencing and Punishment
   350HVIII The Death Penalty
      350HVIII(G) Proceedings

         350HVIII(G)4 Determination and Disposition
            350Hk1789 Review of Proceedings to Impose Death Sentence
               350Hk1789(9) k. Harmless and Reversible Error. Most Cited Cases
     (Formerly 203k343)
Defendant was not prejudiced by trial court's failure to give defendant's requested jury instructions concerning aggravating circumstances at penalty phase of murder prosecution, where defendant did not receive death penalty.

**[7] Criminal Law 110 ⚏409(6.1)**

110 Criminal Law
   110XVII Evidence
      110XVII(L) Admissions
         110k405 Admissions by Accused
            110k409 Proof and Effect
               110k409(6) Corroboration
                  110k409(6.1) k. In General. Most Cited Cases
Sufficient evidence supported conviction for sexual assault with use of deadly weapon, where defendant admitted that victim had been raped and that he was present when acts occurred, although he claimed he was not involved in acts, victim's nightgown had been moved above her waist, her underwear was cut off, pair of scissors was found on dresser nearby, semen was present on inside of pair of black jeans found in bathroom and on floor under victim's pelvic area, and hair found on victim's nightgown matched defendant's.

**[8] Criminal Law 110 ⚏494**

110 Criminal Law
   110XVII Evidence
      110XVII(R) Opinion Evidence
         110k492 Effect of Opinion Evidence
            110k494 k. Experts. Most Cited Cases
Sufficient evidence did not support defendant's conviction for kidnapping, apparently based on defendant's carrying victim from car to house after victim had been shot, where only logical inference from state's expert evidence was that victim was dead when defendant carried him from car to house.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**[9] Kidnapping 231E ☞17**

231E Kidnapping
  231Ek14 Elements
    231Ek17 k. Asportation; Movement of Victim. Most Cited Cases
    (Formerly 232k1)

**Kidnapping 231E ☞18**

231E Kidnapping
  231Ek14 Elements
    231Ek18 k. Confinement, Restraint, or Detention. Most Cited Cases
    (Formerly 232k1)
"Kidnapping" requires willful seizing, confining, or carrying away of a live person.

**[10] Criminal Law 110 ☞622.6(3)**

110 Criminal Law
  110XX Trial
    110XX(A) Preliminary Proceedings
      110k622 Joint or Separate Trials of Codefendants
        110k622.6 In General
          110k622.6(3) k. Discretion in General. Most Cited Cases
          (Formerly 110k622.1(2))

**Criminal Law 110 ☞1148**

110 Criminal Law
  110XXIV Review
    110XXIV(N) Discretion of Lower Court
      110k1148 k. Preliminary Proceedings. Most Cited Cases
Decision to sever joint trial is left to trial court's discretion and will not be reversed absent showing of abuse of discretion.

**[11] Criminal Law 110 ☞622.7(8)**

110 Criminal Law
  110XX Trial
    110XX(A) Preliminary Proceedings
      110k622 Joint or Separate Trials of Codefendants
        110k622.7 Grounds for Severance or Joinder

          110k622.7(8) k. Evidence Admissible Only Against Codefendant; Spillover or Compartmentalization. Most Cited Cases
          (Formerly 110k622.2(8))

**Criminal Law 110 ☞622.7(9)**

110 Criminal Law
  110XX Trial
    110XX(A) Preliminary Proceedings
      110k622 Joint or Separate Trials of Codefendants
        110k622.7 Grounds for Severance or Joinder

          110k622.7(9) k. Confessions, Admissions, or Declarations. Most Cited Cases
          (Formerly 110k622.2(8))

**Criminal Law 110 ☞622.7(11)**

110 Criminal Law
  110XX Trial
    110XX(A) Preliminary Proceedings
      110k622 Joint or Separate Trials of Codefendants
        110k622.7 Grounds for Severance or Joinder

          110k622.7(11) k. Disparity in Weight of Evidence. Most Cited Cases
          (Formerly 110k622.2(11))
Defendant was prejudiced by trial court's failure to sever joint trial in murder prosecution; evidence against defendant was largely circumstantial, and codefendant's confessions to murder referred to another unnamed person, but it was likely that jury deduced that other person was defendant, given fact that defendant and codefendant sat together at trial and testimony indicated that defendant and victim were friends and that defendant, codefendant, and victim all drove from California together.

**[12] Criminal Law 110 ☞662.10**

110 Criminal Law
  110XX Trial
    110XX(C) Reception of Evidence
      110k662 Right of Accused to Confront Witnesses

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

113 Nev. 780, 942 P.2d 157
(Cite as: 113 Nev. 780, 942 P.2d 157)

110k662.10    k.    Confessions    or
Declarations of Codefendants. Most Cited Cases
Admission of codefendant's confessions to murder
which referred to another unnamed person violated
defendant's    Sixth    Amendment    right    of
cross-examination, where codefendant did not
testify. U.S.C.A. Const.Amend. 6.

*780 Gensler & Kuehn, Las Vegas, for Appellant
Ducksworth.
Sgro & Perry, Las Vegas, for Appellant Martin.
**159*781 Frankie Sue Del Papa, Attorney
General, Carson City; Stewart L. Bell, District
Attorney, and James Tufteland, Chief Deputy
District Attorney, and Kimberly Maxson, Deputy
District Attorney, Clark County, for Respondent.

*782 OPINION
PER CURIAM.
This appeal arises out of the convictions of Ronald
Ducksworth, Jr., and Carl Lee Martin on a variety
of charges involving the murders of Joseph Smith
III (Joey) and Vikki Smith (Vikki). Joey and
Vikki's bodies were found at their Las Vegas home
on April 11, 1992. Ducksworth and Martin were
arrested for the murders in May 1992.

After a two week trial, the jury found both
Ducksworth and Martin guilty of all crimes
charged. Both defendants appeal their convictions
on a variety of theories discussed below. We
conclude that no errors occurred with regard to
Ducksworth's conviction, and we affirm that
conviction. However, we conclude that Martin was
prejudiced by the district court's failure to sever the
trials and that Martin's conviction must be reversed
and the matter remanded to the district court for a
new trial.

FACTS

This case arises out of the murders of Joey and his
wife Vikki at their home in Las Vegas. On April
11, 1992, Joseph Smith, Jr. (Smith), Joey's father,
arrived at Joey's house at approximately 1:30 p.m.
Joey did not answer the door, and because Smith
was concerned about Joey and Vikki, he decided to

try to get into the house to see if they were alright.

Smith entered the house through the back door,
which was not locked. Upon entering the house, he
walked down a hallway and saw Joey's dead body
lying face down on the floor in the northwest
bedroom with a pillow over his head and dried
blood around *783 his head. A large piece of
telephone cord and a telephone also lay near him on
the floor. Joey was dressed in a black T-shirt,
white shorts, white socks, and black tennis shoes
and was not wearing any of the jewelry which he
usually wore. Smith found Vikki's dead body in
the southwest bedroom. She was wearing only a
nightgown, and her hands had been bound to the leg
of one of the bunk beds in the bedroom. Her
underpants had been cut at the seams and were
found under her body, and there was dried blood
around her body.

Detective Robert Leonard from the Las Vegas
Metropolitan Police Department testified regarding
the state of the crime scene. He stated that the
perpetrators had been searching for valuables
because the contents of drawers in the northwest
bedroom had been emptied and sorted through.
Also, the contents of a jewelry box had been
emptied onto one of the bunk beds, and many of the
closet doors throughout the house stood open.
Finally, Vikki's purse had been emptied onto the
living room couch.

The carpet underneath the lower part of Vikki's
pelvic area was covered in lotion. In the bathroom
was a pair of size five black pants lying in the sink
that had a substantial amount of a lotion on them.
Testimony revealed that much of the evidence from
the scene was tainted by this lotion.

Dr. Jordan performed the autopsies on Joey and
Vikki and testified as follows. Vikki had been shot
three times, twice in the head and once in the arm.
Joey had been shot three times in the head, and Dr.
Jordan testified in the preliminary hearing and on
direct and cross-examination that all three of the
shots were instantaneously fatal. However, the
State recalled Dr. Jordan to the stand to question
him about the gunshot wounds, and Dr. Jordan
stated that one of the gunshot wounds was not as

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

113 Nev. 780, 942 P.2d 157
**(Cite as: 113 Nev. 780, 942 P.2d 157)**

lethal as the others, but that it was still a lethal wound. The spent casings at the scene revealed that two different nine millimeter weapons were used to kill Joey and Vikki. Based on the state of decomposition, testimony indicated that Joey and Vikki could have been killed in the early morning of Thursday, April 9, 1992. However, the time of death could not be stated with any great certainty. The state of decomposition did indicate, however, that Joey and Vikki were killed at approximately the same time.

An examination of Vikki's sexual organs was conducted but revealed no evidence of **160 trauma or bruising. The sexual assault kit performed on Vikki revealed no semen in her body. Small semen stains were found on the black pants and on the carpet, but these stains were not large enough to yield evidence of the specific blood group of the perpetrator. Additionally, two separate hairs were recovered from Vikki's nightgown; one was similar to Vikki's hair samples and the other was similar to Ducksworth's *784 hair samples. The same type of lotion described above was also found on Vikki's vulva and appeared to be in the vaginal cavity.

The following events led up to the murders of Joey and Vikki. On Wednesday, April 8, 1992, Joey, Martin, Martin's brother Bobby Ray Martin (Bobby), Ducksworth, and Sharee McQueen all drove from Riverside, California, to Las Vegas in Joey's white Mazda.

Sharee was romantically involved with Joey at the time of his death, and she testified that for the two or three days prior to the trip to Las Vegas, Joey had been with her in California. She also testified that he had approximately $2,700 in cash with him; however, when his body was found, he did not have any money.

Joey brought his nine millimeter gun on the trip, and Sharee testified that she recognized the gun because Joey had it at her home in California and that it had recognizable chips and scratches in the paint of the chamber. She noticed it in the car because Joey had it in his lap and then put it under the front seat on the driver's side.

When the group arrived in Las Vegas, they went directly to the Vacation Village Resort where Joey got Sharee a room. Joey left the gun under the seat of the car when he went into the office of the hotel. The four men then left the hotel, and at that time Joey was wearing a primarily black T-shirt with small green and white polka dots, white shorts, and black tennis shoes.

Sharee fell asleep for awhile, and when she woke up, she called Martin to find out if he had seen Joey. Martin told her that Joey was probably somewhere with Vikki. Sharee then told Martin to come pick her up so that she could go back to California. The next morning, April 9, 1992, Martin came by the Vacation Village and picked Sharee up. Martin had a nine millimeter gun in the back seat "for protection," but Sharee testified that she had not seen this particular nine millimeter gun before.

Sharee stayed at Martin's house in Las Vegas for the next two nights and then drove back to California with Martin. The day after she returned to California, she visited her sister, Nikki McQueen, in Riverside, California. At that time, Nikki was one of Ducksworth's girlfriends.

While Sharee was staying with Nikki, she saw Joey's nine millimeter gun under the mattress in Nikki's room. She also testified that she saw Ducksworth wearing a gold link bracelet that Joey had been wearing the night he left her at the Vacation Village. Nikki testified that several days after Ducksworth returned from Las Vegas, she found two guns underneath her mattress. She had never seen either gun, but identified one as a black handgun. She also testified that a few days after Ducksworth's return, she noticed that Ducksworth was wearing a gold necklace and bracelet she had never seen before.

*785 Additionally, Ducksworth gave Nikki a woman's gold wedding band with a single diamond. Because it was too small for Nikki, Ducksworth took the ring, allegedly to have it sized for Nikki; however, Nikki testified that the diamond actually ended up in one of Ducksworth's nugget rings. Several days after Ducksworth's arrest, Nikki

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

113 Nev. 780, 942 P.2d 157
(Cite as: 113 Nev. 780, 942 P.2d 157)

confronted him regarding whether the ring he had tried to give her had been Vikki's. She stated that he acted hurt and did not want to talk about it.

Donnette Peach testified that she was dating Bobby Martin at the time of the murders. She testified that just after midnight on April 9, 1992, the probable date of the murders, Bobby called her at the Las Vegas home of her mother, Donna Gibbs. She testified that during this conversation she heard Joey, Ducksworth, and Martin's voices. At approximately 12:30 a.m., Bobby came alone to Gibbs' house to pick her up.

After Bobby and Donnette left Gibbs' house, they went to a Travel Lodge. They **161 stayed there until Bobby was paged on his beeper thirty-five minutes later. Bobby returned the page from the hotel room phone then told Donnette they were leaving. They went back to Gibbs' house, where he used the phone again. Donnette testified that the conversation lasted about five or six minutes and then she and Bobby left the house again. Only a few blocks from the house, they made a U-turn and returned to Gibbs' house because Bobby's pager had gone off again. This time Bobby left Donnette in the car while he went into Gibbs' house.

Gibbs testified regarding the second phone call. She stated that after Bobby and Donnette left after the first phone call, Ducksworth called wanting to speak to Bobby. Donna told him they had just left, but that she could beep Bobby. After she beeped Bobby, he came back. Since Ducksworth had waited on the phone for Bobby's return, she simply handed the phone over to Bobby. Donna testified that Ducksworth sounded "hysterical, upset" and said that he had to leave and get back to California.

Donnette testified that she fell asleep while she was waiting for Bobby to return from making the second telephone call. She woke up at about 7:00 a.m. that same morning, April 9, 1992, realizing that they were headed back to California and that Ducksworth had joined them. Upon arriving in Riverside, Bobby checked Donnette into a motel and then took Ducksworth elsewhere.

On April 10, 1992, Donnette, her sister Tamica,

Bobby, and Ducksworth went to visit Donnette's brother, William Dale, at his house in Long Beach. Dale testified that while they were visiting him in Long Beach, Ducksworth asked him if there was anywhere he could hide a gun "just in case something happens." Dale testified that when Ducksworth showed him the gun, he recognized it as Joey's nine millimeter gun by the scratches on *786 the chamber. He had seen Joey with the same gun several weeks before at his mother's (Gibbs') house.

On the night of April 11, 1992, Donnette learned of Joey's and Vikki's deaths from Dale. Dale had heard the news from his mother. At the time the group heard about the murders, Donnette testified that Bobby "got like real emotional," but that Ducksworth did not show any emotion. Donnette testified that at some time while she was in California, she and Tamica visited Bobby and Martin's mother in Los Angeles.

Donnette returned to Las Vegas on April 13, 1992. That night she saw Martin at Gibbs' house. Martin pulled her aside and told her not to tell anyone she was back, let anyone know where she had been, or tell anyone that she had been at his mother's house in Los Angeles or where his mother lived.

Smith testified that Martin came by his house on April 12, 1992, and told Smith that he did not have anything to do with the murders and, in fact, had not even arrived in Las Vegas until late Thursday night (April 9) or early Friday morning (April 10). Additionally, Martin stated that he did not know where Joey lived and had never even been to Joey's house because Vikki did not like him.

On April 13, 1992, Dale saw Martin at Gibbs' house in Las Vegas. Dale testified that he had a conversation with Martin about how Joey died. Dale then told Martin that Joey "didn't have to die like he died." Martin responded that it was "all part of the game" and that Joey was just "somebody out there to use." Dale also testified to a conversation with Martin at Gibbs' house after a viewing of Vikki and Joey on April 16, 1992. In that conversation, Martin told Dale that he knew that Joey had been killed first in front of Vikki and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

113 Nev. 780, 942 P.2d 157
**(Cite as: 113 Nev. 780, 942 P.2d 157)**

that Vikki had been sodomized. Dale also testified that he had given a statement to the police at the end of April, during which he stated that Martin admitted to him that he had killed Joey in front of Vikki.

Additionally, Dale testified that on the day of the viewing, he saw Martin wearing the nugget ring that Gibbs had given Joey. Gibbs testified that she had given Joey the ring in March of 1992 when both Joey and Martin were at her house. Both expressed interest in the ring, but because she had showed the ring to Joey first, she told Martin he would have to get it from him. Every time she saw Joey after that, he had the ring on. When Dale asked him at the viewing **162 about his wearing the ring, Martin simply said that Joey had let him wear the ring.

Gibbs also saw Martin on April 15, 1992, when he came by her house. While Martin was at her house, a police officer stopped by to check on Gibbs' youngest daughter. Gibbs stepped out of the house, and the officer showed her some pictures of *787 three men, including Martin. When Gibbs went back into the house and told Martin what had happened, Martin told her to "watch [her] back ' cause by knowing the cops [she] could come up missing."

Kenya Crawl, one of Ducksworth's girlfriends with whom he had a child in 1992, testified regarding incriminating statements he had made to her about his involvement in the murders. She stated that on April 9, 1992, Ducksworth called her at about 3:00 a.m. and said that he had just killed Joey. However, she did not believe Ducksworth's claims until she saw a story about the murders on television on April 11, 1992. After the news coverage, Ducksworth called her and asked if they had any suspects. When she told him no, he stated: "We must have took care of business proper."

Crawl testified that she did not like Joey because in 1989 he had tried to force her to have sex with him and that Ducksworth knew about the incident. Ducksworth told her that on the night of the murders, he had questioned Joey about what he tried to do to her, and this resulted in a fight between Ducksworth and Joey.

Crawl testified that she and Ducksworth had several discussions regarding the murders of Vikki and Joey. Ducksworth told her that Joey had been shot twice in the head and that Vikki had also been shot in the head. He also admitted to stealing money from Joey, but adamantly denied having anything to do with Vikki's rape or murder. Ducksworth also tried to give Crawl a ring, but because she suspected it might have belonged to Vikki, she told him she did not want the ring.

After the news coverage of the murders, Crawl had to move out of her apartment. She moved in with a friend, Brenda Shuaid, for about three weeks. After this, she moved in with Brenda's husband, Al Shuaid. During her stays with both Brenda and Al Shuaid, she continued to have conversations with Ducksworth regarding the murders.

Al testified regarding five or six of Crawl's conversations with Ducksworth which he had overheard. Eventually, Al talked to Ducksworth directly, and he also testified regarding those conversations. Al testified that he had overheard Ducksworth say, and also was told by Ducksworth, that he had killed Joey. Al testified that Ducksworth told him that he killed Joey for his attempted sexual assault of Crawl, that Ducksworth had told him that he and Joey had gotten in an argument over this, and as a result of this argument, he shot Joey in the car. Ducksworth got into Joey's house by dragging Joey up to the door, knocking on the door and telling Vikki to let them in because Joey had been hurt. Ducksworth told Al that initially Vikki refused to let them in, but after *788 she looked out the peephole and saw Joey wrapped up in a blanket, she opened the door.

Ducksworth also told Al that Vikki had been both sodomized and sexually assaulted orally, that he had nothing to do with the acts committed on Vikki, and that he was, in fact, "a hundred percent" against any harm being done to Vikki. Al stated that Ducksworth emphasized this in several conversations. Ducksworth stated that in an attempt to cover up any semen, the lotion had been squirted into her vagina. Ducksworth also confessed to Al that money, jewelry, and a small amount of "dope" had been stolen from Joey and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

113 Nev. 780, 942 P.2d 157
(Cite as: 113 Nev. 780, 942 P.2d 157)

Vikki.

Testimony was also presented regarding the disappearance of Joey's Mazda. Deon Hopkins testified that on her way to work at about 5:20 a.m. on the morning of April 9, 1992, she saw two men driving Joey's white Mazda. She testified that at the time of the murders, she had known Joey for twenty years and knew his car when she saw it. She stated that at the intersection she honked her horn, but neither occupant reacted. Normally, had Joey been in the car, he would have honked back at her. Based on the fact that the occupants did not react, she knew that Joey was not in the car.

**163** She stated that after she realized that Joey was not in the car, she got "nosy" and drove up right next to the side of the car. Hopkins testified that she got a sufficient look at the driver, and based on photographs shown to her by police, she identified the driver as Martin. However, Carolyn Paige, Hopkins' passenger, testified that she could not see who was in the car because it was dark at 5:20 in the morning. She also testified that she recalled there being a dark tint on the windows.

Joey's Mazda was later found at the Vacation Village. An employee of the Vacation Village at the time of the crimes testified that the Mazda sat in the parking lot unmoved between April 9, 1992, and April 14, 1992, when the police located it. When the car was investigated, the following was discovered. The stereo had been ripped out, Joey's cellular phone was on the front seat, and a nine millimeter casing lay on the floorboard between the right front passenger's seat and the door. A black holster and gun belt were found underneath the right front seat. Blood was found in the car on the driver's seat headrest, on the floorboard behind the seat, and on the console next to the emergency brake; the blood found in the car was tested and was consistent with Joey's blood type. However, no bullet holes were found in the car. Two cigarette butts were recovered from the inside of the car and tested, and the saliva found on the cigarette butts was consistent with the sample of saliva that Martin had given to law enforcement officials. Additionally, Martin's fingerprints were found in the car.

*789** After Martin and Ducksworth had returned to California, both were staying with Nikki McQueen. While they were staying at McQueen's apartment, police surveillance was set up outside the apartment to monitor their activities. On May 19, 1992, at approximately 6:00 a.m., Riverside police officers contacted Nikki as she left her apartment. They asked for her consent to search her apartment, and she signed a consent to search form.

At 7:00 a.m., Riverside police officers, secreted behind a fence in back of the apartment, received word that Martin and Ducksworth were trying to flee on foot. After Martin and Ducksworth tried to climb over the fence, they were taken into custody.

On October 19, 1993, the jury found both Martin and Ducksworth guilty of the following charges: two counts of murder with use of a deadly weapon, two counts of first degree kidnapping with use of a deadly weapon, and one count each of burglary with use of a deadly weapon, sexual assault with use of a deadly weapon, robbery with use of a deadly weapon.

Martin's and Ducksworth's sentences were the same. For the two counts of murder, both were sentenced to two consecutive life sentences without the possibility of parole and mandatory additional consecutive life sentences for the weapons enhancement. On the burglary charge, both were sentenced to ten years with an additional mandatory ten year weapon enhancement, the sentence to be served consecutively to the murder charges. For robbery with use of a deadly weapon, both were sentenced to fifteen years plus an additional fifteen years for weapons enhancement, the sentence to be served consecutively to the murder charges. Finally, for the sexual assault charge and the two kidnapping charges, both were sentenced to three terms of life imprisonment with consecutive life imprisonments for use of a deadly weapon, the sentences to run concurrently with each other and the murder sentences. Both defendants appeal.

*DISCUSSION*

*Appellant Ducksworth*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

113 Nev. 780, 942 P.2d 157
(Cite as: 113 Nev. 780, 942 P.2d 157)

*Ducksworth was not denied the opportunity to cross-examine a key witness at the penalty hearing*

Ducksworth claims that he was denied his constitutional right to confront and cross-examine Crawl at the penalty hearing regarding her involvement in an uncharged murder case. During the penalty phase of the trial, evidence was presented that both Ducksworth and Martin were involved in an uncharged murder, assault, and robbery at the LeGardy house in February of 1992. Testimony was also presented that two women were involved.

**164 *790 Because Crawl testified at trial regarding Ducksworth's confession to Joey's murder, the State intended to call Crawl to the stand at the penalty hearing to elicit any evidence from her regarding Ducksworth's involvement in the LeGardy murder. The State assumed that because Ducksworth had confessed to her regarding his involvement in the murder of Vikki and Joey, he would have done the same with regard to the LeGardy murder.

[1] However, outside the presence of the jury, the district court was informed that Crawl herself may have been one of the persons involved in the LeGardy murder.[FN1] The district court allowed Crawl to be questioned outside the presence of the jury, and Crawl indicated that she would invoke her Fifth Amendment rights in regard to any question about the LeGardy murder. The court then refused to allow either side to call Crawl to testify.

FN1. Ducksworth argues that the prosecution improperly withheld the evidence of Crawl's potential involvement in the LeGardy murder in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). However, because the prosecution disclosed the impeaching evidence to the defense counsel the day after Crawl disclosed the evidence, we conclude that there was no error.

In *United States v. Compton*, 365 F.2d 1, 5 (6th Cir.1966), the court addressed the issue of a party calling a witness that it knows will exercise his or her Fifth Amendment rights. The court stated:

Government counsel need not refrain from calling a witness whose attorney appears in court and advises court and counsel that the witness will claim his privilege and will not testify. However, to call such a witness, counsel must have an honest belief that the witness has information which is pertinent to the issues in the case and which is admissible under applicable rules of evidence, if no privilege were claimed. It is an unfair trial tactic if it appears that counsel calls such a witness merely to get him to claim his privilege before the jury to a series of questions not pertinent to the issues on trial....

*Id.*

[2] This is essentially what the defense was attempting to do in its attempt to call Crawl to the stand. Defense counsel claimed that it wanted to elicit Crawl's testimony because she might provide exculpatory evidence for the defendants. However, the district court noted that other witnesses had already provided incriminating evidence against the defendants regarding the LeGardy murder and that nothing in Crawl's testimony would exculpate them. *791 Therefore, it appears that the defense wanted Crawl to take the stand and invoke her Fifth Amendment rights in an attempt to persuade the jury to make negative inferences about her credibility. Based on this, we conclude that the district court did not err in refusing to allow the defense to call Crawl as a witness at the penalty hearing.

*The premeditation instruction given at trial was constitutional*

[3] Ducksworth claims that the premeditation instruction given to the jury was unconstitutional and vague and that it misstated the amount of time necessary for premeditation. We disagree. Prior to trial, the district court gave the following instruction to the jury regarding premeditation:

Premeditation is a design, a determination to kill, distinctly formed in the mind at any moment before

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

113 Nev. 780, 942 P.2d 157
**(Cite as: 113 Nev. 780, 942 P.2d 157)**

or at any time of the killing.
Premeditation need not be for a day, an hour, or even a minute. It may be as instantaneous as successive thoughts of the mind. For if the jury believes from the evidence that the acts constituting the killing has been preceded by and has been the result of premeditation, no matter how rapidly the premeditation is followed by the act constituting the killing, it is willful, deliberate and premeditated murder.

Ducksworth claims that this definition of premeditation is vague and ambiguous. However, in *Powell v. State*, 108 Nev. 700, 709, 838 P.2d 921, 926 (1992), *overruled on other grounds by Powell v. Nevada*, 511 U.S. 79, 114 S.Ct. 1280, 128 L.Ed.2d 1 (1994), we concluded that the same instruction properly **165 defined the concept of premeditation. Therefore, we conclude that the instruction was not unconstitutional or vague.

Furthermore, in *Briano v. State*, 94 Nev. 422, 425, 581 P.2d 5, 7 (1978), we stated that to prove premeditation "it [does not] matter how short a time existed between the formation of the design to kill and the killing itself." Because the jury instruction given in the instant case comports with *Briano*, we conclude that the instruction properly defined the amount of time necessary for premeditation. *See Powell*, 108 Nev. at 709-10, 838 P.2d at 927 (stating that the same jury instruction as the one in the instant case comported with *Briano*).

*The district court did not err in refusing to give Ducksworth's proposed penalty phase instructions*

[4] Ducksworth claims that the district court erred by not substituting *792 his proposed instructions for the ones read at trial. We have stated that upon request, criminal defendants are entitled to jury instructions on their theories of a case so long as there is some evidence, regardless of how weak or incredible, to support their theories. *Harris v. State*, 106 Nev. 667, 670, 799 P.2d 1104, 1105-06 (1990). "However, a criminal defendant is not entitled to an instruction which incorrectly states the law." *Geary v. State*, 110 Nev. 261, 265, 871 P.2d 927, 929 (1994).

[5][6] At the penalty phase, Ducksworth objected to jury instructions 18, 19, and 30 and instead proposed instructions A, B, and C. In instructing the jury, the district court did not substitute Ducksworth's instructions when it instructed the jury. We conclude that the district court did not err.

Ducksworth's proposed instruction A concerned the sentence for first degree murder and was essentially the same as jury instruction 22; thus, the district court did not err in refusing Ducksworth's proposed instruction. *Jefferson v. State*, 108 Nev. 953, 954, 840 P.2d 1234, 1235 (1992). Ducksworth's proposed instructions B and C concerned the aggravating circumstances, and because Ducksworth did not receive the death penalty, we conclude that he was not prejudiced by the district court's failure to give the instructions.

*The evidence adduced at trial was sufficient for the jury to find defendant guilty of sexual assault with the use of a deadly weapon but insufficient to find defendant guilty of first degree kidnapping with the use of a deadly weapon as to victim Joey Smith*

This issue was raised for the first time in Ducksworth's reply brief, and pursuant to NRCP 28(c), we are not required to consider the issue. However, because of the serious nature of the crimes and the length of the sentence imposed, we will reach the issue.

Ducksworth asserts that the evidence at trial was insufficient to warrant a finding that he was guilty of either the sexual assault on Vikki or first degree kidnapping with respect to Joey. We disagree as to the sexual assault conviction, but agree as to the kidnapping conviction.

"The relevant inquiry for this Court is 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Koza v. State*, 100 Nev. 245, 250, 681 P.2d 44, 47 (1984) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979)).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

113 Nev. 780, 942 P.2d 157
(Cite as: 113 Nev. 780, 942 P.2d 157)

[7] *793 Evidence indicated that Vikki's nightgown was moved above her waist, her underwear was cut off, a pair of scissors was found on the dresser nearby, a tampon was found inside the bedroom on the floor close to the body, semen was present on the inside of a pair of black jeans found in the bathroom as well as on the floor under the victim's pelvic area, and Ducksworth's hair was found on Vikki's nightgown. Also, Crawl and Al testified that Ducksworth admitted that the victim had been raped, albeit not by him.

Ducksworth claims that all this equals only circumstantial evidence of sexual assault. However, Ducksworth admitted that Vikki had been raped, although he was not involved in the acts, and that he was present when the acts occurred. Additionally, evidence revealed that the only physical evidence found on Vikki was a hair found on her nightgown **166 that matched Ducksworth's. Therefore, a rational jury could conclude that Ducksworth had sexually assaulted Vikki. Furthermore, the jury was instructed on the law regarding aiding and abetting a crime and could have concluded that Ducksworth had aided and abetted in the commission of the sexual assault.

[8] However, we conclude that sufficient evidence did not support Ducksworth's conviction for the kidnapping of Joey. The kidnapping charge was apparently based on Ducksworth's carrying Joey from the car to the house after he had shot Joey. Ducksworth confessed to Al that he had shot Joey once in the car, and Joey's blood was located in the car. Despite Dr. Jordan's testimony that one of the three shots was not as lethal as the others, he stated on three separate occasions that all three gunshot wounds were instantaneously fatal. Therefore, the only logical inference from the State's evidence was that Joey was dead when Ducksworth wrapped him in the blanket and took him from the car to the front door.

[9] Kidnapping requires the willful seizing, confining, or carrying away of a live person. C.f. Atkins v. State, 112 Nev. 1122, 1127, 923 P.2d 1119, 1122 (1996) (stating that Nevada's sexual assault statute requires a live victim). Because all of the testimony indicated that Joey was dead before he was moved, we conclude that no rational trier of fact could have found the essential elements of the kidnapping charge beyond a reasonable doubt. As such, we reverse Ducksworth's conviction for the kidnapping charge regarding Joey. We note that because the sentence for the *794 kidnapping ran concurrent to the sentences for the murder convictions, we have not, in practical terms, reduced Ducksworth's sentence.

*Appellant Martin*

*The district court erred in refusing to grant a severance*

[10] Martin asserts that the district court erred in failing to grant a severance. NRS 174.165 allows the district court to sever a joint trial "[i]f it appears that a defendant ... is prejudiced by a joinder of ... defendants ... for trial together." Additionally, the decision to sever is left to the trial court's discretion and will not be reversed absent a showing of abuse of discretion. *Amen v. State*, 106 Nev. 749, 756, 801 P.2d 1354, 1359 (1990). Because we conclude that Martin was prejudiced by the joinder at trial with Ducksworth, we reverse his conviction and remand the matter to the district court for a new trial.

[11] The evidence against Martin was largely circumstantial and was much less convincing than was the evidence against Ducksworth. Most damaging to Martin was the testimony of Crawl and Al concerning Ducksworth's confessions which mentioned, both directly and by inference, that Ducksworth had acted with an accomplice. Crawl testified that after Ducksworth had confessed to her that he had killed Joey and she had informed him that the police had no suspects, Ducksworth told her that, "*We* must have took care of business proper." (Emphasis added.) Additionally, Crawl and Al both testified that Ducksworth had told them that Vikki had been sexually assaulted and sodomized, but that he had not been involved in those acts. This testimony created the inference that Ducksworth had acted with an accomplice. On appeal, the State relied heavily on the evidence

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

presented by Crawl and Al to prove that Martin's conviction for sexual assault was supported by sufficient evidence. For example, the State claimed that "Martin also might have committed the offense [of sexual assault] for the simple reason that Ducksworth admitted to doing everything else except those crimes that occurred against Vikki."

The district court gave a limiting instruction before both Crawl and Al's testimony that the testimony was only to be considered in relation to Ducksworth and also gave a general limiting instruction before deliberations began. Martin made motions to sever following both Crawl and Al's testimony, which were denied because the court believed that the jury clearly understood that the testimony only applied to Ducksworth. However, we *795 conclude that this was error because Ducksworth's confessions referred to another unnamed person, and it is likely that **167 the jury deduced that this other person was Martin. This conclusion is bolstered by the fact that Martin and Ducksworth sat together at trial, and testimony had indicated that Martin and Joey were friends and that Martin, Joey, and Ducksworth all drove from California together.

[12] We conclude that because Ducksworth did not testify, the introduction of his confession, which probably inculpated co-defendant Martin, violated Martin's right of cross-examination secured by the Confrontation Clause of the Sixth Amendment. *Stevens v. State*, 97 Nev. 443, 444-45, 634 P.2d 662, 663-64 (1981) (citing *Bruton v. United States*, 391 U.S. 123, 126, 88 S.Ct. 1620, 1622-23, 20 L.Ed.2d 476 (1968)).

In *Stevens*, the appellant's co-defendant made several incriminating statements to officials before the grand jury. Prior to introducing the statements, the prosecution excised all the references to appellant. However, in reversing the conviction and remanding for a new trial, we stated:

It appears likely that the jury read the appellant's name into the blanks in each one of [co-defendant's] statements introduced at the trial below. The circumstantial links between [the co-defendant] and [the appellant], referred to by the prosecutor, and the fact that [the co-defendant] and appellant were being tried together made it not only natural, but

seemingly inevitable, that the jury would infer appellant to be the person referred to in the blanks in [the co-defendant's] statements.

*Id.* at 444, 634 P.2d at 663. The instant case is substantially similar to *Stevens*. The testimony of Crawl and Al was relevant only against Ducksworth. However, in confessing, Ducksworth mentioned an unnamed accomplice, and we conclude that the jury inevitably inferred that Ducksworth's accomplice was Martin.

While a *Bruton* violation does not automatically require reversal of Martin's conviction, we conclude that because it is not clear beyond a reasonable doubt that the improper use of the confession was harmless error, a reversal of Martin's conviction and remand to the district court is warranted. *Stevens*, 97 Nev. at 445, 634 P.2d at 664.

Because we reverse Martin's conviction and remand the case for a new trial, we need not reach Martin's remaining issues on appeal.

### *796 CONCLUSION

We reverse Ducksworth's conviction for kidnapping with regard to Joey, but conclude that all of Ducksworth's other contentions on appeal lack merit. However, because we conclude that the district court erred in failing to grant Martin's motion for severance, we reverse his convictions and remand the case to the district court for a new trial.[FN2]

FN2. The Honorable A. William Maupin, Justice, did not participate in the decision of this matter.

Nev.,1997.
Ducksworth v. State
113 Nev. 780, 942 P.2d 157

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.